Nos. 24-6139, 24-6141

# In the United States Court of Appeals for the Tenth Circuit

OKLAHOMA STATE CONFERENCE OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE,

AMERICAN INDIAN MOVEMENT INDIAN TERRITORY,

PRECIOUS LLOYD, as next friend of S.L.,

ANTHONY CRAWFORD, and

REGAN KILLACKEY,

*Plaintiffs-Appellants/Cross-Appellees,*

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of
the State of Oklahoma,

RYAN WALTERS, in his official capacity as Oklahoma
Superintendent of Public Instruction,

CHRIS VAN DEHENDE, SARAH LEPAK, MIKE TINNEY,
ZACHARY ARCHER, RYAN DEATHERAGE, BECKY CARSON,
in their official capacities as members of the Oklahoma State Board of
Education,

KEVIN STITT, in his official capacity as Governor of Oklahoma,

*Defendants-Appellees/Cross-Appellants.*

On Appeal from the U.S. District Court for the Western District of Oklahoma,
Case No. 21-cv-1022-G, Honorable Charles Goodwin, District Judge

## PLAINTIFFS-APPELLANTS' FIRST BRIEF ON CROSS-APPEAL

***ORAL ARGUMENT REQUESTED***
*(Counsel listed on next page)*

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

Megan Lambert
Oklahoma Bar Number: 33216
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Dariely Rodriguez
Maya Brodziak
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
drodriguez@lawyerscommittee.org
mbrodziak@lawyerscommittee.org

Douglas Koff
Julia Beskin
Sara Solfanelli
Kevin Scot Johns
MCDERMOTT WILL & SCHULTE LLP
919 Third Avenue
New York, NY 10022
douglas.koff@srz.com
julia.beskin@srz.com
sara.solfanelli@srz.com
kevin.johns@srz.com

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, American Civil Liberties Union Foundation, American Civil Liberties Union Foundation of Oklahoma, and Lawyers' Committee for Civil Rights Under Law state that they do not have parent corporations and that no publicly held corporation owns 10% or more of their stock.


Dated: August 27, 2025                              By: /s/ Emerson Sykes
                                                    Emerson Sykes

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

RELATED CASES ............................................................................1

JURISDICTIONAL STATEMENT .......................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................3

INTRODUCTION .............................................................................4

STATEMENT OF THE CASE...............................................................6

    I.  Background...........................................................................6

    II. House Bill 1775 ....................................................................7

    III. Impact of House Bill 1775.......................................................9

    IV. Procedural History ...............................................................11

        A. U.S. District Court for the Western District of Oklahoma ............11

        B.  Supreme Court of Oklahoma .........................................14

        C.  U.S. Court of Appeals for the 10th Circuit ...................................15

SUMMARY OF THE ARGUMENT .......................................................15

STANDARD OF REVIEW .................................................................18

ARGUMENT ..................................................................................19

    I.  The Act Is Unconstitutionally Vague in Its Entirety............................19

        A. The Act Does Not Provide Fair Notice to K-12 Teachers
           About What Instruction Is Prohibited .........................................22

           i.  "Make Part of a Course" Is Unconstitutionally Vague .......25

           ii. Each Prohibited Concept Is Vague ......................................29

           iii. The Act's Reference to Oklahoma Academic
               Standards Exacerbates Its Vagueness................................37

iv. The Act Lacks a Scienter Requirement ...............................40

B.  The Act Invites Arbitrary and Discriminatory
Enforcement in K-12 Schools.......................................41

II.  The District Court Erred in Holding that Plaintiffs Are Not Likely
to Succeed on the Merits of Their First Amendment Right to
Receive Information Claim ....................................................45

A.  Students Have a First Amendment Right to Receive
Curricular Information .................................................45

B.  The Act Fails First Amendment Review Under *Hazelwood* .........50

CONCLUSION...........................................................................53

STATEMENT REGARDING ORAL ARGUMENT ............................................54

Attachment: District Court Order Granting in Part and Denying in Part
Plaintiffs' Motion for a Preliminary Injunction (W.D. Okla. Dkt. 173
filed June 14, 2024) ...........................................................58

# TABLE OF AUTHORITIES

## Cases

*Aid for Women v. Foulston*,
  441 F.3d 1101 (10th Cir. 2006) ...........................................................18

*American Federation of Teachers v. Department of Education*,
  Civil No. SAG-25-628, 2025 WL 2374697 (D. Md. Aug. 14, 2025)...... 30, 35

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) ....................................................... 47, 51

*Ashton v. Kentucky*,
  384 U.S. 195 (1966)...........................................................................22

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) ................................................... 49, 52

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
  457 U.S. 853 (1982)................................................................... 48, 49

*Brown v. Entertainment Merchants Association*,
  564 U.S. 786 (2011)................................................................... 20, 32

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)...........................................................................18

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971)...........................................................................30

*Derma Pen, LLC v. 4EverYoung Ltd.*,
  773 F.3d 1117 (10th Cir. 2014) ..........................................................18

*Epperson v. Arkansas*,
  393 U.S. 97 (1968)...........................................................................46

*Fleming v. Jefferson County School District R-1*,
  298 F.3d 918 (10th Cir. 2002) ...........................................................49

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006)......................................................................46

*Gentile v. State Bar of Nevada*,
    501 U.S. 1030 (1991)....................................................................41

*Gonzalez v. Douglas*,
    269 F. Supp. 3d 948 (D. Ariz. 2017) ............................... 47, 48, 51, 52

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)...................................... 5, 20, 22, 32, 41

*Hazelwood School District v. Kuhlmeier*,
    484 U.S. 260 (1988)...................................... 6, 17, 45, 47, 52

*Hill v. Colorado*,
    530 U.S. 703 (2000)......................................................................20

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) .........................................................18

*Honeyfund.com Inc. v. Governor*,
    94 F.4th 1272 (11th Cir. 2024) .........................................................26

*Honeyfund.com, Inc. v. DeSantis*,
    622 F. Supp. 3d 1159 (N.D. Fla. Aug. 18, 2022) ................................. 26, 30, 33

*Hunt v. City of Los Angeles*,
    638 F.3d 703 (9th Cir. 2011) .............................................................24

*Jordan v. Pugh*,
    425 F.3d 820 (10th Cir. 2005) ...........................................................23

*Keyishian v. Board of Regents*,
    385 U.S. 589 (1967).............................................................. 4, 25, 40

*Kolender v. Lawson*,
    461 U.S. 352 (1983)......................................................................30

*Lamont v. Postmaster General*,
    381 U.S. 301 (1965)................................................................ 45, 46

*Local 8027 v. Edelblut*,
  No. 21-CVG-1077-PB, 2024 WL 2722254
  (D.N.H. May 28, 2024)............................................................ 23, 24, 26, 20, 33

*Local 8027 v. Edelblut*,
  651 F. Supp. 3d 444 (D.N.H. 2023)....................................................40

*Meyer v. Nebraska*,
  262 U.S. 390 (1923)....................................................................46

*NAACP v. U.S. Department of Education*,
  779 F. Supp. 3d 53 (D.D.C. 2025)....................................................35

*National Education Association v. U.S. Department of Education*,
  Civil No. 25-CV-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025)........30

*Nova Health Systems v. Edmondson*,
  460 F.3d 1295 (10th Cir. 2006) .......................................................19

*Papachristou v. City of Jacksonville*,
  405 U.S. 156 (1972)....................................................................40

*Pernell v. Florida Board of Governors*,
  641 F. Supp. 3d 1218 (N.D. Fla.) ............................................. 26, 29, 34, 35, 36

*Santa Cruz Lesbian and Gay Community Center v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020)............................................7, 24

*Sessions v. Dimaya*,
  584 U.S. 148 (2018)................................................................ 21, 22

*Smith v. Goguen*,
  415 U.S. 566 (1974)....................................................................30

*Stanley v. Georgia*,
  394 U.S. 557 (1969)....................................................................45

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957)......................................................................4

*Tennessee Education Association v. Reynolds*,
732 F. Supp. 3d 783 (M.D. Tenn. 2024) ................................................ 26, 30, 37

*Thompson v. Ragland*,
23 F.4th 1252 (10th Cir. 2022) ........................................................................49

*Tinker v. Des Moines Independent Community School District*,
393 U.S. 503 (1969) ..........................................................................................46

*United States v. L. Cohen Grocery Co.*,
255 U.S. 81 (1921) .............................................................................................31

*United States v. Williams*,
553 U.S. 285 (2008) ...........................................................................................41

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) .................................................................................... 21, 40

*Virgil v. School Board of Columbia County*,
862 F.2d 1517 (11th Cir. 1989) ................................................................. 47, 48

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) ..........................................................................48

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ...............................................................................................18

*Wyoming Gun Owners v. Gray*,
83 F.4th 1224 (10th Cir. 2023) .................................................................. 37, 41

**Statutes**

28 U.S.C. § 1292 ..................................................................................................2

28 U.S.C. § 1331 ..................................................................................................2

28 U.S.C. § 1343 ..................................................................................................2

42 U.S.C. § 1983 ..................................................................................................2

Florida Statutes § 1000.05 ................................................................................33

Oklahoma Administrative Code § 210:10-1-23 ....................................... 21, 40, 42

Oklahoma Statutes title 70, § 24-157 (2021) ................... 4, 8, 16, 20, 23, 25, 32–37

**Other Authorities**

Executive Order 13950, 85 Fed. Reg. 60683 (Sep. 28, 2020) ....................... 7, 8, 16

Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (Apr. 29, 2021, 10:42:41 AM) ...............51

Okla. S. 44, 58th Leg., 1st Reg. Sess. (Apr. 21, 2021, 11:29:19 – 11:29:23 PM) ......................................................................................................51

Oklahoma State Department of Education, *Oklahoma Academic Standards* (July 14, 2025) .....................................................................................9

Press Release, Bill Prohibiting "Critical Race Theory" Curriculum Passes House, Okla. H.R. (Apr. 29, 2021) ...................................................................51

## RELATED CASES

Pursuant to Tenth Circuit Rule 28.2(C)(3), Plaintiffs state that Defendants Gentner Drummond, Kevin Stitt, Ryan Walters, members of the Oklahoma State Board of Education, and members of the Oklahoma State Regents for Higher Education ("State-Defendants" below) have filed a cross-appeal in this Court, Case No. 24-6141.

A second related cross-appeal, Case No. 24-6140, was filed by Defendant members of the University of Oklahoma Board of Regents ("University-Defendants" below), but claims against University-Defendants have since been voluntarily dismissed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims present federal questions arising under the First and Fourteenth Amendments to the U.S. Constitution. The district court also had jurisdiction under 28 U.S.C. § 1343 because Plaintiffs brought this action under 42 U.S.C. § 1983.

On June 14, 2024, the district court issued an opinion and order granting in part and denying in part Plaintiffs' Motion for Preliminary Injunction, App. Vol. III at 120, and Plaintiffs filed a timely notice of appeal on July 16, 2024, App. Vol. III at 152. Thus, this Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

Whether the district court committed a legal error by enjoining only parts of House Bill 1775 ("H.B. 1775") because they are unconstitutionally vague, rather than enjoining the Act in its entirety.

Whether the district court committed a legal error by denying Plaintiffs' Motion for a Preliminary Injunction regarding their First Amendment right to receive information claim.

## INTRODUCTION

"Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). For this reason, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (citation omitted). Yet for teachers and students across Oklahoma, including Plaintiffs, their constitutional rights and the very nature of the classroom as a place that nurtures inquiry and discussion are undermined by H.B. 1775, codified as Okla. Stat. tit. 70, § 24-157 (2021). Using vague terms, H.B. 1775's K-12 provisions (hereinafter "the Act") place sweeping restrictions on "requir[ing]" or in any way "mak[ing] part of a course" eight concepts related to race and sex. *Id.* § 24-157(B)(1).

Teachers are left to guess, with the risk of losing their licenses, whether any aspect of their teaching practices might violate the Act's vague language. They reasonably fear that introducing any curricular material that touches on racism or sexism may be deemed to run afoul of the law. Even if issues related to race or sex merely come up during student-led classroom discussions, teachers fear that they might unwittingly be considered to have made a prohibited concept "part of a course." For example, Edmond School District, where Plaintiff Killackey teaches,

cautioned teachers to avoid terms like "diversity" and stripped books like *To Kill a Mockingbird* from reading lists. The Act leaves the permissibility of any curricular materials or instruction to subjective and case-by-case judgment, but the constitutional prohibition on vagueness does not tolerate such moment-to-moment rulemaking. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("A vague law impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis[.]").

The uncertainty paralyzes teachers in their day-to-day work, forcing them to second guess their training and professional judgment, and to pull back from engaging students in assignments and conversations. This not only jeopardizes teachers' effectiveness, but also undermines the educational experiences of students, by cutting off opportunities for them to engage and voice their own inquiries and opinions in the classroom. Plaintiffs' fears are well-founded; since this case was filed, Defendant Oklahoma State Department of Education has actively pursued multiple investigations against school districts for violating the Act and has revoked at least one teacher's license.

The Act also infringes students' First Amendment rights, including the rights of Plaintiffs. The Act unconstitutionally restricts students' access to information about race and sex, for reasons that are not "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273

(1988). The Act deprives students of information from diverse perspectives, which is crucial for building the analytical skills needed to thrive in a heterogeneous community, and cuts off students' ability develop their own viewpoints on these topics.

While the district court recognized and enjoined some of the Act's vague prohibitions, it erroneously let stand provisions that produce the same vagueness concerns, including the prohibition on "mak[ing] part of a course" any prohibited concept, and the rest of the concepts themselves. Similarly, the district court erroneously failed to recognize that the Act implicates and violates students' First Amendment rights. Plaintiffs respectfully request that this Court address the entire scope of constitutional violations created by the Act to render them complete relief.

## STATEMENT OF THE CASE

### I.    Background

In 2020, Oklahomans and Americans across the country engaged in demonstrations, marches, and protests calling for racial justice in all sectors of society. Am. Compl., App. Vol. I at 94–95.[1] As part of this movement, Oklahoma students and educators renewed their efforts to incorporate inclusive and culturally

---

[1] This brief uses the following record citation convention: [Doc. Name where not clear from the text], App. Vol. X. at XX. For citations to the record that are not in the appendix the convention is: [Doc. Name], Dkt. X (Court Name). For citations to documents filed in this Court in this case, the convention is: [Doc. Name], ECF XX.

responsive curricula and programming in Oklahoma education by ensuring, for example, that diverse perspectives are represented. *Id.* at 62–63. For example, Oklahoma City Public Schools adopted a resolution to address racism and bigotry. *Id.* at 98–99. Likewise, Tulsa Public Schools held trainings for educators about addressing racism in their schools and in their instruction. *Id.* at 99.

In response to the nationwide protests and efforts to address racism, President Trump issued Executive Order 13950, 85 Fed. Reg. 60683 (Sep. 28, 2020) ("EO 13950"), purporting to ban nine "divisive concepts" related to racism and sexism in trainings for government employees, contractors, and grantees. *Id.* § 2(a). The executive order explicitly targeted a so-called "destructive ideology," seemingly referring to concepts like structural racism and unconscious bias. *Id.* § 1. In December 2020, a federal court barred EO 13950 from going into effect, because its prohibitions were vague and likely violated the First Amendment rights of government contractors and grantees. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). Still, the Oklahoma Legislature, along with many other states and localities, subsequently introduced legislation prohibiting those same concepts in Oklahoma schools, Am. Compl., App. Vol. I at 80–81.

## II.    House Bill 1775

In April 2021, the Oklahoma Legislature abruptly replaced the text of H.B.

7

1775, which was originally about medical services for student-athletes, with entirely new language copied from EO 13950. Am. Compl., App. Vol. I at 80, 107. H.B. 1775 would eventually become codified into law as Okla. Stat. tit. 70, § 24-157. Am. Compl., App. Vol. I at 78. The final text of the Act is separated into two sections: Section (1)(A) which pertains to higher education, and Section (1)(B), which pertains to K-12 schools. This appeal is limited to Section (1)(B),[2] which says that:

> No teacher, administrator or other employee of a school district, charter school or virtual charter school shall require or make part of a course the following concepts:
> a. one race or sex is inherently superior to another race or sex,
> b. an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously,
> c. an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex,
> d. members of one race or sex cannot and should not attempt to treat others without respect to race or sex,
> e. an individual's moral character is necessarily determined by his or her race or sex,
> f. an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex,
> g. any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or
> h. meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of

---

[2] Plaintiffs also challenged the constitutionality of Section (1)(A), but Plaintiffs have voluntarily dismissed their vagueness and First Amendment academic freedom claims regarding Section (1)(A) in light of favorable rulings from the district court and the Supreme Court of Oklahoma. Am. Voluntary Stipulation of Dismissal, Dkt. 274 (W.D. Okla.). All parties and both courts have agreed that Section (1)(A) cannot or does not apply to higher education curriculum or scholarship. *Id. See also* Order of Prelim. Inj., App. Vol. III at 130–31; *see also* Certified Questions Answered in Part, App. Vol. III at 175–76.

another race.

H.B. 1775 (1)(B)(1).

Section (1)(B) states: "The provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." The Oklahoma Academic Standards, created by Defendant Oklahoma State Board of Education, are comprised of a set of expectations and benchmarks that students should meet at various grade levels and ages. The Oklahoma Academic Standards refer to knowledge and skills students should gain, but do not proscribe any particular lessons or curricular content.[3]

### III.   Impact of House Bill 1775

On May 7, 2021, Defendant Governor Stitt signed H.B. 1775 into law, and it became effective on July 1, 2021. Am. Compl., App. Vol. I at 78. Educators at all levels immediately began making changes to coursework in response to H.B. 1775. *Id.* at 89–92. Public school districts instructed teachers to comply with the Act by avoiding terms like "diversity" and "white privilege" in the classroom whilst acknowledging with regard to at least one prohibited concept, "no one truly knows what this means or can come to an agreement on its meaning." Edmond Pub. Schs. H.B. 1775 Slides, App. Vol. I at 141; Edmond Pub. Schs. Written H.B. 1775

---

[3] Okla. State Dep't of Educ., *Oklahoma Academic Standards* (July 14, 2025), https://perma.cc/F2J8-X6Z4.

Guidance, App. Vol. I at 137.

H.B. 1775 caused an immediate chilling effect on any instruction related to race or sex, as teachers were forced to avoid using recognized best teaching practices, to students' detriment, in an effort to prevent complaints. *See* NAACP Decl., App. Vol. I at 217–18; Anthony Crawford Decl., App. Vol. I at 243; Regan Killackey Decl., App. Vol. I at 248–51; AIM Indian Territory Decl., App. Vol. I at 229–30.

While Plaintiffs' motion for a preliminary injunction was pending, Oklahoma State Department of Education conducted investigations finding that two school districts, Tulsa and Mustang, App. Vol. II at 154–89, and one teacher, Summer Boismier, Pls.' Notice to Ct., Dkt. 211 (W.D. Okla.), had violated H.B. 1775. The State found that Tulsa had violated the law by acknowledging "unconscious bias," a concept that is well-documented in sociological research, despite also finding that there were no "express statements," "direct statements," or "explicit content" that actually implicated H.B. 1775's prohibitions. App. Vol. II at 162–63, 170–71. For both Tulsa and Ms. Boismier, the Defendant Oklahoma State Board of Education handed down a punishment that exceeded what was recommended by the Oklahoma State Department of Education investigators. *Id*. at 159; Dkt. 211 at 2–3 (W.D. Okla.).

## IV.   Procedural History

### A. U.S. District Court for the Western District of Oklahoma

On October 19, 2021, Plaintiffs filed the case below, bringing four claims against H.B. 1775 for violations of their constitutional rights under the First and Fourteenth Amendments. Plaintiffs' facial and as-applied claims against H.B. 1775 included that it is: (1) unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause, (2) a violation of students' right to receive information under the First Amendment, (3) an overbroad and viewpoint-discriminatory regulation on academic freedom in public higher education in violation of the First Amendment, and (4) infused with racial animus and has racially disparate impact in violation of the Fourteenth Amendments' Equal Protection Clause. Am. Compl., App. Vol. I at 124–32. Plaintiffs' third claim regarding First Amendment academic freedom in higher education has been voluntarily dismissed, Am. Voluntary Stipulation of Dismissal, Dkt. 274 (W.D. Okla.), and Plaintiffs did not move for a preliminary injunction on their Fourteenth Amendment equal protection claim. Mot. for Prelim. Inj., App. Vol. I at 142.[4] Therefore, only the vagueness and First Amendment right to receive information claims related to H.B. 1775's application in K-12 public schools are currently before this Court.

---

[4] Discovery related to the Equal Protection claim is ongoing as of the filing of this brief.

11

Plaintiffs for the purposes of this appeal include students, parents, and teachers in Oklahoma public schools: members of the American Indian Movement Indian Territory, members of the Oklahoma State Conference of the National Association for the Advancement of Colored People, Precious Lloyd on behalf of her daughter S.L., and Teachers Anthony Crawford and Regan Killackey.[5]

Defendants on appeal are state officials responsible for implementing the Act, namely Governor Kevin Stitt, Attorney General Gentner Drummond, Oklahoma State Superintendent of Education Ryan Walters, and the members of the Oklahoma State Board of Education.

Ten days after filing their complaint, Plaintiffs filed a motion for preliminary injunction seeking to block enforcement of H.B. 1775 on the basis of their due process vagueness and First Amendment claims. App. Vol. I at 142.[6] In the interim before the court issued its decision, State Defendants (Defendants 1–19) filed a motion for judgment on the pleadings arguing that the Act is not vague and does not

---

[5] Plaintiffs at filing also included the Black Emergency Response Team at the University of Oklahoma and the University of Oklahoma Chapter of the American Association of University Professors, but their claims related to Section (1)(A), the "higher education provisions" of the Act, have been voluntarily dismissed. *See supra* note 2.

[6] On November 23, 2021, University-Defendants and Edmond Public Schools Defendants each filed motions to dismiss plaintiffs' amended complaint for lack of standing. Dkt. 51 (W.D. Okla.); Dkt. 52 (W.D. Okla.). University-Defendants and Edmond Public Schools Defendants have been dismissed and are not party to this appeal.

violate the First or Fourteenth Amendments. App. Vol. II at 228.

On December 4, 2023, the district court heard oral arguments on Plaintiffs' motion for a preliminary injunction and Defendants' motion for judgment on the pleadings. Tr. of Mot. Hr'g., App. Vol. III at 1. On June 14, 2025, the district court issued orders granting in part and denying in part Plaintiffs' motion for a preliminary injunction and granting in part, denying in part, and reserving ruling in part Defendants' motion for judgment on the pleadings. App. Vol. III at 84; App. Vol. III at 120.

In its preliminary injunction order, the district court preliminarily enjoined enforcement of the word "require" in Section (1)(B)(1), App. Vol. III at 134–35, 148–49, and subsections (c) and (d) of Section (1)(B)(1) as "impermissibly vague." *Id.* at 137–40, 149. But the district court denied Plaintiffs' request for a preliminary injunction based on their vagueness claims with regard to other parts of Section (1)(B), including "make part of a course" and the remaining six prohibited concepts. *Id.* at 135–37, 140–43.

The district court also denied the First Amendment right to receive information claim on behalf of K-12 students as a basis for enjoining Section (1)(B)(1) of H.B. 1775. App. Vol. III at 146. In ruling on the Defendants' motions to dismiss and for judgment on the pleadings, the district court: (1) granted judgment on the pleadings in favor of State Defendants on Plaintiffs' First Amendment right

to receive information claim against Section (1)(B)(1), *id.* at 106–09; (2) decided *sua sponte* to certify questions regarding the meaning of the Act to the Oklahoma Supreme Court, *id.* at 110–11; and (3) reserved ruling on Plaintiffs' First and Fourteenth Amendment vagueness claims until the district court received answers from the Oklahoma Supreme Court. *Id.* at 117–18. In the same order, the district court also deemed Edmond Public Schools Defendants an improper party to the case and dismissed all claims against them. *Id.* at 114–17.

On July 16, 2024, all parties filed separate notices of appeal regarding the district court's order of preliminary injunction. *See* App. Vol. III at 150–55. On August 5, 2024, all parties filed a joint motion in this Court to abate the appeal, pending a response to the certified questions from the Oklahoma Supreme Court. ECF 42. This Court granted the motion, ECF 44, and subsequent renewals.

## B. Supreme Court of Oklahoma

On August 27, 2024, the district court certified six questions to the Oklahoma Supreme Court. App. Vol. III at 162. The first three certified questions related to Section (1)(A) and are not relevant to this appeal. *Id.* The remaining certified questions related to the enjoined provisions within Section (1)(B)(1). *Id.* The district court asked the state court to determine "what does it mean to 'require' an identified concept" in Section (1)(B)(1), *id.*, as well as the meanings of subsections (c) and (d), *id.*, all of which the district court had concluded were unconstitutionally vague. *Id.*

14

at 134–35, 137–40.

On June 17, 2025, the Oklahoma Supreme Court issued its opinions. App. Vol. III at 167, 183. In relevant part, the Oklahoma Supreme Court refused to answer the certified questions concerning the meaning of language within Section (1)(B)(1). The court reasoned that this case did not involve "deciding between competing definitions of terms" but instead, "whether these terms can be defined at all in the context of the statute." *Id.* at 179. Further, the court explained that whether a prohibited concept was "'ma[de] part of a course' in a specific classroom grade level . . . would [] be fact determinative," and held that it could not "reasonably define these terms or phrases in the abstract to avoid or alter the constitutional challenge." *Id.* at 179–82.

### C. U.S. Court of Appeals for the 10th Circuit

On June 26, 2025, this Court lifted the abatement and set the case for briefing. *See* ECF 56. Plaintiffs' Fourteenth Amendment vagueness and First Amendment right to receive information claims against Section (1)(B)(1) (hereinafter the "Act") are the focus of Plaintiffs' instant appeal of the district court's Order Granting in Part and Denying in Part Plaintiffs' Motion for a Preliminary Injunction. Notice of Appeal, App. Vol. III at 152.

### SUMMARY OF THE ARGUMENT

Plaintiffs suffer ongoing, irreparable harm as a result of the Act. Plaintiffs

who are teachers, including Regan Killackey and Anthony Crawford as well as members of American Indian Movement Indian Territory ("AIM Indian Territory") and Oklahoma State Conference of the National Association for the Advancement of Colored People ("NAACP of Oklahoma") who are public school educators in the state, are in an impossible bind, threatened with enforcement including the loss of their teaching licenses while unable to be certain that they've steered clear of the law's vague prohibitions. All the while, the Act is undermining their ability to teach their students in accordance with their pedagogical expertise and professional judgment. The Act prohibits educators from "mak[ing] part of a course" a list of vague "divisive concepts," but these prohibitions do not provide objective guidelines for compliance or enforcement. Okla. Stat. tit. 70, § 24-157(B)(1); *see also* EO 13950 § 2(a). Instead, they necessarily turn on subjective value judgments of whether a particular discussion or assignment invokes a disfavored idea. This vagueness encourages teachers to steer far clear in limiting their classroom instruction, assignments, and other teaching practices. At the same time, Teacher-Plaintiffs are expected to provide high-quality instruction according to their experience and expertise, while encouraging critical thinking and empathy in students. This bind has an immediate impact on teachers' ability to do their jobs effectively and jeopardizes their very profession.

While the district court recognized these concerns regarding vagueness and

enjoined the Act in part, it left other provisions in place, finding, *inter alia*, that the law only prohibited "school personnel from directly endorsing, promoting, or inculcating any concept as a normative value." Order of Prelim. Inj., App. Vol. III at 134. However, the district court improperly inserted language that does not appear in the Act itself, and nor would its interpretation adequately resolve the ambiguities created by the law.

Likewise, Student-Plaintiffs, including members of AIM Indian Territory and NAACP of Oklahoma who are enrolled in Oklahoma public schools, suffer ongoing and irreparable injury to their First Amendment rights. The Act infringes on Oklahoma students' right to receive information because it requires teachers to refrain from teaching topics and ideas, without any legitimate educational basis. According to the Supreme Court's decision in *Hazelwood School District v. Kuhlmeier*, courts must intervene when curriculum restrictions are not "reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 273 (1988). The Act fails under *Hazelwood*.

Oklahoma legislators made clear that their intention was to silence instruction about racism and sexism from disfavored viewpoints. And the state's zealous and haphazard enforcement of the Act has reinforced Plaintiffs' fears. The ongoing violation of Plaintiffs' constitutional rights has resulted in a chilling effect across Oklahoma schools.

17

## STANDARD OF REVIEW

This Court "review[s] the denial of a preliminary injunction for abuse of discretion." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd sub nom.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). When a district court denies a preliminary injunction based on a legal error "or where there is no rational basis in the evidence for its ruling[,]" the district court necessarily abuses its discretion. *See Aid for Women v. Foulston*, 441 F.3d 1101, 1115 (10th Cir. 2006) (citation omitted).

This case involves the denial of a preliminary injunction based on asserted constitutional violations under the First and Fourteenth Amendments. Accordingly, this Court reviews *de novo* the district court's determination of Plaintiffs' likelihood of success on the merits. *See Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1119–20 (10th Cir. 2014) ("[T]he district [] relied largely on likelihood of success. Because this element involves [legal matters], we conduct de novo review of the district court's conclusions on likelihood of success.").

A plaintiff "seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The court applies a relaxed standard to the likelihood of success factor

18

if the movant establishes that the factors "tip decidedly in its favor[.]" *Nova Health Sys. v. Edmondson,* 460 F.3d 1295, 1298 n.6 (10th Cir. 2006) (citation omitted). In such cases, the movant needs only to show "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Id.*

Here, the more relaxed standard should apply, but Plaintiffs have met their burden under either test. The district court's determination in part that Plaintiffs did not show a likelihood of success on the merits was erroneous, and denial of the requested preliminary injunction was an abuse of discretion.

## ARGUMENT

Plaintiffs are likely to succeed on the merits of their Fourteenth Amendment vagueness and First Amendment right to receive information claims. The district court erred in denying in part Plaintiffs' Motion for a Preliminary Injunction. This Court should rectify this legal error by enjoining the remainder of H.B. 1775.

## I.    The Act Is Unconstitutionally Vague in Its Entirety.

This Court should hold that the entirety of the Act as contested on appeal is unconstitutionally vague. The district court correctly held that the Act's overarching prohibition on "requir[ing]" concepts was unconstitutionally vague, App. Vol. III at 134–35, and that prohibited concepts (c) and (d) were unconstitutionally vague in their entirety, *id.* at 137–40. But the court failed to acknowledge the Act's vagueness as a whole, concluding incorrectly that the rest of the law was not vague.

The Act is "void for vagueness [because] its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law violates the Fourteenth Amendment's Due Process Clause "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colo.*, 530 U.S. 703, 732 (2000). The Act does both.

The Act fails to provide notice to teachers about what instruction is prohibited. Teachers are prohibited from directly or indirectly "requir[ing] or mak[ing] part of a course" abstract, undefined concepts related to racism and sexism. Okla. Stat. tit. 70, § 24-157(B)(1). However, Teacher-Plaintiffs don't know what instructional activities are permissible because they may result in discussions of racism and sexism, such as assigning texts from diverse authors to teach students to consider various perspectives, Killackey Decl., App. Vol. I at 247–50; Crawford Decl., App. Vol. I at 240–42, or facilitating student led debates, *Id.* at 242. The Act's directive that teaching is permissible if it "align[s] to" state academic standards, Okla. Stat. tit. 70, § 24-157(B), only adds to the confusion, leaving teachers to guess where a particular book or lesson plan falls between making a prohibited concept part of a course or aligning with educational objectives like promoting critical thinking. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 807 (2011) (Alito, J., concurring) ("Vague laws force potential speakers to steer far wider of the unlawful zone than if

20

the boundaries of the forbidden areas were clearly marked.") (citation modified).

The Act's lack of objective standards also encourages arbitrary and discriminatory enforcement. Without objective definitions of what types of statements or conduct could be interpreted to violate the Act, or any guidance on how teachers could navigate between the Act's prohibitions and the Oklahoma Academic Standards, the Act turns on subjective interpretation and invites arbitrary and discriminatory enforcement. *See Sessions v. Dimaya*, 584 U.S. 148, 175 (2018) (Gorsuch, J., concurring in part) (vague laws "can invite the exercise of arbitrary power . . . by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up.").

The district court correctly imposed a "stringent vagueness test[,]" *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 499 (1982), because of the severity of penalties under H.B. 1775, including suspension or license revocation for individuals and accreditation deficiencies for schools. Okla. Admin. Code § 210:10-1-23(h), (j). The court explained, "while as a general matter 'enactments with civil rather than criminal penalties' have been given 'greater tolerance,' civil statutes that impose severe penalties—such as 'strip[ping] persons of their professional licenses and livelihoods'—may warrant the same high expectation of clarity." Order of Prelim. Inj., App. Vol. III at 127 (alteration in original) (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 498–99;

21

*Dimaya*, 584 U.S. at 184–85 (Gorsuch, J., concurring in part)). A more stringent vagueness test is also warranted because the Act "abuts upon sensitive areas of basic First Amendment freedoms," interfering with students' right to receive information, *see Grayned*, 408 U.S. at 109 (citation modified). In any event, the Act would still fail a less stringent vagueness test. *See* Order of Prelim. Inj., App. Vol. III at 133, n.10; *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966) (recognizing that even where a more stringent test for vagueness does not apply, "[v]ague laws in any area suffer a constitutional infirmity." (collecting cases)).

### A. The Act Does Not Provide Fair Notice to K-12 Teachers About What Instruction Is Prohibited.

The Act uses sweeping terms to broadly prohibit instruction about racism and sexism without referencing, much less defining, the statements or conduct that would trigger penalties under the law. Teacher-Plaintiffs and other educators around the state can lose their teaching licenses for violating a law that they cannot be expected to decipher.

Oklahoma legislators passed the Act as an emergency measure to suppress disfavored speech in schools, a goal that underscores the need for clarity. Am. Compl., App. Vol. I at 108–14. Legislators openly expressed their desire to silence discussion of viewpoints with which they disagreed, including, *inter alia*, critical race theory, implicit bias, systemic racism, intersectionality, and police brutality. *Id.* But the legislature did not pass a law that straightforwardly prohibits referencing

22

critical race theory in the classroom, for example, or even substantiate, much less address, alleged concerns of indoctrination writ large. Instead, the Act broadly prohibits anything that might "make part of a course" concepts that the legislature believes align with critical race theory and other disfavored viewpoints. Okla. Stat. tit. 70, § 24-157(B)(1). Eschewing clarity in the law's objective makes it more difficult for teachers to understand what in their everyday teaching practices the legislature means to prohibit.

As explained *infra*, the Defendants conceded that enforcement is not limited to recitation of the specific concepts, permitting enforcement against anything that directly or indirectly could be interpreted by third parties to violate the law. As such, "rather than take on issues of structural racism, implicit bias, and affirmative action directly, [the law] employs general terms" that raise myriad questions for practical application. *Loc. 8027 v. Edelblut*, No. 21-CVG-1077-PB, 2024 WL 2722254, at *9 (D.N.H. May 28, 2024) ("Edelblut"), *appeal docketed* (1st Cir. July 26, 2024); *see also* Order on Prelim. Inj., App. Vol. III at 127 (Recognizing the "factors considered in 'deciding whether a challenged statute provides fair notice' include 'the enactment's purpose [and] the harm it attempts to prevent'") (quoting *Jordan v. Pugh*, 425 F.3d 820, 825 (10th Cir. 2005)).

In striking down a law prohibiting instruction on politically disfavored concepts, the *Edelblut* court highlighted the practical difficulties for teachers

discerning what instruction is prohibited, identifying challenges that also exist under

H.B. 1775:

> While teaching can sometimes consist of merely instructing students on objective facts, teachers often employ more nuanced techniques designed to encourage the development of critical thinking skills. For example, teachers may attempt to stimulate discussion by asking students pointed questions or encourage debate by presenting students with ideas contrary to their own. When such techniques are used to explore a banned concept, it is impossible to know whether a banned concept has been impermissibly taught.

*Edelblut,* No. 21-CV-1077-PB, 2024 WL 2722254, at *12; *see also Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 544 (N.D. Cal. 2020) ("The line between teaching or implying (prohibited) and informing (not prohibited) 'is so murky, enforcement of the ordinance poses a danger of arbitrary and discriminatory application.'") (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011).

The Act lacks the fair notice required by the Due Process Clause in at least four respects. First, it does not clarify which pedagogical strategies would constitute making prohibited concepts "part of a course." Second, each of the Act's eight banned concepts is vague. Third, the Act's allowance for teaching concepts that "align to" the Oklahoma Academic Standards does not create an objective limit on the Act and instead emphasizes its confusing and unworkable nature. Fourth, teachers can violate the Act without intending to do so because there is no scienter requirement.

### i.    "Make Part of a Course" Is Unconstitutionally Vague.

The Act begins, "No [school personnel] shall require or make part of a course the following concepts…." Okla. Stat. tit. 70, § 24-157(B)(1). It does not define what it would mean to "require" or separately, to "make part of a course." The district court correctly noted that the Act's restriction that no school personnel shall "require" the concepts was vague, holding that "to generally direct that a concept may not be required opens the statute to a variety of interpretations" (emphasis omitted), but erroneously concluded that "make part of a course" could be "plain[ly] and ordinarily understood… to prohibit school personnel from directly endorsing, promoting, or inculcating any concept as a normative value." Order of Prelim. Inj., App. Vol. III at 134. However, this definition does not appear within the Act itself and muddies the water further by relying on terms that are themselves overly vague. The Supreme Court, in *Keyishian v. Board of Regents*, 385 U.S. 589, 599 (1967), held that similar terms—prohibiting the employment of a higher education instructor who "advocates, advises or teaches the [prohibited] doctrine"—were impermissibly vague in the context of classroom instruction because they "may well [reach] one who merely advocates the doctrine in the abstract without any attempt to indoctrinate others[.]"

Courts have recently struck down analogous laws prohibiting classroom instruction on racism and sexism as unconstitutionally vague because they did not

define the types of teaching that were prohibited. *See Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *12 (striking down as unconstitutionally vague provision requiring that students may not be "taught, instructed, inculcated or compelled to express belief . . ."); *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1183 (N.D. Fla. 2022) (holding Florida's Stop WOKE Act's prohibition on including certain concepts in workplace training provided "no guidance on the line between 'objective discussion' and 'endorsement'" and that certain concepts were unconstitutionally vague), *aff'd sub nom*. *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024); *Pernell v. Fla. Bd. of Governors*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022) (holding the higher education provisions of Florida's Stop WOKE Act are unconstitutionally vague, *inter alia*), *appeal docketed* (11th Cir. 2022); *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 808 (M.D. Tenn. 2024) ("*T.E.A.*") (addressing prohibition "not merely on teaching the prohibited concepts, but also 'including' or 'promoting' them 'as part of a course of instruction.'").

Even in comparison to corresponding language in Executive Order 13950 and other similar laws found to be unconstitutionally vague, "make part of a course" is exceptionally opaque. As the Oklahoma State Supreme Court points out, even using a common ordinary meaning, "whether a teacher 'makes part of a course' in a specific classroom grade level [a prohibited concept] would [] be fact determinative" and could not be interpreted "in the abstract." App. Vol. III at 179.

The inability to decipher an objective standard for what the Act prohibits before it is enforced epitomizes the vagueness concern the Due Process Clause is designed to shield against.

The Act does not specify, and teachers cannot know, which instructional activities are forbidden. NAACP Decl., App. Vol. I at 215–16. Teacher-Plaintiffs reasonably wonder if they are required to avoid any texts, even primary sources, that directly mention racial oppression, white privilege, systemic racism, and implicit bias. Killackey Decl., App. Vol. I at 248–49; *see also* NAACP Decl., App. Vol. I at 216–17. They similarly wonder whether they should omit teaching certain aspects of history or steer further clear and avoid any sources that a student might perceive to relate to a prohibited concept and whether they can continue to use texts by diverse authors to introduce various viewpoints on issues. Killackey Decl., App. Vol. I at 247–50; Crawford Decl., App. Vol. I at 240–42.

Compounding the problem, the scope of "make part of a course" may extend beyond teachers' control. Even if teachers do not directly introduce texts about racism and sexism, students often initiate class discussions about these topics in response to readings and instruction on current events. NAACP Decl., App. Vol. I at 216; Crawford Decl., App. Vol. I at 241–42. Can a teacher respond to comments without making them a "part of a course?" Are they made "part of the course" if the teacher does not respond or interject to direct the conversation? It is

impossible to know whether Oklahoma might deem such a discussion to be "part of a course." By grading or offering academic credit on student responses related to racism or sexism, would a teacher violate the law? If a student discussion or debate veers into discussion of race and gender, how are teachers to respond? Crawford Decl., App. Vol. I at 241–2. Would teachers violate the Act by asking students questions if their response relates to racism or sexism? *Id.* at 241; NAACP Decl., App. Vol. I at 218. When teachers engage students by encouraging them to write about topics that interest them, must they specify that any topics that could be interpreted to relate to racism and sexism are off limits? Crawford Decl., App. Vol. I at 240.

Teachers receive pedagogical training to push students to develop higher level thinking skills, helping them to deepen their understanding and to consider all sides of particular issues. NAACP Decl., App. Vol. I at 217; Killackey Decl., App. Vol. I at 246–47. Must teachers disregard this training altogether for every topic that could potentially relate to race and gender? *Id.* at 250. Does the Act forbid teachers from using the recommended pedagogical practice of "shar[ing] a personal story to model how students can connect with the curricula and make meaning out of complex material"? NAACP Decl., App. Vol. I at 217. The litany of questions goes on; the bottom line is that teachers do not have fair notice of what forms of teaching violate the Act.

28

The Act's failure to define "make part of a course" infuses vagueness throughout the remaining provisions. Vagueness about *how* teachers may teach within the confines of the law is an overarching concern separate from valid concerns about *what* may be taught. Vagueness permeates H.B. 1775 because "make part of a course" applies to all of its provisions. *See Pernell*, 641 F. Supp. 3d at 1286 (striking down statute where unconstitutionally vague clause "commands the entire statute[.]"). Even if the Act's prohibited concepts and so-called safe harbor provision were clear, which they are not, the Act would still be unconstitutionally vague because teachers still would not know what instructional activities were permissible and which were prohibited.

### ii.    Each Prohibited Concept Is Vague.

The Act does not define the terms or phrases used in the prohibited concepts or provide guidance to what sorts of comments or arguments could be interpreted to fall within their broad scope. NAACP Decl., App. Vol. I at 215–16. Like similar laws found vague, it appeals instead to inherently nebulous concepts or ideas. As a court considering a very similar New Hampshire law noted, "the banned concepts speak only obliquely about the speech that they target and, in doing so, fail to provide teachers with much-needed clarity as to how the [challenged law] appl[ies] to the very topics [it was] meant to address." *Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *12; *see also Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, Civil No. 25-

CV-091-LM, 2025 WL 1188160, at *19 (D.N.H. Apr. 24, 2025) ("[T]o label a program as a 'diversity, equity, and inclusion' program necessarily involves 'appeals to abstract principles with contestable moral and political content—such that the practical meaning of the Act must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it.'") (quoting *T.E.A.*, 732 F. Supp. 3d at 807); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, Civil No. SAG-25-628, 2025 WL 2374697, at *30 (D. Md. Aug. 14, 2025) (finding government rule unconstitutionally vague including because it left "entirely within [the government's] discretion to decide what conduct counts as DEI at all" and noting that DEI is a broad concept); *Honeyfund*, 622 F. Supp. 3d at 1183–84 ("[M]any would suggest that it is impossible to discuss a concept—or anything for that matter—as perceived without distortion by personal feelings, prejudice, or interpretation. This is especially true when discussing concepts rooted in historical phenomena . . . .") (citation modified); *Smith v. Goguen*, 415 U.S. 566, 578 (1974) (statute with operating term "treats contemptuously," turns on subjective preference, and "simply has no core"); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (statute with operating term "annoying" found vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all"); *Kolender v. Lawson*, 461 U.S. 352, 353–54 (1983)

(requirement to provide "credible and reliable" identification was unconstitutionally vague); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 86–87 (1921) (prohibition on "unjust and unreasonable" rates was unconstitutionally vague). The same critique applies to the Act.

The district court correctly recognized concepts (c) and (d) as unconstitutionally vague, Order of Prelim. Inj., App. Vol. III at 137–40, but erred in holding that the other prohibited concepts do not violate the Due Process Clause. The district court attempted to narrow the prohibited concepts by declaring some broad categories of instruction permissible under the law. For example, the court asserted, without basis, that the following concepts and practices are permissible under the Act: (1) instruction on the historical existence and current manifestations of racism and sexism, even involving criminal, malicious, or discriminatory events, *id.* at 135–36, 141; (2) action or inaction by individuals or institutions can be racist, sexist, result in oppression, or be morally wrong, *id.* at 136–37, 140; (3) policies or institutions can be racist or sexist, *id.*; (4) racism and sexism resulted in present advantages and disadvantages for members of a certain race or sex, *id.* at 141; and (5) instruction that "might cause a student to feel discomfort or distress." *id.* at 142. But these categories themselves remain confusingly broad, ill-defined, and next to impossible to apply consistently in the real-world classroom environment.

31

The district court's description of topics that are permissible under the remaining prohibited concepts deepens the confusion because it infers exceptions that are not in the plain language of the Act. The district court did not point to any objective guideposts within the law in reaching its conclusions or explain how a teacher could know whether a particular program or practice would be deemed permissible under the court's characterization or prohibited under the terms of the Act. The district court's favorable interpretation of the banned concepts runs directly contrary to the statements from Oklahoma legislators about the topics they understood the Act to censor in schools, Am. Compl., App. Vol. I at 109–14, as well as Defendants' own enforcement of the Act, *see infra* Argument Part I. B. To read them into the law would be to incorrectly and impermissibly rewrite the state law. *See, e.g.*, *Brown*, 564 U.S. at 813 (Alito, J., concurring) (courts must "'extrapolate [a law's] allowable meaning' from the statutory text and authoritative interpretations of similar laws by courts of the State . . . "[I]t is not within the [federal court's] power to construe and narrow state laws.") (quoting *Grayned*, 408 U.S. at 110) (citation modified).

Concept (a), that "one race or sex is inherently superior to another race or sex," is unconstitutionally vague. Okla. Stat. tit. 70 § 24-157(B)(1)(a). When

considering language nearly identical to H.B. 1775,[7] *Edelblut* and *Honeyfund* courts asked, "what is prohibited [by the concept] beyond literally espousing that, for example, White people are superior to Black people." *Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *9, n.7 (citation modified); *Honeyfund*, 622 F. Supp. 3d at 1181. The *Honeyfund* court even described the concept as "mired in obscurity." 622 F. Supp. 3d at 1181.

Concept (b), that "an individual, by virtue of his race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously," fares no better. Okla. Stat. tit. 70 § 24-157(B)(1)(b). When considering the same language, the *Edelblut* court noted the difficulties of interpretation and asked if "instructing students on the prevalence of implicit bias" would violate the law. No. 21-CV-1077-PB, 2024 WL 2722254, at *9. This holding is hard to reconcile with the district court's assertion that the provision "does not prohibit teaching that an institution or a policy that contributes to or perpetuates a preference for one" race or sex over another is racist or sexist. Order of Prelim. Inj., App. Vol. III at 136–37. It also runs counter to the confusion expressed by Teacher-Plaintiffs about the instruction that is forbidden. NAACP Decl., App. Vol. I at 215–16 (NAACP

---

[7] The *Edelblut* court considered identical language to concept (a) while the *Honeyfund* and *Pernell* courts attempted to decipher a similarly structured restriction on instruction that one race or sex is "morally superior" to another race or sex. Fla. Stat. § 1000.05(4)(a)(1).

Member Teacher B.B. "do[es] not understand what conduct is prohibited under the law.... [and] is not clear on what they can and cannot teach"); Crawford Decl., App. Vol. I at 242 ("It is not clear to me what type of conduct violates H.B. 1775 because the law's language is extraordinarily confusing and vague.").

In *Pernell*, looking at nearly identical statutory text, the court held that instruction on "white privilege," "institutional racism[,]" and the "effects of ongoing systemic discrimination" could be interpreted to violate the same language in concepts (b) and (e), that an individual's "moral character is necessarily determined by his or her sex[,]" 641 F. Supp. 3d at 1256–58 (citation modified). But here, the district court inexplicably asserted that "teaching that an action by a person or institution is racist or sexist or results in undue oppression" was not prohibited by these concepts. Order of Prelim. Inj., App. Vol. III at 136–37.

Concept (f), that "an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex," is also void for vagueness. Okla. Stat. tit. 70 § 24-157(B)(1)(f). Plaintiff Crawford expressed confusion about the meaning of this prohibition in the scope of instruction and noted particular difficulty understanding how to apply the concept to student-led discussions and debates. App. Vol. I at 242. In *Pernell*, the court determined that instruction on privilege and collective responsibility

would violate the language of the same concept. 641 F. Supp. 3d at 1257, 1260. Similarly, in *NAACP v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53, 66 (D.D.C. 2025), the court notes: "it is unclear what it means to use [] a program to 'advantage' one race over another. . . . Would courses taught by professors who promote the view that systemic racism exists, and that race can be central to one's experiences and identity, be unlawful?" *See also Am. Fed'n of Tchrs.*, Civil No. SAG-25-628, 2025 WL 2374697, at *31 (citing *NAACP*, 779 F. Supp. 3d at 66). Yet, counter to the vagueness acknowledged by those courts, the district court claimed the prohibition at issue did not "preclude teaching that past actions of racism or sexism have resulted in present advantages… [or] disadvantages for members of a certain race or sex." Order of Prelim. Inj., App. Vol. III at 141.

Concept (g), that "any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex," cannot withstand constitutional scrutiny. Okla. Stat. tit. 70 § 24-157(B)(1)(g). Despite confusion from teachers regarding the meaning of this concept to instructional activities, NAACP Decl., App. Vol. I at 215–16, Crawford Decl., App. Vol. I at 242, the district court erroneously held that this concept was "sufficiently clear" and did not "prohibit the teaching of subjects involving race or sex merely because they might cause a student to feel discomfort or distress…. [And the reaction of] a student who is discomfited upon learning about a historical

event in which persons of her race harmed persons of another race… would instead be due to historical fact" Order of Prelim. Inj., App. Vol. III at 141–142. But a teacher cannot divine whether each student will interpret a statement that could cause guilt as intended; violations depend on the listener's reaction and could be implied beyond verbatim recitation of the Act. For example, the *Pernell* court held that an instructional exercise that references "collective responsibility for [] wrongs" in Argentine society "as well as the broader extermination of indigenous people" violated the same concept. 641 F. Supp. 3d at 1257, 1260. The district court's explanation still does not clarify what other forms of psychological distress are covered by the concept, including whether notions of responsibility without guilt are permissible.

Finally, concept (h), that "meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race," runs afoul of the Due Process Clause. Okla. Stat. tit. 70 § 24-157(B)(1)(h). For example, Teacher B.B. expressed confusion regarding what would be interpreted to violate this banned concept. App. Vol. I at 215–16. When considering the same concept, the *T.E.A.* court explained:

> In the real world with its preexisting racial and sexual or gender-based divisions, the question of whether a 'meritocracy,' is 'inherently racist' has many potential answers, but with many potential ways of understanding the question in the first place. That open-ended contestability is a part of life and, indeed, part of the lifeblood of democracy. When it is made the foundation of a prohibitory statute, however, what results is an

'impossibility of ascertaining, by any reasonable test, that the Legislature meant one thing rather than another.'

*T.E.A.*, 732 F. Supp. 3d at 808 (citation modified).

The contours of each concept could be almost limitless. For example, teachers do not know how far the prohibitions extend, and must consider, at their own peril, whether any references to diversity, oppression, systemic power, and privileges in instruction are now forbidden by the Act. NAACP Decl., App. Vol. I at 215–18; Killackey Decl., 248–49. That the district court interpreted the Act's terms differently from other courts is itself indicative of the law's openness to different interpretations and applications.

### iii.   The Act's Reference to Oklahoma Academic Standards Exacerbates Its Vagueness.

H.B. 1775's so-called safe harbor, which permits "teaching of concepts that align to the Oklahoma Academic Standards," deepens the Act's vagueness. Okla. Stat. tit. 70 § 24-157(B). Beyond a topic explicitly mentioned in the standards, it is impossible to know how closely instruction must "align" to be protected. *See Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1237 (10th Cir. 2023) (finding a statute requiring disclosure of contributions and expenditures "related to" electioneering unconstitutionally vague because it did "not provide fair notice of the scope of donations plausibly covered.").

The Oklahoma Academic Standards broadly reference instructional topics

and skills students should achieve but do not answer teachers' outstanding questions about what particular materials, pedagogical practices, or classroom conversations the Act prohibits or allows. Plaintiff Crawford explained that "the standards are more general and are not intended to be proscriptive," noting that teachers are "responsible for selecting [their] curriculum and instruction." App. Vol. I at 243.

For example, the Oklahoma English Language Arts standards for grade 12 state that "[s]tudents will evaluate how authors writing on the same issue reached different conclusions because of differences in assumptions, evidence, reasoning, and viewpoints, including examining rhetorical appeals, bias, and use of logical fallacies." *Id.* at 242. Students in grade 12 are also "expected to 'acknowledge counterclaims or alternate perspectives.' But the prohibitions in H.B. 1775 suggest that teachers must restrict students' exposure to alternate perspectives." *Id.* As Plaintiff Crawford observed, "the exception makes the law even more confusing instead of adding clarity because I do not understand how deeply or extensively I—or my students—can discuss, write about, or read about issues related to race or sex." *Id.* at 243. If instruction "could allow a student to meet these standards," but the standard is not directly referenced, is it protected? *Id.* How will teachers know what teaching would be protected by the safe harbor? Can teachers extend the principles or identify additional examples to topics or

events listed in the standard? Where a standard lists names of Black historical figures, are teachers "still permitted to teach about historical figures who are not named in the state standards[?]" NAACP Decl., App. Vol. I at 216. Plaintiff-Teachers raised other questions about the practical application of the safe harbor provision. Where a standard references skill development, are teachers permitted to select texts that address themes of racism, sexism, oppression, overall conflict, and imbalances of power? Killackey Decl., App. Vol. I at 247–48. Are teachers required to restrict students' exposure to alternate perspectives if they relate to race or gender? Crawford Decl., App. Vol. I at 242–43. If so, how? Do they have to avoid primary sources, editorials, letters, political speeches, or essays that discuss these themes unless they are specifically enumerated in the standard? Killackey Decl., App. Vol. I at 248. The safe harbor simply does not answer practical questions about the scope of permissible instruction under the Act.

The safe harbor also does not address and could not cure vagueness with regard to the permissibility of teaching concepts in Advanced Placement courses, which follow College Board curricula and are not outlined in the Oklahoma Academic Standards. These courses address themes of race, sex, gender, equity, identity, oppression, and racism. *Id.* at 247. They require students to grapple with current social issues and to consider various perspectives, studying texts from diverse authors. *Id.*

### iv.    The Act Lacks a Scienter Requirement.

The Act does not include any scienter requirement before penalizing disfavored speech. Thus, teachers can be caught in the Act's snares without any intent to violate the Act. *See Local 8027 v. Edelblut*, 651 F. Supp. 3d 444, 460 (D.N.H. 2023); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972) (noting lack of "protect[ion] from being caught in [the statute's] net by the necessity of having a specific intent to commit an unlawful act."). For example, a teacher may introduce information to diversify students' understanding of perspectives on an issue, without intending to present concepts as correct or to cause a student to feel guilt. Killackey Decl., App. Vol I at 250. The lack of a scienter requirement is monumental because the Act draws an indecipherable line between permissible and prohibited teaching. The Oklahoma Administrative Code limits the revocation of licenses to "willful violation[s]", § 210:10-1-23(j)(2), but does not at all circumscribe other penalties pursuant to the Act, including the suspension of licenses for teachers and accreditation deficiencies for schools. *Id.* § 210:10-1-23(h), (j). Moreover, while a scienter requirement "may mitigate a law's vagueness," *Vill. of Hoffman Ests.*, 455 U.S. at 499, even this would be insufficient to save a law like H.B. 1775. *See Keyishian*, 385 U.S. at 599–600 (finding unconstitutional a law that required instructors to act "wilfully and deliberately[.]").

## B. The Act Invites Arbitrary and Discriminatory Enforcement in K-12 Schools.

The Act is also unconstitutionally vague because it encourages arbitrary and discriminatory enforcement. "[L]aws must provide explicit standards for those who apply them." *Wyo. Gun Owners*, 83 F.4th at 1237 (quoting *Grayned*, 408 U.S. at 108). However, without objective standards that can be consistently applied, the Act "is so imprecise that discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991). The invitation for arbitrary and discriminatory enforcement stems from the Act's failure to specify the instructional content and pedagogical methods that are prohibited, as described *supra*. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Wyo. Gun Owners*, 83 F.4th at 1238 (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)).

Teachers credibly fear that the Act will be enforced in an arbitrary and discriminatory fashion because enforcement depends on the listeners' reaction. Teacher B.B. worries that the Act is "open to subjective interpretation" and has "heard legislators say that the boundaries of the restrictions will be clarified 'on the ground' as parents raise complaints." App. Vol. I at 215–16. Plaintiff Crawford is "not clear how state authorities will interpret the vague language of

H.B. 1775 and so [he] fear[s] punishment for teaching material that [he] believe[s] best meets the needs of [his] students but may be interpreted as violating H.B. 1775." App. Vol. I at 243.

Concerns about subjective interpretation have been further validated by the divergent guidance from schools and school districts about the topics and teaching strategies that violate the law. Teacher B.B.'s school "[d]istrict leadership suggested teachers only discuss topics that touch upon systemic racism and sexism if a student raises a question about it." App. Vol. I at 216. Plaintiff Killackey received guidance from the Edmond Public School District suggesting these topics were completely off limits, as teachers were instructed to "avoid the terms 'white privilege' and 'diversity' in class;" "[a]void the term 'diversity' when naming units or lessons;" and "[u]nder 1775, [d]o not discuss 'white privilege' as part of your lesson." App. Vol. I at 248. The district also removed anchor texts that discussed race from English classes, including all of the texts from diverse authors. *Id.* at 248–49. The discrepancy in interpretations of what the law prohibits is consequential, as the regulations require each school to investigate complaints of alleged violations and reach a final determination. Okla. Admin. Code § 210:10-1-23(g)(2)–(3).

Indeed, the State's own enforcement of the Act underscores the risk of arbitrary and discriminatory enforcement. The Oklahoma State Department of

Education concluded that a Tulsa Public Schools training violated the Act,

concluding it "incorporated and/or is based on" prohibited concepts but admitted

that neither the presentation slides nor audio included "express statements," "explicit

content," or "direct statements" of prohibited concepts. App. Vol. II at 170–71.

Instead, the offending language identified was:

1. [S]ocietal systems, including public schools, were originally solely developed by the majority, who were then predominantly White, middle-class individuals;
2. [D]emographics are changing and we can expect to be interacting with students of varying cultures, ethnicities and backgrounds such that we need to be aware of our own inherent biases, as well as historical biases against minorities;
3. [D]eeply rooted stereotypes, built over time and by history and culture, can still be found in classrooms. These can turn into implicit bias and can eventually lead to discrimination if unchecked;
4. [S]tatistics demonstrate that while just 18% of preschool students were Black in 2015, they accounted for 42% of the out-of-school suspensions, that Black students were suspended three times more than White students, that Black students with disabilities are more likely to be suspended or restrained, and that teachers hold lower expectations (explicitly or implicitly) for Black and Latino children as compared to White peers;
5. [W]hile progress has been made toward racial equity, more supports are needed to adapt to changing classrooms, including a need to examine implicit biases, how societal and systemic systems are biased against minority students; and
6. [T]he goal of the course is to provide an overview of racial bias, including a discussion of understanding racial bias and strategies to develop cultural competence.

*Id.* at 170. The Oklahoma State Department of Education concluded that the

training violated prohibited concepts (b), that an individual is inherently racist,

sexist, or oppressive, whether consciously or unconsciously; (f), that an individual

bears responsibility for actions committed in the past by other members of the same race or sex; and/or (g), that an individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of race or sex. *Id.* The State did not connect the individual statements to the prohibited concepts and, by using "and/or" when listing the violated prohibited concepts, evidenced its own confusion about the meaning of the Act's prohibitions.

The State's determination that Mustang Public Schools violated the Act similarly demonstrates the Act's problematic enforcement. The Oklahoma State Department of Education concluded that discussion of privilege, even without the expressed intention to "[r]aise awareness of various forms of privilege" in students, and the district recognized that the activity "*could* provoke certain emotions" (emphasis added), violated concept (g) by eliciting racial discomfort. Ex. 1 to Resp. of Defs. [1-18] to Pls.' Suppl. Submission, App. Vol. II at 210. But the State did not consider the fact that the exercise could provoke an emotional reaction from students without educators requiring or instructing students that they should feel such emotions, or even intending for the exercise to provoke such emotions.

In sum, this Court should hold that the entirety of the Act is unconstitutionally vague.

## II. The District Court Erred in Holding that Plaintiffs Are Not Likely to Succeed on the Merits of Their First Amendment Right to Receive Information Claim.

It is long established that the Government may not infringe on "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Listeners independently possess a First Amendment right to receive information, distinct from a corresponding speaker's First Amendment right to speak. *See Lamont v. Postmaster Gen.*, 381 U.S. 301, 306–07 (1965) (holding that the First Amendment protects Americans' right to receive "communist political propaganda" through the mail, even though the foreign government distributors of the mailers did not have their own independent First Amendment right to do so). Regardless of the First Amendment protection afforded to teachers in their curricular speech, public school students possess an independent First Amendment right to receive information free from ideologically motivated censorship. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (holding that the government may not restrict public school students' First Amendment rights in the curricular context unless such restrictions are "reasonably related to legitimate pedagogical concerns.").

### A. Students Have a First Amendment Right to Receive Curricular Information.

The district court erred in determining that the First Amendment does not protect students' right to receive information in public school curriculum. Order on Mots. to Dismiss & for J. on Pleadings, App. Vol. III at 106–09; Order of Prelim.

Inj., App. Vol. III at 133. In declining to enjoin the Act based on Plaintiffs' First Amendment claims, the district court reasoned that public school teachers do not possess a First Amendment right to their curricular speech in light of *Garcetti v. Ceballos,* 547 U.S. 410 (2006), and other government employee speech cases, and that public school students therefore lack any First Amendment right to receive information. Order of Prelim. Inj., App. Vol. III at 133; Order on Mots. to Dismiss & for J. on Pleadings, App. Vol III at 109 n.26. Not so. Regardless of the First Amendment protection afforded to teachers in their curricular speech, public school students possess an independent First Amendment right to receive information free from ideologically motivated censorship. *See Lamont*, 381 U.S. at 306–07.

To be sure, courts have acknowledged that "[b]y and large, public education in our Nation is committed to the control of state and local authorities." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). But the "state's power to prescribe a curriculum" must still be constitutionally "reasonable[.]" *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923). This is why, for example, the Supreme Court has held that "the First Amendment does not permit the State" to prohibit teaching the theory of evolution "for the sole reason that it is deemed to conflict with a particular religious doctrine" held by those in power. *See Epperson*, 393 U.S. at 103, 106.

Students do not "shed their constitutional rights . . . at the schoolhouse gate[,]" *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), and it

46

follows that students also maintain their First Amendment right to access information at school. Indeed, the Supreme Court has held that restrictions on students' First Amendment rights in the curricular context must be "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273 (recognizing that public students' First Amendment rights extend to articles in a school newspaper). Both the Ninth and Eleventh Circuit Courts of Appeals have applied *Hazelwood* to public school students' First Amendment right to receive curricular information claims. *See Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) (ruling in favor of the students); *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989) (ruling in favor of the school).

In *Arce*, public school students challenged a statute that led to the elimination of a school district's Mexican American Studies program. 793 F.3d at 973. The Ninth Circuit concluded that the students' First Amendment right to receive barred the state from removing "materials otherwise available in a [] classroom unless its actions are reasonably related to legitimate pedagogical concerns." *Id.* at 983. On remand, the District of Arizona ultimately determined that the challenged statute violated students' First Amendment right to receive curricular information. *Gonzalez v. Douglas*, 269 F. Supp. 3d 948 (D. Ariz. 2017). The district court held that the stated goal of "reduc[ing] racism in schools" was "a legitimate pedagogical objective[,]" but concluded that the statute in fact amounted to unconstitutional

curricular censorship "enacted and enforced for narrowly political, partisan, and racist reasons[,]" *id.* at 973, and without "legitimate basis for believing that [the program] was promoting racism such that eliminating it would reduce racism." *Id.* at 974.

In *Virgil*, the Eleventh Circuit applied *Hazelwood* in holding that the First Amendment requires public school officials to advance legitimate pedagogical interests when they remove material from school classrooms. *Virgil*, 862 F.2d at 1521–22. While legitimate pedagogical interests may include ensuring curricular materials are age-appropriate, *id.* at 1522–23, as the court found in that case, mere objections to the ideological or political viewpoint expressed in materials cannot justify their removal.

Running counter to the other federal appellate jurisdictions that have opined on this issue, the Eighth Circuit in *Walls v. Sanders*, 144 F.4th 995 (8th Cir. 2025), recently held that K-12 students lack a First Amendment right to receive information where K-12 teachers lack First Amendment protection for their curricular speech. Plaintiffs believe this case was wrongly decided in several ways, including the court's misreading of *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), holding that the case "lacks any holding as to the First Amendment[.]" *Walls*, 144 F.4th at 1003. However, a majority of Justices on the *Pico* Court agreed that removing materials from school libraries implicates students'

First Amendment rights. In addition to the three-justice majority, Justice Blackmun's partial concurrence noted that the Supreme Court's cases "command" a First Amendment limitation on why government officials may remove a library book. *Pico*, 457 U.S. at 878–79 (Blackmun, J., concurring in part). Likewise, Justice White, in his concurrence with the judgment, thought that the case should be remanded for further fact-finding about the school board's specific reasons—an exercise that would have been pointless if no facts could have established a First Amendment violation. *Id*. at 883–84. And even Justice Rehnquist, joined by Chief Justice Burger and Justice Powell in dissent, "cheerfully concede[d]" that "[o]ur Constitution does not permit the official suppression of ideas[,]" including in schools. *Id*. at 907 (Rehnquist, J., dissenting (quoting plurality op.) (emphasis in original)).

This Court has not yet weighed in on students' right to receive information in public school curriculum under the First Amendment, but it has applied *Hazelwood* to other student First Amendment claims related to curriculum. *See Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 924 (10th Cir. 2002) (student speech as part of a tile project); *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) (student actor in a school play); *Thompson v. Ragland*, 23 F.4th 1252 (10th Cir. 2022) (student course evaluations).

**B. The Act Fails First Amendment Review Under *Hazelwood*.**

Plaintiffs have shown that K-12 educators have removed material from the school curriculum as a result of the Act. Killackey Decl., App. Vol. I at 248–49. The Government does not dispute that the Act requires the removal of curricular material; it is, in fact, the expressed purpose of the law to prohibit teaching some ideas. In considering whether these removals implicated the First Amendment, the district court erroneously declined to analyze whether the State-Defendants' enforcement of the Act advanced any legitimate pedagogical purpose. If this Court, or in the alternative, the district court on remand, applies *Hazelwood* to the situation at hand, Plaintiffs can demonstrate their likelihood of success on the merits.

The district court should have enjoined the Act in its entirety as a violation of K-12 students' right to receive information because it does not advance a legitimate pedagogical interest. The Act requires the removal of specified curriculum to achieve the unconstitutional purpose of viewpoint discrimination. At the time it was passed, legislators made clear that the Act was intended to silence and suppress speech with which they disagreed: precisely the kind of viewpoint discrimination the First Amendment is designed to prevent. Am. Compl., App. Vol. I at 109–14. Legislators explained the Act's purpose was to prohibit discussion of "the theory of

implicit bias,"[8] to stop the use of words like "diversity" instead of "excellence" and "equity" instead of "equality";[9] and to eliminate school trainings that discussed "institutionalized racism," "white supremacy," and "whiteness" as concepts.[10] But the Government may not limit Student-Plaintiffs' access to information simply to pursue "narrowly political" and "partisan" objectives. *Accord Arce*, 793 F.3d at 983 *with Gonzalez*, 269 F. Supp. 3d at 973.

The State's claimed legitimate pedagogical concern is pretext. In their response to Plaintiffs' motion for a preliminary injunction, the State Defendants argued that the intent behind the Act is to stop "invidious discrimination." App. Vol. II at 22. Of course, preventing invidious discrimination can be a legitimate pedagogical interest, but there is no reason to believe that this was actually what motivated the state legislature; indeed, legislators' and other state officials' own words belie this manufactured justification. *See* Am. Compl., App. Vol. I at 109–14. Faced with a similar situation in *Arce/Gonzalez*, the District Court of Arizona on remand held the statute violated students' First Amendment rights because "reducing racism is only a pretextual objective, and that the statute was in fact enacted and

---

[8] Press Release, Bill Prohibiting "Critical Race Theory" Curriculum Passes House, Okla. H.R. (Apr. 29, 2021).

[9] Okla. H.R. 50, 58th Leg. 1st Reg. Sess. (April 29, 2021, 10:42:41 AM) (Rep. West) at 12:35:59–12:36-15 PM.

[10] *Id.* at 12:08:20 PM (Rep. Humphrey); Okla. S. 44, 58th Leg., 1st Reg. Sess. (April 21, 2021, 11:29:19 – 11:29:23 PM) (Sen. Bullard).

enforced for narrowly political, partisan, and racist reasons." *Gonzalez*, 269 F. Supp. 3d at 973; *see also Axson-Flynn*, 356 F.3d at 1292–93 (holding that under *Hazelwood*, this Court "would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was pretextual" (emphasis and citation omitted)).

Even taking the State Defendants' dubious justification at face value, censoring specific topics and political viewpoints within the classroom is not "reasonably related" to that goal. *Hazelwood*, 484 U.S. at 273. Oklahoma schools are already subject to state and federal antidiscrimination laws that are aimed at preventing invidious, disparate treatment of students based on race, gender, and other protected categories without instituting a prophylactic ban on teaching about certain ideas. Excising materials related to race and sex from the curriculum that are meant to enrich students' learning does not reasonably relate to compliance with these existing antidiscrimination measures; it is quite the opposite. In educating future generations, schools should strive to provide more, not less, information, perspectives, and fora for critical discussions about race, identity, and history. *See* AIM Indian Territory Decl., App. Vol. I at 226–30. This notion is a bedrock First Amendment principle, and core to our democratic society, where the answer to an educated, enlightened citizenry lies with the pursuit of more knowledge and exchange of ideas, not a government-prescribed orthodoxy of thought.

**CONCLUSION**

For the reasons explained above, Plaintiffs are entitled to a preliminary injunction blocking the enforcement of the Act in its entirety. Plaintiffs request that this court reverse the district court's partial denial of the motion for a preliminary injunction and grant the full injunction immediately, or in the alternative, remand the case to the district court for reconsideration.

Respectfully submitted,

Megan Lambert
Oklahoma Bar Number: 33216
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org


Maya Brodziak
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
mbrodziak@lawyerscommittee.org

*/s/* Emerson Sykes
Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

Douglas Koff
Julia Beskin
Sara Solfanelli
Kevin Scot Johns
MCDERMOTT WILL & SCHULTE LLP
919 Third Avenue
New York, NY 10022
douglas.koff@srz.com
julia.beskin@srz.com
sara.solfanelli@srz.com
kevin.johns@srz.com

Dated August 27, 2025

*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully request oral argument given the significance of the constitutional issues in this appeal to Plaintiffs and the thousands of teachers, students, parents, and community members in Oklahoma who are adversely affected by the Directive.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2025, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/* Emerson Sykes
Emerson Sykes

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,105 words.

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman style.

*/s/* Emerson Sykes
Emerson Sykes

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made; and (2) any paper copies of this document submitted to the Court are exact copies of the version electronically filed.

*/s/* Emerson Sykes
Emerson Sykes

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

BLACK EMERGENCY RESPONSE   )
TEAM et al.,   )
  )
    Plaintiffs,   )
  )
v.   )  **Case No. CIV-21-1022-G**
  )
GENTNER DRUMMOND, in his official )
capacity as Oklahoma Attorney   )
General, et al.,   )
  )
    Defendants.   )

## ORDER OF PRELIMINARY INJUNCTION

Before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 27) and

Supplements thereto (Doc. Nos. 79, 83, 100, 168, 169),[1] asking the Court to enjoin officials

of the State of Oklahoma and the University of Oklahoma[2] from enforcing Oklahoma

---

[1] Plaintiffs are: Black Emergency Response Team; University of Oklahoma Chapter of the American Association of University Professors; Oklahoma State Conference of the National Association for the Advancement of Colored People; American Indian Movement Indian Territory; Precious Lloyd *ex rel.* S.L.; Anthony Crawford; and Regan Killackey.

[2] Defendants are: Genter Drummond, in his official capacity as Oklahoma Attorney General; Ryan Walters, in his official capacity as Oklahoma Superintendent of Public Education; Zachary Archer, Donald Burdick, Sarah Lepak, Katie Quebedeaux, and Kendra Wesson, in their official capacities as members of the Oklahoma State Board of Education; Kevin Stitt, in his official capacity as Governor of Oklahoma; Jack Sherry, Dennis Casey, Steven Taylor, Courtney Warmington, P. Mitchell Adwon, Jeffrey Hickman, Dustin Hilliary, Ken Levit, and Michael Turpen, in their official capacities as the Oklahoma State Regents for Higher Education (collectively, the "State Defendants"); and John R. "Rick" Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, and Eric Stevenson in their official capacities as members of the Board of Regents of the University of Oklahoma (collectively, the "University Defendants"). All claims against Defendants University of Oklahoma Board of Regents and Independent School District No. 12 of Oklahoma County, Oklahoma, have been dismissed pursuant to a separate order of the Court.

House Bill 1775 ("H.B. 1775" or "the Act") and its implementing regulations. The parties have submitted additional responses and briefing on the Motion. *See* Doc. Nos. 58, 60, 61, 66, 90, 91, 96, 97, 146, 148, 158. In addition, on December 4, 2023, the Court heard argument from counsel. *See* Doc. No. 160.[3]

## I.   BACKGROUND

Governor Kevin Stitt signed Oklahoma House Bill 1775 ("H.B. 1775" or "the Act") into law on May 7, 2021. The Act, codified in title 70, section 24-157 of the Oklahoma Statutes, and its implementing regulations, codified in Oklahoma Administrative Code § 210:10-1-23 (the "Implementing Rules"),[4] prohibit the training or teaching of specified subjects in Oklahoma schools.

With respect to public colleges and universities, the Act directs:

> No enrolled student of an institution of higher education within The Oklahoma State System of Higher Education shall be required to engage in any form of mandatory gender or sexual diversity training or counseling; provided, voluntary counseling shall not be prohibited. Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited.

Okla. Stat. tit. 70, § 24-157(A)(1). The Act directs the Oklahoma State Regents for Higher Education (the "State Regents") to promulgate rules to implement the provisions of section

---

[3] Both Plaintiffs and Defendants declined to present any testimony or evidence beyond the affidavits and documents attached to their various filings.

[4] Unless stated otherwise, references herein to the Act encompass the Implementing Rules, as such rules are authorized in and required by the Act to implement the provisions of the Act. *See* Okla. Stat. tit. 70, § 24-157(A)(2), (B)(2).

24-157(A), but they have not yet done so.  *See id.* § 24-157(A)(2); Univ. Defs.' Mot. to Dismiss (Doc. No. 51) at 19.

With respect to school districts, charter schools, and virtual charter schools (collectively, "K-12 Schools"), the Act directs:

> No teacher, administrator or other employee of a school district, charter school or virtual charter school shall require or make part of a course the following concepts:
>
> a. one race or sex is inherently superior to another race or sex,
>
> b. an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously,
>
> c. an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex,
>
> d. members of one race or sex cannot and should not attempt to treat others without respect to race or sex,
>
> e. an individual's moral character is necessarily determined by his or her race or sex,
>
> f. an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex,
>
> g. any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or
>
> h. meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race.

Okla. Stat. tit. 70, § 24-157(B)(1).  This prohibition is limited by a clause providing that "[t]he provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards."  *Id.* § 24-157(B).  The Oklahoma Academic Standards ("Academic Standards") are educational objectives developed by the State Board of Education and approved by the Oklahoma Legislature reflecting subject matter standards for public school students in Oklahoma.  *See id.* § 11-103.6(A).  Public school

districts are required to develop and implement curriculum based on the Academic Standards. *See id.* The Act's Implementing Rules authorize the State Department of Education to suspend or revoke the license or certificate of K-12 School employees found to have violated the Act. *See* Okla. Admin. Code § 210:10-1-23(j).

## II.   PLAINTIFFS' CLAIMS

Plaintiffs bring suit under 42 U.S.C. § 1983, requesting preliminary and permanent injunctive relief, as well as a declaratory judgment that the Act is unconstitutional facially and as applied under the First and Fourteenth Amendments to the United States Constitution. *See* Am. Compl. (Doc. No. 50) at 76.

Specifically, Plaintiffs contend that:

1. The Act is unconstitutionally vague, facially and as applied by Defendants, in violation of the Fourteenth Amendment;

2. The Act infringes on the right of students to receive information, facially and as applied by Defendants, in violation of the First Amendment;

3. The Act is overbroad and imposes impermissible viewpoint-based restrictions, facially and as applied by Defendants, in violation of the First Amendment; and

4. The Act violates the Equal Protection Clause of the Fourteenth Amendment.

*See id.* ¶¶ 156-189.

III.   ANALYSIS

Federal Rule of Civil Procedure 65 sets forth requirements for a district court to issue a preliminary injunction.  *See* Fed. R. Civ. P. 65(a).  "Because a preliminary injunction is an extraordinary remedy never awarded as of right, the movant must make a clear and unequivocal showing it is entitled to such relief."  *Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021) (citation and internal quotation marks omitted).  As explained by the Tenth Circuit,

> Ordinarily, a movant seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest.

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

"[C]ourts disfavor some preliminary injunctions and so require more of the parties who request them."  *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (internal quotation marks omitted).

> Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial.  Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win.  To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-

merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor.

*Id.* (citations and internal quotation marks omitted).

Here, the Court finds that the preliminary relief sought by Plaintiffs is not a disfavored injunction. First, a preliminary injunction would not disturb the status quo. The status quo is the last "uncontested" and "peaceable" status between the parties "before the dispute developed." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (internal quotation marks omitted). In the context of a newly enacted statute challenged on constitutional grounds, the status quo is the period prior to the statute's enactment. *See BNSF Ry. Co. v. City of Edmond*, No. CIV-19-769-G, 2019 WL 5608680, at *2 n.1 (W.D. Okla. Oct. 30, 2019). Second, injunctive relief would be prohibitory, rather than mandatory, because such relief would not "affirmatively require [Defendants] to act in a particular way." *Schrier*, 427 F.3d at 1261 (internal quotation marks omitted). It instead would only enjoin Defendants from taking action to enforce the Act. Finally, a preliminary injunction would not irreversibly afford Plaintiffs all the relief they could recover at trial, because a prohibition on enforcing the Act could be undone at the conclusion of a determination on the merits. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247-48 (10th Cir. 2001).

### A. *Likelihood of Success on the Merits*

Plaintiffs' request for preliminary injunctive relief relies upon two arguments. First, Plaintiffs contend that the Act is impermissibly vague and thereby violates the Fourteenth Amendment's guarantee of due process. Second, Plaintiffs contend that the Act infringes

upon the First Amendment rights of educators to speak on certain subjects and the corollary right of students to hear that speech.  *See* Pls.' Mot. Prelim. Inj. at 18-28.

### 1.  *Plaintiffs' Fourteenth Amendment Challenge*

A vague law violates the Fourteenth Amendment's guarantee of due process, as citizens are entitled to know what the law is so they can conform their conduct to it.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  And citizens are entitled to laws of sufficient clarity that they leave no room for capricious enforcement by judges, police, or other officials.  *See Sessions v. Dimaya*, 584 U.S. 148, 175 (2018) (Gorsuch, J., concurring in part) (noting that vague laws "can invite the exercise of arbitrary power . . . by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up").  This due process guarantee is compromised when a statute "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement."  *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023) (internal quotation marks omitted).

Courts recognize that "we can never expect mathematical certainty from our language" and, so, some level of inexactness will not offend the guarantee of due process. *Grayned*, 408 U.S. at 110; *see also Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016) (Souter, J.) ("Because words are rough-hewn tools, not surgically precise instruments, some degree of inexactitude is acceptable in statutory language." (alteration, omission, and internal quotation marks omitted)).  "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the

nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Factors considered in "deciding whether a challenged statute provides fair notice" include "the enactment's purpose, the harm it attempts to prevent, whether there is a scienter requirement, and the interpretations of individuals charged with enforcement." *Jordan v. Pugh*, 425 F.3d 820, 825 (10th Cir. 2005).

Importantly here, a law that "threatens to inhibit the exercise of constitutionally protected rights," like the right to free speech, will prompt a "stringent vagueness test." *Vill. of Hoffman Ests.*, 455 U.S. at 499; *see also NAACP v. Button*, 371 U.S. 415, 432 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression."). And, while as a general matter "enactments with civil rather than criminal penalties" have been given "greater tolerance," civil statutes that impose severe penalties— such as "strip[ping] persons of their professional licenses and livelihoods"—may warrant the same high expectation of clarity. *Vill. of Hoffman Ests.*, 455 U.S. at 498-99; *Dimaya*, 584 U.S. at 184-85 (Gorsuch, J., concurring in part).

To properly evaluate the contention that the Act is unconstitutionally vague, the Court must consider the meaning of the challenged provisions of the Act. In construing a state statute, a federal court must remain mindful that "state courts are the final arbiters of state law." *United States v. DeGasso*, 369 F.3d 1139, 1145 (10th Cir. 2004). "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. *Id.* (alteration and internal quotation marks omitted). "[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts and its deterrent effect on legitimate expression is both real

and substantial." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975) (citation omitted).  A federal court, however, is "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (internal quotation marks omitted); *see also Okla. State Conf. of NAACP v. O'Connor*, 569 F. Supp. 3d 1145, 1153 (W.D. Okla. 2021) (declining to "apply[] limitations to the [state] statute that simply do not exist in the text"). Because Oklahoma laws are severable by default, the Court may strike words from the statute to save it.  *See* Okla. Stat. tit. 75, § 11a(1); *Okla. Corr. Pro. Ass'n, Inc. v. Doerflinger*, 468 F. App'x 916, 917 (10th Cir. 2012).  But inserting words in order to achieve a particular construction "would exceed the power and function of the court, and would fail to bind state prosecutors, leaving the citizens of [Oklahoma] vulnerable to prosecutions under the actual language of the statute." *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194-95 (10th Cir. 2000).  Stated differently, the Court "will not rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988).

Because section 24-157(A) and section 24-157(B) impose different restrictions at different educational levels, the Court considers these provisions separately.[5]

### a.  Section 24-157(A)(1): Colleges and Universities

Section 24-157(A)(1) of the Act provides, in relevant part: "No enrolled student . . . . shall be required to engage in any form of mandatory gender or sexual diversity training

---

[5] The Supreme Court has clarified that in a facial challenge for vagueness the plaintiff is not required to show that the challenged statute is vague in all of its applications.  *See*

or counseling . . . . Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited." Okla. Stat. tit. 70, § 24-157(A)(1).

### 1) Prohibition of Mandatory Gender or Sexual Diversity Training and Counseling

As set forth by separate Order, the Court has determined that Plaintiffs lack standing to challenge the first sentence of section 24-157(A)(1), which provides that "gender or sexual diversity training or counseling" must be voluntary rather than mandatory. Plaintiffs' claims challenging this provision have been dismissed without prejudice for lack of subject-matter jurisdiction. Accordingly, no injunctive relief is warranted as to enforcement of the first sentence of section 24-157(A)(1).

### 2) Prohibition of Any Requirement or Orientation That Presents Race or Sex Stereotyping or Bias on the Basis of Race or Sex

Plaintiffs claim that the second sentence of section 24-157(A)(1), which prohibits "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex," is impermissibly vague under the Fourteenth Amendment and, therefore, enforcement of that provision should be enjoined. Defendants respond that the language of section 24-157(A)(1) is sufficiently clear. Because this aspect of the Act

---

*Johnson v. United States*, 576 U.S. 591, 602-03 (2015) (explaining that the Supreme Court's holdings "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp"). Under Tenth Circuit precedent, such a plaintiff "must show, at a minimum, that the challenged law would be vague in the vast majority of its applications; that is, that 'vagueness permeates the text of the law.'" *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (alteration an internal quotation marks omitted).

implicates the First Amendment rights of the university level instructor-Plaintiffs, the Court applies a "stringent vagueness test." *Vill. of Hoffman Estates*, 455 U.S. at 499.

When interpreting a statute, "[i]f the words of the statute have a plain and ordinary meaning, [the Court] appl[ies] the text as written." *Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009); *accord Day v. Great Nw. Ins. Co.*, 623 F. Supp. 3d 1252, 1255 (W.D. Okla. 2022) (citing *Hamilton v. Northfield Ins. Co.*, 473 P.3d 22, 26 (Okla. 2020)).  As discussed in the Court's Order on Defendants' motions to dismiss and for judgment on the pleadings, entered contemporaneously with this Order, the Court construes the principal terms in the second sentence of section 24-157(A)(1) as follows.  Although the Act does not expressly define "orientation," the plain and ordinarily understood meaning of that term is, in this context, a program or course offered by universities and colleges to provide introductory information to new students.[6]  The text of the Act includes no definition or limiting modifier for the term "requirement."  The plain and ordinarily understood meaning of that term encompasses a broad range of activity[7] and would include, in context, everything from the courses demanded by a university for a degree to the assignments and readings demanded by a professor for a course.  The text of the Act also includes no definition or limiting modifier for the term "presents."  The plain and ordinarily

---

[6] *See Oxford English Dictionary*, s.v. "orientation (n.), sense 1.4," *accessible at* https://doi.org/10.1093/OED/5986710372 (2024) ("The process of familiarizing a new or prospective student, recruit, etc., with the content of a course, the basics of a subject, the nature of college life, etc.  Also: a course intended to provide such familiarization.").

[7] *See Oxford English Dictionary*, s.v. "requirement (n.), sense 3.b," *accessible at* https://doi.org/10.1093/OED/9723059198 (2024) ("Something called for or demanded; a condition which must be complied with.").

understood meaning of that term likewise encompasses a broad range of activity[8] and would include, in context, any situation in which race or sex stereotyping or bias is deliberately introduced or otherwise discussed.   Thus, again as discussed in the contemporaneous Order, the Court has concluded that an Oklahoma court would construe section 24-157(A)(1)'s prohibition of "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex" to be a restriction on curricular speech, specifically here the information a university level instructor-Plaintiff teaches in any orientation, required course, or course assignment.

Applying these definitions together, the Court further determines that the second sentence of section 24-157(A)(1) would prohibit a professor from endorsing discriminatory beliefs during an orientation or course.   The ambiguity of the term "presents" means, however, that the provision also could reasonably be construed to mean that a professor is prohibited from describing or identifying discriminatory beliefs in an orientation or course. Likewise, the provision also could reasonably be construed to mean that a professor is prohibited from discussing or assigning the reading of a work in which the author describes or identifies discriminatory beliefs—for example, an analysis of how historic beliefs about race led to the enslavement and subjugation of Black men and women as depicted in Mark

---

[8] *See Oxford English Dictionary*, s.v. "present (v.), sense 1.7.a," *accessible at* https://doi.org/10.1093/OED/5912943123 (2024) ("To make clear to the mind or thought; to convey, suggest, or exhibit to mental perception; to put forward for reflection, consideration, or scrutiny; to set forth, describe.").

Twain's *Huckleberry Finn* or an analysis of how current stereotypes about gender affect the employment opportunities of women.

Implicitly recognizing this ambiguity, Defendants have differing interpretations of how to interpret "requirement" in the second sentence of section 24-157(A)(1). The State Defendants insert the word "similar" to modify "requirement," so as for the prohibition to extend to "orientation[s]" "or similar requirements." State Defs.' Resp. (Doc. No. 61) at 22. The University Defendants merge "requirement" with "orientation" to create a prohibition on "required orientations." Univ. Defs.' Resp. (Doc. No. 58) at 7-8. The Court rejects Defendants' invitation to add limiting modifiers that would implement their preferred interpretations of section 24-157(A)(1), whether it be to recast the statute as applying only to a "required orientation" or to orientations and "similar requirements" that endorse racial or sexual stereotyping or bias. As noted above, a federal court is not empowered to rewrite a state statute in this manner. *See Stenberg*, 530 U.S. at 944; *see also Okla. State Conf. of NAACP*, 569 F. Supp. 3d at 1153.

The Court concludes that Plaintiffs have made a strong showing that section 24-157(A)(1)'s prohibition of "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex," Okla. Stat. tit. 70, § 24-157(A)(1), is so indefinite "that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1038 (10th Cir. 2009) (alteration and internal quotation marks omitted).

### b.  Section 24-157(B)(1): K-12 Schools

Plaintiffs likewise claim that section 24-157(B)(1) is void for vagueness in violation of the Fourteenth Amendment and, therefore, enforcement of that provision should be enjoined.  Defendants respond that the prohibitions of section 24-157(B)(1) are clearly defined.

As set forth by separate Order, the Court has determined that Plaintiffs' assertion of First Amendment protection for the speech regulated by section 24-157(B)(1) is unavailing because state and local authorities are permitted to regulate the curricular speech of K-12 teachers.  While the absence of a free speech interest, and the fact that section 24-157(B)(1) is a civil statute, might suggest that a greater latitude for vagueness should be allowed, the Court is not convinced that is so.  Considering the relevant factors, *see Jordan*, 425 F.3d at 825, what is most notable here is that the Act's Implementing Rules authorize the State Department of Education to suspend or revoke the license or certificate of K-12 School employees found to have violated the Act.  *See* Okla. Admin. Code § 210:10-1-23(j).[9] Given the severity of potential consequences for K-12 teachers upon a violation of section 24-157(B)(1), the Court applies a stringent vagueness test.[10]

---

[9] The Implementing Rules impose a scienter requirement for the revocation of teacher licenses but not for the suspension of teacher licenses.  *Compare* Okla. Admin. Code 210:10-1-23(j)(1) (stating "State Department of Education shall make a determination of whether to initiate proceedings to suspend the license or certificate of any school employee who is found to have violated" section 24-157(B)(1)), *with id.* at 210:10-1-23(j)(2) (stating "State Board of Education shall initiate proceedings to revoke the license or certificate of any school employee for 'willful violation' of" section 24-157(B)(1)).

[10] The Court would reach the same result if a less stringent vagueness test were applied.

*1)  To Require the Prohibited Concepts*

Each prohibition in section 24-157(B)(1) begins with the same introductory verb clause: "No [school personnel] *shall require or make part of a course* the following concepts . . . ."  Okla. Stat. tit. 70, § 24-157(B)(1) (emphasis added).  Plaintiffs criticize this introductory directive as, among other things, lacking clarity as to whether it prohibits personnel from merely addressing the cited concepts.  *See* Pls.' Mot. Prelim. Inj. at 19.

There are two aspects of section 24-157(B)(1)'s introductory verb clause: to "require" a prohibited concept and to "make part of a course" a prohibited concept.  The Court agrees with Defendants that when the phrase "make part of a course" is read in conjunction with the eight prohibited concepts themselves, the plain and ordinarily understood meaning of section 24-157(B)(1) is to prohibit school personnel from directly endorsing, promoting, or inculcating any concept as a normative value.

The same cannot be said of the term "require" as used in section 24-157(B)(1).  As a threshold matter, the phrase presents an illogical mismatch between verb and object.  It would be logical and fall within normal usage to say that a *concept*—that is, an idea or a notion—may be *taught*, or for that matter to say that a *concept* may not be *required*—i.e., ordered or made compulsory—*to be taught.*  But to generally direct that a *concept* may not be *required* opens the statute to a variety of interpretations.

The State Defendants urge the Court to fix this mismatch by interpreting section 24-157(B)(1)'s "require . . . the . . . concepts" to mean that no school personnel shall "teach the specified concepts as being true."  Okla. Stat. tit. 70, § 24-157(B)(1); Tr. Mot. Hr'g 47:14-16 (Doc. No. 162); *see also* State Defs.' Resp. at 24-25.  But, again, a federal court

is not empowered to rewrite a state statute by adding such modifiers.  *See Stenberg*, 530 U.S. at 944; *Okla. State Conf. of NAACP*, 569 F. Supp. 3d at 1153.  Considering the plain text of the statute, and giving each word its ordinary meaning, the Court concludes that Plaintiffs have sufficiently shown that section 24-157(B)(1) is unconstitutionally vague as to the term "require" in the introductory verb clause.

### 2)  To Make the Prohibited Concepts Part of a Course

As to the second aspect of the introductory verb clause, and the eight prohibited concepts in subsections 24-157(B)(1)(a) through (h), the Court finds that the resulting directives are—with two exceptions—sufficiently clear to give ordinary people fair notice of the conduct prohibited thereby and, further, are not so standardless as to invite arbitrary enforcement.  The Court emphasizes that, in so finding, it has construed the directives in subsections 24-157(B)(1)(a) through (h) as narrow in scope in light of both the plain text of the statute itself and the statute's express incorporation of the Academic Standards as a "safe harbor" such that teaching any concepts that "align with" an Academic Standard is permitted under the Act.

> a.  *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . one race or sex is inherently superior to another race or sex . . . ."*

The directive in subsection (a) is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment.  The text prohibits teaching that any single race

is of higher value than another race or that any sex is of higher value than another sex.[11]
Contrary to Plaintiffs' arguments, this provision does not reasonably prohibit teaching
about how mistaken beliefs about the superiority of one race or sex have existed in history,
how such beliefs exist now, or how those beliefs have affected or currently affect the
actions of people or institutions.

> b. *"No [school personnel] shall . . . make part of a course the . .*
> *. concept[]: . . . an individual, by virtue of his or her race or*
> *sex, is inherently racist, sexist or oppressive, whether*
> *consciously or unconsciously . . . ."*

The directive in subsection (b) is likewise sufficiently clear to satisfy the due process
requirement of the Fourteenth Amendment.  The text prohibits teaching that a person,
simply as a result of belonging to any particular race or sex, has the characteristic of being
prejudiced against other persons because of their belonging to a different race or sex, or
the characteristic of keeping others in subjection or hardship because of their belonging to
a different race or sex.[12]  Contrary to Plaintiffs' arguments, this text does not reasonably

---

[11] *See* Oxford English Dictionary, s.v. "superior (adj.), sense II.7.a," *accessible at*
https://doi.org/10.1093/OED/3488245575 (2024) ("Higher in notional or abstract rank, or
in a scale or series; of a higher or better nature or character.").

[12] *See* Oxford English Dictionary, s.v. "racist (adj.)," *accessible at*
https://doi.org/10.1093/OED/1166463562 (2024) ("Prejudiced, antagonistic, or
discriminatory towards a person or people on the basis of their membership of a particular
racial or ethnic group, typically one that is a minority or marginalized; expressing or
characterized by racism."); *id.*, s.v. "sexist (adj.)," *accessible at*
https://doi.org/10.1093/OED/3045936212 (2024) ("Of, relating to, or characteristic of
sexism or sexists; that advocates or practi[c]es sexism, esp. against women."); *id.*, s.v.
"sexism (n.2)," *accessible at* https://doi.org/10.1093/OED/3048626588 (2024)
("[P]rejudice, stereotyping, or discrimination, typically against women, on the basis of
sex"); *id.*, s.v. "oppressive (adj.), sense 2.b," *accessible at*
https://doi.org/10.1093/OED/6548577607 (2024) ("Of a person, social group, government,
etc.: that oppresses (oppress v. 3a); characterized by or disposed to such oppression;

prohibit teaching that an action by a person or an institution is racist or sexist or results in undue oppression, or that inaction by a person or an institution in the face of racism or sexism is itself racist or sexist. And the text does not prohibit teaching that an institution or a policy that contributes to or perpetuates a preference for one race over another is racist, or that an institution or a policy that contributes to or perpetuates a preference for one sex over another is sexist.

> c. *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex . . . ."*
>
> -and-
>
> d. *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . members of one race or sex cannot and should not attempt to treat others without respect to race or sex . . . ."*

The Court will discuss subsections (c) and (d) together. Subsection (c) prohibits making part of a course that it is acceptable for a person to "receive adverse treatment" due to that person's race or sex. Okla. Stat. tit. 70, § 24-157(B)(1)(c). Subsection (d) prohibits making part of a course that it is unacceptable for a person to "attempt to treat others without respect to race or sex." *Id.* § 24-157(B)(1)(d). Thus, the construction of both provisions depends in part on the meaning of the words "treat" and relatedly "treatment."

---

tyrannical."); *id.*, s.v. "oppress (v.), sense 3.a," *accessible at* https://doi.org/10.1093/OED/1037181714 (2024) ("To keep (a person or group of people, esp. a minority or other subordinate group) in subjection and hardship by the unjust exercise of authority, power, or strength; to exploit; to tyrannize over.").

The term "treat" is not defined in the Act and the use of that term has not been addressed by any Oklahoma court, either as to the Act generally or as to subsections (c) and (d) specifically.  As used, "treat" is not subject to any modifier beyond subsection (c)'s—but not subsection (d)'s—specification that the treatment be "adverse."

Mindful of a federal court's limited capacity in construing a state statute, the Court must evaluate subsections (c) and (d) based on the ordinary meaning of the word "treat," which is expansive in scope.[13]  The prohibitions in these subsections are not limited to the subjects of employment and admissions; indeed, the plain language of the prohibitions extends across every social, political, historical, and religious context.  Accordingly, the text of subsection (c) would prohibit teaching that it is ever proper to draw distinctions based on race or sex if they favor one group over another.  So, subsection (c) would prohibit a teacher from endorsing widely rejected ideas (e.g., that it is acceptable to restrict access to public accommodations based on race), which appears likely to have been the intended result.  But subsection (c) would also—on its face—prohibit a teacher from making part of a course ideas that are subjects of current political debate (e.g., whether it is permissible to consider race or sex in college admissions or through an affirmative action hiring plan) or ideas that are accepted by a significant number of people and are reflected in current law (e.g., that men but not women should be subject to military conscription).  In some instances, that type of broad scope might be merely broad and not also ambiguous, but here

---

[13] *See* Oxford English Dictionary, s.v. "treat (v.), sense 7.a," *accessible at* https://doi.org/10.1093/OED/5300748815 (2024) ("To deal with, behave or act towards (a person, animal, etc.) in some specified way; to 'use' (well, ill, properly, reverently, etc.).").

the totality of the Act reflects that these provisions are simply unclear.  Considering the relevant factors, the Court finds that there is a strong likelihood that Plaintiffs will be able to show that the text of subsection (c) does not provide fair notice to school administrators and teachers as to what is prohibited by that subsection and what is not and, therefore, that subsection (c) is impermissibly vague in violation of the Fourteenth Amendment.  *See Jordan*, 425 F.3d at 825.

Subsection (d) suffers from similar ambiguity.  The wording of this prohibition is cumbersome.  *Cf. Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1182 (N.D. Fla. 2022) (describing such a directive as "a rarely seen triple negative, resulting in a cacophony of confusion"), *aff'd sub nom. Honeyfund.com Inc. v. Governor, State of Fla.*, 94 F.4th 1272 (11th Cir. 2024).  The text of subsection (d) would prohibit teaching that it is impossible or undesirable to "treat" a person of one race in the same way as a person of another race, or to "treat" a person of one sex in the same way as a person of another sex.  And so, like subsection (c), subsection (d) extends across various contexts and would prohibit making as part of a course the proposition that it is proper in any circumstance to draw distinctions based on race or sex.  The statute would appear to prohibit a teacher from endorsing widely rejected ideas (e.g., teaching that children *should* be judged by the color of their skin and *not* the content of their character), endorsing ideas that are subjects of current political debate (e.g., that facially neutral policies may, due to historical racial or sexual discrimination, result in disparate impact among races or sexes), and endorsing ideas that are widely accepted and are reflected in current law (e.g., that separate sports divisions may be established for boys and girls).  Again, upon considering the relevant factors, the

Court finds that there is a strong likelihood that Plaintiffs will be able to show that the text of subsection (d) does not provide fair notice to school administrators and teachers as to what is prohibited by that subsection and what is not and, therefore, that subsection (d) is impermissibly vague in violation of the Fourteenth Amendment. *See Jordan*, 425 F.3d at 825.

At this preliminary stage, the Court finds that subsections (c) and (d) of section 24-157(B)(1) are unconstitutionally vague because their scope is so indefinite "that persons of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *Kleinsmith*, 571 F.3d at 1038 (alteration and internal quotation marks omitted).

> e.   *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . an individual's moral character is necessarily determined by his or her race or sex . . . ."*

The directive in subsection (e) is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment. The text prohibits teaching that a person is of a certain moral character due to the person's race or sex.[14] As with subsection (b), the text does not prohibit teaching that a particular action by a person or institution—including a failure to recognize racism or sexism and to act to rectify it—is morally wrong.

> f.   *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . an individual, by virtue of his or her race or*

---

[14] *See* Oxford English Dictionary, s.v. "character (n.), sense II.9.a," *accessible at* https://doi.org/10.1093/OED/4055170406 (2024) ("The sum of the moral and mental qualities which distinguish an individual or a people, viewed as a homogeneous whole; a person's or group's individuality deriving from environment, culture, experience, etc.; mental or moral constitution, personality.").

> *sex, bears responsibility for actions committed in the past by other members of the same race or sex . . . ."*

The directive in subsection (f) is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment. The text prohibits teaching that a person is responsible for the past actions of another person simply because they share a common race or sex. *See* Okla. Stat. tit. 70, § 24-157(B)(1)(f). Contrary to Plaintiffs' arguments, the text does not prohibit teaching about historical or current events in which members of one race or sex acted criminally, maliciously, or discriminatorily toward members of another race or sex. Nor does it reasonably preclude teaching that past actions of racism or sexism have resulted in present advantages for members of a certain race or sex or have resulted in present disadvantages for members of a certain race or sex.

> g. *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex . . . ."*

The directive in subsection (g) is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment. The text prohibits making part of a course the concept that a person should feel discomfort, guilt, anguish, or distress because of the person's race or sex.[15] As with subsection (f), the text of subsection (g) does not prohibit teaching about historical or current events in which members of one race or sex acted

---

[15] *See* Oxford English Dictionary, s.v. "'on account of' in account (n.), sense P.1.d.iii.i," *accessible at* https://doi.org/10.1093/OED/1255070184 (2024) ("For the sake of, in consideration of; by reason of, because of.").

criminally, maliciously, or discriminatorily—or that past actions of racism or sexism have resulted in present advantages or disadvantages for members of a certain race or sex.

Notably, contrary to Plaintiffs' concerns, the text of subsection (g) does not prohibit the teaching of subjects involving race or sex merely because they might cause a student to feel discomfort or distress. Take as an example a student who is discomfited upon learning about a historical event in which persons of her race harmed persons of another race. That student's reaction to the facts of the event would not, absent more, mean that a teacher impermissibly taught that the student "*should* feel discomfort . . . *on account of* . . . her race." *Id.* § 24-157(B)(1)(g) (emphasis added). Any reaction by the student would instead be due to historical fact: e.g., the cruelty of the acts at issue and the harm that was experienced because of those acts. In other words, while a teacher may and should teach about events that make students uncomfortable, such coursework is distinct from teaching students that their race or sex should *itself* be a cause for discomfort or shame. The Court construes the text of subsection (g) as prohibiting the latter conduct, not the former.

> h. *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race."*

The directive in subsection (h) prohibits teaching that a meritocratic system or characteristics such as a strong work ethic are in and of themselves racist or sexist or were devised to keep members of another race or sex in subjection or hardship.[16] Whatever

---

[16] *See* Oxford English Dictionary, s.v. "oppress (v.), sense 3.a," *accessible at* https://doi.org/10.1093/OED/1037181714 (2024) ("To keep (a person or group of people,

might be said about the necessity of this prohibition, the Court finds that the text is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment.

*i.   The Oklahoma Academic Standards as a Safe Harbor*

Further, the safe harbor of the Academic Standards limits the scope of each of the directives set forth above, expressly protecting the teaching of "concepts that align to" listed topics that include, and reasonably require discussion of, past and present race and sex discrimination.   *See id.* § 24-157(B) (prescribing that "[t]he provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards").  These subjects include historical events and ideas: slavery in America and its political and economic consequences;[17] the ratification of the Constitution and the founders' treatment of enslaved persons and all women;[18] the colonization of tribal lands and the United States' subsequent interactions with American Indians,[19] including policies of conquest and forcible removal of tribes and attempted assimilation;[20] the women's suffrage movement;[21] the role of slavery "as the principal cause of increased sectional

---

esp. a minority or other subordinate group) in subjection and hardship by the unjust exercise of authority, power, or strength; to exploit; to tyrannize over.").

[17] *See 2019 Oklahoma Academic Standards for Social Studies* at 5.1.5, 5.2.8, 5.4.2, 8.3.3, 8.9, WH.2.4, *available at* https://sde.ok.gov/oklahoma-academic-standards (last updated Oct. 11, 2023).

[18] *See id.* at 8.3.3, 8.12.2.

[19] *See id.* at 3.2.2, 3.3.8, 4.3.1, 5.2.6, 8.3.4, 8.8.4, OKH.2.3, OKH.2.4, OKH.3.1.

[20] *See id.* at 3.2.2, 3.3.8, 8.4.2, 8.7.3, 8.12.5, OKH.2.3, OKH.2.4, OKH.3, OKH.5.1, USH.1.3.

[21] *See id.* at 8.2.2, 8.9.5, USH.2.1, USH.2.3.

polarization leading to the Civil War";[22] the Reconstruction Era and adoption of the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution;[23] civil rights struggles in America, including Black Codes and Jim Crow Laws;[24] the founding of Oklahoma and the effect of federal policies on American Indians during early statehood;[25] the disenfranchisement of minorities and racial tensions in twentieth-century America (expressly including the "Tulsa Race Riot"[26] and the internment of Japanese-Americans during World War II[27]);[28] and the "major events, personalities, tactics[,] and effects of the Civil Rights Movement."[29]   The protected topics also include the effects of past bias and discrimination on current behavior[30] and "ongoing issues including immigration, criminal justice reform, employment, environmental issues, race relations, civic engagement, and education."[31]

These standards largely if not entirely embrace the topics identified by Plaintiffs as potentially affected by subsections (a), (b), (e), (f), (g), and (h) of the Act.  As to subsections

---

[22] *Id.* at 8.10, 8.11.

[23] *See id.* at 8.12.

[24] *See id.* at 8.9.3, 8.12.2, 8.12.3, 8.12.4, USH.1.2.

[25] *See id.* at OKH.4, OKH.5.1.

[26] *See id.* at OKH.5.2, USH.4.1.

[27] *See id.* at USH.5.1.

[28] *See id.* at USH.2.1.G, USH.4.1.B.

[29] *Id.* at OKH.6.1, USH.7.1.

[30] *See id.* at PS.7.2 ("Explain how bias, discrimination and use of stereotypes influence behavior with regard to gender, race, sexual orientation and ethnicity . . . .").

[31] *Id.* at OKH.6.9; *see also id.* at OKH.6.5, USH.7.2, USH.9.3.

(c) and (d) of the Act, however, the Court finds that even the broad reach of the Academic Standards does not fully mitigate the vagueness of those directives. The broad scope of the terms "treat" and "treatment" in subsections (c) and (d) implicates concepts beyond those listed in, or that reasonably "align to," the Academic Standards.

### c. Conclusion

The Court's role here is not to assess whether the Act is needed or wise but to evaluate whether its language is so vague that the Act "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *StreetMediaGroup*, 79 F.4th at 1253 (internal quotation marks omitted). As set forth above, the Court finds that Plaintiffs have established a substantial likelihood of success on the merits insofar as (1) their claim that section 24-157(A)(1)'s prohibition of "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex" is impermissibly vague in violation of the Fourteenth Amendment; and (2) their claim that section 24-157(B)(1) is impermissibly vague in violation of the Fourteenth Amendment, as to the use of the introductory verb clause term "require," and with respect to subsections (c) and (d) in their entirety. Okla. Stat. tit. 70, § 24-157(A)(1), (B)(1).[32]

---

[32]Although the Act lacks a severability clause, Oklahoma law presumes statutes are severable absent a finding that the valid provisions "are so essentially and inseparably connected with" the void provisions that "the court cannot presume the Legislature would have enacted the remaining valid provisions without the void one[s]" or that the remaining valid provisions "standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." Okla. Stat. tit. 75, § 11a(1). The Court finds that

### 2. *Plaintiffs' First Amendment Challenge*

Plaintiffs also contend that a preliminary injunction should issue because the Act infringes upon the rights of educators to teach certain information and the corollary right of students to hear that information.  *See* Pls.' Mot. Prelim. Inj. at 22-28.

With respect to section 24-157(A)(1) of the Act, which applies to public universities and colleges, the Court has determined—as set forth by separate Order—that Plaintiffs lack standing to challenge the first sentence of that provision, and—as set forth above—that Plaintiffs have made a strong showing that the second sentence of that provision is unconstitutionally vague.  Therefore, the Court need not reach Plaintiffs' First Amendment challenge to section 24-157(A)(1).

With respect to section 24-157(B)(1) of the Act, which restricts what K-12 School personnel in Oklahoma may make part of a course, the Court has determined—as set forth by separate Order—that Plaintiffs' claims based on the First Amendment should be dismissed because Plaintiffs have not shown that section 24-157(B)(1) infringes on their First Amendment rights.   Therefore, no injunction would be appropriate based on Plaintiffs' claims challenging section 24-157(B)(1) as violative of the First Amendment.

---

excising the second sentence from section 24-157(A)(1), "require or" from section 24-157(B)(1), and subsections (c) and (d) of section 24-157(B)(1) in their entirety, does not impair the validity of the remainder of those sections or preclude a presumption that the Legislature would have enacted the remaining provisions without those terms.

## B.  Irreparable Harm

 "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."  *Dominion Video Satellite*, 269 F.3d at 1156.  "Any deprivation of any constitutional right fits that bill."  *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019).  Because Plaintiffs have made a strong showing of likelihood of success on the merits of their Fourteenth Amendment claims to the extent set forth above, "no further showing of irreparable injury" is required.  *Id.* at 805.

## C.  Balance of Equities and the Public Interest

The third and fourth preliminary injunction standards—whether "the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction" and whether "the injunction would not be adverse to the public interest," *Dominion Video Satellite*, 269 F.3d at 1154—merge when, as here, the government is opposing the preliminary injunction.  *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  The State Defendants contend that a preliminary injunction would deprive Oklahomans of a law prescribing a public education "crafted out of the state's democratic process and policy judgments."  State Defs.' Resp. at 30.  But the State has no legitimate interest in enforcing a law determined to be unconstitutionally vague.  *See Free the Nipple-Fort Collins*, 916 F.3d at 807 ("[I]t's always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks omitted)); *Planned Parenthood of Ark. & E. Okla. v. Cline*, 910 F. Supp. 2d 1300, 1308 (W.D. Okla. 2012) ("The public has an interest in constitutional rights being upheld and in

unconstitutional decisions by the government being remedied."). These considerations weigh in favor of imposition of an injunction.

*D. Security*

Although no party has addressed the provision of a bond, Federal Rule of Civil Procedure 65(c) requires the giving of security as a condition precedent to the granting of a preliminary injunction. "However, the Court has discretion to require only a nominal bond, or no bond at all," where, as here, "issues of overriding public concern or important federal rights are involved." *Entm't Merchants Ass'n v. Henry*, No. CIV-06-675-C, 2006 WL 2927884, at \*4 (W.D. Okla. Oct. 11, 2006) (citing *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964)). Defendants will suffer no financial harm from an imposition of preliminary injunctive relief. The security requirement of Rule 65(c) shall be waived.

CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (Doc. No. 27) is GRANTED IN PART and DENIED IN PART, as follows:

Defendants herein, their officers, agents, servants, employees, and attorneys, and persons who are in active concert or participation with those individuals, are hereby ENJOINED from enforcing, until such time as a final decision is issued on the merits of this case:

- the provision: "Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex is prohibited." Okla. Stat. tit. 70, § 24-157(A)(1);

- the word "require" in the introductory verb clause in title 70, section 24-157(B)(1) of the Oklahoma Statutes;

- subsections (c) and (d) of title 70, section 24-157(B)(1) of the Oklahoma Statutes, in their entireties; or

- the Implementing Rules, to the extent they are inconsistent with this Order.

IT IS SO ORDERED this 14th day of June, 2024.

CHARLES B. GOODWIN
United States District Judge