Nos. 24-6139, 24-6141

# In the United States Court of Appeals for the Tenth Circuit

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

AMERICAN INDIAN MOVEMENT INDIAN TERRITORY,

PRECIOUS LLOYD, as next friend of S.L.,

ANTHONY CRAWFORD, and

REGAN KILLACKEY,

*Plaintiffs-Appellants/Cross-Appellees,*

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of the State of Oklahoma,

RYAN WALTERS, in his official capacity as Oklahoma Superintendent of Public Instruction,

CHRIS VAN DEHENDE, SARAH LEPAK, MIKE TINNEY, ZACHARY ARCHER, RYAN DEATHERAGE, BECKY CARSON, in their official capacities as members of the Oklahoma State Board of Education,

KEVIN STITT, in his official capacity as Governor of Oklahoma,

*Defendants-Appellees/Cross-Appellants.*

On Appeal from the U.S. District Court for the Western District of Oklahoma, No. 21-cv-1022-G, Honorable Charles Goodwin, District Judge

**PLAINTIFFS-APPELLANTS' APPENDIX – VOLUME I of III**

*(Counsel listed on next page)*

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

Megan Lambert
Oklahoma Bar Number: 33216
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Dariely Rodriguez
Maya Brodziak
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
drodriguez@lawyerscommittee.org
mbrodziak@lawyerscommittee.org

Douglas Koff
Julia Beskin
Sara Solfanelli
Kevin Scot Johns
MCDERMOTT WILL & SCHULTE LLP
919 Third Avenue
New York, NY 10022
douglas.koff@srz.com
julia.beskin@srz.com
sara.solfanelli@srz.com
kevin.johns@srz.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS


Document ........................................ Page

District Court Docket Sheet........................................................1

Amended Complaint (ECF 50)........................................................57

Exhibit 1, Edmond Public Schools Written H.B. 1775 Guidance (ECF 50-1)........................................................136

Exhibit 2, Edmond Public Schools H.B. 1775 Slides (ECF 50-2)..........139

Motion for a Preliminary Injunction & Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction (ECF 27)....................142

Exhibit 1, Text of H.B. 1775 (ECF 27-1)........................................179

Exhibit 2, H.B. 1775 Emergency Rules (ECF 27-2)............................184

Exhibit 3, Declaration of the Black Emergency Response Team (ECF 27-3)........................................................191

Exhibit 4, Declaration of the University of Oklahoma Chapter of American Association of University Professors (ECF 27-4)........................................................199

Exhibit 5, Declaration of Anthony R. Douglas, the Oklahoma State Conference of the National Association for the Advancement of Colored People (ECF 27-5)........................................211

Exhibit 6, Declaration of Mary Topaum, on behalf of the American Indian Movement Indian Territory Chapter (ECF 27-6)..............223

Exhibit 7, Declaration of S.L. (ECF 27-7)....................................232

Exhibit 8, Declaration of Anthony Crawford (ECF 27-8)....................238

Exhibit 9, Declaration of Regan Killackey (ECF 27-9)........................245

Exhibit 10, Declaration of Marvin Lynn, Ph.D (ECF 27-10)................252

Query Reports Utilities Help Log Out

APPEAL

# U.S. District Court
# Western District of Oklahoma[LIVE] (Oklahoma City)
# CIVIL DOCKET FOR CASE #: 5:21-cv-01022-G

Black Emergency Response Team et al v. OConnor et al
Assigned to: Judge Charles Goodwin
Case in other court: Tenth Circuit, 24-06139
Tenth Circuit, 24-06140
Tenth Circuit, 24-06141
Cause: 42:1983 Civil Rights Act

Date Filed: 10/19/2021
Jury Demand: None
Nature of Suit: 448 Civil Rights: Education
Jurisdiction: Federal Question

**Plaintiff**

**Black Emergency Response Team** represented by

**Megan E Lambert**
ACLU of Oklahoma Foundation
PO Box 13327
Oklahoma City, OK 73113
405-525-3831
Email: mlambert@acluok.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Hines**
ACLU of Oklahoma Foundation
PO Box 13327
Oklahoma City, OK 73113
580-786-8773
Email: ahines@acluok.org
*ATTORNEY TO BE NOTICED*

**Adam Kimelman**
Schulte Roth & Zabel LLP
919 3rd Ave
New York, NY 10022
845-978-2277
Email: adam.kimelman@srz.com
*ATTORNEY TO BE NOTICED*

**Amir A Shakoorian Tabrizi**
Schulte Roth & Zabel LLP
901 Fifteenth Street, NW
Suite 800
Washington, DC 20005
212-756-2000
Email: amir.shakooriantabrizi@srz.com
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**David Hinojosa**
National Center for Youth Law
Litigation
818 Connecticut Ave. NW
Ste 426
Washington, DC 20006
202-223-0724
Fax: 510-835-8099
Email: dhinojosa@youthlaw.org
*TERMINATED: 08/16/2024*
*ATTORNEY TO BE NOTICED*

**Douglas Koff**
Schulte Roth & Zabel LLP
919 3rd Ave
New York, NY 10022
212-756-2000
Email: Douglas.Koff@srz.com
*ATTORNEY TO BE NOTICED*

**Elahe Hosseini**
Schulte Roth & Zabel LLP
919 3rd Ave
New York, NY 10022
212-756-2000
Email: elahe.hosseini@srz.com
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth V Curran**
Freshfields US LLP
3 World Trade Center
175 Greenwich Street
Ste 51st Fl
New York, NY 10007
212-277-4000
Email: Elizabeth.Curran@srz.com
*TERMINATED: 10/11/2023*
*ATTORNEY TO BE NOTICED*

**Emerson Sykes**
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
646-885-8331
Email: ESykes@aclu.org
*ATTORNEY TO BE NOTICED*

**Gary Stein**
Schulte Roth & Zabel LLP
919 3rd Ave
New York, NY 10022
212-756-2000
Email: gary.stein@srz.com

*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
Lawyers Committee for Civil Rights Under Law
1500 K Street, NW
Ste 900
Washington, DC 20005
202-662-8326
Email: gbonadies@lawyerscommittee.org
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Johanna F Roberts**
Norman Wohlgemuth
401 S. Boston Ave.
Suite 3200
Tulsa, OK 74103
918-697-2202
Email: hroberts@nwlawok.com
*TERMINATED: 03/14/2023*
*ATTORNEY TO BE NOTICED*

**Julia Beskin**
Schulte Roth & Zabel LLP
919 3rd Ave
New York, NY 10022
212-756-2000
Email: Julia.Beskin@srz.com
*ATTORNEY TO BE NOTICED*

**Kevin S. Johns**
Schulte Roth & Zabel LLP
919 3rd Ave
New York, NY 10022
212-756-2262
Email: kevin.johns@srz.com
*ATTORNEY TO BE NOTICED*

**Leah Watson**
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
212-519-7855
Email: lwatson@aclu.org
*ATTORNEY TO BE NOTICED*

**Maya Brodziak**
Lawyers' Committee for Civil Rights Under Law
1500 K St NW
Suite 900
Washington, DC 20005

202-662-8339
Email: mbrodziak@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

**Michael G. Cutini**
Schulte Roth & Zabel LLP
919 3rd Ave
New York, NY 10022
212-756-2000
Email: michael.cutini@srz.com
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Ramya A Sundaram**
Schulte Roth & Zabel LLP
919 3rd Ave
New York, NY 10022
212-756-2000
Email: ramya.sundaram@srz.com
*TERMINATED: 01/16/2024*
*ATTORNEY TO BE NOTICED*

**Sara Solfanelli**
Schulte Roth & Zabel LLP
919 3rd Ave
New York, NY 10022
212-756-2000
Email: sara.solfanelli@srz.com
*ATTORNEY TO BE NOTICED*

**Sarah A Hinger**
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
212-519-7882
Email: shinger@aclu.org
*ATTORNEY TO BE NOTICED*

**Sumayya Saleh**
Lawyers' Committee for Civil Rights Under Law
1500 K St NW
Suite 900
Washington, DC 20005
813-351-9423
Email: ssaleh@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

**Taylor A. Dumpson-Lippincott**
Lawyers' Committee for Civil Rights Under Law
1500 K St NW
Suite 900
Washington, DC 20005

443-944-6250
Email: officialtaylordumpson@gmail.com
*TERMINATED: 09/26/2023*
*ATTORNEY TO BE NOTICED*

**Zakiya Shani Lewis**
Lawyers' Committee for Civil Rights Under Law
1500 K St NW
Suite 900
Washington, DC 20005
202-662-8348
Email: zlewis@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**University of Oklahoma Chapter of the American Association of University Professors**

represented by

**Megan E Lambert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Hines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam Kimelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amir A Shakoorian Tabrizi**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**David Hinojosa**
(See above for address)
*TERMINATED: 08/16/2024*
*ATTORNEY TO BE NOTICED*

**Douglas Koff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elahe Hosseini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth V Curran**
(See above for address)
*TERMINATED: 10/11/2023*
*ATTORNEY TO BE NOTICED*

**Emerson Sykes**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Gary Stein**
(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Johanna F Roberts**
(See above for address)
*TERMINATED: 03/14/2023*
*ATTORNEY TO BE NOTICED*

**Julia Beskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin S. Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maya Brodziak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael G. Cutini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Ramya A Sundaram**
(See above for address)
*TERMINATED: 01/16/2024*
*ATTORNEY TO BE NOTICED*

**Sara Solfanelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah A Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sumayya Saleh**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Taylor A. Dumpson-Lippincott**
(See above for address)
*TERMINATED: 09/26/2023*
*ATTORNEY TO BE NOTICED*

**Zakiya Shani Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Oklahoma State Conference of the National Association for the Advancement of Colored People**

represented by

**Megan E Lambert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Hines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam Kimelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amir A Shakoorian Tabrizi**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**David Hinojosa**
(See above for address)
*TERMINATED: 08/16/2024*
*ATTORNEY TO BE NOTICED*

**Douglas Koff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elahe Hosseini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth V Curran**
(See above for address)
*TERMINATED: 10/11/2023*
*ATTORNEY TO BE NOTICED*

**Emerson Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gary Stein**

(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Johanna F Roberts**
(See above for address)
*TERMINATED: 03/14/2023*
*ATTORNEY TO BE NOTICED*

**Julia Beskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin S. Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maya Brodziak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael G. Cutini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Ramya A Sundaram**
(See above for address)
*TERMINATED: 01/16/2024*
*ATTORNEY TO BE NOTICED*

**Sara Solfanelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah A Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sumayya Saleh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Taylor A. Dumpson-Lippincott**
(See above for address)

*TERMINATED: 09/26/2023*
*ATTORNEY TO BE NOTICED*

**Zakiya Shani Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Indian Movement Indian Territory** represented by

**Megan E Lambert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Hines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam Kimelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amir A Shakoorian Tabrizi**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**David Hinojosa**
(See above for address)
*TERMINATED: 08/16/2024*
*ATTORNEY TO BE NOTICED*

**Douglas Koff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elahe Hosseini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth V Curran**
(See above for address)
*TERMINATED: 10/11/2023*
*ATTORNEY TO BE NOTICED*

**Emerson Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gary Stein**
(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Johanna F Roberts**
(See above for address)
*TERMINATED: 03/14/2023*
*ATTORNEY TO BE NOTICED*

**Julia Beskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin S. Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maya Brodziak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael G. Cutini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Ramya A Sundaram**
(See above for address)
*TERMINATED: 01/16/2024*
*ATTORNEY TO BE NOTICED*

**Sara Solfanelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah A Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sumayya Saleh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Taylor A. Dumpson-Lippincott**
(See above for address)
*TERMINATED: 09/26/2023*
*ATTORNEY TO BE NOTICED*

**Zakiya Shani Lewis**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Precious Lloyd**
*as next friend of S.L.*

represented by

**Megan E Lambert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Hines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam Kimelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amir A Shakoorian Tabrizi**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**David Hinojosa**
(See above for address)
*TERMINATED: 08/16/2024*
*ATTORNEY TO BE NOTICED*

**Douglas Koff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elahe Hosseini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth V Curran**
(See above for address)
*TERMINATED: 10/11/2023*
*ATTORNEY TO BE NOTICED*

**Emerson Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gary Stein**
(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Johanna F Roberts**
(See above for address)
*TERMINATED: 03/14/2023*
*ATTORNEY TO BE NOTICED*

**Julia Beskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin S. Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maya Brodziak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael G. Cutini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Ramya A Sundaram**
(See above for address)
*TERMINATED: 01/16/2024*
*ATTORNEY TO BE NOTICED*

**Sara Solfanelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah A Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sumayya Saleh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Taylor A. Dumpson-Lippincott**
(See above for address)
*TERMINATED: 09/26/2023*
*ATTORNEY TO BE NOTICED*

**Zakiya Shani Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anthony Crawford** represented by **Megan E Lambert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Hines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam Kimelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amir A Shakoorian Tabrizi**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**David Hinojosa**
(See above for address)
*TERMINATED: 08/16/2024*
*ATTORNEY TO BE NOTICED*

**Douglas Koff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elahe Hosseini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth V Curran**
(See above for address)
*TERMINATED: 10/11/2023*
*ATTORNEY TO BE NOTICED*

**Emerson Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gary Stein**
(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna F Roberts**
(See above for address)
*TERMINATED: 03/14/2023*
*ATTORNEY TO BE NOTICED*

**Julia Beskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin S. Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maya Brodziak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael G. Cutini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Ramya A Sundaram**
(See above for address)
*TERMINATED: 01/16/2024*
*ATTORNEY TO BE NOTICED*

**Sara Solfanelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah A Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sumayya Saleh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Taylor A. Dumpson-Lippincott**
(See above for address)
*TERMINATED: 09/26/2023*
*ATTORNEY TO BE NOTICED*

**Zakiya Shani Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Regan Killackey** represented by **Megan E Lambert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Hines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam Kimelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amir A Shakoorian Tabrizi**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**David Hinojosa**
(See above for address)
*TERMINATED: 08/16/2024*
*ATTORNEY TO BE NOTICED*

**Douglas Koff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elahe Hosseini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth V Curran**
(See above for address)
*TERMINATED: 10/11/2023*
*ATTORNEY TO BE NOTICED*

**Emerson Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gary Stein**
(See above for address)
*TERMINATED: 07/24/2023*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna F Roberts**
(See above for address)
*TERMINATED: 03/14/2023*
*ATTORNEY TO BE NOTICED*

**Julia Beskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin S. Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maya Brodziak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael G. Cutini**
(See above for address)
*TERMINATED: 04/05/2023*
*ATTORNEY TO BE NOTICED*

**Ramya A Sundaram**
(See above for address)
*TERMINATED: 01/16/2024*
*ATTORNEY TO BE NOTICED*

**Sara Solfanelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah A Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sumayya Saleh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Taylor A. Dumpson-Lippincott**
(See above for address)
*TERMINATED: 09/26/2023*
*ATTORNEY TO BE NOTICED*

**Zakiya Shani Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Gentner Drummond**
*in his official capacity as Oklahoma Attorney General*

represented by **Andy N Ferguson**
1304 Swan Lake Road
Edmond, OK 73003
405-698-0263
Email: Andy@ANFLegal.com
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
405-521-3921
Email: ellen.carr@oag.ok.gov
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
Drummond Law PLLC
1500 S Utica Ave
Suite 400
Tulsa, OK 74104
918-749-7378
Fax: 918-749-7869
Email: gmg@drumlaw.com
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
University of Oklahoma Office of Legal Counsel
660 Parrington Oval
Suite 213
Norman, OK 73019
405-325-4124
Fax: 405-325-7681
Email: tsikpa@ou.edu

**William Patrick Flanagan**
Oklahoma Office of Attorney General
313 NE 21st Street
Oklahoma City
Oklahoma City, OK 73105
405-521-3921
Email: william.flanagan@oag.ok.gov
*ATTORNEY TO BE NOTICED*

**Zachary P West**
Attorney General's Ofc-NE 21STREET-OKC
313 NE 21st St
Oklahoma City, OK 73105
405-521-3021
Fax: 405-521-4518
Email: zach.west@oag.ok.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ryan Walters**
*in his official capacity as Oklahoma*

represented by **Andy N Ferguson**
(See above for address)

*Superintendent of Public Instruction*

*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Donald Burdick** represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Marla Hill**<br>*TERMINATED: 06/14/2024* | represented by | **Andy N Ferguson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Garry M Gaskins , II**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Megan E Lambert**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**William Patrick Flanagan**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Zachary P West**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Sarah Lepak** | represented by | **Andy N Ferguson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Ellen Carr**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Garry M Gaskins , II**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Megan E Lambert**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Tina Sharell Ikpa**<br>(See above for address)<br><br>**William Patrick Flanagan**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Zachary P West**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Suzanne Reynolds**<br>*TERMINATED: 06/14/2024* | represented by | **Andy N Ferguson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Garry M Gaskins , II** |

(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kendra Wesson** represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Trent Smith**
*in their official capacities as members of the Oklahoma State Board of Education*
*TERMINATED: 06/14/2024*
represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Patrick Flanagan**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kevin Stitt**
*in his official capacity as Governor of Oklahoma*

represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jeffrey Hickman**

represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Turpen** represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steven Taylor** represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dennis Casey** represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dustin Hilliary** represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ann Holloway**
*TERMINATED: 06/14/2024*

represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**P Mitchell Adwon, Jr**
*in their official capacities as members of the Oklahoma State Board of Education*

represented by **Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jack Sherry** represented by

**Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Courtney Warmington**
*in their official capacities as the Oklahoma State Regents for Higher Education* represented by

**Andy N Ferguson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**

(See above for address)

**William Patrick Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Robert Ross** represented by **C.B. Moore**
University of Oklahoma
Office of Legal Counsel
660 Parrington Oval
Ste 213
Norman, OK 73019
405-325-4124
Fax: 405-325-7681
Email: cbmoore@ou.edu
*ATTORNEY TO BE NOTICED*

**M Daniel Weitman**
University of Oklahoma Office of Legal Counsel
660 Parrington Oval
Suite 213
Norman, OK 73019
405-325-4124
Fax: 405-325-7681
Email: dan.weitman@ou.edu
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Frank Keating**
*TERMINATED: 06/18/2024* represented by **M Daniel Weitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rick Braught**
*TERMINATED: 03/19/2024*

represented by **M Daniel Weitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Natalie Shirley**

represented by **C.B. Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**M Daniel Weitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eric Stevenson**

represented by **C.B. Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**M Daniel Weitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Anita Holloway** represented by **C.B. Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**M Daniel Weitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rick Nagel**
*in their official capacities as members of the Board of Regents of the University of Oklahoma*
represented by **C.B. Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**M Daniel Weitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Angela Grunewald**<br>*in her official capacity as the Superintendent of Edmond Public Schools*<br>*TERMINATED: 08/24/2022* | represented by | **F Andrew Fugitt**<br>The Center for Education Law<br>900 N Broadway Ave<br>Suite 300<br>Oklahoma City, OK 73102<br>405-528-2800<br>Fax: 405-528-5800<br>Email: afugitt@cfel.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Justin C Cliburn**<br>The Center for Education Law<br>900 N Broadway Ave<br>Suite 300<br>Oklahoma City, OK 73102<br>405-528-2800<br>Fax: 405-528-5800<br>Email: jcliburn@cfel.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Megan E Lambert**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Zachary P West**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Jamie Underwood**<br>*TERMINATED: 08/24/2022* | represented by | **F Andrew Fugitt**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Justin C Cliburn**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Megan E Lambert**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Zachary P West**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Cynthia Benson**<br>*TERMINATED: 08/24/2022* | represented by | **F Andrew Fugitt**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Justin C Cliburn**<br>(See above for address) |

*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen Duncan**
*TERMINATED: 08/24/2022*

represented by

**F Andrew Fugitt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin C Cliburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lee Ann Kuhlman**
*in their official capacities as members of the Board of Education of Edmond Public Schools*
*TERMINATED: 08/24/2022*

represented by

**F Andrew Fugitt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin C Cliburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Zachary P West**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Independent School District No 12 of Oklahoma County Oklahoma**
*also known as*
Edmond Public Schools

represented by

**F Andrew Fugitt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin C Cliburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Katie Quebedeaux**
*in their official capacities as members of the Oklahoma State Board of Education*

represented by **Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**Defendant**

**William Flanagan**
*TERMINATED: 03/14/2023*

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Carlisha Bradley**
*TERMINATED: 03/14/2023*

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jennifer Monies**
*TERMINATED: 03/14/2023*

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Estela Hernandez**
*TERMINATED: 03/14/2023*

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brian Bobek**
*TERMINATED: 03/14/2023*

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jay Helm**
*TERMINATED: 03/14/2023*

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph Parker, Jr**
*TERMINATED: 06/14/2024*

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Cawley**
*TERMINATED: 06/18/2024*

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Phil Albert**
*TERMINATED: 06/18/2024*

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**University of Oklahoma Board of Regents**

represented by **Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Zachary Archer**

represented by **Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ken Levit**

represented by **Ellen Carr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry M Gaskins , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John R Braught**

represented by **C.B. Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**M Daniel Weitman**
(See above for address)

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

**Defendant**

**Kenneth S Waits** represented by **C.B. Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**M Daniel Weitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan E Lambert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Sharell Ikpa**
(See above for address)

| Date Filed | # | Docket Text |
|---|---|---|
| 10/19/2021 | 1 | COMPLAINT against All Defendants filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Guidance from Edmond Written, # 2 Exhibit 2 - ELA 12 Align. re 1775, # 3 Civil Cover Sheet)(jjs) (Entered: 10/19/2021) |
| 10/19/2021 | 2 | ENTRY of Appearance by Megan E Lambert on behalf of All Plaintiffs (Lambert, Megan) (Entered: 10/19/2021) |
| 10/19/2021 | 3 | Summons Issued Electronically as to All Defendants. (jjs) . (Entered: 10/19/2021) |
| 10/19/2021 | | PAYMENT FOR A CIVIL CASE Filing fee $ 402, receipt number AOKWDC-3782948. (Lambert, Megan) (Entered: 10/19/2021) |
| 10/20/2021 | 4 | MOTION for Leave to Appear Pro Hac Vice *Emerson Sykes* Filing fee $ 50, receipt number AOKWDC-3783810 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 5 | MOTION for Leave to Appear Pro Hac Vice *Sarah Hinger* Filing fee $ 50, receipt number AOKWDC-3783824 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 6 | MOTION for Leave to Appear Pro Hac Vice *Leah Watson* Filing fee $ 50, receipt number AOKWDC-3783839 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application) (Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 7 | MOTION for Leave to Appear Pro Hac Vice *Genevieve Bonadies Torres* Filing fee $ 50, receipt number AOKWDC-3783845 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 8 | MOTION for Leave to Appear Pro Hac Vice *David Hinojosa* Filing fee $ 50, receipt number AOKWDC-3783861 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV |

| | | |
|---|---|---|
| | | Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 9 | MOTION for Leave to Appear Pro Hac Vice *Gary Stein* Filing fee $ 50, receipt number AOKWDC-3783869 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 10 | MOTION for Leave to Appear Pro Hac Vice *Michael Cutini* Filing fee $ 50, receipt number AOKWDC-3783876 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 11 | MOTION for Leave to Appear Pro Hac Vice *Sara Solfanelli* Filing fee $ 50, receipt number AOKWDC-3783880 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 12 | MOTION for Leave to Appear Pro Hac Vice *Elahe Hosseini* Filing fee $ 50, receipt number AOKWDC-3783884 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 13 | MOTION for Leave to Appear Pro Hac Vice *Amir Shakoorian* Filing fee $ 50, receipt number AOKWDC-3783891 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/20/2021 | 14 | MOTION for Leave to Appear Pro Hac Vice *Ramya Sundaram* Filing fee $ 50, receipt number AOKWDC-3783895 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 10/20/2021) |
| 10/21/2021 | 15 | ORDER granting 9 Motion to Appear Pro Hac Vice and permitting attorney Gary Stein to appear as counsel of record in this matter for Plaintiffs, subject to attorney Gary Stein filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 16 | ORDER granting 5 Motion to Appear Pro Hac Vice and permitting attorney Sarah Hinger to appear as counsel of record in this matter for Plaintiffs, subject to attorney Sarah Hinger filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 17 | ORDER granting 10 Motion to Appear Pro Hac Vice and permitting attorney Michael Cutini to appear as counsel of record in this matter for Plaintiffs, subject to attorney Michael Cutini filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 18 | ORDER granting 7 Motion to Appear Pro Hac Vice and permitting attorney Genevieve Bonadies Torres to appear as counsel of record in this matter for Plaintiffs, subject to attorney Genevieve Bonadies Torres filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 19 | ORDER granting 6 Motion to Appear Pro Hac Vice and permitting attorney Leah Watson to appear as counsel of record in this matter for Plaintiffs, subject to attorney Leah Watson filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 20 | ORDER granting 14 Motion to Appear Pro Hac Vice and permitting attorney Ramya Sundaram to appear as counsel of record in this matter for Plaintiffs, subject to attorney Ramya Sundaram filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on |

| | | |
|---|---|---|
| | | the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 21 | ORDER granting 4 Motion to Appear Pro Hac Vice and permitting attorney Emerson Sykes to appear as counsel of record in this matter for Plaintiffs, subject to attorney Emerson Sykes filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 22 | ORDER granting 11 Motion to Appear Pro Hac Vice and permitting attorney Sara Solfanelli to appear as counsel of record in this matter for Plaintiffs, subject to attorney Sara Solfanelli filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 23 | ORDER granting 13 Motion to Appear Pro Hac Vice and permitting attorney Amir Shakoorian Tabrizi to appear as counsel of record in this matter for Plaintiffs, subject to attorney Amir Shakoorian Tabrizi filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 24 | ORDER granting 12 Motion to Appear Pro Hac Vice and permitting attorney Elahe Hosseini to appear as counsel of record in this matter for Plaintiffs, subject to attorney Elahe Hosseini filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/21/2021 | 25 | ORDER granting 8 Motion to Appear Pro Hac Vice and permitting attorney David Hinojosa to appear as counsel of record in this matter for Plaintiffs, subject to attorney David Hinojosa filing an entry of appearance, see LCvR 83.4, by November 4, 2021 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/21/2021. (jb) (Entered: 10/21/2021) |
| 10/26/2021 | 26 | SUMMONS Returned Executed by American Indian Movement Indian Territory, Black Emergency Response Team, Anthony Crawford, Regan Killackey, University of Oklahoma Chapter of the American Association of University Professors, Precious Lloyd, Oklahoma State Conference of the National Association for the Advancement of Colored People. All Defendants. (Lambert, Megan) (Entered: 10/26/2021) |
| 10/29/2021 | 27 | MOTION for Preliminary Injunction by All Plaintiffs. (Attachments: # 1 Exhibit 1 - H.B. 1775, # 2 Exhibit 2 - HB 1775 Emergency Rules, # 3 Exhibit 3 - BERT Declaration, # 4 Exhibit 4 - OU-AAUP Declaration, # 5 Exhibit 5 - NAACP-Oklahoma Declaration, # 6 Exhibit 6 - AIM Indian Territory Declaration, # 7 Exhibit 7 - S.L. Declaration, # 8 Exhibit 8 - Anthony Crawford Declaration, # 9 Exhibit 9 - Regan Killackey Declaration, # 10 Exhibit 10 - Dr. Marvin Lynn Declaration)(Lambert, Megan) (Entered: 10/29/2021) |
| 11/03/2021 | 28 | ENTRY of Appearance by Gary Stein on behalf of Black Emergency Response Team (Stein, Gary) (Entered: 11/03/2021) |
| 11/03/2021 | 29 | ENTRY of Appearance by Michael G Cutini on behalf of Black Emergency Response Team (Cutini, Michael) (Entered: 11/03/2021) |
| 11/03/2021 | 30 | ENTRY of Appearance by Gary Stein on behalf of All Plaintiffs (Stein, Gary) (Entered: 11/03/2021) |
| 11/03/2021 | 31 | ENTRY of Appearance by Michael G. Cutini on behalf of All Plaintiffs (Cutini, Michael) (Entered: 11/03/2021) |

| | | |
|---|---|---|
| 11/03/2021 | 32 | ENTRY of Appearance by Sara Solfanelli on behalf of All Plaintiffs (Solfanelli, Sara) (Entered: 11/03/2021) |
| 11/03/2021 | 33 | ENTRY of Appearance by Ramya A Sundaram on behalf of All Plaintiffs (Sundaram, Ramya) (Entered: 11/03/2021) |
| 11/03/2021 | 34 | ENTRY of Appearance by Elahe Hosseini on behalf of All Plaintiffs (Hosseini, Elahe) (Entered: 11/03/2021) |
| 11/03/2021 | 35 | ENTRY of Appearance by Amir A Shakoorian Tabrizi on behalf of All Plaintiffs (Shakoorian Tabrizi, Amir) (Entered: 11/03/2021) |
| 11/03/2021 | 36 | ENTRY of Appearance by Genevieve Bonadies Torres on behalf of All Plaintiffs (Torres, Genevieve) (Entered: 11/03/2021) |
| 11/04/2021 | 37 | ENTRY of Appearance by Leah Watson on behalf of All Plaintiffs (Watson, Leah) (Entered: 11/04/2021) |
| 11/04/2021 | 38 | ENTRY of Appearance by Sarah A Hinger on behalf of All Plaintiffs (Hinger, Sarah) (Entered: 11/04/2021) |
| 11/04/2021 | 39 | ENTRY of Appearance by Genevieve Bonadies Torres on behalf of All Plaintiffs (Torres, Genevieve) (Entered: 11/04/2021) |
| 11/04/2021 | 40 | ENTRY of Appearance by Emerson Sykes on behalf of All Plaintiffs (Sykes, Emerson) (Entered: 11/04/2021) |
| 11/08/2021 | 41 | RETURN OF SERVICE - NON SUMMONS for Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction, including attachments Exhibits #1 to 10 (Exhibit #1 - H.B. 1775, Exhibit #2 - HB 1775 Emergency Rules, Exhibit #3 - BERT Declaration, Exhibit #4 - OU-AAUP Declaration, Exhibit #5 - NAACP-Oklahoma Declaration, Exhibit #6 - AIM Indian Territory Declaration, Exhibit #7 - S.L. Declaration, Exhibit #8 - Anthony Crawford Declaration, Exhibit #9 - Regan Killackey Declaration, Exhibit #10 - Dr. Marvin Lynn Declaration) by American Indian Movement Indian Territory, Black Emergency Response Team, Anthony Crawford, Regan Killackey, Precious Lloyd, Oklahoma State Conference of the National Association for the Advancement of Colored People, University of Oklahoma Chapter of the American Association of University Professors (Sykes, Emerson) (Entered: 11/08/2021) |
| 11/08/2021 | 42 | ENTRY of Appearance by M Daniel Weitman on behalf of Phil Albert, Michael Cawley, Anita Holloway, Frank Keating, Rick Nagel, Natalie Shirley, Eric Stevenson (Weitman, M) (Entered: 11/08/2021) |
| 11/08/2021 | 43 | ENTRY of Appearance by Tina S Ikpa on behalf of Phil Albert, Michael Cawley, Anita Holloway, Frank Keating, Rick Nagel, Natalie Shirley, Eric Stevenson (Ikpa, Tina) (Entered: 11/08/2021) |
| 11/09/2021 | 44 | ENTRY of Appearance by F Andrew Fugitt on behalf of Cynthia Benson, Kathleen Duncan, Angela Grunewald, Lee Ann Kuhlman, Jamie Underwood (Fugitt, F) (Entered: 11/09/2021) |
| 11/09/2021 | 45 | ENTRY of Appearance by Justin C Cliburn on behalf of Cynthia Benson, Kathleen Duncan, Angela Grunewald, Lee Ann Kuhlman, Jamie Underwood (Cliburn, Justin) (Entered: 11/09/2021) |
| 11/09/2021 | 46 | ENTRY of Appearance by Zachary P West on behalf of Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack |

| | | |
|---|---|---|
| | | Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington (West, Zachary) (Entered: 11/09/2021) |
| 11/09/2021 | 47 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 27 MOTION for Preliminary Injunction by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (West, Zachary) (Entered: 11/09/2021) |
| 11/09/2021 | 48 | ENTRY of Appearance by Andy N Ferguson on behalf of Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington (Ferguson, Andy) (Entered: 11/09/2021) |
| 11/09/2021 | 49 | ORDER granting 47 UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 27 MOTION for Preliminary Injunction. Defendants shall file their response on or before December 10, 2021. Signed by Judge Charles Goodwin on 11/09/2021. (jb) (Entered: 11/09/2021) |
| 11/09/2021 | 50 | AMENDED COMPLAINT against All Defendants filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Guidance from Edmond Written, # 2 Exhibit 2 - ELA 12 Align. re 1775) (Lambert, Megan) (Entered: 11/09/2021) |
| 11/23/2021 | 51 | MOTION to Dismiss by Phil Albert, Michael Cawley, Anita Holloway, Frank Keating, Rick Nagel, Natalie Shirley, Eric Stevenson. (Attachments: # 1 Exhibit HB 1775) (Weitman, M) (Entered: 11/23/2021) |
| 11/23/2021 | 52 | MOTION to Dismiss *Amended Complaint* by Cynthia Benson, Kathleen Duncan, Angela Grunewald, Lee Ann Kuhlman, Jamie Underwood. (Cliburn, Justin) (Entered: 11/23/2021) |
| 11/23/2021 | 53 | ANSWER to 50 Amended Complaint by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington.(Ferguson, Andy) (Entered: 11/23/2021) |
| 12/06/2021 | 54 | UNOPPOSED MOTION for Extension of Time by All Plaintiffs. (Lambert, Megan) (Entered: 12/06/2021) |
| 12/07/2021 | 55 | ORDER granting 54 Motion for Extension of Time. Plaintiffs shall file their response briefs on or before January 13, 2022. Signed by Judge Charles Goodwin on 12/07/2021. (jb) (Entered: 12/07/2021) |
| 12/08/2021 | 56 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 27 MOTION for Preliminary Injunction by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (West, Zachary) (Entered: 12/08/2021) |
| 12/09/2021 | 57 | ORDER granting 56 UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 27 MOTION for Preliminary Injunction . Defendants shall file their response on or before December 16, 2021. Signed by Judge Charles Goodwin on 12/09/2021. (jb) (Entered: 12/09/2021) |
| 12/16/2021 | 58 | RESPONSE in Opposition re 27 MOTION for Preliminary Injunction filed by Phil Albert, Michael Cawley, Anita Holloway, Frank Keating, Rick Nagel, Natalie Shirley, |

| | | |
|---|---|---|
| | | Eric Stevenson. (Weitman, M) (Entered: 12/16/2021) |
| 12/16/2021 | 59 | MOTION to Strike *Affidavits* by Phil Albert, Michael Cawley, Anita Holloway, Frank Keating, Rick Nagel, Natalie Shirley, Eric Stevenson. (Ikpa, Tina) (Entered: 12/16/2021) |
| 12/16/2021 | 60 | RESPONSE to Motion re 27 MOTION for Preliminary Injunction filed by Cynthia Benson, Kathleen Duncan, Angela Grunewald, Lee Ann Kuhlman, Jamie Underwood. (Attachments: # 1 Exhibit Ex. 1-Aff. of Emily Steele, # 2 Exhibit Ex. 2-Aff. of Jacqueline Rasnic)(Cliburn, Justin) (Entered: 12/16/2021) |
| 12/16/2021 | 61 | RESPONSE in Opposition re 27 MOTION for Preliminary Injunction filed by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (Attachments: # 1 Exhibit 1- Ark AG Op, # 2 Exhibit 2- Mont AG Op, # 3 Exhibit 3- Taylor Affidavit, # 4 Exhibit 4- Barresi Affidavit, # 5 Exhibit 5- HB 1775 Vote Record, # 6 Exhibit 6- Jones Affidavit, # 7 Exhibit 7- NEA Guide)(Ferguson, Andy) (Entered: 12/16/2021) |
| 12/20/2021 | 62 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 59 MOTION to Strike *Affidavits*, 61 Response in Opposition to Motion,, 58 Response in Opposition to Motion, 60 Response to Motion, by All Plaintiffs. (Lambert, Megan) (Entered: 12/20/2021) |
| 12/21/2021 | 63 | ORDER granting 62 UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 59 MOTION to Strike *Affidavits*, 61 Response in Opposition to Motion,, 58 Response in Opposition to Motion, 60 Response to Motion, . Plaintiffs shall file their replies in support of their motion for preliminary injunction (Doc. No. 27 ) and their response in opposition to the motion to strike (Doc. No. 59 ) on or before January 13, 2022. Signed by Judge Charles Goodwin on 12/21/2021. (jb) (Entered: 12/21/2021) |
| 01/12/2022 | 64 | UNOPPOSED MOTION for Leave to File Excess Pages by All Plaintiffs. (Lambert, Megan) (Entered: 01/12/2022) |
| 01/12/2022 | 65 | ORDER granting 64 Motion for Leave to File Excess Pages. Plaintiffs may file a combined reply brief in support of their Motion for Preliminary Injunction of 25 pages or less. Signed by Judge Charles Goodwin on 01/12/2022. (jb) (Entered: 01/12/2022) |
| 01/13/2022 | 66 | REPLY to Response to Motion re 27 MOTION for Preliminary Injunction filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Second BERT Declaration, # 2 Exhibit 2 - John Doe Declaration, # 3 Exhibit 3 - EPS English 2019 Curriculum)(Lambert, Megan) (Entered: 01/13/2022) |
| 01/13/2022 | 67 | RESPONSE in Opposition re 51 MOTION to Dismiss *by Phil Albert, Michael Cawley, Anita Holloway, Frank Keating, Rick Nagel, Natalie Shirley, and Eric Stevenson* filed by All Plaintiffs. (Lambert, Megan) (Entered: 01/13/2022) |
| 01/13/2022 | 68 | RESPONSE in Opposition re 52 MOTION to Dismiss *Amended Complaint Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, and Courtney Warmington* filed by All Plaintiffs. (Lambert, Megan) (Entered: 01/13/2022) |
| 01/13/2022 | 69 | RESPONSE in Opposition re 59 MOTION to Strike *Affidavits by Phil Albert, Michael Cawley, Anita Holloway, Frank Keating, Rick Nagel, Natalie Shirley, and Eric Stevenson* filed by All Plaintiffs. (Lambert, Megan) (Entered: 01/13/2022) |

| | | |
|---|---|---|
| 01/19/2022 | 70 | ORDER. A status conference will be held in this matter on January 25, 2022, at 02:00 p.m. Signed by Judge Charles Goodwin on 01/19/2022. (jb) (Entered: 01/19/2022) |
| 01/20/2022 | 71 | REPLY to Response to Motion re 51 MOTION to Dismiss filed by Phil Albert, Michael Cawley, Anita Holloway, Frank Keating, Rick Nagel, Natalie Shirley, Eric Stevenson. (Weitman, M) (Entered: 01/20/2022) |
| 01/20/2022 | 72 | MOTION to Strike 66 Reply to Response to Motion, *New Evidence* by All Defendants. (West, Zachary) (Entered: 01/20/2022) |
| 01/20/2022 | 73 | REPLY to Response to Motion re 52 MOTION to Dismiss *Amended Complaint* filed by Cynthia Benson, Kathleen Duncan, Angela Grunewald, Lee Ann Kuhlman, Jamie Underwood. (Cliburn, Justin) (Entered: 01/20/2022) |
| 02/01/2022 | 74 | RESPONSE to Motion re 72 MOTION to Strike 66 Reply to Response to Motion, *New Evidence* filed by All Plaintiffs. (Lambert, Megan) (Entered: 02/01/2022) |
| 02/02/2022 | 75 | NOTICE (other) by All Plaintiffs *of State Board of Education Rulemaking Process* (Lambert, Megan) (Entered: 02/02/2022) |
| 03/08/2022 | 76 | JOINT MOTION to Substitute Party by All Plaintiffs. (Lambert, Megan) (Entered: 03/08/2022) |
| 08/08/2022 | 77 | MOTION for Leave *to File Supplemental Papers* by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Plaintiffs' Proposed Supplemental Submission, # 2 Exhibit 1a - OSDE Letter, # 3 Exhibit 1b - Aug. 6, 2022 Tulsa World Article, # 4 Exhibit 1c Tulsa Public Schools Letter)(Lambert, Megan) (Entered: 08/08/2022) |
| 08/16/2022 | 78 | ENTRY of Appearance by Johanna F Roberts on behalf of All Plaintiffs (Roberts, Johanna) (Entered: 08/16/2022) |
| 08/24/2022 | 79 | NOTICE (other) by All Plaintiffs re 27 MOTION for Preliminary Injunction *of Supplemental Authority* (Attachments: # 1 Exhibit 1 - Honeyfund PI Order)(Lambert, Megan) (Entered: 08/24/2022) |
| 08/24/2022 | 80 | ORDER granting 76 Motion to Substitute Party as set forth herein. Counsel for Independent School District No. 12, Oklahoma County, Oklahoma shall enter their appearances within 10 days from the date of this Order. Signed by Judge Charles Goodwin on 08/24/2022. (jb) (Entered: 08/24/2022) |
| 08/24/2022 | 81 | ORDER granting 77 Motion for Leave. Plaintiffs may file the Supplemental Submission attached to their Motion as Exhibit 1 (Doc. No. 77-1) and the exhibits thereto (Doc. Nos. 77-1, 77-2, 77-3) on or before August 26, 2022. In addition, Defendants may file a supplemental response limited to the new information and argument raised in Plaintiffs' Supplemental Submission on or before September 2, 2022. Signed by Judge Charles Goodwin on 08/24/2022. (jb) (Entered: 08/24/2022) |
| 08/25/2022 | 82 | ENTRY of Appearance by Justin C Cliburn on behalf of Independent School District No 12 of Oklahoma County Oklahoma (Cliburn, Justin) (Entered: 08/25/2022) |
| 08/25/2022 | 83 | SUPPLEMENT re 27 MOTION for Preliminary Injunction by All Plaintiffs. (Attachments: # 1 Exhibit 1 - OSDE Letter, # 2 Exhibit 2 - Aug. 6, 2022 Tulsa World Article, # 3 Exhibit 3 - TPS Letter)(Lambert, Megan) (Entered: 08/25/2022) |
| 08/25/2022 | 84 | ENTRY of Appearance by F Andrew Fugitt on behalf of Independent School District No 12 of Oklahoma County Oklahoma (Fugitt, F) (Entered: 08/25/2022) |
| 09/01/2022 | 85 | MOTION for Extension of Time to File Response/Reply as to 83 Supplement by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph |

| | | |
|---|---|---|
| | | Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (West, Zachary) (Entered: 09/01/2022) |
| 09/01/2022 | 86 | ORDER granting 85 MOTION for Extension of Time to File Response/Reply as to 83 Supplement . Defendants 1-18 may file their response on or before September 7, 2022. Signed by Judge Charles Goodwin on 09/01/2022. (jb) (Entered: 09/01/2022) |
| 09/06/2022 | 87 | MOTION for Leave to Appear Pro Hac Vice *for Taylor Dumpson* Filing fee $ 50, receipt number AOKWDC-3985813 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Dumpson PHV)(Lambert, Megan) (Entered: 09/06/2022) |
| 09/07/2022 | 88 | MOTION to Seal *Exhibit* by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (West, Zachary) (Entered: 09/07/2022) |
| 09/07/2022 | 89 | ORDER granting 88 Motion to Seal. Signed by Judge Charles Goodwin on 09/07/2022. (jb) (Entered: 09/07/2022) |
| 09/07/2022 | 90 | RESPONSE re 83 Supplement filed by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (Attachments: # 1 Mustange Privilege Walk)(West, Zachary) (Entered: 09/07/2022) |
| 09/07/2022 | 91 | SEALED EXHIBIT by Defendants Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington Re: 83 Supplement (West, Zachary) (Entered: 09/07/2022) |
| 09/08/2022 | 92 | ORDER granting 87 Motion to Appear Pro Hac Vice. On or before September 21, 2022, Attorney Taylor Alexis Dumpson shall electronically file an entry of appearance on the form prescribed by the Clerk of Court. Signed by Judge Charles Goodwin on 09/08/2022. (jb) (Entered: 09/08/2022) |
| 09/12/2022 | 93 | ENTRY of Appearance by Taylor Alexis Dumpson on behalf of All Plaintiffs (Dumpson, Taylor) (Entered: 09/12/2022) |
| 09/14/2022 | 94 | MOTION to Seal *Exhibit* by All Plaintiffs. (Lambert, Megan) (Entered: 09/14/2022) |
| 09/14/2022 | 95 | ORDER granting 94 Motion to Seal. Plaintiffs may file Exhibit A to their reply submission under seal. Signed by Judge Charles Goodwin on 09/14/2022. (jb) (Entered: 09/14/2022) |
| 09/14/2022 | 96 | REPLY by Plaintiffs American Indian Movement Indian Territory, Black Emergency Response Team, Anthony Crawford, Regan Killackey, Precious Lloyd, Oklahoma State Conference of the National Association for the Advancement of Colored People, University of Oklahoma Chapter of the American Association of University Professors re 83 Supplement filed by All Plaintiffs. (Attachments: # 1 Exhibit 2 - Teacher Statement) (Lambert, Megan) (Entered: 09/14/2022) |
| 09/14/2022 | 97 | SEALED EXHIBIT by Plaintiffs American Indian Movement Indian Territory, Black Emergency Response Team, Anthony Crawford, Regan Killackey, Precious Lloyd, Oklahoma State Conference of the National Association for the Advancement of Colored People, University of Oklahoma Chapter of the American Association of University Professors Re: 96 Reply, (Lambert, Megan) (Entered: 09/14/2022) |

| | | |
|---|---|---|
| 09/21/2022 | 98 | MOTION for Leave *to File a Surreply* by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (West, Zachary) (Entered: 09/21/2022) |
| 09/21/2022 | 99 | MOTION for Leave *to File a Surreply* by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (Attachments: # 1 Attachment Defendants' Surreply)(West, Zachary) (Entered: 09/21/2022) |
| 11/21/2022 | 100 | NOTICE (other) by All Plaintiffs re 27 MOTION for Preliminary Injunction *of Supplemental Authority* (Attachments: # 1 Exhibit 1 - Pernell PI Order)(Lambert, Megan) (Entered: 11/21/2022) |
| 12/06/2022 | 101 | ENTRY of Appearance by William P Flanagan on behalf of Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington (Flanagan, William) (Entered: 12/06/2022) |
| 01/04/2023 | 102 | MOTION for Leave *to Conduct Limited Discovery* by All Plaintiffs. (Lambert, Megan) (Entered: 01/04/2023) |
| 01/11/2023 | 103 | MOTION to Withdraw as Attorney by All Plaintiffs. (Roberts, Johanna) (Entered: 01/11/2023) |
| 01/25/2023 | 104 | NOTICE (other) by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington (Flanagan, William) (Entered: 01/25/2023) |
| 01/25/2023 | 105 | ENTRY of Appearance by Garry M Gaskins, II on behalf of Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington (Gaskins, Garry) (Entered: 01/25/2023) |
| 01/25/2023 | 106 | MOTION for Judgment on the Pleadings by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (Flanagan, William) (Entered: 01/25/2023) |
| 01/25/2023 | 107 | RESPONSE to Motion re 102 MOTION for Leave *to Conduct Limited Discovery* filed by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (Flanagan, William) (Entered: 01/25/2023) |
| 02/01/2023 | 108 | REPLY to Response to Motion re 102 MOTION for Leave *to Conduct Limited Discovery* filed by All Plaintiffs. (Lambert, Megan) (Entered: 02/01/2023) |
| 02/08/2023 | 109 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 106 MOTION for Judgment on the Pleadings by All Plaintiffs. (Lambert, Megan) (Entered: 02/08/2023) |

| | | |
|---|---|---|
| 02/24/2023 | 110 | RESPONSE to Motion re 106 MOTION for Judgment on the Pleadings filed by All Plaintiffs. (Lambert, Megan) (Entered: 02/24/2023) |
| 02/28/2023 | 111 | MOTION for Leave to Appear Pro Hac Vice *for Kevin Scot Johns* Filing fee $ 50, receipt number AOKWDC-4101236 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 02/28/2023) |
| 03/03/2023 | 112 | REPLY to Response to Motion re 106 MOTION for Judgment on the Pleadings filed by Brian Bobek, Carlisha Bradley, Dennis Casey, William Flanagan, Jay Helm, Estela Hernandez, Jeffrey Hickman, Joy Hofmeister, Ann Holloway, Jennifer Monies, John OConnor, Joseph Parker, Jr, Jack Sherry, Trent Smith, Kevin Stitt, Steven Taylor, Michael Turpen, Courtney Warmington. (Flanagan, William) (Entered: 03/03/2023) |
| 03/07/2023 | 113 | MOTION for Leave to Appear Pro Hac Vice *for Elizabeth Curran* Filing fee $ 50, receipt number AOKWDC-4107244 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 03/07/2023) |
| 03/14/2023 | 114 | ORDER granting 103 Motion to Withdraw as Attorney. Attorney Johanna F Roberts terminated. Signed by Judge Charles Goodwin on 03/14/2023. (jb) (Entered: 03/14/2023) |
| 03/14/2023 | 115 | ORDER granting 113 Motion to Appear Pro Hac Vice, subject to attorney Curran filing an entry of appearance, see LCvR 83.4, by March 27, 2023 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 03/14/2023. (jb) (Entered: 03/14/2023) |
| 03/14/2023 | 116 | ORDER granting 111 Motion to Appear Pro Hac Vice, subject to attorney Johns filing an entry of appearance, see LCvR 83.4, by March 27, 2023 on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 03/14/2023. (jb) (Entered: 03/14/2023) |
| 03/14/2023 | 117 | ORDER. The Defendants herein are hereby automatically substituted pursuant to Federal Rule of Civil Procedure 25(d). Signed by Judge Charles Goodwin on 03/14/2023. (jb) (Entered: 03/14/2023) |
| 03/23/2023 | 118 | ENTRY of Appearance by Elizabeth V Curran on behalf of All Plaintiffs (Curran, Elizabeth) (Entered: 03/23/2023) |
| 03/23/2023 | 119 | ENTRY of Appearance by Kevin S. Johns on behalf of All Plaintiffs (Johns, Kevin) (Entered: 03/23/2023) |
| 03/30/2023 | 120 | MOTION to Withdraw as Attorney *for Amir Shakoorian* by All Plaintiffs. (Lambert, Megan) (Entered: 03/30/2023) |
| 03/30/2023 | 121 | MOTION to Withdraw as Attorney *for Michael Cutini* by All Plaintiffs. (Lambert, Megan) (Entered: 03/30/2023) |
| 03/30/2023 | 122 | MOTION to Withdraw as Attorney *for Elahe Hosseini* by All Plaintiffs. (Lambert, Megan) (Entered: 03/30/2023) |
| 04/05/2023 | 123 | ORDER granting 122 Motion to Withdraw as Attorney. Attorney Elahe Hosseini terminated. Signed by Judge Charles Goodwin on 04/05/2023. (jb) (Entered: 04/05/2023) |
| 04/05/2023 | 124 | ORDER granting 121 Motion to Withdraw as Attorney. Attorney Michael G. Cutini terminated. Signed by Judge Charles Goodwin on 04/05/2023. (jb) (Entered: 04/05/2023) |
| 04/05/2023 | 125 | ORDER granting 120 Motion to Withdraw as Attorney. Attorney Amir A Shakoorian Tabrizi terminated. Signed by Judge Charles Goodwin on 04/05/2023. (jb) (Entered: 04/05/2023) |

| | | |
|---|---|---|
| 07/06/2023 | 126 | MOTION to Withdraw *Genevieve Bonadies Torres* by All Plaintiffs. (Torres, Genevieve) (Entered: 07/06/2023) |
| 07/06/2023 | 127 | MOTION to Withdraw as Attorney *for Gary Stein* by All Plaintiffs. (Lambert, Megan) (Entered: 07/06/2023) |
| 07/14/2023 | 128 | MOTION for Leave to Appear Pro Hac Vice *for Maya Brodziak* Filing fee $ 100, receipt number AOKWDC-4206417 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 07/14/2023) |
| 07/24/2023 | 129 | ORDER granting 126 Motion to Withdraw. Signed by Judge Charles Goodwin on 07/24/23. (rr) (Entered: 07/24/2023) |
| 07/24/2023 | 130 | ORDER granting 127 Motion to Withdraw as Attorney. Attorney Gary Stein terminated. Signed by Judge Charles Goodwin on 07/24/23. (rr) (Entered: 07/24/2023) |
| 07/24/2023 | 131 | ORDER granting 128 Motion to Appear Pro Hac Vice. Signed by Judge Charles Goodwin on 07/24/23. (rr) (Entered: 07/24/2023) |
| 08/04/2023 | 132 | ENTRY of Appearance by Maya Brodziak on behalf of All Plaintiffs (Brodziak, Maya) (Entered: 08/04/2023) |
| 08/28/2023 | 133 | UNOPPOSED MOTION for Hearing by All Plaintiffs. (Lambert, Megan) (Entered: 08/28/2023) |
| 08/30/2023 | 134 | MOTION to Withdraw as Attorney by All Plaintiffs. (Dumpson, Taylor) (Entered: 08/30/2023) |
| 09/26/2023 | 135 | ORDER granting 134 Motion to Withdraw as Attorney. Attorney Taylor Alexis Dumpson terminated. Signed by Judge Charles Goodwin on 09/26/2023. (jb) (Entered: 09/26/2023) |
| 09/26/2023 | 136 | ORDER denying as moot 109 UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 106 MOTION for Judgment on the Pleadings. Signed by Judge Charles Goodwin on 09/26/2023. (jb) (Entered: 09/26/2023) |
| 09/27/2023 | 137 | MOTION for Leave to Appear Pro Hac Vice *of Julia Beskin* Filing fee $ 100, receipt number AOKWDC-4260219 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 09/27/2023) |
| 09/27/2023 | 138 | MOTION for Leave to Appear Pro Hac Vice *of Douglas Koff* Filing fee $ 100, receipt number AOKWDC-4260235 by All Plaintiffs. (Attachments: # 1 Exhibit 1 - PHV Application)(Lambert, Megan) (Entered: 09/27/2023) |
| 09/28/2023 | 139 | MOTION to Expedite *Consideration* by All Plaintiffs. (Lambert, Megan) (Entered: 09/28/2023) |
| 09/28/2023 | 140 | MOTION to Withdraw as Attorney *of Elizabeth V. Curran* by All Plaintiffs. (Lambert, Megan) (Entered: 09/28/2023) |
| 10/11/2023 | 141 | ORDER granting 140 Motion to Withdraw as Attorney. Attorney Elizabeth V Curran terminated. Signed by Judge Charles Goodwin on 10/11/2023. (jb) (Entered: 10/11/2023) |
| 10/11/2023 | 142 | ORDER granting 137 Motion to Appear Pro Hac Vice subject to Attorney Beskin filing an entry of appearance, see LCvR 83.4, by October 25, 2023, on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 10/11/2023. (jb) (Entered: 10/11/2023) |
| 10/11/2023 | 143 | ORDER granting 138 Motion to Appear Pro Hac Vice subject to Attorney Koff filing an entry of appearance, see LCvR 83.4, by October 25, 2023, on the form prescribed by the |

| | | |
|---|---|---|
| | | Clerk of the Court. Signed by Judge Charles Goodwin on 10/11/2023. (jb) (Entered: 10/11/2023) |
| 10/11/2023 | 144 | ORDER. The training materials filed in Plaintiffs' Sealed Exhibit 1 (Doc. No. 97 ) in support of the Reply to Defendants' Response to Plaintiffs' Supplemental Submission (Doc. No. 96 ) are not accessible using the credentials provided by Plaintiff. Plaintiffs to file an amended sealed exhibit with updated credentials within seven (7) days of the issuance of this Order. Signed by Judge Charles Goodwin on 10/11/2023. (jb) (Entered: 10/11/2023) |
| 10/11/2023 | 145 | ORDER granting 98 Motion for Leave and 99 Motion for Leave. The State Defendants are ORDERED to file their surreply (currently attached as an exhibit to the Motion) within seven (7) days of the date of this Order. Signed by Judge Charles Goodwin on 10/11/2023. (jb) (Entered: 10/11/2023) |
| 10/12/2023 | 146 | SEALED EXHIBIT by Plaintiff Black Emergency Response Team Re: 97 Sealed Exhibit, 144 Order, (Sykes, Emerson) (Entered: 10/12/2023) |
| 10/12/2023 | 147 | ORDER granting 133 UNOPPOSED MOTION for Hearing filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team. The parties are ADVISED that a status conference will be held in this matter on Tuesday, October 24, 2023, at 10:30 a.m. Signed by Judge Charles Goodwin on 10/12/2023. (jb) (Entered: 10/12/2023) |
| 10/13/2023 | 148 | SURREPLY re 96 Reply, filed by Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Marla Hill, Dustin Hilliary, Ann Holloway, Frank Keating, Sarah Lepak, Rick Nagel, Joseph Parker, Jr, Suzanne Reynolds, Jack Sherry, Trent Smith, Eric Stevenson, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington, Kendra Wesson. (West, Zachary) (Entered: 10/13/2023) |
| 10/16/2023 | 149 | ENTRY of Appearance by Julia Beskin on behalf of All Plaintiffs (Beskin, Julia) (Entered: 10/16/2023) |
| 10/16/2023 | 150 | ENTRY of Appearance by Douglas Koff on behalf of All Plaintiffs (Koff, Douglas) (Entered: 10/16/2023) |
| 10/16/2023 | 151 | ORDER denying 59 MOTION to Strike *Affidavits*. Signed by Judge Charles Goodwin on 10/16/2023. (jb) (Entered: 10/16/2023) |
| 10/17/2023 | 152 | ENTRY of Appearance by David Hinojosa on behalf of All Plaintiffs (Hinojosa, David) (Entered: 10/17/2023) |
| 10/19/2023 | 153 | ORDER denying 72 MOTION to Strike *New Evidence*. Within seven days of the date of this Order, any Defendant or group of Defendants may file a limited surreply responding to the new information contained in the affidavits of Reed and Doe, i.e., Exhibit 1 and Exhibit 2 to Document No. 66 . Any such brief shall not exceed five pages in length. Signed by Judge Charles Goodwin on 10/19/2023. (jb) (Entered: 10/19/2023) |
| 10/20/2023 | 154 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 1/25/2022 before Judge Charles B. Goodwin. Court Reporter: Emily Cripe, Telephone number 4056095094. Transcript of: Status Conference Volume: I of I Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/13/2023. Redacted Transcript Deadline set for 11/20/2023. Release of Transcript Restriction set for 1/18/2024. (ec) (Entered: 10/20/2023) |

| | | |
|---|---|---|
| 10/24/2023 | 155 | ORDER denying 102 Motion for Leave to Conduct Limited Discovery. Signed by Judge Charles Goodwin on 10/24/2023. (jb) (Entered: 10/24/2023) |
| 10/24/2023 | 156 | Minute Entry for proceedings held before Judge Charles Goodwin: Status Conference held on 10/24/2023. (Court Reporter Susan Fenimore.) (jb) (Entered: 10/24/2023) |
| 10/24/2023 | 157 | ORDER. The Court ORDERS oral argument on the outstanding Motion for Preliminary Injunction (Doc. No. 27 ), Motions to Dismiss (Doc. Nos. 51 , 52 ), and Motion for Judgment on the Pleadings (Doc. No. 106 ) on Monday, December 4, 2023, at 10:00 a.m. in Courtroom 305 of the William J. Holloway, Jr. United States Courthouse. Plaintiffs Motion to Expedite Consideration (Doc. No. 139 ) is DENIED as moot. Signed by Judge Charles Goodwin on 10/24/2023. (jb) (Entered: 10/24/2023) |
| 10/25/2023 | 158 | SURREPLY re 66 Reply to Response to Motion, *for Preliminary Injunction* filed by P Mitchell Adwon, Jr, Rick Braught, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Marla Hill, Dustin Hilliary, Anita Holloway, Ann Holloway, Frank Keating, Sarah Lepak, Rick Nagel, Katie Quebedeaux, Suzanne Reynolds, Robert Ross, Jack Sherry, Natalie Shirley, Trent Smith, Eric Stevenson, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington, Kendra Wesson. (Attachments: # 1 Exhibit Affidavit of David Wrobel)(Weitman, M) (Entered: 10/25/2023) |
| 12/01/2023 | 159 | ORDER. The Court ADVISES counsel to be prepared to address the issues set forth herein. Signed by Judge Charles Goodwin on 12/01/2023. (jb) (Entered: 12/01/2023) |
| 12/04/2023 | 160 | Minute Entry for proceedings held before Judge Charles Goodwin: Motion Hearing held on 12/4/2023 re 106 MOTION for Judgment on the Pleadings filed by Sarah Lepak, Jack Sherry, Dennis Casey, Ann Holloway, Jeffrey Hickman, Suzanne Reynolds, Courtney Warmington, Kendra Wesson, Ryan Walters, Michael Turpen, P Mitchell Adwon, Jr, Donald Burdick, Steven Taylor, Trent Smith, Marla Hill, Gentner Drummond, Dustin Hilliary, Kevin Stitt; 52 MOTION to Dismiss *Amended Complaint* filed by Jamie Underwood, Kathleen Duncan, Lee Ann Kuhlman, Angela Grunewald, Cynthia Benson; 27 MOTION for Preliminary Injunction filed by Precious Lloyd, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey; and 51 MOTION to Dismiss filed by Robert Ross, Rick Nagel, Anita Holloway, Rick Braught, Eric Stevenson, Natalie Shirley, Frank Keating. (Court Reporter Emily Cripe.) (jb) (Entered: 12/04/2023) |
| 12/06/2023 | 161 | ENTRY of Appearance by Adam Hines on behalf of All Plaintiffs (Hines, Adam) . (Entered: 12/06/2023) |
| 12/19/2023 | 162 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 12/4/2023 before Judge Charles B. Goodwin. Court Reporter: Emily Cripe, Telephone number 4056095094. Transcript of: Motion hearing Volume: I of I Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/9/2024. Redacted Transcript Deadline set for 1/19/2024. Release of Transcript Restriction set for 3/18/2024. (ec) (Entered: 12/19/2023) |
| 01/09/2024 | 163 | MOTION to Withdraw as Attorney *of Ramya Sundaram* by All Plaintiffs. (Lambert, Megan) (Entered: 01/09/2024) |
| 01/16/2024 | 164 | ORDER granting 163 Motion to Withdraw as Attorney. Attorney Ramya A Sundaram terminated. Signed by Judge Charles Goodwin on 01/16/2024. (jb) (Entered: 01/16/2024) |

| | | |
|---|---|---|
| 05/03/2024 | 165 | NOTICE OF PENDING MOTIONS by All Plaintiffs (Lambert, Megan) (Entered: 05/03/2024) |
| 05/17/2024 | 166 | MOTION for Hearing by All Plaintiffs. (Hines, Adam) (Entered: 05/17/2024) |
| 05/17/2024 | 167 | ORDER granting 166 MOTION for Status Conference filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team. The parties are ADVISED that a status conference will be held in this matter on Friday, June 7, 2024 at 10:30 a.m. The conference will be conducted telephonically. Signed by Judge Charles Goodwin on 05/17/2024. (jb) (Entered: 05/17/2024) |
| 05/22/2024 | 168 | NOTICE (other) by All Plaintiffs re 68 Response in Opposition to Motion, 67 Response in Opposition to Motion, 27 MOTION for Preliminary Injunction , 66 Reply to Response to Motion, 110 Response to Motion (Attachments: # 1 Exhibit 1 - TEA v. Reynolds) (Hines, Adam) (Entered: 05/22/2024) |
| 05/31/2024 | 169 | NOTICE (other) by All Plaintiffs re 68 Response in Opposition to Motion, 67 Response in Opposition to Motion, 27 MOTION for Preliminary Injunction , 110 Response to Motion (Attachments: # 1 1 - Local 8027, AFT-N.H., AFL-CIO, et al. v. Edelblut, et al.) (Lambert, Megan) (Entered: 05/31/2024) |
| 06/07/2024 | 171 | Minute Entry for proceedings held before Judge Charles Goodwin: Status Conference held on 6/7/2024. (Court Reporter Sherri Grubbs.) (jb) (Entered: 06/14/2024) |
| 06/10/2024 | 170 | MOTION for Leave to Appear Pro Hac Vice *of Zakiya Lewis* Filing fee $ 100, receipt number BOKWDC-4451196 by All Plaintiffs. (Attachments: # 1 1 - Request for Admission PHV of Zakiya Lewis)(Lambert, Megan) (Entered: 06/10/2024) |
| 06/14/2024 | 172 | ORDER. The Court GRANTS IN PART, DENIES IN PART, and RESERVES RULING IN PART as to the University Defendants' Motion to Dismiss (Doc. No. 51 ) as set forth herein. The Court GRANTS IN PART, DENIES IN PART, and RESERVES RULING IN PART as to the State Defendants' Motion for Judgment on the Pleadings (Doc. No. 106 ) as set forth herein. The Motion to Dismiss (Doc. No. 52 ) filed by Defendant Independent School District No. 12, Oklahoma County, Oklahoma, is GRANTED IN PART and DENIED AS MOOT IN PART, as set forth herein. The Court shall separately direct the parties to submit proposed questions of state law relating to article XIII, section 8 of the Oklahoma Constitution for certification to the Oklahoma Supreme Court. Signed by Judge Charles Goodwin on 06/14/2024. (jb) (Entered: 06/14/2024) |
| 06/14/2024 | 173 | ORDER granting in part and denying in part 27 Motion for Preliminary Injunction as set forth herein. Signed by Judge Charles Goodwin on 06/14/2024. (jb) (Entered: 06/14/2024) |
| 06/14/2024 | 174 | ORDER. The Court ORDERS that the parties submit, on or before June 28, 2024, the following: an agreed proposed schedule for discovery and pretrial litigation, an agreed list of questions to be certified to the Oklahoma Supreme Court, and an agreed statement of facts relevant to the certified questions, showing fully the nature of the controversy out of which the questions arose. If the parties are unable to agree on any of the above matters, each party (or group of parties) shall submit the required items individually, again no later than June 28, 2024. Any objection or response to any individual submission shall be filed no later than July 9, 2024. Signed by Judge Charles Goodwin on 06/14/2024. (jb) (Entered: 06/14/2024) |
| 06/14/2024 | 175 | ORDER granting 170 Motion to Appear Pro Hac Vice subject to Attorney Lewis filing an entry of appearance, see LCvR 83.4, by June, 28, 2024, on the form prescribed by the |

| | | |
|---|---|---|
| | | Clerk of the Court. Signed by Judge Charles Goodwin on 06/14/2024. (jb) (Entered: 06/14/2024) |
| 06/18/2024 | 176 | MOTION to Extend Deadlines or Hearings by P Mitchell Adwon, Jr, Rick Braught, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Dustin Hilliary, Anita Holloway, Sarah Lepak, Rick Nagel, Katie Quebedeaux, Robert Ross, Jack Sherry, Natalie Shirley, Eric Stevenson, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington. (Ikpa, Tina) (Entered: 06/18/2024) |
| 06/18/2024 | 177 | NOTICE (other) by Phil Albert, Rick Braught, Michael Cawley, Anita Holloway, Frank Keating, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson, University of Oklahoma Board of Regents (Ikpa, Tina) (Entered: 06/18/2024) |
| 06/18/2024 | 178 | ORDER granting 176 Motion to Extend Deadlines or Hearings as set forth herein. Signed by Judge Charles Goodwin on 06/18/2024. (jb) (Entered: 06/18/2024) |
| 06/25/2024 | 179 | ENTRY of Appearance by Zakiya Shani Lewis on behalf of All Plaintiffs (Lewis, Zakiya) (Entered: 06/25/2024) |
| 07/08/2024 | 180 | MOTION for Extension of Time to File Answer re 50 Amended Complaint *Out of Time* by Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson, University of Oklahoma Board of Regents. (Ikpa, Tina) (Entered: 07/08/2024) |
| 07/11/2024 | 181 | ORDER granting 180 MOTION for Extension of Time to File Answer re 50 Amended Complaint *Out of Time*. John R. Rick Braught, Robert Ross, Natalie Shirley, Eric Stevenson, Kenneth Waits, Anita Holloway, and Rick Nagel shall file their answer to Plaintiffs' Amended Complaint no later than July 12, 2024. Signed by Judge Charles Goodwin on 07/11/2024. (jb) (Entered: 07/11/2024) |
| 07/12/2024 | 182 | ANSWER to 50 Amended Complaint by Rick Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson, University of Oklahoma Board of Regents. (Ikpa, Tina) (Entered: 07/12/2024) |
| 07/12/2024 | 183 | RESPONSE re 178 Order on Motion to Extend Deadlines or Hearings filed by P Mitchell Adwon, Jr, Rick Braught, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Marla Hill, Dustin Hilliary, Anita Holloway, Sarah Lepak, Rick Nagel, Katie Quebedeaux, Robert Ross, Jack Sherry, Natalie Shirley, Eric Stevenson, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington. (Gaskins, Garry) (Entered: 07/12/2024) |
| 07/12/2024 | 184 | RESPONSE re 178 Order on Motion to Extend Deadlines or Hearings filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Plaintiffs' Proposed Scheduling Order)(Lambert, Megan) (Entered: 07/12/2024) |
| 07/15/2024 | 185 | NOTICE OF APPEAL by Rick Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson, University of Oklahoma Board of Regents. (Ikpa, Tina) (Entered: 07/15/2024) |
| 07/15/2024 | 186 | NOTICE OF APPEAL as to 173 Order on Motion for Preliminary Injunction, 172 Order on Motion to Dismiss,, Order on Motion for Judgment on the Pleadings,,,,,,,,, by P Mitchell Adwon, Jr, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Dustin Hilliary, Sarah Lepak, Katie Quebedeaux, Jack Sherry, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington, Kendra Wesson. (West, Zachary) (Entered: 07/15/2024) |
| 07/15/2024 | 187 | NOTICE OF APPEAL as to 173 Order on Motion for Preliminary Injunction by All Plaintiffs. (Hines, Adam) (Entered: 07/15/2024) |

| | | |
|---|---|---|
| 07/16/2024 | 188 | USCA Appeal Fee received in the amount of $ 605, receipt number 500007779, re 185 Notice of Appeal filed by Rick Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson, University of Oklahoma Board of Regents (naa) (Entered: 07/16/2024) |
| 07/16/2024 | 189 | PRELIMINARY RECORD LETTER - Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 185 Notice of Appeal (Attachments: # 1 Attachment 1 - Preliminary Record on Appeal)(rp) (Entered: 07/16/2024) |
| 07/16/2024 | 190 | PRELIMINARY RECORD LETTER - Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 186 Notice of Appeal, (Attachments: # 1 Attachment 1 - Preliminary Record on Appeal)(rp) (Entered: 07/16/2024) |
| 07/16/2024 | 191 | PRELIMINARY RECORD LETTER - Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 187 Notice of Appeal (Attachments: # 1 Attachment 1 - Preliminary Record on Appeal)(rp) (Entered: 07/16/2024) |
| 07/16/2024 | 192 | Tenth Circuit USCA Case Number 24-6141 for 186 Notice of Appeal, filed by Sarah Lepak, Jack Sherry, Dennis Casey, P Mitchell Adwon, Jr, Donald Burdick, Steven Taylor, Jeffrey Hickman, Courtney Warmington, Katie Quebedeaux, Gentner Drummond, Kendra Wesson, Dustin Hilliary, Kevin Stitt, Ryan Walters, Michael Turpen. Civil case docketed. Preliminary record filed. DATE RECEIVED: 07/16/2024 Docketing statement, Filing Fee, and Transcript order form due 07/30/2024 for P. Mitchell Adwon Jr., Donald Burdick, Dennis Casey, Genter Drummond, Jeffrey Hickman, Dustin Hilliary, Sarah Lepak, Ken Levit, Katie Quebedeaux, Jack Sherry, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington and Kendra Wesson. Notice of appearance due on 07/30/2024 for P. Mitchell Adwon Jr., American Indian Movement Indian Territory, Black Emergency Response Team, Donald Burdick, Dennis Casey, Anthony Crawford, Genter Drummond, Jeffrey Hickman, Dustin Hilliary, Independent School District No. 12 of Oklahoma County Oklahoma, Regan Killackey, Sarah Lepak, Ken Levit, Precious Lloyd, Oklahoma State Conference of the National Association for the Advancement of Colored People, Katie Quebedeaux, Jack Sherry, Kevin Stitt, Steven Taylor, Michael Turpen, University of Oklahoma Chapter of the American Association of University Professors, Ryan Walters, Courtney Warmington, and Kendra Wesson. [24-6141] --[Edited 07/16/2024 by AT to add text that filing fee is due 07/30/2024 for the appellants. ] (rp) (Entered: 07/16/2024) |
| 07/16/2024 | 193 | Tenth Circuit USCA Case Number 24-6139 for 187 Notice of Appeal filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team. Civil case docketed. Preliminary record filed. DATE RECEIVED: 07/16/2024 Docketing statement, transcript order form and notice of appearance due 07/30/2024 for American Indian Movement Indian Territory, Black Emergency Response Team, Anthony Crawford, Regan Killackey, Precious Lloyd, Oklahoma State Conference of the NAACP and University of Oklahoma Chapter of the American Association of University Professors. Notice of appearance also due on 07/30/2024 for P. Mitchell Adwon Jr., Zachary Archer, Rick Braught, Donald Burdick, Dennis Casey, Genter Drummond, Jeffrey Hickman, Dustin Hilliary, Anita Holloway, Independent School District No. 12 of Oklahoma County, Oklahoma, Sarah Lepak, Ken Levit, Rick Nagel, Katie Quebedeaux, Robert Ross, Jack Sherry, Natalie Shirley, Eric Stevenson, Kevin Stitt, Steven Taylor, Michael Turpen, University of |

| | | |
|---|---|---|
| | | Oklahoma Board of Regents, Ryan Walters, Courtney Warmington and Kendra Wesson. Disclosure statements due 7/30/24. [24-6139](rp) (Entered: 07/16/2024) |
| 07/16/2024 | 194 | Tenth Circuit USCA Case Number 24-6140 for 185 Notice of Appeal filed by Robert Ross, Rick Nagel, Natalie Shirley, Rick Braught, University of Oklahoma Board of Regents, Eric Stevenson, Anita Holloway. Civil case docketed. Preliminary record filed. DATE RECEIVED: 07/16/2024. Notice of appearance, Docketing statement, and Transcript order form due 07/30/2024 for Rick Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson and Kenneth S. Waits. Notice of appearance due on 07/30/2024 for American Indian Movement Indian Territory, Black Emergency Response Team, Anthony Crawford, Regan Killackey, Precious Lloyd, Oklahoma State Conference of the National Association for the Advancement of Colored People and University of Oklahoma Chapter of the American Association of University Professors. Disclosure statement due on 07/30/2024 for American Indian Movement Indian Territory, Black Emergency Response Team, Oklahoma State Conference of the National Association for the Advancement of Colored People and University of Oklahoma Chapter of the American Association of University Professors [24-6140] (rp) (Entered: 07/16/2024) |
| 07/17/2024 | 195 | USCA Appeal Fee received in the amount of $ 605, receipt number 500007791, re 186 Notice of Appeal, filed by Sarah Lepak, Jack Sherry, Dennis Casey, P Mitchell Adwon, Jr, Donald Burdick, Steven Taylor, Jeffrey Hickman, Courtney Warmington, Katie Quebedeaux, Gentner Drummond, Kendra Wesson, Dustin Hilliary, Kevin Stitt, Ryan Walters, Michael Turpen (rp) (Entered: 07/17/2024) |
| 07/18/2024 | 196 | USCA Appeal Fee received in the amount of $ 605, receipt number 500007817, re 187 Notice of Appeal filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team (rp) (Entered: 07/18/2024) |
| 07/22/2024 | 197 | RESPONSE re 178 Order on Motion to Extend Deadlines or Hearings filed by P Mitchell Adwon, Jr, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Dustin Hilliary, Sarah Lepak, Katie Quebedeaux, Jack Sherry, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington, Kendra Wesson. (Gaskins, Garry) (Entered: 07/22/2024) |
| 07/22/2024 | 198 | RESPONSE re 183 Response, 178 Order on Motion to Extend Deadlines or Hearings filed by All Plaintiffs. (Hines, Adam) (Entered: 07/22/2024) |
| 07/30/2024 | 199 | TRANSCRIPT LETTER advising transcript is already on file re 185 Notice of Appeal filed by Robert Ross, Rick Nagel, Natalie Shirley, Rick Braught, University of Oklahoma Board of Regents, Eric Stevenson, Anita Holloway. The record is ready for appeal purposes. (naa) (Entered: 07/30/2024) |
| 07/30/2024 | 200 | TRANSCRIPT Order Form by P Mitchell Adwon, Jr, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Dustin Hilliary, Sarah Lepak, Katie Quebedeaux, Jack Sherry, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington, Kendra Wesson that transcripts are not necessary. See order form for dates and proceedings. (Gaskins, Garry) (Entered: 07/30/2024) |
| 07/30/2024 | 201 | TRANSCRIPT Order Form by Rick Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson, University of Oklahoma Board of Regents that transcripts are necessary. See order form for dates and proceedings. (Weitman, M) (Entered: 07/30/2024) |

| | | |
|---|---|---|
| 07/30/2024 | 202 | TRANSCRIPT Order Form by All Plaintiffs re 187 Notice of Appeal that transcripts are not necessary. See order form for dates and proceedings. (Lambert, Megan) (Entered: 07/30/2024) |
| 07/31/2024 | 203 | TRANSCRIPT LETTER advising transcript is already on file re 186 Notice of Appeal, filed by Sarah Lepak, Jack Sherry, Dennis Casey, P Mitchell Adwon, Jr, Donald Burdick, Steven Taylor, Jeffrey Hickman, Courtney Warmington, Katie Quebedeaux, Gentner Drummond, Kendra Wesson, Dustin Hilliary, Kevin Stitt, Ryan Walters, Michael Turpen. The record is ready for appeal purposes. (naa) (Entered: 07/31/2024) |
| 07/31/2024 | 204 | TRANSCRIPT LETTER advising transcript is already on file. The record is ready for appeal purposes. (naa) (Entered: 07/31/2024) |
| 08/02/2024 | 205 | MOTION to Withdraw as Attorney *David Hinojosa* by All Plaintiffs. (Hinojosa, David) (Entered: 08/02/2024) |
| 08/06/2024 | 206 | ORDER of USCA as to 187 Notice of Appeal filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team, 186 Notice of Appeal, filed by Sarah Lepak, Jack Sherry, Dennis Casey, P Mitchell Adwon, Jr, Donald Burdick, Steven Taylor, Jeffrey Hickman, Courtney Warmington, Katie Quebedeaux, Gentner Drummond, Kendra Wesson, Dustin Hilliary, Kevin Stitt, Ryan Walters, Michael Turpen, 185 Notice of Appeal filed by Robert Ross, Rick Nagel, Natalie Shirley, University of Oklahoma Board of Regents, Anita Holloway, Rick Braught, Eric Stevenson. Order filed by Clerk of the Court on the parties' joint motion to hold appeal in abeyance. These appeals are abated pending the district court's certification of state law questions and the Oklahoma Supreme Court's response. (Reason for abatement: DCt Motion) Appellants' status report due 09/05/2024 by Black Emergency Response Team, et al. Served on 08/06/2024. [24-6139, 24-6140, 24-6141] (rp) (Entered: 08/06/2024) |
| 08/16/2024 | 207 | ORDER granting 205 Motion to Withdraw as Attorney. Attorney David Hinojosa terminated. Signed by Judge Charles Goodwin on 08/16/2024. (jb) (Entered: 08/16/2024) |
| 08/27/2024 | 208 | ORDER CERTIFYING STATE-LAW QUESTIONS TO THE OKLAHOMA SUPREME COURT. Signed by Judge Charles Goodwin on 08/27/2024. (jb) (Entered: 08/27/2024) |
| 08/28/2024 | 209 | LETTER from Clerk of Court to Oklahoma Supreme Court Clerk of Court (rp) (Entered: 08/28/2024) |
| 08/30/2024 | 210 | ORDER. The Court imposes the deadlines herein relevant to litigation of the equal protection claims. Signed by Judge Charles Goodwin on 08/30/2024. (jb) (Entered: 08/30/2024) |
| 09/03/2024 | 211 | NOTICE (other) by Anthony Crawford, Regan Killackey, Black Emergency Response Team, University of Oklahoma Chapter of the American Association of University Professors, Oklahoma State Conference of the National Association for the Advancement of Colored People, American Indian Movement Indian Territory, Precious Lloyd (Attachments: # 1 Exhibit 1 - Application to Revoke Teaching Certificate Summer Boismier, # 2 Exhibit 2 - Hearing Officer's Findings of Fact and Conclusions of Law, # 3 Exhibit 3 - Board Meeting Agenda August 22, 2024, # 4 Exhibit 4 - The Oklahoman News Story)(Lambert, Megan) (Entered: 09/03/2024) |
| 09/05/2024 | 212 | ORDER. Defendant Ryan Walters, in his official capacity as Oklahoma Superintendent of Public Education, and Defendants Zachary Archer, Donald Burdick, Sarah Lepak, Katie Quebedeaux, and Kendra Wesson, in their official capacities as members of the Oklahoma State Board of Education, are DIRECTED to file a written response to Plaintiffs' Notice |

| | | |
|---|---|---|
| | | (Doc. No. 211 ) within seven (7) days of the issuance of this Order. Defendants shall attach to their Response (under seal if appropriate) a copy of the revocation order, a copy of the relevant minutes of the August 22, 2024 Board meeting, and any other documents necessary for the Court to consider this matter. Signed by Judge Charles Goodwin on 09/05/2024. (jb) (Entered: 09/05/2024) |
| 09/12/2024 | 213 | RESPONSE re 211 Notice (other),, 212 Order,, filed by Gentner Drummond, Ryan Walters, Donald Burdick, Sarah Lepak, Kendra Wesson, Kevin Stitt, Jeffrey Hickman, Michael Turpen, Steven Taylor, Dennis Casey, Dustin Hilliary, P Mitchell Adwon, Jr, Jack Sherry, Courtney Warmington, Katie Quebedeaux. (Attachments: # 1 Exhibit 1 -Order Revoking Teaching Certificate)(Gaskins, Garry) (Entered: 09/12/2024) |
| 10/29/2024 | 214 | MOTION for Leave to Appear Pro Hac Vice *of Sumayya Saleh* Filing fee $ 100, receipt number AOKWDC-4555352 by All Plaintiffs. (Attachments: # 1 Attachment 1 - Request for Admission PHV (Saleh))(Lambert, Megan) (Entered: 10/29/2024) |
| 11/05/2024 | 215 | ORDER granting 214 Motion to Appear Pro Hac Vice. On or before November 19, 2024, Attorney Saleh shall electronically file an entry of appearance on the form prescribed by the Clerk of Court. Signed by Judge Charles Goodwin on 11/05/2024. (jb) (Entered: 11/05/2024) |
| 11/07/2024 | 216 | ENTRY of Appearance by Sumayya Saleh on behalf of All Plaintiffs (Saleh, Sumayya) (Entered: 11/07/2024) |
| 11/20/2024 | 217 | MOTION to Clarify *and Brief in Support* by Gentner Drummond, Ryan Walters, Donald Burdick, Sarah Lepak, Kendra Wesson, Kevin Stitt, Jeffrey Hickman, Michael Turpen, Steven Taylor, Dennis Casey, Dustin Hilliary, P Mitchell Adwon, Jr, Jack Sherry, Courtney Warmington, Katie Quebedeaux, Zachary Archer, Ken Levit. (Attachments: # 1 Exhibit 1 - Pls' RFP, # 2 Exhibit 2 - State Defs' RFP Resp, # 3 Exhibit 3 - Pls' RFP Reply)(Gaskins, Garry) (Entered: 11/20/2024) |
| 11/21/2024 | 218 | ORDER denying 217 Motion to Clarify. Signed by Judge Charles Goodwin on 11/21/2024. (jb) (Entered: 11/21/2024) |
| 12/03/2024 | 219 | ORDER of USCA as to 187 Notice of Appeal filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team, 186 Notice of Appeal, filed by Sarah Lepak, Jack Sherry, Dennis Casey, P Mitchell Adwon, Jr, Donald Burdick, Steven Taylor, Jeffrey Hickman, Courtney Warmington, Katie Quebedeaux, Gentner Drummond, Kendra Wesson, Dustin Hilliary, Kevin Stitt, Ryan Walters, Michael Turpen, 185 Notice of Appeal filed by Robert Ross, Rick Nagel, Natalie Shirley, University of Oklahoma Board of Regents, Anita Holloway, Rick Braught, Eric Stevenson. Order filed by Clerk of the Court directing Appellants by 3/03/2025 or within 5 days of any event that materially affects the abatement of these cross-appeals, appellants shall file an abated case status report. Any such abated case status report shall advise the court of each partys respective position concerning whether the abatement of these cross-appeals ought to continue. See order for further details. Served on 12/03/2024. [24-6139, 24-6140, 24-6141] (rp) (Entered: 12/03/2024) |
| 12/11/2024 | 220 | MOTION to Supplement by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Plaintiffs' Supplemental Briefing)(Hines, Adam) (Entered: 12/11/2024) |
| 12/12/2024 | 221 | RESPONSE in Opposition re 220 MOTION to Supplement filed by Gentner Drummond, Ryan Walters, Donald Burdick, Sarah Lepak, Kendra Wesson, Kevin Stitt, Jeffrey Hickman, Michael Turpen, Steven Taylor, Dennis Casey, Dustin Hilliary, P Mitchell |

| | | |
|---|---|---|
| | | Adwon, Jr, Jack Sherry, Courtney Warmington, Zachary Archer, Ken Levit. (Gaskins, Garry) (Entered: 12/12/2024) |
| 01/10/2025 | 222 | JOINT MOTION for Extension of Time to Complete Discovery *Schedule Deadlines* by All Parties. (Lambert, Megan) (Entered: 01/10/2025) |
| 01/10/2025 | 223 | MOTION to Compel *State Defendants to Comply with Plaintiffs' First Request for Production and Entry of ESI Order* by All Plaintiffs. (Attachments: # 1 Exhibit 1 - First Request for Production to State Defendants, # 2 Exhibit 2 - State Defendants Response and Objections, # 3 Exhibit 3 - Discovery Letter, # 4 Exhibit 4 - Electronic Discovery Protocol)(Lambert, Megan) (Entered: 01/10/2025) |
| 01/10/2025 | 224 | MOTION to Compel *University Defendants to Comply with Plaintiffs' First Request for Production* by All Plaintiffs. (Attachments: # 1 Exhibit 1 - First Request for Production to University Defendants, # 2 Exhibit 2 - Discovery Letter, # 3 Exhibit 3 - University Defendants Response and Objections, # 4 Exhibit 4 - Cover Letter, # 5 Exhibit 5 - November 8th Letter, # 6 Exhibit 6 - Discovery Email Chain)(Lambert, Megan) (Entered: 01/10/2025) |
| 01/10/2025 | 225 | ORDER granting 222 Motion for Extension of Time as set forth herein. Signed by Judge Charles Goodwin on 01/10/2025. (jb) (Entered: 01/10/2025) |
| 01/14/2025 | 226 | ORDER denying 220 Motion to Supplement. Signed by Judge Charles Goodwin on 01/14/2025. (jb) (Entered: 01/14/2025) |
| 01/28/2025 | 227 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 223 MOTION to Compel *State Defendants to Comply with Plaintiffs' First Request for Production and Entry of ESI Order* by Gentner Drummond, Ryan Walters, Donald Burdick, Sarah Lepak, Kendra Wesson, Kevin Stitt, Jeffrey Hickman, Michael Turpen, Steven Taylor, Dennis Casey, Dustin Hilliary, P Mitchell Adwon, Jr, Jack Sherry, Courtney Warmington, Katie Quebedeaux, Zachary Archer, Ken Levit. (Gaskins, Garry) (Entered: 01/28/2025) |
| 01/29/2025 | 228 | MOTION for Extension of Time to File Response/Reply as to 224 MOTION to Compel *University Defendants to Comply with Plaintiffs' First Request for Production* by Robert Ross, Natalie Shirley, Eric Stevenson, Anita Holloway, Rick Nagel, John R Braught, Kenneth S Waits. (Ikpa, Tina) (Entered: 01/29/2025) |
| 01/29/2025 | 229 | ORDER granting 227 Motion for Extension of Time. State Defendants shall file their Response to Plaintiffs' Motion to Compel (Doc. No. 223 ) no later than February 14, 2025. Signed by Judge Charles Goodwin on 01/29/2025. (jb) (Entered: 01/29/2025) |
| 01/29/2025 | 230 | ORDER granting 228 Motion for Extension of Time. University Defendants shall file their Response to Plaintiffs' Motion to Compel (Doc. No. 224 ) no later than February 14, 2025. Signed by Judge Charles Goodwin on 01/29/2025. (jb) (Entered: 01/29/2025) |
| 02/04/2025 | 231 | MOTION for Leave to Appear Pro Hac Vice *of Adam Kimelman* Filing fee $ 100, receipt number AOKWDC-4622256 by All Plaintiffs. (Attachments: # 1 Attachment 1 - Request for Admission PHV (Kimelman))(Lambert, Megan) (Entered: 02/04/2025) |
| 02/04/2025 | 232 | ORDER granting 231 Motion to Appear Pro Hac Vice subject to Attorney Kimelman filing an entry of appearance, see LCvR 83.4, by February 18, 2025, on the form prescribed by the Clerk of the Court. Signed by Judge Charles Goodwin on 02/04/2025. (jb) (Entered: 02/04/2025) |
| 02/06/2025 | 233 | ENTRY of Appearance by Adam Kimelman on behalf of All Plaintiffs (Kimelman, Adam) (Entered: 02/06/2025) |

| | | |
|---|---|---|
| 02/11/2025 | 234 | RESPONSE to Motion re 224 MOTION to Compel *University Defendants to Comply with Plaintiffs' First Request for Production* filed by Robert Ross, Natalie Shirley, Eric Stevenson, Anita Holloway, Rick Nagel, John R Braught, Kenneth S Waits. (Attachments: # 1 Exhibit BERT Plaintiffs' Response to University Defendants' First RFPs, # 2 Exhibit OU-AAUP Plaintiffs' Response to University Defendants' First RFPs, # 3 Exhibit Plaintiffs' First RFPs to University Defendants', # 4 Exhibit Email, # 5 Exhibit October 25, 2024 Letter, # 6 Exhibit University Defendants' Response to Plaintiffs' First RFPs, # 7 Exhibit University Defendants' First RFPs to Plaintiffs', # 8 Exhibit NAACP-OK Plaintiffs' Response to University Defendants' First RFPs)(Ikpa, Tina) (Entered: 02/11/2025) |
| 02/14/2025 | 235 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 234 Response to Motion,,, 224 MOTION to Compel *University Defendants to Comply with Plaintiffs' First Request for Production* by All Plaintiffs. (Brodziak, Maya) (Entered: 02/14/2025) |
| 02/14/2025 | 236 | RESPONSE to Motion re 223 MOTION to Compel *State Defendants to Comply with Plaintiffs' First Request for Production and Entry of ESI Order* filed by Gentner Drummond, Ryan Walters, Donald Burdick, Sarah Lepak, Kendra Wesson, Kevin Stitt, Jeffrey Hickman, Michael Turpen, Steven Taylor, Dennis Casey, Dustin Hilliary, P Mitchell Adwon, Jr, Jack Sherry, Courtney Warmington, Katie Quebedeaux, Zachary Archer, Ken Levit. (Attachments: # 1 Exhibit 1 - Discovery in BERT Email dated 10.22.2024)(Gaskins, Garry) (Entered: 02/14/2025) |
| 02/18/2025 | 237 | ORDER granting 235 Motion for Extension of Time. Plaintiffs shall file their Reply to University Defendants' Response (Doc No. 234 ) no later than February 28, 2025. Signed by Judge Charles Goodwin on 02/18/2025. (jb) (Entered: 02/18/2025) |
| 02/18/2025 | 238 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 236 Response to Motion,, 223 MOTION to Compel *State Defendants to Comply with Plaintiffs' First Request for Production and Entry of ESI Order* by All Plaintiffs. (Brodziak, Maya) (Entered: 02/18/2025) |
| 02/18/2025 | 239 | ORDER granting 238 Motion for Extension of Time. Plaintiffs shall file their reply to State Defendants' Response (Doc No. 236 ) no later than February 28, 2025. Signed by Judge Charles Goodwin on 02/18/2025. (jb) (Entered: 02/18/2025) |
| 02/28/2025 | 240 | REPLY to Response to Motion re 224 MOTION to Compel *University Defendants to Comply with Plaintiffs' First Request for Production and Memorandum of Law in Further Support* filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Message from President Harroz)(Lambert, Megan) (Entered: 02/28/2025) |
| 02/28/2025 | 241 | REPLY to Response to Motion re 223 MOTION to Compel *State Defendants to Comply with Plaintiffs' First Request for Production and Entry of ESI Order and Memorandum of Law in Further Support* filed by All Plaintiffs. (Lambert, Megan) (Entered: 02/28/2025) |
| 03/03/2025 | 242 | ORDER of USCA as to 187 Notice of Appeal filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team. Order filed by Clerk of the Court continuing abatement of these cross-appeals. On the earlier of 06/02/2025 or within five days of any event that materially affects the abatement of these cross-appeals, appellants shall file an abated case status report that reports on the status of these matters. Please see Order for additional information. Served on 03/03/2025. [24-6139, 24-6140, 24-6141] (llr) . (Entered: 03/04/2025) |

| | | |
|---|---|---|
| 03/03/2025 | 243 | FILED IN ERROR Modified on 3/4/2025 (naa). (Entered: 03/04/2025) |
| 04/08/2025 | 244 | JOINT MOTION to Stay Case *Stay Discovery as to University Defendants and to Abate the Motion to Compel as to University Defendants by University Defendants and* by All Plaintiffs. (Attachments: # 1 Exhibit OK Supreme Court Dec. 16 Order, # 2 Exhibit OU Certification Brief in Chief, # 3 Exhibit OU Certification Answer Brief, # 4 Exhibit Plaintiffs Certification Brief in Chief, # 5 Exhibit Plaintiffs Certification Answer Brief) (Brodziak, Maya) (Entered: 04/08/2025) |
| 04/22/2025 | 245 | NOTICE of Subpoena by All Plaintiffs (Attachments: # 1 Exhibit 1 - Subpoenas) (Lambert, Megan) (Entered: 04/22/2025) |
| 05/03/2025 | 246 | JOINT MOTION for Hearing by All Plaintiffs. (Lambert, Megan) (Entered: 05/03/2025) |
| 05/06/2025 | 247 | ENTRY of Appearance by Ellen Carr on behalf of P Mitchell Adwon, Jr, Zachary Archer, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Dustin Hilliary, Sarah Lepak, Ken Levit, Katie Quebedeaux, Jack Sherry, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington, Kendra Wesson (Carr, Ellen) (Entered: 05/06/2025) |
| 05/27/2025 | 248 | JOINT MOTION for Extension of Time to Complete Discovery *Schedule Deadlines* by All Plaintiffs. (Brodziak, Maya) (Entered: 05/27/2025) |
| 06/02/2025 | 249 | ORDER of USCA as to 187 Notice of Appeal filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team, 186 Notice of Appeal, filed by Sarah Lepak, Jack Sherry, Dennis Casey, P Mitchell Adwon, Jr, Donald Burdick, Steven Taylor, Jeffrey Hickman, Courtney Warmington, Katie Quebedeaux, Gentner Drummond, Kendra Wesson, Dustin Hilliary, Kevin Stitt, Ryan Walters, Michael Turpen, 185 Notice of Appeal filed by Robert Ross, Rick Nagel, Natalie Shirley, University of Oklahoma Board of Regents, Anita Holloway, Rick Braught, Eric Stevenson. Order filed by Clerk of the Court. Upon consideration of appellants June 2, 2025 status report, the court: (1) continues the abatement of these cross-appeals; and (2) directs appellants to advise this court of the status of the questions the district court certified to the Oklahoma Supreme Court by filing a written status report on the earlier of September 2, 2025 or within five days of any event that materially affects the abatement of these cross-appeals. At a minimum, appellants status report shall advise the court of each partys respective position concerning whether the abatement of these cross-appeals ought to continue and, if any party contends that the abatement should not continue, that partys position on how these cross-appeals ought to proceed. Served on 06/02/2025. Text only entry - no attachment. [24-6139, 24-6140, 24-6141] (llr) Modified date filed on 6/3/2025 (llr). (Entered: 06/03/2025) |
| 06/10/2025 | 250 | MOTION to Substitute Party *Pursuant to Federal Rule 25(d)* by Rick Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson, Kenneth S Waits. (Weitman, M) (Entered: 06/10/2025) |
| 06/12/2025 | 251 | ENTRY of Appearance by C.B. Moore on behalf of John R Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson, Kenneth S Waits (Moore, C.B.) (Entered: 06/12/2025) |
| 06/20/2025 | 252 | NOTICE re 208 Order, by Oklahoma Supreme Court regarding Certified Questions of Law.(llr) Modified on 6/30/2025 (jcc). (Entered: 06/20/2025) |
| 06/26/2025 | 253 | ORDER of USCA as to 187 Notice of Appeal filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American |

| | | |
|---|---|---|
| | | Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team, 186 Notice of Appeal, filed by Sarah Lepak, Jack Sherry, Dennis Casey, P Mitchell Adwon, Jr, Donald Burdick, Steven Taylor, Jeffrey Hickman, Courtney Warmington, Katie Quebedeaux, Gentner Drummond, Kendra Wesson, Dustin Hilliary, Kevin Stitt, Ryan Walters, Michael Turpen, 185 Notice of Appeal filed by Robert Ross, Rick Nagel, Natalie Shirley, University of Oklahoma Board of Regents, Anita Holloway, Rick Braught, Eric Stevenson. Order filed by Clerk of the Court lifting the abatement of these appeals. First brief on cross-appeal and joint appendix due 07/28/2025 for American Indian Movement Indian Territory, Black Emergency Response Team, Anthony Crawford, Regan Killackey, Precious Lloyd, Oklahoma State Conference of the National Association for the Advancement of Colored People and University of Oklahoma Chapter of the American Association of University Professors. Served on 06/26/2025. [24-6139, 24-6140, 24-6141] (llr) (Entered: 06/26/2025) |
| 06/30/2025 | 254 | STIPULATION of Dismissal *of equal protection claim without prejudice by Plaintiff NAACP-Oklahoma against Defendant Members of the University of Oklahoma Board of Regents* by Oklahoma State Conference of the National Association for the Advancement of Colored People. (Brodziak, Maya) (Entered: 06/30/2025) |
| 07/02/2025 | 255 | MOTION for Reconsideration re 173 Order on Motion for Preliminary Injunction, 172 Order on Motion to Dismiss,, Order on Motion for Judgment on the Pleadings,,,,,,,,, *and Brief in Support* by John R Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, Eric Stevenson, Kenneth S Waits. (Weitman, M) (Entered: 07/02/2025) |
| 07/17/2025 | 256 | NOTICE of Subpoena by All Plaintiffs (Attachments: # 1 Exhibit Exhibit 1 - Subpoenas) (Brodziak, Maya) (Entered: 07/17/2025) |
| 07/21/2025 | 257 | STIPULATION of Dismissal *of First Amendment and Fourteenth Amendment Vagueness claims against OU Defendants and State Regents* by All Plaintiffs. (Brodziak, Maya) (Entered: 07/21/2025) |
| 07/24/2025 | 258 | MOTION for Protective Order *Against Plaintiffs' Notices of Deposition and Subpoenas to Testify at a Deposition in a Civil Trial* by P Mitchell Adwon, Jr, Zachary Archer, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Dustin Hilliary, Sarah Lepak, Ken Levit, Katie Quebedeaux, Jack Sherry, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington, Kendra Wesson. (Attachments: # 1 Exhibit 1-7.17.25 30b6 Depo. Notice - Okla. State Brd. of Edu., # 2 Exhibit 2-7.17.25 30b6 Depo. Notice - State Regents, # 3 Exhibit 3-7.17.25 Depo. Notice - Carlisha Bradley, # 4 Exhibit 4-7.17.25 Depo. Notice - Joy Hofmeister, # 5 Exhibit 5-Bradley Subpoena, # 6 Exhibit 6-Hofmeister Subpoena)(Gaskins, Garry) (Entered: 07/24/2025) |
| 07/24/2025 | 259 | MOTION for Protective Order *Against Plaintiffs' Document Subpoenas of Edmond Public Schools, Mustang Public Schools, and Tulsa Public Schools* by P Mitchell Adwon, Jr, Zachary Archer, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Sarah Lepak, Ken Levit, Katie Quebedeaux, Jack Sherry, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington, Kendra Wesson. (Gaskins, Garry) (Entered: 07/24/2025) |
| 07/29/2025 | 260 | SECOND AMENDED SCHEDULING ORDER granting 248 JOINT MOTION for Extension of Time to Complete Discovery *Schedule Deadlines* filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team to the extent set forth herein. Signed by Judge Charles Goodwin on 07/29/2025. (jb) (Entered: 07/29/2025) |

| | | |
|---|---|---|
| 07/31/2025 | 261 | NOTICE (other) by P Mitchell Adwon, Jr, Zachary Archer, Donald Burdick, Dennis Casey, Gentner Drummond, Jeffrey Hickman, Dustin Hilliary, Sarah Lepak, Ken Levit, Katie Quebedeaux, Jack Sherry, Kevin Stitt, Steven Taylor, Michael Turpen, Ryan Walters, Courtney Warmington, Kendra Wesson re 258 MOTION for Protective Order *Against Plaintiffs' Notices of Deposition and Subpoenas to Testify at a Deposition in a Civil Trial*, 259 MOTION for Protective Order *Against Plaintiffs' Document Subpoenas of Edmond Public Schools, Mustang Public Schools, and Tulsa Public Schools*, 256 Notice of Subpoena (Gaskins, Garry) (Entered: 07/31/2025) |
| 08/01/2025 | 262 | NOTICE (other) by American Indian Movement Indian Territory, Black Emergency Response Team, Anthony Crawford, Regan Killackey, Precious Lloyd, Oklahoma State Conference of the National Association for the Advancement of Colored People, University of Oklahoma Chapter of the American Association of University Professors *of Firm Name Change* (Johns, Kevin) (Entered: 08/01/2025) |
| 08/01/2025 | 263 | ORDER of USCA as to 187 Notice of Appeal filed by Precious Lloyd, University of Oklahoma Chapter of the American Association of University Professors, American Indian Movement Indian Territory, Regan Killackey, Anthony Crawford, Oklahoma State Conference of the National Association for the Advancement of Colored People, Black Emergency Response Team. Order filed by Clerk of the Court granting the parties Joint Stipulation to Dismiss Appeal as it pertains Black Emergency Response Team and the University of Oklahoma Chapter of the American Association of University Professors. As to the parties and/or appeals unaffected by this order, the first brief on cross-appeal remains due as set forth in the courts 07/03/2025 order. See order for additional information. Served on 08/01/2025. [24-6139] (llr) (Entered: 08/01/2025) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/06/2025 14:06:38 | | | |
| **PACER Login:** | sophiefeng | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:21-cv-01022-G Start date: 1/1/1974 End date: 8/6/2025 |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

[1] BLACK EMERGENCY RESPONSE TEAM,

[2] UNIVERSITY OF OKLAHOMA CHAPTER OF THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,

[3] OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

[4] AMERICAN INDIAN MOVEMENT INDIAN TERRITORY,

[5] PRECIOUS LLOYD, as next of friend of S.L.,

[6] ANTHONY CRAWFORD, and

[7] REGAN KILLACKEY,

*Plaintiffs*,

v.

[1] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General,

[2] JOY HOFMEISTER, in her official capacity as Oklahoma Superintendent of Public Instruction,

[3] WILLIAM FLANAGAN,
[4] CARLISHA BRADLEY,
[5] JENNIFER MONIES,
[6] ESTELA HERNANDEZ,
[7] BRIAN BOBEK,
[8] TRENT SMITH, in their official capacities as members of the Oklahoma State Board of Education,

[9] KEVIN STITT, in his official capacity as Governor of Oklahoma,

Case No. 5:21-cv-1022-G

Hon. Charles B. Goodwin

**AMENDED COMPLAINT**

[10] JEFFREY HICKMAN,
[11] MICHAEL TURPEN,
[12] STEVEN TAYLOR,
[13] DENNIS CASEY,
[14] JAY HELM,
[15] ANN HOLLOWAY,
[16] JOSEPH PARKER JR.,
[17] JACK SHERRY,
[18] COURTNEY WARMINGTON, in their official capacities as the Oklahoma State Regents for Higher Education,

[19] MICHAEL CAWLEY,
[20] FRANK KEATING,
[21] PHIL ALBERT,
[22] NATALIE SHIRLEY,
[23] ERIC STEVENSON,
[24] ANITA HOLLOWAY,
[25] RICK NAGEL, in their official capacities as members of the Board of Regents of the University of Oklahoma,

[26] ANGELA GRUNEWALD, in her official capacity as the Superintendent of Edmond Public Schools,

[27] JAMIE UNDERWOOD,
[28] CYNTHIA BENSON,
[29] KATHLEEN DUNCAN,
[30] LEE ANN KUHLMAN, in their official capacities as members of the Board of Education of Edmond Public Schools,

*Defendants*.

## INTRODUCTION

1. This is an action brought by Oklahoma students and educators challenging the state legislature's unprecedented and unconstitutional censorship of discussions about race and gender in schools through the passage of House Bill 1775 (codified as 70 Okla. Stat. tit. 70, § 24-157 (2021)) (hereinafter "H.B. 1775" or "the Act") and its implementing regulations (codified as Okla. Admin. Code § 210: 10-1-23) (hereinafter "the Rules").

2. H.B. 1775 severely restricts discussions on race and gender in Oklahoma's elementary, secondary, and higher education schools without any legitimate pedagogical justification, using language that is simultaneously sweeping and unclear. Public universities are prohibited from offering "any orientation or requirement" that presents "any form of race or sex stereotyping" or "bias on the basis of race or sex," leaving educators and students to guess at the scope of such broad, undefined terms and how this impacts the treasured principle of academic freedom in the state's universities. The Act further prohibits elementary and secondary school teachers from "mak[ing] part of a course" a list of eight banned "concepts" copied verbatim from an executive order issued in September 2020 by then-President Trump, which a federal court ultimately blocked as impermissibly vague. The Act's vague, overbroad, and viewpoint discriminatory provisions leave Oklahoma educators with an impossible—and unconstitutional—choice: avoid topics related to race or sex in class materials and discussions or risk losing their teaching licenses for violating the law.

3. The Act's confounding language is not only facially unconstitutional but its application has also chilled and censored speech that strikes at the heart of public education and the nation's democratic institutions. Educators at all levels are blacklisting books by diverse authors and adapting their instructional approaches to avoid raising complex questions about race and gender. District administrators have struck texts by Black and women authors from their reading lists, including *To Kill a Mockingbird*, *Their Eyes Were Watching God*, *I Know Why the Caged Bird Sings*, *Narrative of the Life of Frederick Douglass*, and *A Raisin in the Sun,* while leaving in place texts by White and male authors. Teachers have received guidance to comply with H.B. 1775 by avoiding terms such as "diversity" and "white privilege," while administrators have simultaneously acknowledged that "no one truly knows what [the Act] means or can come to agreement on its meaning." Professors have stopped testing on certain theories related to the implications of race on society, and university librarians are afraid to purchase materials related to race and gender. In response to serious complaints of racism and discrimination on its campus and to provide a safer climate for all, the University of Oklahoma ("OU") had required all students to participate in sexual harassment training and diversity, equity, and inclusion coursework; but now, OU is prohibited under the Act from mandating the training and coursework. Across the state, educators are censoring their speech to avoid deeper student inquiry around race, gender, and inequality because they do not know where the line between lawful and unlawful conduct lies.

4. This suppression of speech robs students of the information, ideas, and instructional approaches that result in the type of robust dialogue and analytical thinking

that courts have long recognized are essential to the preservation of America's democratic system. Describing schools as the "nurseries of democracy," *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021), the Supreme Court has emphasized that:

> The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection."

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (alteration in original)).

5. By erasing the perspectives of historically marginalized communities and restricting the robust exchange of ideas, H.B. 1775 prevents students from accessing information that will help prepare them to be active participants in democracy. This censorship directly contravenes Oklahoma's own instructional goals as well as constitutional values. Oklahoma's educational standards guide educators to prepare students "to become informed, contributing, and participating citizens in this democratic republic"[1] by engaging in curricula that is "inclusive of the identities that reflect the richness and diversity of the human experience"[2] to cultivate a more complete

---

[1] Okla. State Dep't of Educ., *Oklahoma Academic Standards for Social Studies, Pre-K–12* at 3 (Feb. 28, 2019), https://sde.ok.gov/sites/default/files/documents/files/Oklahoma%20Academic%20Standards%20for%20Social%20Studies%208.26.19.pdf [hereinafter "Social Studies Practices"].

[2] Okla. State Dep't of Educ., *2021 Oklahoma Academic Standards for English Language Arts* 5, https://sde.ok.gov/sites/default/files/documents/files/2021%20Oklahoma%20Academic%

understanding of the past and present. If schools and colleges are to fulfill their public purpose and fashion civic-minded Oklahomans, they must remain places where ideas—even ones deemed controversial by politicians—can be freely and robustly exchanged, including those related to racism and other forms of discrimination.

6. Open dialogue about race and gender carries particular importance in Oklahoma, whose history is checkered with attempts to suppress the perspectives of Black, Indigenous, and other marginalized people from the classroom. For a century, government-run "Indian boarding schools" subjected Indigenous Oklahomans to schooling designed to "kill the Indian in him, and save the man."[3] The majority of Oklahomans have never learned about the Tulsa Race Massacre of 1921, when a violent White mob destroyed the prosperous Black neighborhood of Greenwood, killing hundreds of its residents. These events continue to shape the lives of Oklahomans, carrying fruitful lessons for tackling today's most pressing issues and building a stronger, more inclusive future for all Oklahomans.

7. Efforts were ongoing to rectify this historic erasure and provide a fuller account of historical events, incorporating diverse perspectives. Leading up to H.B. 1775, students took action, calling for greater diversity and inclusion in education, and such

20Standards%20for%20English%20Language%20Arts.pdf [hereinafter "Okla. Educ. Standards for Language Arts"].

[3] Addison Kliewer et al., *"Kill the Indian, Save the Man": Remembering the Stories of Indian Boarding Schools*, Enid News & Eagle (Mar. 10, 2020), https://www.enidnews.com/oklahoma/remembering-the-stories-of-indian-boarding-schools/article_2dab0af4-62f2-11ea-8b72-63670b5a9f9b.html.

demands mounted in 2020 and into 2021 as the state and country engaged in mass movements for racial and gender justice. In response, schools and educators incorporated robust culturally responsive curricula and instruction, anti-racist practices, diverse perspectives, and a variety of diversity, equity and inclusion ("DEI") training programs in the best interests of their students. These approaches allow educators to lead their students to deeper levels of analysis and evaluation, as well as to bridge connections with students. Such approaches benefit all students but especially students who are of color, women and girls, and LGBTQ+ (collectively, "historically marginalized students") whose stories are often underrepresented and whose educational interests have largely been ignored for decades.

8. Bypassing the normal legislative process and acting on an "emergency" basis without evidentiary support, the Oklahoma legislature enacted H.B. 1775 to override the choices of professional educators. Proponents of the law made no attempt to conceal their desire to impose their own political and racial views upon the state's public school students. H.B. 1775's lead authors in the House and Senate transparently declared that the Act's purpose was to prohibit conversations related to "implicit bias" and "systemic racism," concepts that innumerable studies have shown are innate to the human experience, and the open discussion of which creates more inclusive, safe, and engaging educational spaces for historically marginalized students. Legislative supporters openly disparaged the Black Lives Matter movement and drew parallels to the Ku Klux Klan, and they sought to vilify concepts with which they disagreed by calling them "Marxist," "un-American," and "revolutionary" programs.

9. H.B. 1775 is an unlawful intrusion by politicians into the classroom—without input from educators—that dictates not just *what* can be taught, but *how* teachers must teach in service of an avowedly political agenda. By seeking to “cast a pall of orthodoxy over the classroom” based on partisan and racial interests, the Act impinges on the “transcendent value” of academic freedom that courts safeguard to preserve the very foundations of democracy. *Keyishian*, 385 U.S. at 603.

10. Under the rules promulgated by the Oklahoma State Board of Education (hereinafter “SBE”) pursuant to the Act, teachers and educational institutions face severe sanctions for violating the law’s unclear parameters, including the loss of education licenses, certificates, and accreditation. And the State has declared open season on all elementary and secondary school educators and educational institutions by allowing any member of the public to file a complaint with their district or the State Board of Education.

11. This type of state censorship is wholly unconstitutional. H.B. 1775 must be struck down on its face and as applied under the First and Fourteenth Amendments because the U.S. Constitution firmly rejects the Act’s improper racial and partisan motives and methods for effectuating censorship. H.B. 1775 silences speech through its vague, overbroad and viewpoint discriminatory terms, and intentionally targets and denies access to ideas aimed at advancing the educational and civic equality of historically marginalized students because of the legislators’ own discomfort and disagreement with certain viewpoints.

12. Plaintiffs respectfully urge this Court to declare the Act and its implementing regulations unconstitutional under the First and Fourteenth Amendments, and issue injunctive relief barring Defendants from enforcing it.

## PARTIES

**Plaintiffs**

13. Plaintiff Black Emergency Response Team ("BERT") sues on its behalf and on behalf of its members. BERT is a group of Black student leaders at OU dedicated to creating a safer and more supportive university experience for Black students. The purpose of the association is to advocate on behalf of Black students to OU's administration and to help Black students navigate access to support and resources when they experience racism on campus. BERT was formed in January of 2019, shortly after an OU student was filmed using blackface and the n-word, the latest in a series of racist incidents on campus, to respond to "any racial incidents in the future and play a strategic role in making the University of Oklahoma a more inclusive environment." BERT's members are harmed by the passage of H.B. 1775 because the law prohibits any "training or requirement that presents any form of race or sex stereotyping" among other restrictions. In response to the law, OU's DEI course and sexual harassment training is now optional rather than mandatory for all students. As a result, BERT's members now face heightened levels of racial and gender hostility and harassment, and the organization must be more vigilant in responding to incidents of racism and sexual assault. BERT's members are further harmed by H.B. 1775 in their classrooms. Due to the Act's chilling effect on professors' speech, BERT's members are denied access to essential information

related to race and sex. Several members fear that H.B. 1775 greatly diminishes the value of their degrees, particularly for the fields of African American Studies, Anthropology, and other related majors.

14. Plaintiff University of Oklahoma Chapter of the American Association of University Professors (hereinafter "OU-AAUP") sues on its behalf and on behalf of its members. OU-AAUP is a nonprofit association of faculty and academic professionals. The American Association of University Professors (hereinafter "AAUP") develops standards and procedures that maintain quality in education and academic freedom in U.S. colleges and universities. The OU-AAUP was founded in 2020 for AAUP members employed by OU. H.B. 1775 has harmed OU-AAUP's members by infringing on their academic freedom to present and research topics regarding race and sex. One OU-AAUP member was instructed not to include critical race theory (also referred to as "CRT") on exams. Other members are restructuring their pedagogical approach wholesale to avoid topics related to race, gender, or sexual orientation. Still more members fear complaints and sanctions for continuing to teach material related to race, gender, and sexual orientation. A Department Chair is considering whether they may offer classes in Black Literature under H.B. 1775. A librarian is concerned that they may be unable to purchase texts and materials relating to race, gender, and sexual orientation for the library. Many professors of marginalized backgrounds fear for their safety in their classrooms, on campus, and in their neighborhoods under the hostile culture empowered by H.B. 1775.

15. Plaintiff Oklahoma State Conference of the National Association for the Advancement of Colored People (hereinafter "NAACP-Oklahoma") sues on its behalf

and on behalf of its members. Founded in 1913, NAACP-Oklahoma is the oldest civil rights organization in Oklahoma. Its mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination. To advance its mission, NAACP-Oklahoma's key goals include educational advocacy to ensure that all students have access to a quality, integrated public education. NAACP-Oklahoma actively participates in the NAACP's Youth & College Division, and NAACP-Oklahoma has Youth & College Division chapters at nearly every public university in Oklahoma, including OU.

16. NAACP-Oklahoma serves as the umbrella organization for local branch units throughout the state and includes more than 1500 members in all 77 counties of Oklahoma. The majority of NAACP-Oklahoma's members identify as African American or Black, but the organization also includes members who are Native American or Indigenous, of mixed Black and European descent, and from a diverse range of other ethnic backgrounds. NAACP-Oklahoma also includes members of diverse gender identities, including LGBTQ+ people. A substantial number of NAACP-Oklahoma's members include elementary, middle, and high school students, and such students' parents, in the school districts of Ardmore, Chickasha, Edmond, Enid, Lawton, Muskogee, Oklahoma City, Tulsa, and other areas of the state, including:

a. NAACP-Oklahoma member Student A.A., who is a 9th grade student in Edmond Public Schools and who identifies as White. Student A.A. desires greater access to diverse texts, particularly texts by non-White and women authors, because such perspectives broaden Student A.A.'s

worldview, better prepare Student A.A. to participate in a multiethnic democracy, and enable Student A.A. to engage in advanced inquiry and problem-solving. H.B. 1775 restricts Student A.A.'s access to information and ideas that are essential for academic growth and success.

b. NAACP-Oklahoma member Teacher B.B., who identifies as African American and teaches in Muskogee Public Schools. As a result of H.B. 1775, Teacher B.B. had to change their approach to teaching, including avoiding topics that could possibly lead to discussion of banned concepts and approaches that push students to engage in higher levels of thinking, including analysis and evaluation. For example, Teacher B.B. no longer plans to introduce information related to current events, such as the detention centers at the border, because such topics are not enumerated in the state standards and discussing them could be interpreted as violating H.B. 1775 by prompting inquiry about systemic racism and implicit bias. These discussions also may make certain students "feel discomfort," which is outlawed under H.B. 1775 but difficult, if not impossible, for Teacher B.B. to predict given the law's highly subjective standard. Teacher B.B. is concerned that these changes will make the classroom environment less engaging, inclusive, and rigorous. Teacher B.B. has modified their curriculum due to fear of sanctions.

c. NAACP-Oklahoma member Principal C.C., who is a principal in Chickasha Public Schools. Principal C.C. recently identified possible DEI training for their teaching staff to address difficult topics involving race and gender, which is essential to improving the inclusivity of the curriculum and environment at their school. These trainings included discussing the concept of implicit bias and data about racial disparities within the school system. Principal C.C. wants to build an inclusive school community but will not be able to offer this training because H.B. 1775's vague and overbroad terms make Principal C.C. fearful of sanctions. As a result, Principal C.C. has not been able to utilize the tools and resources that leading experts recommend to improve the campus climate, recruit faculty members, and increase the engagement and achievement of students from all backgrounds, particularly those from historically marginalized groups.

17. Plaintiff American Indian Movement Indian Territory (hereinafter "AIM Indian Territory") sues on its behalf and on behalf of its members. AIM Indian Territory is a grassroots chapter of the prominent Native American rights organization, the American Indian Movement, which was founded in 1968 to address the plight of Urban Indians. The AIM Indian Territory has 37 members statewide, who come from a variety of tribal nations and/or identify as multi-racial. Approximately 30 of AIM's members are parents of children currently enrolled in Oklahoma elementary and secondary public schools. AIM Indian Territory's mission is to protect and fight for Indigenous rights and to better Indigenous communities throughout the State of Oklahoma and across Turtle

Island, which includes addressing issues of education justice, poverty, systemic racism, treaty rights, cultural preservation, and self-determination. One of AIM Indian Territory's key goals is to ensure that all students—including Native American students—receive a culturally relevant and inclusive education that enriches students' critical thinking skills and promotes cross-cultural exchange and appreciation for diverse cultures. H.B. 1775 harms AIM Indian Territory's mission and members by chilling classroom conversations that cultivate an educationally inclusive environment that best supports AIM members' safety, scholastic success, and skills to tackle barriers faced by their communities.

18. Plaintiff S.L. is an eleventh-grade student in Millwood High School who identifies as a Black woman. S.L. is enrolled in Plaintiff Anthony Crawford's English 4 class. S.L. is passionate about discussing current events and real-world topics in the classroom. S.L. is especially interested in learning about the histories and perspectives of Black, Indigenous, and other people of color because the curriculum too often leaves these viewpoints out. H.B. 1775 directly threatens S.L.'s ability to access important concepts and information that allows them, and other students, to formulate their own opinions and solutions regarding the challenges facing American society.

19. Plaintiff Anthony Crawford identifies as Black and is a high school teacher at Millwood High School. Mr. Crawford is dedicated to providing all students in his classroom with an atmosphere of inquiry so that they develop the reading, writing, and communication skills necessary to succeed as workers, leaders, and citizens in broader society. Because of H.B. 1775's confusing, broad and vague language, Mr. Crawford has been unable to discern what type of conduct violates the law and he fears sanctions and

punishment. Mr. Crawford teaches material that he believes best meets the needs of his students—including certain readings about injustice, particularly on the basis of race and gender, which could be swept into the category of prohibited topics and subject him to punishment. H.B. 1775 hampers Mr. Crawford's ability to impart information and skills that enable his students to succeed on state exams, excel in college and graduate courses, and thrive within broader society.

20. Plaintiff Regan Killackey identifies as White and has been an English Teacher at Edmond Memorial High School for over 14 years and a teacher for 19 years. Mr. Killackey and his colleagues at Edmond Public Schools are dedicated to creating an inclusive environment for all students and helping them build the critical thinking skills needed to write and speak about issues of social, political, and cultural significance. Following the passage of H.B. 1775, Mr. Killackey was instructed to avoid certain concepts, phrases like "diversity" and "white privilege", and books by non-White and women authors. Mr. Killackey is no longer able to lead appropriate educational classroom discussions on topics related to race, sex, and gender. H.B. 1775 prohibits Mr. Killackey from fully and effectively guiding the next generation of responsible citizens capable of collectively forming robust public opinion.

**Defendants**

21. Defendant John O'Connor is the Attorney General. He is sued in his official capacity. According to the emergency rules promulgated by the SBE, he is partially responsible for enforcement of H.B. 1775.

22. Defendant Joy Hofmeister is the Oklahoma State Superintendent and President of the SBE. The SBE is vested with the supervision of instruction in public schools, and charged with performing "all functions necessary to the administration of a school district in Oklahoma,"[4] including the adoption of "a social studies core curriculum with courses of instruction for all students enrolled in the public schools that reflect the racial, ethnic, religious, and cultural diversity of the United States of America."[5] Defendant Hofmeister is sued in her official capacity. Defendants SBE and Hofmeister are responsible for enforcing H.B. 1775.

23. Defendants William Flanagan, Carlisha Bradley, Jennifer Monies, Estela Hernandez, Brian Bobek, and Trent Smith are members of the SBE (hereinafter "SBE members"), and have concurrent responsibility to supervise instruction in public schools and adopt a curriculum in compliance with the Oklahoma School Code, §70-1-101, et al. The SBE also adopted emergency rules governing the implementation of H.B. 1775 in public schools. Defendant SBE members are sued in their official capacities and are responsible for enforcing H.B. 1775.

24. Defendant Governor Kevin Stitt is the Chief Executive of Oklahoma. He is sued in his official capacity. Defendant Stitt is responsible for signing H.B. 1775 into law and approving the promulgated emergency rules by the SBE. He is responsible for enforcing H.B. 1775 as the Chief Executive of Oklahoma.

[4] 70 O.S. § 5-117.

[5] 70 O.S. § 11-103.6b.

25. Defendant Oklahoma State Regents for Higher Education (hereinafter "State Regents") have broad authority to determine standards and coursework across the state's higher education system. The State Regents members are: Chair Jeffrey W. Hickman, Vice Chair Michael Turpen, Secretary Steven Taylor, Assistant Secretary Dennis Casey, Jay Helm, Anne Holloway, Joseph Parker Jr., Jack Sherry, and Courtney Warmington (hereinafter "State Regents members"). Defendant State Regents members are sued in their official capacities. Defendants State Regents and State Regents members are responsible for enforcing H.B. 1775.

26. Defendant University of Oklahoma Board of Regents (hereinafter "OU Regents") is the official governing body of The University of Oklahoma, Cameron University, and Rogers State University. The OU Regents members are: Chair Michael Cawley, Vice Chair Frank Keating, Phil B. Albert, Natalie Shirley, Eric Stevenson, Anita Holloway, and Rick Nagel (collectively, "OU Regents members"). OU Regents members are sued in their official capacities. Defendants OU Regents and OU Regents members are responsible for enforcing H.B. 1775.

27. Defendant Angela Grunewald is the Edmond Public Schools Superintendent and executive officer of the Edmond Public Schools Board of Education, which governs Edmond Public Schools (hereinafter "EPS"). EPS is the third largest district in Oklahoma, serving more than 23,800 students. The district has 17 elementary schools, six middle schools, three high schools, an alternative high school, and an early childhood center. EPS is the largest full-time employer in Edmond, with over 3,000 employees. The district is 62% White, 11% Black, 11% Hispanic, 9% Mixed, 5% Asian,

and 2% American Indian.[6] EPS's instructional vision is based on five pillars: collaboration, creativity, choice, inquiry, and reflection. Defendant Grunewald is sued in her official capacity. Defendant Grunewald is responsible for enforcing H.B. 1775.

28. The Edmond Public Schools Board of Education (hereinafter "EPS Board") is responsible for the supervision of instruction in EPS. The EPS Board members are: President Jamie Underwood, Vice President Cynthia Benson, Kathleen Duncan, and Lee Ann Kuhlman (hereinafter "EPS Board members"). The EPS Board members are sued in their official capacities. Defendants EPS Board and EPS Board members are responsible for enforcing H.B. 1775.

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

30. In addition, this Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57.

31. Venue is proper in this District under 28 U.S.C § 1391(b) and (e) because Defendants are public officials in the State of Oklahoma and sued in their official capacities. Defendants reside within this District and/or perform official duties within the

[6] Edmond Pub. Schs., *2019-2020 Report to the Community* 4 (2020), https://edmondschools.net/wp-content/uploads/2019/09/FINAL-2019-2020-ANNUAL-REPORT.pdf.

State of Oklahoma. This Court, accordingly, has personal jurisdiction over the Defendants.

## FACTUAL ALLEGATIONS

### I. Freedom Of Speech In Schools Is Central To Fostering And Preserving A Democratic Society.

32. Schools play an essential role in the preservation of democratic institutions and ideals. As the Supreme Court has recognized, America's schools are vital for "prepar[ing] citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972). They are "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). The Supreme Court has also recognized the "fundamental role" of higher education "in maintaining the fabric of society." *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) (citation omitted).

33. Reflecting the important role of education in a democratic society, the First Amendment protects "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Bd. of Educ. v. Pico*, 457 U.S. 853, 866–68 (1982) (plurality opinion). "[J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico,* 457 U.S. at 868.

34. Academic freedom is similarly a "special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. A necessary component of academic freedom is the freedom of teachers and students "to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire,* 354 U.S. 234, 250 (1957); *see also Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2046 ("the school itself has an interest in protecting a student's unpopular expression . . . [because] America's public schools are the nurseries of democracy"). The interest in preserving academic freedom is especially strong in the context of higher education. *See Sweezy*, 354 U.S. at 250 ("The essentiality of freedom in the community of American universities is almost self-evident . . . To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation").

35. Consonant with the importance of preserving the right to receive information is the constitutional requirement that all students, regardless of their race or sex, have equal access to education and the academic freedom available therein. The ability of students to access education equally impacts their "ability to study, to engage in discussions" and to "exchange views with other students." *Brown*, 347 U.S. at 493 (quoting *McLaurin v. Oklahoma State Regents*, 339 U.S. 637, 641 (1950)). Moreover, diversity in all its forms is central to achieving the democratic goals of education, inasmuch as "[e]ffective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized." *Grutter*, 539 U.S. at 331–332.

36. Oklahoma's governing education standards, developed by a wide range of experienced educators, reflect these important goals and values. For example, the Oklahoma Academic Standards for Social Studies, state, in part:

> Having a literate citizenry rests on a commitment to democratic values and the practice of them. It requires the ability to use knowledge about one's community, nation and world, apply inquiry processes, and employ skills of data collection and analysis, collaboration, decision-making; and problem-solving. . . .
>
> A well-rounded, vigorous social studies education encourages and enables each student to acquire a core of basic knowledge, an arsenal of useful skills, and a way of thinking drawn from many academic disciplines. Thus equipped, students are prepared to become informed, contributing, and participating citizens in this democratic republic – the United States of America.[7]

37. H.B. 1775 stands in opposition to these core democratic principles and constitutional rights. Rather than offering students the ability to engage broadly and inclusively in academic debate and discourse, the law severely restricts discussions and coursework about race and sex. Further, the Act's censorship of speech rests upon illicit motives and inflicts disparate harm: H.B. 1775 was enacted with the particular intent of harming historically marginalized students, and the Act has had its intended effect.

[7] Social Studies Practices at 3.

## II. H.B. 1775 Prohibits Opportunities For Free Debate And Discussion, And Is Overbroad, Vague, And Viewpoint Discriminatory.

### *a. The plain text of H.B. 1775 is overbroad, vague, and viewpoint discriminatory.*

38. On May 7, 2021, Governor Stitt signed H.B. 1775 into law, codified as 70 O.S. § 24-157. It became effective on July 1, 2021.

39. The text of the Act is ambiguous and confusing, leaving educators, legislators, and enforcers to guess what it means, chilling protected speech and expression, and encouraging arbitrary and discriminatory enforcement. Legislators themselves recognized the broad ambiguity of the law's terms, and this vagueness was left unaddressed in the final version of the law. As one concerned legislator pointed out in the House debate, it is unclear whether the Act prohibits teaching about a staggeringly wide range of topics from the wage gap to Hitler's motivation for World War II.[8]

40. Section (1)(A)(1) provides that:

> No enrolled student of an institution of higher education within The Oklahoma State System of Higher Education shall be required to engage in any form of mandatory gender or sexual diversity training or counseling; provided, voluntary counseling shall not be prohibited. Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited.

[8] Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 29, 2021, 10:34:07 AM), https://www.okhouse.gov/Video/Default.aspx [hereinafter "April 29th House Session"].

70 O.S. § 24-157(1)(A)(1). On the House floor, Representative Meloyde Blancett (D) repeatedly asked for clarification on what these provisions meant, saying "it's not clear."[9] No clarification was provided.

41. The vagueness of these terms makes it unclear which of the many forms of on-campus speech and expression are impacted by the prohibition. The law does not define the terms "training" or "counseling," "orientation," or "requirement." The lack of specificity is particularly problematic in a law addressed to the higher education setting, where the purpose animating the institution is to educate or "train" students, and where certain courses are "required" and every course contains "required" readings and assignments.

42. It is still further unclear what it would mean for a student to be "required to engage" in a training or counseling. For example, it is not clear whether the law prohibits requiring active participation or extends to required attendance and passive receipt of information. Moreover, on a college campus, many forms of "training" or "counseling" may occur. For example, the law could prohibit trainings as required parts of a student's orientation to campus, on-campus jobs, or extracurricular activities. The law also does not make exceptions for training or counseling that may be instituted to remedy a violation of state or federal law civil rights laws, including laws addressing racial and sexual harassment.

[9] *Id.* at 11:32:15–11:32:37 AM.

43. It is also unclear what topics are covered by "gender or sexual diversity." For example, universities are obligated to explain their gender-based discrimination, sexual harassment, and sexual assault policies to all students, faculty, and staff, but the Act appears to prohibit them from doing so.

44. Nor does the law define how any "orientation" or "requirement" might "present . . . stereotyping or bias." Vast swaths of coursework are seemingly censored under the law for interrogating how stereotypes and bias play out in society. For example, the law on its face—and even more so when interpreted through the comments of H.B. 1775's sponsors specifically targeting and disparaging "the theory of implicit bias"[10]—chills a professor's ability to require that students read or learn about the concept of implicit bias; *i.e.*, the idea that people can act on the basis of racial, gender, sexual orientation or other stereotypes without consciously intending to do so. Yet implicit bias has long been an important concept in a variety of academic disciplines, including cognitive psychology, sociology, organizational behavior and others.

45. Section (1)(B)(1) is also vague and overbroad. The section lists eight vaguely worded concepts aimed at censoring classroom discussions and materials. 70 O.S. § 24-157(1)(B)(1). The banned concepts listed in this section were copied verbatim from former President Donald Trump's Executive Order 13950 (hereinafter "EO 13950") (discussed *infra* Section IV(a)). Although a federal court barred EO 13950 from going

[10] Press Release, Bill Prohibiting "Critical Race Theory" Curriculum Passes House, Okla. H.R. (Apr. 29, 2021), https://www.okhouse.gov/members/PrintStory.aspx?NewsID=8125.

into effect, in part, under the First Amendment in December 2020, *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020), the Oklahoma Legislature enacted H.B. 1775 months later without curing vague terminology.

46. Section (1)(B)(1) provides: that "[n]o teacher, administrator or other employee of a school district, charter school or virtual charter school shall require or make part of a course" the enumerated concepts. *Id.* In the first instance, the law applies to any "teacher" or "administrator," and could conceivably be applied to a teacher or administrator at any level of education, including pre-school teachers and college professors. On the House floor, legislators noted that the bill is "confusing" and that "it's unclear as to what applies to higher education versus common education and so forth."[11]

47. Further, the term "require or make part of a course" is not defined by the law. To prohibit making any "concept" a "part of a course" reaches an unlimited scope of classroom discussion and of the general free speech and expression that occurs within a school. It is further unclear what the distinct prohibition on "requiring" a "concept" is intended to address. By its terms, the law is not limited to "courses" or "require[ments]" for students and applies to any "employee of a school district" or charter school. In this way, the law reaches broadly to implicate requirements made of employees or other facets of the administration of a school system. When combined with the vagueness of the enumerated concepts, the law's capacity to chill protected expression and to be applied in an arbitrary and discriminatory manner is vast.

[11] April 29th House Session at 10:12:03–10:13:40 AM.

48. Section (1)(B)(1)(a) prohibits the concept that "one race or sex is inherently superior to another race or sex." *Id.* § 24-157(1)(B)(1)(a). H.B. 1775's vague and overbroad language puts educators at risk of losing their livelihoods if they teach about historical events and individuals who subscribed to these viewpoints, even if they do so to critique these positions and without advocating these positions. Thus, this provision causes educators to shy away from open and frank dialogue on these topics.

49. Section (1)(B)(1)(b) prohibits the concept that "an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously." *Id.* § 24-157(1)(B)(1)(b). Particularly as interpreted in light of legislators' statements, this broad and vaguely worded provision deprives students of information about (among other things) "implicit bias," which, as noted above, is a concept relevant to many academic fields.

50. Section (1)(B)(1)(c) prohibits the concept that "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex." *Id.* § 24-157(1)(B)(1)(c). This sweeping prohibition chills classroom discussion of important contemporary topics, as educators fear the significant repercussions of making an erroneous guess as to what discussions are permissible and what discussions are forbidden.

51. Section (1)(B)(1)(d) prohibits the concept that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." *Id.* § 24-157(1)(B)(1)(d). While treating others with respect, or treating others equally and fairly, would be laudable goals to teach and encourage, H.B. 1775's contorted prohibition of the

concept that people "cannot and should not attempt to treat others without respect to race or sex" is undecipherable. It is unclear what it would mean to treat a person "without respect to race or sex," and it is further unclear what it would mean to teach that a person "cannot or should not attempt" to do so. Combining these phrases in one prohibition creates a confusing double negative. Both state and federal laws and regulations addressing discrimination are well established, but the Oklahoma Legislature did not reference existing law to clarify its meaning or explain the intended operation of H.B. 1775 in relation to these laws. While the Oklahoma Legislature intended subsection (d) to have some force and effect, it is not clear what it prohibits. As such, students and educators are left to guess at its meaning, violating their due process rights and chilling their speech and expression.

52. Additionally, section (1)(B)(1)(g) prohibits the concept that "any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex." *Id.* § 24-157(1)(B)(1)(g). The lack of clarity in the law encourages application to prohibit any discussion or expression that might result in a person experiencing, among other emotions, "discomfort," without regard to the intent of the speaker. Students frequently confront subject matter that may prompt "discomfort," "guilt," "anguish," or "distress." When students study art, philosophy, history, science, or any other subject matter, they encounter new and complex ideas and a range of viewpoints, any of which may prompt a range of emotions as part of the educational process. This is no more or less true when the subject matter touches on race or sex. Discussions of American and world history, including the Holocaust, slavery, and

segregation, for example, undoubtedly invoke a range of emotions. Moreover, avoiding or ignoring race and sex when relevant to a subject of study or as experienced in students' lives can itself produce feelings of discomfort or anguish. The law therefore puts teachers in an impossible situation.

53. Section (1)(B)(1)(h) also bans the concept that "meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race." *Id.* § 24-157(1)(B)(1)(h). Again, it is unclear what this means and how it is to be enforced. The law could be applied to prohibit any critiques of systems of "meritocracy" in the past—such as discussing the debunked science surrounding the eugenics movement—or engaging with present debates about reliance on standardized tests and legacy college admissions, for example. Again, a wide range of classroom discussion and student thought and expression is chilled by this vaguely worded prohibition.

54. Section (1)(B) asserts that "[t]he provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." *Id.* § 24-157(1)(B). However, the law's prohibitions are so broad and open-ended that there is no clear way to interpret and apply the law without presenting conflicts or potential non-alignment with the Oklahoma Academic Standards and the law fails to define "align," leading educators to silence a wide range of permissible speech to avoid sanctions.

55. H.B. 1775 incorporates numerous vague and overbroad terms that add further ambiguity to the Act when taken as a whole. H.B. 1775 is additionally overbroad in that it places restrictions on what educators can teach and what students can learn

based on political ideology, singling out disfavored discussions of the topics of race and gender. The ambiguities in the law lead educators and students to steer wide of its terms, chilling a broad scope of protected speech and undermining the role that education plays in preparing students to participate in the state's and nation's diverse and democratic society. The law further chills certain disfavored speech—about race and sex—and is amenable to arbitrary and discriminatory application that harms all students, but inflicts pronounced harms on historically marginalized students.

56. When asked if he could understand that H.B. 1775 "seems like it would come from a dictatorial society," the House sponsor of the bill Representative Kevin West (R) replied, "for this to be falling under a dictatorship-type of legislation, it would be saying *this is what you're going to teach*, and we would spell that out . . . What this is doing is saying that you're not gonna [teach] these areas—these concepts that based solely on your race or your sex, that you are automatically *this*."[12] But, as House Representative John Waldron (D) predicted, "the wise teacher will learn to watch their words. They'll learn to avoid controversy. They'll teach a sanitized view of American and Oklahoma history so as to avoid the fate of John Scopes. Our children will suffer for they will not know their history."[13]

---

[12] April 29th House Session at 11:23:16–11:24:00 AM.

[13] *Id.*

***b. The emergency rules approved by the State Board of Education to implement H.B. 1775 expand its scope and impose severe sanctions.***

57. As directed by H.B. 1775, the SBE approved temporary, emergency rules regarding the implementation and enforcement of H.B. 1775 (the "Rules") on September 10, 2021 (codified as Okla. Admin. Code § 210: 10-1-23). Rather than clarify the vague terms of H.B. 1775, the implementing Rules adopt an expansive interpretation of H.B. 1775, demonstrating and solidifying both its ambiguity and reach.

58. Regarding elementary and secondary education, the Rules establish a broad, non-exhaustive definition of "course" as "any forum where instruction or activities tied to the instruction are provided, including courses, training, seminars, professional development, lectures, sessions, coaching, tutoring, or any other class." Okla. Admin. Code § 210:10-1-23(b)(1)(B). Thus, the Rules fail to provide clarity and only emphasize the breadth and ambiguity in the law's reach. Moreover, where H.B. 1775 was vague, the implementing Rules clearly sweep in speech directed to school employees by referencing "professional development," for example.

59. The Rules prohibit public schools from "adopting programs or utilizing textbooks, instructional materials, curriculum, classroom assignments, orientation, interventions, or counseling that include, incorporate or are based on [the banned concepts.]" *Id.* § 210:10-1-23(d)(3). The Rules likewise prohibit entering into "agreements" based on such concepts. The laundry list of regulated information set forth in the Rules highlights the broad sweep of H.B. 1775 and introduces further vagueness. The Rules make clear that particular textbooks and materials are subject to the

prohibitions, meaning that educators could be prohibited from exposing students to a book that contained the banned "concepts," even if the purpose of a lesson was to critically examine the arguments put forth in the book. Moreover, where the law prohibits "requir[ing] or mak[ing] part of a course" the banned concepts, the Rules introduce additional terms to which the prohibition extends, including "programs," "counseling," and "interventions," without definition.

60. In addition, the Rules prohibit school support for "affinity groups . . . unless specifically permitted by Title IX." *Id.* § 210: 10-1-23(d)(8). "Affinity groups" is not defined by the law. Merriam-Webster defines "affinity group" as "a group of people having a common interest or goal or acting together for a specific purpose (as for a chartered tour)."[14] Moreover, the Rules do not clarify what it would mean for a school to "support" an affinity group. This prohibition could be applied to a wide range of student clubs, groups, and activities—chess club, academic bowl, or even a senior class field trip—that make up an important part of the educational experience.

61. The Rules further affirm the broad reach of H.B. 1775 and the broad range of staff members who face penalties, including: "superintendents of schools, principals, supervisors, librarians, school, [*sic*] classroom teachers or other personnel performing instructional, administrative and supervisory services in the public schools." O.A.C. § 210: 10-1-23(J).

---

[14] Affinity Group, Merriam-Webster, https://www.merriam-webster.com/dictionary/affinity%20group.

62. The Rules also confirm the State's intent to enforce H.B. 1775 broadly, compounding the chilling effect of the law. They establish sanctions for individuals and entities that fail to comply with H.B. 1775 and the implementing regulations. Individuals face suspension or license revocation if found in violation of H.B. 1775 or the Rules. *Id.* A school found in violation faces accreditation penalties. *Id.* § 210: 10-1-23(h).

63. The Rules also lay out several mechanisms permitting members of the public to file complaints against individuals and school districts, and to facilitate investigations. Reports of violations may be filed by "students, parents, teachers, school staff, and members of the public" through the school's designated employee to receive and resolve such complaints, *id.* § 210: 10-1-23(g)(1), or directly with the State Department of Education (hereinafter "SDE"). *Id.* § 210: 10-1-23(g)(4). The Rules also encourage the filing of complaints by affording parents the "right to inspect curriculum, instructional materials, classroom assignments, and lesson plans to ensure compliance with [H.B. 1775]," and by providing "whistleblower protections" to complainants. *Id.* § 210: 10-1-23(e), (l).

64. Further, the Rules provide that, so long as a complaint is "legally sufficient," the school "shall be required" to conduct an investigation. But the Rules do not define "legally sufficient," and the terms of both the Rules and H.B. 1775 are vague and overbroad. Teachers, administrators, librarians and other school personnel therefore know that if they say or do anything that any member of the public could claim was a violation of H.B. 1775, they will, at a minimum, be the subject of an official school investigation that could take up to three months to complete, while their profession hangs

in the balance. *Id.* § 210: 10-1-23(g)(3). This broad enforcement mechanism thus further chills free speech and expression.

65. The Rules also require districts to "adopt policies and procedures, including incorporating into employee and student handbooks" terms that comply with the requirements of H.B. 1775 and the implementing regulations. *Id.* § 210: 10-1-23(g). Such policies must include designating an employee to receive complaints and specifically notifying individuals of the right to file complaints. *Id.* § 210: 10-1-23(g)(2).

***c. H.B. 1775 has censored and chilled protected speech and expression in elementary and secondary schools.***

66. In attempting to comply with H.B. 1775 and its implementing rules, EPS has adopted guidance for teachers. As the guidance authors express, "[u]nfortunately, no one truly knows what [the law] means or can come to an agreement on its meaning." *See* Exhibit 1. The guidelines also offer that, "If a student asks, 'What is CRT?' then a teacher may respond with, 'it's often a theory used in higher education to look at laws in society.' This response would not violate the law." *Id.* As this guidance demonstrates, in attempting to steer clear of the law's prohibitions, educators are chilled in their ability to provide students with anything but the most ambiguous answers to their questions, stymieing students' ability to learn and engage with subject matter.

67. In interpreting and applying H.B. 1775, EPS has also prohibited teachers from using the terms "diversity" and "white privilege." Exhibit 2. It has struck the only books by women authors or authors of color—*To Kill a Mockingbird* by Harper Lee and A *Raisin in the Sun* by Lorraine Hansberry—from its list of anchor texts, the texts around

which teachers build curriculum, while retaining books by White male authors. It has also removed other commonly taught texts by Black and women authors—*Their Eyes Are Watching God* by Zora Neale Hurston, *I Know Why the Caged Bird Sings* by Maya Angelou, and *Narrative of the Life of Fredrick Douglass* by Fredrick Douglass—from its curriculum.

68. In addition, EPS did not offer the "Diversity Module" training that had been provided to teachers in 2020, which encouraged teachers to "embrace uncomfortable and courageous conversations about race," "reflect on how marginalized students have barriers they must navigate every day," and "share tips and ideas for moving forward to build courageous classrooms and professional teams where everyone belongs."

69. Plaintiff NAACP-Oklahoma's member who is an EPS student ("Student A.A.") identifies as White and as a boy and desires greater access to diverse texts, particularly texts by non-White and women authors, because such perspectives broaden Student A.A.'s worldview, better prepare A.A. to participate in a multiethnic democracy, and enable Student A.A. to engage in advanced inquiry and problem-solving. As a result of H.B. 1775 and its application through the policies of EPS, Student A.A. has lost access to texts by Black and women authors that explicitly discuss racial and gender relations, and the corresponding classroom discussions that explore such issues from multiple angles. Plaintiff Killackey, an EPS teacher, likewise attests that the loss of these texts is a detriment to the students' social, cognitive, and emotional development since such books create robust dialogue and create a stimulating, supportive environment for all students.

70. Teachers across the state fear similar restrictions under H.B. 1775. Through utilization of vague terms with a harsh enforcement mechanism, H.B. 1775 chills permissible speech by teachers who are uncertain whether their instruction could lead students to inquire about a prohibited concept. Plaintiff NAACP-Oklahoma's member Teacher B.B. reported that H.B. 1775 is so vague and confusing that they do not understand what conduct is prohibited under the law, and fear that school officials will make examples of certain teachers. They worry these punishments will disproportionately fall on teachers of color. Further, since the passage of H.B. 1775, Teacher B.B.'s school district has not offered DEI training, a training that was provided at the start of prior school years.

71. Likewise, Plaintiff Crawford, a high school teacher in the Millwood Public Schools, structures his courses to stimulate debate among students by intentionally including multiple viewpoints. However, based on the Act's vague terms, Mr. Crawford is not clear whether he can expose students to certain viewpoints and theories that are relevant to the public discussion of contemporary issues. For example, he is uncertain whether the law prohibits presenting the idea that the wealth gap stems from systemic racism and sexism, alongside alternative ideas that the wealth gap results from individual decision-making.

72. Plaintiff S.L., a high school student enrolled in Mr. Crawford's class, desires access to information and theories related to systemic racism, discrimination, and the perspectives of Black community members and scholars. By threatening Mr.

Crawford's ability to include such content in his courses, H.B. 1775 threatens Plaintiff S.L.'s access to such information and ideas.

73. Similarly, H.B. 1775's chilling effect on DEI trainings and curricula negatively impacts Plaintiff AIM Indian Territory's continued advocacy for Indigenous awareness and cultural competence in schools. By restricting students' access to the full range of historical, literary, and contemporary accounts, H.B. 1775 also deprives AIM's members of ideas that facilitate greater inquiry, understanding, and problem-solving. Moreover, H.B. 1775's effect of creating campus climates that are less inclusive and hostile for students of color inflicts harm on AIM Indian Territory's student members who often face harassment and alienation in school—ranging from having their braids forcibly cut by classmates to bans on traditional regalia at graduation—which arise from cultural misunderstanding and prejudice that could be ameliorated by the type of inclusive speech that H.B. 1775 chills.

***d. As a result of H.B. 1775, academic freedom in higher education has been limited.***

74. Following the passage of H.B. 1775, OU ended two mandatory student courses and trainings. First, OU ended the requirement that students attend training on sexual violence, a requirement that had been in place for several years and formed a part of OU's efforts to comply with federal law. Second, OU scrapped a requirement for incoming students to take a diversity course, "Gateway to Belonging," adopted in response to student demands following a series of racially hostile acts on campus and developed in collaboration with students from BERT. By making the DEI course and

sexual harassment training voluntary rather than mandatory in order to comply with H.B. 1775, students of color, including members of BERT, now feel less safe on campus.

75. Pursuant to H.B. 1775, students and professors at OU, including members of BERT and OU-AAUP, have had their academic freedom significantly restricted. AAUP members have removed from their courses texts which directly address race, gender, and sexual orientation; they are unsure if they can select library materials reflecting recent research on issues of race, gender, and sexual orientation; they are amending their courses to avoid critical inquiry into issues related to racism, oppression, and colonialism; and they will no longer teach through the analytical lens of critical race theory, alongside other frameworks.

76. For example, BERT seeks exposure to the full range of information related to race and sex because understanding the sources of prejudice better equips members to deconstruct and dismantle it. BERT's members have expressed that the Act puts their education at risk because it deprives them of the theoretical frameworks and historical perspectives that are essential to their majors and courses of study, including Anthropology and African American Studies.

77. H.B. 1775 and state and local actions implementing the law are vague, restrict students' access to information, and limit academic freedom in overbroad and viewpoint discriminatory terms. They are open to arbitrary and discriminatory enforcement, and evidence from the limited time that the law has been in effect demonstrates the uneven nature of its application to silence certain speech by educators and students. It is not an accident that the law disparately and discriminatorily chills

speech by and supporting students of color and other historically marginalized students. The history leading up to the Act's passage, as well as the debate and discussion of the Act, make clear that this was an intended and foreseeable form of the law's arbitrary and discriminatory application.

## III. Oklahoma Educators Recognize That Inclusive Education, Consistent With The State's Instructional Goals, Better Prepares Students To Participate In Democratic Institutions And In A Diverse Society.

### *a. Oklahoma educators responded to students' calls for discussions about race and gender by providing exposure to diverse viewpoints and ideas.*

78. Following the killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and numerous other Black people in 2020, Oklahomans and Americans across the country increased their calls for advancing racial justice throughout all sectors of society. A multiracial coalition of millions of people engaged in racial justice demonstrations, often organized under the banner of Black Lives Matter, making the 2020 protests among the most significant mass movements in the country's history. Across Oklahoma, thousands of peaceful protestors marched for racial justice in Ardmore, Bartlesville, Brown Arrow, Edmond, Lawton, Muskogee, Norman, Oklahoma City, and many other cities.

79. These calls for racial justice reflected a larger shift across the country. According to a 2020 study conducted by Monmouth University, a newfound majority of

Americans agreed that: "racism and discrimination is a 'big problem,'" and "there's a lot of discrimination against black Americans in society."[15]

80. The 2020 movement for racial justice included demands for gender justice, as Black trans and queer leaders brought attention to the disproportionate violence faced by LGBTQ+ people of color. Mass movements such as the "Me Too" and "Time's Up" campaigns further shed light on the rampant discrimination faced by women, especially against women of color. And battles for equal treatment for LGBTQ+ individuals likewise continued, especially in light of key court cases, including the *Bostock v. Clayton County* transgender employment case. 140 S.Ct. 1731 (2020). LGBTQ+ people celebrated victories in Oklahoma as well when the state elected Representative Mauree Turner, who became Oklahoma's first openly nonbinary lawmaker.

81. These social and legal shifts popularized discussions about how to dismantle racism and sexism and how to increase inclusivity, surfacing concepts such as "structural" "systemic" or "institutional" racism, and "racial privilege" or "white privilege." Students in Oklahoma witnessed these events and participated in these conversations.

82. On OU's campus, BERT held a sit-in and hunger strike in February 2020 in response to recurring experiences of anti-Black disrespect and denigration (including the recent use of blackface and the n-word on campus by professors and students). BERT

[15] Nate Cohn & Kevin Quealy, *How Public Opinion Has Moved on Black Lives Matter*, N.Y. Times (June 10, 2020), https://www.nytimes.com/interactive/2020/06/10/upshot/black-lives-matter-attitudes.html.

peacefully demanded that OU create a mandatory DEI course to make OU a safer place for Black students and other historically marginalized students.

83. Elementary and secondary school students also sought to discuss these issues in their schools. In July 2020, students from the state Student Advisory Council met with the Superintendent of Public Instruction and "[p]rompted by current events and nationwide protests . . . discussed their experiences with racial and ethnic identity in schools," calling for new ways to discuss these issues in schools.[16] For example, one council member suggested a diversity course as a high school requirement, arguing that "[w]e're really lacking the ability to have the hard conversations. We have financial literacy. How can we have 'communication literacy?'" The council member conveyed that "[e]veryone in my class looked like me, and I wasn't aware of the struggles other people faced. I couldn't sympathize with it because I didn't understand it." Other council members also conveyed a desire to address these issues directly through their education. As one member conveyed, "[w]e have to go back and face our problems. They won't go away on their own." Another similarly stressed that "[w]e need a better curriculum to teach people the mistakes of our past and how we can do better going forward."

84. In response to students' calls for greater exposure to diverse voices and ideas, many schools and educators increased access to information that acknowledges and addresses the past and present experiences and inequities faced by historically

[16] Press Release, Okla. State Dep't Educ., Hofmeister's Student Advisory Council Shares Thoughts on Distance Learning, Systemic Racism (June 30, 2020), https://sde.ok.gov/newsblog/2020-07-01/hofmeister%E2%80%99s-student-advisory-council-shares-thoughts-distance-learning-systemic.

marginalized students (hereinafter "Inclusive Speech"). Inclusive Speech is not intended to harm any student groups. Inclusive Speech includes "culturally responsive curricula" (also known as "culturally inclusive" curricula), which seek to present a more robust and informed portrayal of topics by, for example, including the perspectives and experiences of diverse communities in historical and present-day examples of injustice like slavery, Jim Crow, segregation, and racial discrimination.[17] Inclusive speech also includes discussions about stereotypes, prejudice, explicit and implicit bias, or "unconscious" bias, which refers to the "the attitudes or stereotypes that affect our understanding, actions, and decisions in an unconscious manner."[18]

85. Inclusive Speech may also include anti-racism education and, in higher education settings, critical race theory, which is a body of scholarship most commonly used in law schools and graduate schools that involves: (1) the pursuit of understanding how racial subordination originated and has been maintained in the United States, especially in relation to the legal system; and (2) a desire to change the legal system so that it no longer supports racial subordination.

---

[17] Antonia L. Hill, *Culturally Responsive Teaching: An Investigation of Effective Practices for African American Learners* 23–24 (Dec. 2012) (Ph.D. dissertation, Loyola University Chicago), https://ecommons.luc.edu/cgi/viewcontent.cgi?article=1352&context=luc_diss; Dr. Chastity McFarlan, *Supporting Marginalized Students Through Culturally Relevant Pedagogy*, Renaissance (Sept. 10, 2021), https://www.renaissance.com/2021/09/10/blog-supporting-marginalized-students-through-culturally-relevant-pedagogy/.

[18] NEA Ctr. for Soc. Just., *Implicit Bias, Microaggressions, and Stereotypes Resources* (Jan. 2021), https://www.nea.org/resource-library/implicit-bias-microaggressions-and-stereotypes-resources.

86. Inclusive Speech takes many forms but it is unified by the aim of ensuring equal access to educational content for students of all backgrounds, and exposure to various perspectives that reflect the diversity of Oklahoma and America.

87. In higher education, OU fostered Inclusive Speech by responding to BERT's request for curricula that combats discrimination and cultivates a racially inclusive campus climate. In July 2020, OU revised its strategic plan to incorporate mandatory DEI coursework for all incoming freshmen. The course sought to "help students gain an understanding of diverse perspectives from people of different abilities, identities, cultures, and social backgrounds, building an intercultural awareness that will allow them to interact more effectively with others." The course would identify the sources of prejudice and discrimination, with an emphasis on combatting racism.

88. School districts likewise engaged in Inclusive Speech to meet student and community calls for greater equity. For example, in June 2020, the Oklahoma City Public Schools ("OKCPS") adopted the "Resolution on George Perry Floyd Protests." The Resolution affirmed the Board's belief that:

> [T]he long term, systemic solution to the problem of implicit bias, institutional racism, structural racism, and bigotry can and should be addressed by the public school systems in this country, through intentional acts, to provide equal opportunities for all children to have a high-quality education.[19]

---

[19] Okla. City Public Schools Bd. Educ., *Resolution on George Perry Floyd Protests* (June 8, 2020), https://www.okcps.org/site/default.aspx?PageType=3&DomainID=4&ModuleInstanceID=5049&ViewID=6446EE88-D30C-497E-9316-3F8874B3E108&RenderLoc=0&FlexDataID=9844&PageID=0

The Board further resolved to

> [R]oot out practices stemming from implicit bias, prejudice, and discrimination, by implementing our educational equity framework, continuing our work with the Student Experience and Equity Committee, and providing training to every district employee to recognize and correct implicit and explicit bias.[20]

89. Similarly, Tulsa Public Schools held a training in 2020 to discuss how teachers could develop coursework around "environmental racism and what effects it has had at the local, national, and international levels," and "misogyny and racism in STEM fields and how to counter it."[21] These efforts built upon trainings by the Center for Transformative Teacher Training (referred to as "CT3") that Tulsa Public Schools had provided since 2016 to educate employees on the dangers of racially exclusive practices and to intentionally celebrate the diversity of its students.

***b. Educators' and students' interest in diverse perspectives and diverse viewpoints to address barriers resonates with the state's own goals.***

90. Educators' and students' augmented efforts throughout 2020 to increase the inclusion of diverse voices and viewpoints advanced the state's own educational values and goals.

91. Diversity is a bedrock value of higher education institutions to cultivate robust intellectual exchange. The OU Regents' policies emphasize OU's "obligation…to provide a full range of materials on any subject, even though some views might be

---

[20] *Id.*

[21] Ray Carter, *Tusla Schools Include 'Social Justice' in Staff Training*, OCPA (Sept. 24, 2020), https://www.ocpathink.org/post/tulsa-schools-include-social-justice-in-staff-training

currently unpopular or controversial."[22] OU asserts it is "educationally desirable that students be confronted with diverse opinions of all kinds."[23]

92. Oklahoma's elementary and secondary school guidance similarly places primary emphasis on the inclusion of diverse perspectives. Oklahoma Statute § 11-103.6b mandates that the

> State Board of Education shall adopt a social studies core curriculum with courses of instruction… that reflect the racial, ethnic, religious, and cultural diversity of the United States of America [and that] shall include, but not be limited to, African Americans, Native Americans, and Hispanic Americans.

93. The SBE's published "Social Studies Practices" similarly reflects this value for diverse points of view, stating students should be able to "Analyze and Address Authentic Civic Issues," including a demonstrated "ability to investigate problems taking into consideration multiple points of view represented in arguments, structure of an explanation, and other sources."[24]

94. Other subject areas similarly reflect the SBE's emphasis on exposing students to diverse perspectives. Oklahoma's 2021 English Language Arts (hereinafter "ELA") Academic Standards require that students at nearly every grade level "work

---

[22] Univ. Okla. Bd. Regents, *Regents' Policy Manual for the University of Oklahoma* 12, https://www.ou.edu/regents/official_agenda/CurrentPolicyManual.pdf.

[23] *Id.*

[24] Social Studies Practices at 6.

effectively and respectfully in diverse groups," particularly in developing listening and speaking skills.[25] The ELA Academic Standards also state:

> The language arts classroom is a place that is inclusive of the identities that reflect the richness and diversity of the human experience. All learners must hear the voices of their own heritage in the literature they encounter. They must also be given the opportunity to speak with the voices they choose for themselves in the writing they create.[26]

95. The State's educational guidance makes it equally clear that students are not only capable but expected to engage with uncomfortable aspects of American history by encouraging "[a] balanced study of history [which] helps students understand the how and why of the challenges and successes of past societies."[27] Students are encouraged to read texts that espouse ideas with which they may disagree in order to "[r]einforce critical thinking by evaluating and challenging ideas and assumptions."[28] The state's educational framework embraces the inclusion of differing viewpoints to hone students' "ability to investigate problems taking into consideration multiple points of view."[29]

96. The State's own educational objectives recognize that students of every age benefit from deeply engaging with issues related to race, sex, and America's social structures. For example, the state standards expect third graders to be able to "explain the

[25] Okla. Educ. Standards for Language Arts at 44.

[26] Social Studies Practices at 5.

[27] *Id.* at 4.

[28] *Id.* at 76.

[29] *Id.* at 6.

processes of cultural diffusion, acculturation, assimilation, and globalization," and discuss ethnicity and gender, amongst other topics.[30] By fifth grade, Oklahoma students are expected to be able to "examine multiple points of view regarding the evolution of race relations in Oklahoma."[31] By seventh grade, Oklahoman students are expected to be able to "explain how bias, discrimination and use of stereotypes influence behavior with regard to gender, race, sexual orientation and ethnicity."[32] By ninth grade, Oklahoman students are expected to "examine contemporary challenges and successes in meeting the needs of the American citizen and society," including race relations, civic engagement, "perceived biases in the media," and other domestic issues.[33]

97. In high school, students are expected to critically examine and analyze bias in a text by:

> evaluat[ing] how authors writing on the same issue reached different conclusions because of differences in assumptions, evidence, reasoning, and viewpoints, including examining rhetorical appeals, bias, and use of logical fallacies.[34]

98. Each of these learning objectives are thwarted by H.B. 1775. Oklahoma's own instructional goals demonstrate that students in the state are capable of understanding and engaging with these complex topics.

---

[30] *Id.* at 63.

[31] *Id.* at 45.

[32] *Id.* at 49.

[33] *Id.* at 62.

[34] Okla. Educ. Standards for Language Arts at 115.

99. The student members of Plaintiffs BERT, NAACP-Oklahoma, and AIM Indian Territory, and Plaintiff S.L. are capable and eager to engage in lessons that expose them to diverse ideas and viewpoints related to race, sex, and systemic inequality. Plaintiffs AAUP-OU, Mr. Crawford, and Mr. Killackey, who are educators or have members who are educators, affirm that their students benefit from engaging in complex conversations related to race, sex, and systemic inequality because it stimulates the type of discussion, debate, and inquiry that cultivates higher-level thinking skills and problem-solving that results in greater academic success and civic engagement.

## IV. The Oklahoma Legislature Passed H.B. 1775 With The Racial And Partisan Intent To Chill Speech That Increases The Educational Achievement, Success, And Safety Of Historically Marginalized Students.

100. The sequence of events leading up to the passage of H.B. 1775, contemporaneous legislative statements, the historical background of the Act, and departures from procedural and substantive norms all demonstrate that H.B. 1775 represents a politically motivated use of the power of the state government to chill, censor, and prohibit Inclusive Speech, which benefits all students, and particularly historically marginalized students.

101. This censorship does not stand in isolation. H.B. 1775 is part of a nationwide attempt, seeded by former President Donald Trump, to censor discussions of race and gender in the classroom. Republican lawmakers across the country proposed bills that attempt to ban educators from teaching about gender and race discrimination, as well as concepts relating to racial equity, critical race theory, and other forms of speech

aimed at acknowledging and addressing the past and present inequities facing historically marginalized communities in education and other social sectors.

***a. President Trump attacked and illegally prohibited speech aimed at addressing bias, prejudice and discrimination through Executive Order 13950.***

102. As the state and the nation participated in peaceful protests promoting racial justice throughout the spring and summer of 2020, President Trump took a series of actions to publicly attack and suppress speech with which he disagreed, including speech that sought to address bias, prejudice, and discrimination in the workplace and to dismantle systemic racism and sexism.

103. On September 17, 2020, President Trump hosted a White House Conference on American History, where he maligned critical race theory in education and the 1619 Project[35] as "crusade[s] against American history," "toxic propaganda," and "ideological poison, that, if not removed [would] . . . destroy our country."[36] President Trump also announced that he would soon establish the 1776 Commission by Executive Order to "promote patriotic education."[37]

104. On September 22, 2020, President Trump issued EO 13950, which sought to censor certain viewpoints and chill speech that diverged from President Trump's own

---

[35] President Trump Remarks at White House History Conference, Nat'l Archives Museum (Sept. 17, 2020), https://web.archive.org/web/20201001042035/https://www.whitehouse.gov/briefings-statements/remarks-president-trump-white-house-conference-american-history/.

[36] *Id.*

[37] *Id.*

notions of the country's founding ideals. Specifically, EO 13950, in part, banned federal contractors and federal grant recipients from engaging in workplace training that purportedly "inculcates" employees on the following concepts:

(1) one race or sex is inherently superior to another race or sex;

(2) the United States is fundamentally racist or sexist;

(3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

(5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

(6) an individual's moral character is necessarily determined by his or her race or sex;

(7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.[38]

105. In issuing EO 13950, President Trump and his administration expressly sought to censor concepts such as "intersectionality," "critical race theory," "white privilege," systemic racism, and the Black Lives Matter movement by calling such concepts "radical," "leftist," and anti-American, among other derogatory descriptors.

106. On December 20, 2020, a federal court partially enjoined EO 13950 on the grounds that the plaintiffs were likely to succeed on their vagueness challenge. *Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 543. The district court found that EO 13950's banned concepts are "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited." *Id.* In reaching this decision, the district court flatly rejected the government's argument that the plaintiffs' chilled speech "furthers race a[nd] sex stereotypes and scapegoating," noting that such a position "is a gross mischaracterization of the speech Plaintiffs want to express and an insult to their work of addressing discrimination and injustice towards historically underserved communities." *Id.* at 546.

107. As noted earlier, H.B. 1775 copied eight of the nine banned concepts verbatim from EO 13950. *See* 70 O.S. § 24-157(1)(B)(1)(a)–(h).[39]

---

[38] Combatting Race and Sex Stereotyping, Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020), https://www.federalregister.gov/documents/2020/09/28/2020-21534/combating-race-and-sex-stereotyping.

[39] The lone exception is concept (3) of EO 13950 (that "the United States is fundamentally racist or sexist"), which is not expressly prohibited by H.B. 1775.

***b. The Oklahoma legislature deviated from its own procedure to pass H.B. 1775, in furtherance of its racial and partisan interests.***

108. In March 2021, Rep. West, Senator David Bullard (R), and their Republican colleagues exploited the legislative committee process to re-write H.B. 1775, an existing bill with entirely different content, to specifically target and censor the Inclusive Speech and related educational programs popularized by 2020's movements for racial and gender justice, with which many Republican legislators disagreed.

109. H.B. 1775 was originally introduced on January 20, 2021 by House Representative Sherrie Conley (R). It was entitled: "Schools; [. . .] changing act name to Riley's Rule; requiring development of an Emergency Action Plan."[40] It would ensure that schools hosting athletic activities had emergency plans in place in preparation for medical emergencies.

110. The Common Education Committee of the House of Representatives made minor amendments to the bill. However, the Senate Education Committee, led by Sen. Bullard and Rep. Conley, made substantial changes, including a new title, new summary, and entirely new provisions on mandatory training and the inclusion of certain concepts related to race and sex.

---

[40] The summary of H.B. 1775 initially read:

> An Act relating to schools; amending Section 1, Chapter 141, O.S.L. 2020 (70 O.S. Supp. 2020, Section 27-104), which relates to emergency medical services at athletic events or activities; changing act name to Riley's Rule; requiring development of an Emergency Action Plan; specifying contents of plan; providing for annual rehearsal of plan; requiring review of plan prior to certain athletic events; providing for certain filing of plan; and providing an effective date.

O.A.C. § 210:10-1-23.

111. Sen. Bullard and Rep. West were substituted as authors of the bill and moved to accept the amendments in their respective legislative chambers. Rep. West said the amendment's purpose was to "end the requirements for race-based biased curriculum in our schools and mandatory gender or sexual diversity training while also allowing for voluntary counseling."[41]

112. After the House Chair ruled that the amendment was not germane to the subject of the introduced bill, in accordance with Oklahoma House Rule 8.21(c), Republicans moved to suspend the germaneness rule.

113. A vote was cast for an absent representative to reach the number needed to suspend the rule, resulting in another vote being taken to adopt the motion and send H.B. 1775 to the Governor's desk.

114. The law was passed on May 3, 2021 on an emergency basis because representatives wanted to ensure it went into effect for the upcoming school year. The legislature did not reference a particular change in Oklahoma educational practices, either in the recent past or pending, that the legislature needed to address on an emergency basis. All Republican members of the legislature present and voting voted in favor of H.B. 1775; all Democratic members present and voting voted against it.

115. Following the passage of H.B. 1775, the Oklahoma legislature continued to target Inclusive Speech and programs. On May 24, 2021, Rep. Conley introduced House

[41] April 29th House Session at 9:57:46–9:57:57 AM.

Resolution 1038 ("H.R. 1038"): "A Resolution discouraging schools from mandating professional development for teachers that cover critical race theory, Project 1619 or the issues provided in Enrolled House Bill No. 1775 of the 1st Regular Session of the 58th Oklahoma Legislature." The Resolution was co-authored by Rep. West, the principal author of H.B. 1775. H.R. 1038 was adopted by the House on May 27, 2021.

***c. H.B. 1775 was animated by racial and partisan interests, not improving the quality of education for Oklahoma students.***

116. Statements by H.B. 1775's authors and its supporters during the legislative debates and in the media also reveal H.B. 1775 was motivated, in part, by racial and partisan interests. Indeed, H.B. 1775's banned concepts—and their suppression of different viewpoints, particularly those of Black and LGBTQ+ advocates—contrast directly with Oklahoma's own aforementioned learning standards, which celebrate "diversity."

117. Rep. West said the bill would "end the requirements for race-based biased curriculum in our schools and mandatory gender or sexual diversity training while also allowing for voluntary counseling."[42] Rep. West's comments revealed that the true target of H.B. 1775 was speech embraced by advocates promoting diversity, equity, and belonging:

> "We are in a fight for the future of our children and our grandchildren . . . Critical Race Theory prescribes a revolutionary program that would overturn the principles of the Declaration [of Independence] and destroy the remaining structure of the Constitution. Critical race theorists are masters

[42] April 29th House Session at 9:57:46–9:57:57 AM.

> of language manipulation by changing definitions or making slight modifications to words that are used…. [Examples include the use of] "diversity" instead of "excellence," "equity" instead of "equality," the "collective" instead of "individualism," and "just communities" instead of "justice."[43]

118. In the floor debates, Democratic representatives repeatedly pressed Rep. West to offer specific examples of an Oklahoma "curriculum" or "course" that H.B. 1775 sought to ban.[44] Rep. West's singular answer was: "critical race theory and CT3,"[45] the latter referring to the Center for Transformative Teacher Training that contracts with Tulsa Public Schools to better support diverse students. *See supra* Section III.

119. Instead of providing a cohesive and accurate definition of CRT, Rep. West and other supporters of H.B. 1775 used the term as a catch-all for ideas with which they disagreed and to instill fear among the public. Their piecemeal depictions of CRT were false, incomplete, distorted, and intended to vilify and stigmatize the approach. Rep. West issued a press statement asserting critical race theory is based on "Marxist ideology that is designed to teach children to hate American exceptionalism and distrust others based on skin color or gender."[46] Senator Nathan Dahm (R), co-author and co-sponsor of H.B. 1775 in the Senate, celebrated H.B. 1775's passage on Twitter by posting: "Just got

---

[43] April 29th House Session at 12:34:20–12:36:08 PM.

[44] April 29th House Session at 11:28:40–11:28:50 PM.

[45] April 29th House Session at 11:28:53–11:28:53 PM.

[46] Connor Hansen, *Proposed Law Would Ban Teaching Certain Race and Gender Topics*, Fox 25 (Apr. 30, 2021), https://okcfox.com/news/local/proposed-law-would-ban-teaching-certain-race-and-gender-topics?fbclid=IwAR1iRjQOf9W4dSWv69K--YFg0fdLxB4BZbF3VhDElnKEsNP37c-OHnmEnlY

a call from @GovStitt that he has signed HB1775 which would prohibit our students from being forced to learn the racist, Marxist concepts known as #CriticalRaceTheory. This is a huge win in stopping this indoctrination."[47] Senator Shane Jett (R), co-author and co-sponsor of H.B. 1775, similarly expressed his support of H.B. 1775 as necessary to address CRT, which he characterized as "Marxist indoctrination."[48]

120. Comments about CRT also expose that H.B. 1775's underlying motive included suppressing discussions of implicit bias and systemic racism, particularly against Black people. In his press release celebrating the passage of H.B. 1775, Rep. West disparaged critical race theory and described it as "teach[ing] that most laws and systems in America are historically rooted in the racist oppression of black people and other marginalized groups. It promotes the theory of implicit bias and inherent racism due to one's skin color."[49]

121. Legislators' comments also make plain that H.B. 1775 sought to censor entire topics and approaches that received increased attention in 2020 as important for increasing the educational and civic equality of historically marginalized students.

---

[47] Nathan Dahm (@NathanDahm), Twitter(May 7, 2021, 6:34 PM), https://twitter.com/NathanDahm/status/1390797145222127621.

[48] James Varney, *Shane Jett, Oklahoma State Senator, Wants to Ban Critical Race Theory from Being Taught in Schools*, Wash. Times (Mar. 1, 2021), https://www.washingtontimes.com/news/2021/mar/1/shane-jett-oklahoma-state-senator-wants-to-ban-cri/

[49] *Bill Promoting "Critical Race Theory" Curriculum Passes House*, Okla. H.R. (Apr. 29, 2021), https://www.okhouse.gov/members/PrintStory.aspx?NewsID=8125.

122. During the House debate, House Representative Justin Humphrey (R) spoke in favor of H.B. 1775 and likened the Black Lives Matter movement to the Ku Klux Klan. In response, Rep. West agreed that the Black Lives Matter movement met the description of a "terrorist group."[50] In an outside media appearance corresponding with the passage of H.B. 1775, Rep. West explicitly shared a desire to end teachings related to the Black Lives Matter movement, as well as teachings related to critiques of "colorblindness."[51]

123. Rep. Humphrey vocalized his strong support of the bill by asserting "Police brutality is a lie…Those are the kind of lies that we must end."[52] Days before Governor Stitt signed the bill into law, Rep. West appeared on the local news to explain that H.B. 1775 was necessary to respond to concerns over "culturally responsive teaching."[53]

124. Proponents of H.B. 1775, such as Senator Rob Standridge (R), were also explicit about their desire to eliminate school trainings that discussed "institutionalized racism," "white supremacy," and "whiteness" as concepts.[54]

---

[50] April 29th House Session at 11:09:59–11:10:48 AM.

[51] Okla. House Republicans, Rep. Kevin West on Newsmax, Facebook (May 4, 2021, at 00:50–1:10), https://www.facebook.com/watch/?v=493694505011113.

[52] April 29th House Session at 12:08:20–12:08:38 PM.

[53] Rep. Kevin West, *supra* note 51, at 00:36–00:40.

[54] Okla. S. 44, 58th Leg., 1st Reg. Sess. (11:10:20 - 11:11:40 PM), https://oksenate.gov/live-chamber [hereinafter "April 21st Senate Session"]; *Sen. Standridge Issues Statement Thanking Fellow Members for Supporting H.B. 1775*, Okla. S., (Apr. 22, 2021), https://oksenate.gov/press-releases/sen-standridge-issues-statement-thanking-fellow-members-supporting-hb-1775.

125. Furthermore, H.B. 1775's supporters explicitly expressed a desire to suppress any discussion of intersectionality, gender identity, and gender fluidity. Sen. Bullard stated H.B. 1775's banned concepts were necessary because "[Critical Race Theory] teaches a lie called 'intersectionality,' it teaches about systemic racism, inherent racism, and automatically assumes white supremacy in anyone . . . . It is a poison to the minds of our kids." [55] Rep. Humphrey proclaimed his support for the bill based on his opposition to teaching in school that "talk[s] about taking away gender so that we say there is no woman."[56] In an outside media appearance to promote H.B. 1775, Rep. West explained the law was necessary to address concerns about teachers inserting into the classroom discussions about "differences between gender identification, biological sex, and gender expression."[57]

126. Legislators' statements in support of the legislation also made clear that H.B. 1775's provisions were specifically meant to target OU's mandatory DEI programming, which had been adopted for the purpose of combatting anti-Black racism on campus. When asked for a justification for the bill's provision, Rep. West stated that he "has spoken with OU students about the bill" who called OU's diversity training "completely pointless," and felt "the training is more an exercise in determining school-

[55] April 21st Senate Session at 11:29:21–11:29:38 PM.

[56] April 29th House Session at 12:07:55–12:08:05 PM.

[57] Rep. Kevin West, *supra* note 51, at 00:57–01:04.

approved responses than anything."[58] Other legislators paired their support of H.B. 1775 with their disparagement of OU as un-American in its support of CRT. Rep. Jett complained that critical race theory was "Marxist indoctrination" that was now taught at OU, which he referred to as "the Democratic People's Republic of Norman."[59]

127. There was an utter absence of evidence in the legislative record to substantiate any of the alleged harms that the Act purports to address. During the floor debates, legislators arguing in support of H.B. 1775 did not specifically reference, collect, or heed the input of state education officials, school administrators, or teachers. In fact, legislators actively disregarded the concerns shared publicly by numerous educators and education officials who spoke out against the Act.

#### *d. The Oklahoma legislature also departed from substantive norms in passing H.B. 1775.*

128. The passage of H.B. 1775 reflects an unprecedented intrusion into the authority normally afforded to local educators and administrators. Oklahoma's lawmakers and courts have routinely viewed educators and administrators as best positioned to tailor the specific contours of classroom discussion to achieve the state standards, meet the particularized needs of students and the local community, and promote the civic literacy skills that are vital for engaging in today's pluralistic, diverse world. H.B. 1775's establishment of state control over teachers' specific curricular

[58] Ray Carter, *Ban on Racist Stereotyping Contrary to OU's Goals*, *President Says*, OCPA (May 7, 2021), https://www.ocpathink.org/post/ban-on-racist-stereotyping-contrary-to-ous-goals-president-says.

[59] Varney, *supra* note 48.

speech and pedagogies represents a significant departure from Oklahoma's educational norms.

129. Oklahoma's Deregulation Act ("EDA"), for example, ensures that local schools have the necessary freedom to innovate and improve education systems in order to maximize student learning and performance." 70 O.S. § 3-125. Similarly, 70 O.S. § 18-101 states that "maximum public autonomy and responsibility for public education should remain with the local school districts and the patrons of such districts."

130. While the legislature retains certain decision making over elementary and secondary education policy, Oklahoma law states "[s]chool districts shall exclusively determine the instruction, curriculum, reading lists and instructional materials and textbooks, subject to any applicable provisions or requirements as set forth in law, to be used in meeting the subject matter standards." 70 O.S. § 11-103.6a.

131. The SBE's website likewise explains that state standards:

> Do not dictate how teachers should teach… Do not mandate a specific curriculum… Do not limit advanced work beyond the standards… Do not prescribe all that can or should be taught… Do not prescribe interventions for students below grade-level.[60]

132. The State's higher education framework also typically affords substantial deference to educators. For example, the State Regents—who are constitutionally

[60] Okla. State Dep't Educ., *Oklahoma Academic Standards* (July 22, 2021), https://sde.ok.gov/oklahoma-academic-standards.

endowed to manage university affairs, Okla. Const. art. XIII, §3 [61]—state in their handbook that they "recognize the primary role of institutional faculty, administrators, and governing boards in initiating and recommending needed changes in educational programs. The institutional faculty are the discipline experts responsible for developing and teaching the curriculum."[62]

133. The law also departs from education norms by *excluding* certain viewpoints. There are no other provisions in Oklahoma's school code that require excising entire "concepts," or points of view, related to race or sex or similar category.

134. Taken together, legislators' contemporaneous statements show H.B. 1775 was specifically intended to eliminate Inclusive Speech and related programs that arose to enhance the educational and civic experiences of Black people and other historically marginalized groups.

## V. By Passing Rules That Broaden The Censorship Initiated By The Legislature, The State Board Of Education's Actions Further Reflect The Racial And Partisan Motives Underlying The Act.

135. The promulgation of Emergency Rules provides additional evidence of a racial motive through the SBE's departure from ordinary norms, lack of transparency, and implicit and explicit references to race.

---

[61] Okla. Const. art. XIII, § 3; *see also Bd. of Regents of Univ. of Okla. v. Baker,* 638 P.2d 464, 467 (1981) (observing that the Oklahoma Constitution reflects an "inten[t] to limit legislative control over University affairs. Oklahoma is one of only a few states in which the legal status of public universities is constitutional rather than statutory.").

[62] *Chapter 3: Academic Affairs*, Section 3.4, Okla. State. Regents for Higher Educ., https://www.okhighered.org/state-system/policy-procedures/part3.shtml.

136. On July 12, 2021, the SBE released temporary, emergency rules detailing the implementation and enforcement mechanisms for H.B. 1775 after a flawed process. Tulsa Public Schools expressed its disappointment and concerns about the process:

> The lack of notice, the disregard for the operational needs of the public school districts it serves, and the absence of engagement with those who will bear the burden of these rules demonstrate a lack of transparency in the Oklahoma State Board of Education's process for considering an issue of such magnitude.[63]

137. While state lawmakers rarely attend SBE meetings, numerous Republican legislators attended, including Rep. West and several co-sponsors of H.B. 1775. Their attendance, another departure from the norm, demonstrates the influence that Oklahoma legislators tried to exert on the SBE's rulemaking process.

138. Seven members of the public made comments. Only one of the seven commentators publicly identified as Black and as a student, and that student spoke against the Rules.[64]

139. When discussion by the SBE commenced, the SBE's lone Black member, Carlisha Bradley, spoke at length in opposition to the Rules.[65] She emphasized that H.B.

---

[63] Brady Halbleib & Katie Keleher, *State Board of Education Passes Temporary Rules on Teaching Critical Race Theory*, KJRH (Jul. 12, 2021), https://www.kjrh.com/news/local-news/republican-lawmakers-asking-state-board-of-education-to-set-guidelines-for-the-ban-on-critical-race-theory.

[64] Okla. State Dep't Educ., *Oklahoma State Board of Education Meeting*, Facebook (July 12, 2021, at 1:21:24–1:26:00) [hereinafter "SBE Meeting"], https://www.facebook.com/OklaSDE/videos/547623546410680/.

[65] *Id.* at 2:05:45–2:07:27.

1775 was based on a fundamental misunderstanding of CRT, which was taught in colleges and not elementary and secondary schools, as "it is an advanced theory and study."[66] She also faulted the Rules for lack of transparent process, whereby members only received the Rules "minutes before [the] meeting."[67] Ms. Bradley voiced her concern over the fact that schools, teachers, and students—who are most impacted by this rule—were not able to weigh in on the impact of this decision, and that this process excluded "the voices of those who are most proximate to this work."[68]

140. An SBE member spoke in favor of the Rules and said the state's "largest districts . . . to whom much is given" deserve to be admonished for some of their practices to date.[69] The two largest school districts in Oklahoma are Oklahoma City Public Schools and Tulsa Public Schools, both of which have increasingly embraced Inclusive Speech in recent years.

141. Ms. Bradley pushed back and pointed out that the "large school districts" referred to by proponents of H.B. 1775 served student populations that include proportionately more students of color, who would be the students most harmed by the Rules.

142. The Rules were adopted with no amendments by the SBE through a 5-1 vote, with the only "no" vote cast by Bradley.

---

[66] *Id.* at 2:07:07–2:07:12.

[67] *Id.* at 2:06:14–2:07:17.

[68] *Id.* at 2:06:18–2:06:41.

[69] *Id.* at 2:05:12–2:05:17.

143. On August 26, 2021, the SBE announced the adopted emergency rules required a revote because of "technical errors."[70] Superintendent Hofmeister blamed the unspecified "scrivener's errors" on a "rushed and unorthodox process."[71]

144. On September 10, 2021, the SBE re-approved the Rules that were identical in substance to the July emergency rules with the technical errors corrected.

145. As described previously, *see* Section II(a), the SBE Rules further draw out serious constitutional concerns with the law. They introduce wide-ranging and unrestrained reporting mechanisms, and impose severe sanctions for those found in violation of the Act's vague terms. In doing so, the Rules increase the Act's reach into protected speech, its chilling effect, and its likelihood of arbitrary enforcement. And spurred on by Oklahoma legislators who enacted H.B. 1775 with discriminatory intent, the SBE's actions further reflect the racial and partisan motives underlying the Act's unprecedented censorship.

## VI. The Harms Of H.B. 1775 Disproportionately Fall On Students Of Color, With Compounded Harms For LGBTQ+, Women, And Girls Of Color.

146. H.B. 1775's censorship of Inclusive Speech harms all Oklahomans because its inclusion in classrooms provides a multitude of benefits for students and society at large. Student body diversity—and the resultant diversity in views and perspectives that flows from such diverse students' participation—improves critical thinking and problem

---

[70] Ray Carter, *Education Agency Botches Anti-Racism Regulations*, OCPA (Aug. 26, 2021), https://www.ocpathink.org/post/education-agency-botches-anti-racism-regulations.

[71] *Id.*

solving, increases cross-racial understanding, reduces stereotypes and prejudices, and develops leadership skills and many other skills necessary to thrive in an increasingly diverse society.[72] Research also shows that a culturally inclusive education can increase graduation rates, school attendance, and standardized test scores.[73] These benefits manifest for all students.

147. While all Oklahomans are harmed by H.B. 1775, the Act's censorship of Inclusive Speech inflicts disproportionate injury on students of color, with compounded harms for LGBTQ+, women, and girls of color. Inclusive Speech and related programs serve to close existing opportunity gaps and inequalities faced by students of color and other historically marginalized groups. Research demonstrates that increasing cultural proficiency among teachers and introducing culturally responsive teaching practices and pedagogy can provide effective support for students of color.[74] Studies in brain science and education find that drawing on learners' background knowledge shapes comprehension.[75] Research also illustrates that instructional materials, assignments, and texts that reflect students' backgrounds and experiences are critical to engagement and

---

[72] *See, e.g.,* Roslyn Arlin Mickelson, *Research Brief: School Integration and K-12 Outcomes: An Updated Quick Synthesis of the Social Science Evidence* 5, Nat'l Coal. on Sch. Diversity (Oct. 2016), https://files.eric.ed.gov/fulltext/ED571629.pdf.

[73] *See, e.g.,* Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127, 217 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf.

[74] *Id.* at 127–66.

[75] *See Understanding Culturally Responsive Teaching,* New Am., https://www.newamerica.org/education-policy/reports/culturally-responsive-teaching/understanding-culturally-responsive-teaching/ (discussing and citing studies).

deep, meaningful learning.[76] Additional research shows that enrollment in an ethnic studies course results in positive academic outcomes across a variety of indicators, including a 21% increase in ninth-grade attendance rates and average GPA increase of 1.4 grade points.[77]

148. Prohibiting Inclusive Speech for students of color and other historically marginalized groups exacerbates existing disparities in education. On the whole, historically marginalized groups are underrepresented in educational curricula. As a result, educational curricula and programs do not reflect the diversity of historically marginalized groups' past and present contributions, challenges, and perspectives. When historically marginalized figures do appear, they often are portrayed as victims, or in overly simplified or stereotyped roles. For example, many Oklahoma public school students have been required to participate in reenactments of the 1889 Land Run—which glorify the western expansion period of United States and Oklahoma history during which Indigenous people were forcibly displaced. Only recently have some school districts begun to revisit this practice to teach historical accounts from Indigenous perspectives. By further restricting the perspectives of people of color and other marginalized groups, H.B. 1775 inflicts pronounced harm on students of color who already do not see their communities reflected in the curricula and, therefore, feel less engaged by and connected to classroom discussions.

---

[76] Summer Wood & Robin Jocius, *Combatting "I Hate This Stupid Book!": Black Males and Critical Literacy*, 66 The Reading Teacher 661, 661–69 (2013).

[77] Dee & Penner, *supra* note 73, at 129.

149. In addition, Inclusive Speech serves to break down stereotypes and prejudices that disproportionately inflict harm on students of color, both within the educational system and broader society across healthcare, the penal system, and workplaces. For example, trainings on implicit bias help to counteract existing prejudice which research suggests results in educators disciplining Black students more harshly than their White peers for similar offenses.[78]

150. Such barriers are compounded for students of color who have other marginalized identities, including LGBTQ+ students of color. LGBTQ+ students are subject to bullying and harassment at much higher rates. One state survey assessing school climate for LGBTQ+ youth in Oklahoma's secondary schools found that up to 76% of respondents reported verbal harassment for gender, gender expression, and sexual orientation, and up to 34% reported physical harassment and 15% of those cases resulting in physical assaults.[79] LGBTQ+ students of color face additional barriers, as surveys indicate that LGBTQ+ youth of color report a higher likelihood of dropping out of school due to hostile school climates as compared to their White LGBTQ+ peers.[80] While Inclusive Speech serves to address these barriers, H.B. 1775's censorship further deprives

[78] *See, e.g., Educator Bias is Associated with Racial Disparities in Student Achievement and Discipline*, Brookings (July 20, 2020), https://www.brookings.edu/blog/brown-center-chalkboard/2020/07/20/educator-bias-is-associated-with-racial-disparities-in-student-achievement-and-discipline/.

[79] *School Climate for LGBTQ Students in Oklahoma*, GLSEN (2019), https://www.glsen.org/sites/default/files/2021-01/Oklahoma-Snapshot-2019.pdf.

[80] *Educational Exclusion: Drop Out, Push Out, and the School-to-Prison Pipeline Among LGBTQ Youth*, GLSEN (2013), https://www.glsen.org/sites/default/files/2019-11/Educational_Exclusion_2013.pdf.

LGBTQ+ youth of color of anti-discrimination measures, educational supports, and engaging curricula.

151. Women and girls of color also face a range of compounded barriers in the education context due to the intersections between their racial and gender identity. For example, girls of color disproportionately face punitive disciplinary measures in school and sexual harassment. Inclusive speech can serve to effectively address these intersectional barriers.

152. As discussed further above, many schools and educators proactively sought Inclusive Speech and related programs to particularly address the needs of historically marginalized students facing these persistent opportunity gaps. *See, e.g., supra* Section III(b). H.B. 1775's supporters sought to reverse course.

153. During the floor debates, H.B. 1775's supporters singled out diversity and inclusion programs and other forms of Inclusive Speech that aimed to help improve the education for historically marginalized students. *See supra* Section IV(c). They further used code words and disparaged Black-led movements. *Id.*

154. Plaintiffs' lived experiences confirm the findings that Inclusive Speech is vital for the provision of a quality education and thriving democracy for all Oklahomans, and particularly Oklahomans of color. All Plaintiffs who are educators, or have educator members, affirm that Inclusive Speech has increased the engagement, participation, and sense of belonging for students of color in their classroom. Plaintiffs who are students of color, or have student members of color, similarly express their desire to gain greater exposure to the perspectives of communities of color and theories related to race and

gender because such conversations make them feel more connected to the curricula and prepared to tackle the issues facing their communities. Inclusive Speech makes them more comfortable and confident to participate in courses and share their viewpoints in classroom and campus discussions.

155. In this vein, NAACP-Oklahoma's members and community partners report that teaching about systemic racism and biases—conscious and unconscious—is critical for broadening perspectives; developing solutions for society and building a better, more equitable future; combatting ignorance; and empowering the Black community and other groups to know their history, including their triumphs and tools for overcoming challenges.

## CLAIMS FOR RELIEF

### First Cause of Action

### Fourteenth Amendment — Vagueness

156. All prior paragraphs are incorporated here by reference.

157. A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Faustin v. City & Cty. of Denver*, 423, F.3d 1192, 1201 (10th Cir. 2005). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule). And where First Amendment rights are at stake, "[s]tricter standards of permissible statutory vagueness may be applied." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *Hynes v. Mayor and Council of*

*Borough of Oradell,* 425 U.S. 610, 620 (1976)). A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000).

158. The Act is unconstitutionally vague on its face and as applied to Plaintiffs because it fails to provide fair notice of what educators can and cannot include in their courses, and because it invites arbitrary and discriminatory enforcement—up to and including the loss of teaching licenses.

159. Educators, including Plaintiffs Killackey, Crawford, and NAACP-Oklahoma's members who are educators, at every level are confused about what they can legally teach and risk the loss of employment, licenses and certifications.

160. H.B. 1775 is vague and violates the Fourteenth Amendment rights of Plaintiff NAACP-Oklahoma and Plaintiff Killackey facially and as applied by Defendants Joy Hofmeister, SBE members, John O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, OU Regents members, Angela Grunewald, EPS Board, and the EPS Board members.

161. H.B. 1775 is vague and violates the Fourteenth Amendment rights of Plaintiff S.L., Plaintiff AIM Indian Territory, and Plaintiff Crawford facially and as applied by Defendants Joy Hofmeister, SBE, SBE members, John O'Connor, and Governor Kevin Stitt.

162. H.B. 1775 is vague and violates the Fourteenth Amendment rights of Plaintiff BERT and Plaintiff OU-AAUP facially and as applied by Defendants John

O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, and OU Regents members.

163. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights to due process.

## Second Cause of Action

### First Amendment – Right to Receive Information

164. All prior paragraphs are incorporated here by reference.

165. The First Amendment binds the State of Oklahoma pursuant to the incorporation doctrine of the Fourteenth Amendment. In all of the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

166. The First Amendment protects the right to receive information and ideas as well as the right to disseminate ideas. Laws regarding school curricula that impede the rights of students to receive information and ideas, without legitimate pedagogical justification, violate the First Amendment. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). H.B. 1775 violates the First Amendment, both on its face and as applied, because it prohibits educators from teaching about specific concepts on the topics of race and sex, and it imposes restrictions on the ideas that students may be exposed to in public schools. These restrictions are unconstitutionally designed to promote a narrowly partisan, political, or racially biased agenda. *See Pico*, 457 U.S. at 870. To the extent that the Act could be interpreted as having any legitimate pedagogical

purpose, it is overbroad, because "a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

167. H.B. 1775 is overbroad and violates the First Amendment right to receive ideas of Plaintiff NAACP-Oklahoma facially and as applied by Defendants Joy Hofmeister, SBE, SBE members, John O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, OU Regents members, Angela Grunewald, EPS Board, and EPS Board members.

168. H.B. 1775 is overbroad and violates the First Amendment right to receive ideas of Plaintiff S.L. and Plaintiff AIM Indian Territory facially and as applied by Defendants Joy Hofmeister, SBE, SBE members, John O'Connor, and Governor Kevin Stitt.

169. H.B. 1775 is overbroad and violates the First Amendment right to receive ideas of BERT facially and as applied by Defendants John O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, and OU Regents members.

170. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their First Amendment rights to receive information and ideas.

## **Third Cause of Action**

### **First Amendment – Overbroad and Viewpoint-Based Restriction on Academic Freedom**

171. All prior paragraphs are incorporated herein by reference.

172. The First Amendment binds the State of Oklahoma pursuant to the incorporation doctrine of the Fourteenth Amendment. In all of the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

173. The Act is overbroad and imposes unconstitutional viewpoint-based restrictions on academic freedom. The Supreme Court has repeatedly held that academic freedom deserves First Amendment protection. *Keyishian*, 385 U.S. at 603; *Sweezy*, 354 U.S. at 250; *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) ("Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment."); *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) (stressing importance of free speech rights in public school context); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 237 (2000) (Stevens, J., concurring) ("Our understanding of academic freedom has included not merely liberty from restraints on thought, expression, and association in the academy, but also the idea that universities and schools should have the freedom to make decisions about how and what to teach."). *See also Dow Chem. Co. v. Allen,* 672 F.2d 1262, 1274–76 (7th Cir. 1982); *Gray v. Bd. of Higher Educ.,* 692 F.2d 901, 909 (2d Cir. 1982).

174. The purpose and effect of enforcing the Act is to ban speech about biases on the basis of race or sex because of legislators' objections to the messages that discussion of such topics may convey. The Act is not narrowly tailored to achieve any compelling interest that may be served by this type of censorship.

175. H.B. 1775 is overbroad and discriminates by viewpoint against Plaintiff OU-AAUP and Plaintiff BERT in violation of the First Amendment facially and as applied by Defendants John O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, and OU Regents members.

176. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their First Amendment rights to speech because the Act is overbroad, viewpoint discriminatory, and infringes on academic freedom.

## Fourth Cause of Action

### Fourteenth Amendment – Racially Discriminatory Purpose

177. All prior paragraphs are incorporated here by reference.

178. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

179. An official action taken for the purpose of discriminating on account of race has no legitimacy under the United States Constitution. *City of Richmond, Va. v. United States*, 422 U.S. 358, 278–79 (1975).

180. Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Instead, the plaintiff's burden is to show that discriminatory purpose was a motivating factor, rather than the primary or sole purpose. *Id.* at 265–66.

181. Discriminatory intent does not require racial animus, hatred or bigotry but rather "[t]he 'intent to discriminate' forbidden under the Equal Protection Clause is merely the intent to treat differently." *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008).

182. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights,* 429 U.S. at 266.

183. Because legislation that "appears neutral on its face" may nonetheless be motivated by discrimination, the United States Supreme Court articulated several non-exhaustive factors to inform an analysis of discriminatory intent, including: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or reports." *Id.* at 266–68; *see also Dowell by Dowell v. Bd. of Educ. of Okla. City Pub. Sch.*, 8 F.3d 1501, 1518 (10th Cir. 1993).

184. Application of the *Arlington Heights* factors reveals that the Act was enacted, in part, with the purpose to discriminate against students of color by chilling and suppressing Inclusive Speech aimed at enhancing the educational, social, and civic experiences of students of color and their families. The Act explicitly singles out concepts related to sex and race. The Act will foreseeably disparately harm students of

color, with compounded harms for students of color who also identify as women, girls, and LGBTQ+.

185. Comments by H.B. 1775's sponsors make it explicitly clear that H.B. 1775 targets the elimination of curriculum, instruction, conversations and programming designed to improve the educational, social, and civic experiences of historically marginalized groups. The Act, however, does not address the exclusion and underrepresentation of such historically marginalized groups' interests in the present-existing curriculum and instruction.

186. The Act's history and Oklahoma's own history of racial and gender discrimination, known and reasonably foreseeable discriminatory impact, sequence of events and substantive departures from the normal legislative process that resulted in its enactment, and the tenuousness of the stated justifications for the new law, all show that it was enacted with a discriminatory purpose in violation of the Equal Protection Clause of the Fourteenth Amendment.

187. H.B. 1775 violates the Fourteenth Amendment right to equal protection of Plaintiff NAACP-Oklahoma as applied by Defendants John O'Connor, Joy Hofmeister, SBE members, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, OU Regents members, Angela Grunewald, the EPS Board, and EPS Board members.

188. H.B. 1775 violates the Fourteenth Amendment right to equal protection of Plaintiff S.L. and Plaintiff AIM Indian Territory as applied by Defendants John O'Connor, Joy Hofmeister, SBE, SBE members, and Governor Kevin Stitt.

189. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights to equal protection.

**PRAYER FOR RELIEF**

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs respectfully request that this Court:

1. Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing the Act;
2. Declare 70 O.S. § 24-157 and O.A.C. § 210: 10-1-23 unconstitutional, facially and as applied, under the First and Fourteenth Amendments to the United States Constitution;
3. Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and
4. Grant such additional relief as the interests of justice may require.

Dated: November 9, 2021

Respectfully submitted,

/s/ Megan Lambert
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Genevieve Bonadies Torres
David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Gary Stein
Michael Cutini
Sara Solfanelli
Elahe Hosseini
Amir Shakoorian
Ramya Sundaram
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2021, I electronically filed the foregoing Amended Complaint with the Clerk of Court using the CM/ECF system. I further certify that all below-named counsel of record are registered CM/ECF users and will be served by the CM/ECF system:

**Andy N. Ferguson**
**Zachary P. West**
Attorney General's Office
313 NE 21 St
Oklahoma City, OK 73105

**M. Daniel Weitman**
**Tina S. Ikpa**
University of Oklahoma Office of Legal Counsel
660 Parrington Oval
Suite 213
Norman, OK 73019

**F. Andrew Fugitt**
**Justin C. Cliburn**
The Center for Education Law
900 N Broadway Ave
Suite 300
Oklahoma City, OK 73102

Dated: November 9, 2021

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113

Tel.: 405-524-8511
mlambert@acluok.org

*Counsel for Plaintiffs*

# EXHIBIT 1

## Guidelines for HB 1775

Know the 8 prohibitions outlined in law:

| **PROHIBITION**<br>*No teacher, administrator, or other school employee shall require or make part of any Course offered in a public school the following discriminatory principles . . .* | **WHAT DOES IT MEAN?**<br>*Educators shall not teach or make part of their classroom instruction any of the 8 prohibitions.* |
|---|---|
| 1. . . . one race or sex is inherently superior to another race or sex, | This idea cannot be explicitly stated or taught.<br>We cannot control the feelings of others, but we can control content.<br>Directly teaching this concept would be a violation. |
| 2. . . . an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously, | Key word is **inherently**<br>We can say that historically some laws in society may have been racist, sexist or oppressive, in that the laws contained different provisions or requirements for members of a race that weren't required of another race, but we cannot say **you** are racist, sexist or oppressive because of who you are. |
| 3. . . . an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex, | This is Title VI (race) and Title IX (sex) - discrimination is not allowed. This aligns with current discrimination policies already in place. |
| 4. . . . members of one race or sex cannot and should not attempt to treat others without respect to race or sex, | Unfortunately, no one truly knows what this means or can come to an agreement on its meaning. However, having a discussion about race or diversity in the classroom will not be a violation. |
| 5. . . . an individual's moral character is necessarily determined by his or her race or sex, | We cannot tell individuals they are a certain way simply because of their race or sex or that they are inherently good or bad based upon their race or sex.<br>We can not teach that someone's character is predetermined by their race or sex. |
| 6. . . . an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex, | We can still teach historical events and discuss the ramifications of topics such as slavery and civil rights without putting the responsibility of these events on the students in our classrooms. We cannot blame a student or place personal responsibility on students for historical issues. |
| 7. . . . any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or | We cannot tell students how they should or should not feel; yet, we cannot control their feelings. Students may feel anger, sadness, despair or discomfort about a topic, but we cannot make or tell a student to feel uncomfortable. We should not actively promote that students should feel distress or discomfort. We should not fear this statement. We cannot tell students they should feel guilty because of their race or sex. |
| 8. . . . meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race. | Same applies here as in all the above statements.<br>Definition of meritocracy: a system, organization, or society in which people are chosen and moved into positions of success, power, and influence on the basis of their demonstrated abilities and merit. |

**Additional Guidelines:**

Nothing in this law talks about Critical Race Theory, which is typically taught at the university level. CRT is not part of the Oklahoma curriculum. We are not going to "broaden" the meaning of HB 1775 or language of the law.

When teaching, provide the facts without stating students should "think this" or "believe this."

This law does not prohibit conversations about race, ethnicity, diversity, or gender. You still have all the tools you had before, and as always, do not interject your opinion.

If a student brings up a topic related to a prohibition point in HB 1775 within a class discussion, you are okay. You were not teaching the topic and cannot control what a student brings up. However, teachers should always moderate classroom discussions.

If a student asks, "What is CRT?," then a teacher may respond with, "It's often a theory used in higher education to look at laws in society." This response would not violate the law.

Just because a book depicts a character or historical figure who is experiencing or practicing racism, this does not mean you are promoting or transferring that same concept to your students. Classroom discussions centered around such readings should not include any of the 8 prohibitions from HB 1775.

College Board curriculum may still be taught. If there is something specific in the *College Board Curriculum* that you feel may fall under one of these 8 prohibitions, please let us know and we will seek additional guidance.

We teach history so that we do not repeat it. This law does not prohibit such teachings.

EPS Policy and Procedures:

A **policy** will be presented to the board on August 2. This policy will provide the steps to file a complaint. The policy needs to be in student and teacher handbooks once approved by the board. Parents have always had the right to review curriculum.

There is a **formal complaint process** outlined in this policy:

1. Complaints must be responded to within 10 days.
   a. In writing
   b. Give name
   c. Name concept (from the 8) that was violated
   d. Provide witnesses
   e. Provide date it happened
2. Outcomes from complaints - 1 let know within 10 days if investigated, 90 days to investigate, 30 days to report findings to SDE
3. If wrongdoing found, could be disciplined following normal discipline actions, SDE can pull certification, false reports can be punished
4. Disciplinary actions fall within current policy and is confidential (except notifying SDE)
5. Key word in complaint is WILLFUL
6. The complaint process is intended for current staff, students or guardians.

If **supplemental materials** are going to be used in the classroom, in addition to the district adopted curriculum or district-approved extended reading lists, please complete the appropriate form linked HERE from Policy #3600RF.

**Form B:** This form may be attached to the class syllabus at the start of the year OR this verbiage may be included in the class syllabus with the parent permission verbiage being included on the typical acknowledgement" of syllabus.

**Form A:** anything that may be found later in the year to add to the course as supplemental material

# EXHIBIT 2

# Questions or Concerns about HB 1775

*"Obstacles don't have to stop you. If you run into a wall, don't turn around and give up. Figure out how to climb it, go through it, or work around it." -- Michael Jordan*

- Avoid the term “diversity” when naming units or lessons.
  - Ex: Instead of a “Diversity Lit Circle,”just call it a Lit Circle.

- Under 1775, Do not discuss “white privilege” as part of your lesson. Students can bring up the topic or discussion.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

[1] BLACK EMERGENCY RESPONSE TEAM, et al.,

*Plaintiffs*,

v.

[l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,

*Defendants*.

Case No. 5:21-cv-01022-G

Hon. Charles B. Goodwin

**MOTION FOR A PRELIMINARY INJUNCTION &**
**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Genevieve Bonadies Torres
David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005

Gary Stein
Michael Cutini
Sara Solfanelli
Elahe Hosseini
Amir Shakoorian Tabrizi
Ramya Sundaram
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

Megan Lambert
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

I. PRELIMINARY STATEMENT ........ 1

II. STATEMENT OF FACTS ........ 3

A. Background ........ 3

B. Text of H.B. 1775 and the Emergency Rules ........ 6

C. Implementation of the Act ........ 9

III. ARGUMENT ........ 11

A. Plaintiffs Are Likely to Succeed on The Merits of Their Claims ........ 12

1. The Act is too vague for Oklahoma educators to understand its provisions ........ 12

2. The Act is a viewpoint discriminatory and overbroad infringement on academic freedom ........ 16

3. The Act, for no legitimate purpose, restricts students' access to information ........ 19

B. Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury ........ 23

C. Plaintiffs' Injury is Great, and Preliminary Relief Will Not Harm Defendants ........ 23

D. An Injunction Would Serve the Public Interest ........ 24

IV. CONCLUSION ........ 25

PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ........ 21

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ........ 24

*Axson-Flynn v. Johnson,*
356 F.3d 1277 (10th Cir. 2004) ........ 19, 21, 22

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982) ........ 1, 19, 20, 22

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
269 F.3d 1149 (10th Cir. 2001) ........ 11

*Dr. John's, Inc. v. City of Roy*,
465 F.3d 1150 (10th Cir. 2006) ........ 12, 15

*Elam Constr., Inc. v. Regional Transp. Dist.,*
129 F.3d 1343 (10th Cir. 1997) ........ 25

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 23

*Faustin v. City & Cty. Of Denver, Colo.*,
423 F.3d 1192 (10th Cir. 2005) ........ 12

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019) ........ 23

*Giebel v. Sylvester,*
244 F.3d 1182 (9th Cir. 2001) ........ 16

*Gonzalez v. Douglas*,
269 F. Supp. 3d 948 (D. Ariz. 2017) ........ 21

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ........ 12, 15

*Griswold v. Connecticut,*
381 U.S. 479 (1965) .......... 20

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) .......... 1, 19, 20

*Hill v. Colorado,*
530 U.S. 703 (2002) .......... 12

*Hynes v. Mayor and Council of Borough of Oradell*,
425 U.S. 610 (1976) .......... 12

*Keyishian v. Board of Regents*,
385 U.S. 589 (1967) .......... 1, 16, 17

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
141 S. Ct. 2038 (2021) .......... 21, 25

*Miles v. Denver Pub. Sch.*,
944 F.2d 773 (10th Cir. 1991) .......... 21

*N.A.A.C.P. v. Button*,
371 U.S. 415 (1963) .......... 17

*Pac. Frontier v. Pleasant Grove City,*
414 F.3d 1221 (10th Cir. 2005) .......... 25

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978) .......... 17

*Roberts v. Madigan*,
921 F.2d 1047 (10th Cir. 1990) .......... 19

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
508 F. Supp. 3d 521 (N.D. Cal. 2020) .......... 6, 12

*South Wind Women's Center, LLC v. Stitt*,
455 F. Supp. 3d 1219 (W.D. Okla. 2020) .......... 11

*Stanley v. Georgia*,
394 U.S. 557 (1969) .......... 19

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) .......... 1, 17, 25

*Verlo v. Martinez*,
820 F.3d 1113 (10th Cir. 2016) .......... 23, 25

*W. Va. Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .......... 20

**STATUTES**

70 O.S. § 24-157 .......... *passim*

Okla. Admin. Code § 210:10-1-23 .......... 1, 8, 16

**OTHER AUTHORITIES**

Addison Kliewer et al., *'Kill the Indian, Save the Man': Remembering the Stories of Indian Boarding Schools*, Enid News & Eagle (Mar. 10, 2020) .......... 3

House Rules of the Oklahoma House of Representatives, 58th Leg. (2021–22) .......... 6

Janel George, *A Lesson on Critical Race Theory*, ABA (Jan. 11, 2021) .......... 11

Matt Trotter, *GOP Lawmakers Send Stitt Bill To Ban Critical Race Theory in Oklahoma Schools*, Tulsa Public Radio (Apr. 29, 2021) .......... 6

Nuria Martinez-Keel, '*A Conspiracy of Silence': Tulsa Race Massacre Was Absent from Schools for Generations*, The Oklahoman (May 26, 2021) .......... 3

Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 29, 2021) .......... 6, 9, 24

Okla. S. 44, 58th Leg., 1st Reg. Sess. (April 21, 2021) .......... 9, 24

Okla. State Dep't of Educ.,
*2021 Oklahoma Academic Standards for English Language Arts* .......... *passim*

Okla. State Dep't of Educ.,
*2021 Oklahoma Academic Standards for Social Studies* .......... 8, 10, 21, 25

Okla. State Dep't of Educ.,
*Oklahoma Academic Standards* (July 22, 2021) .......... 8

Okla. State Dep't of Educ.,
*Oklahoma Public School Fast Facts 2020–21* (Aug. 2021) .......... 7

Okla. State Regents,
*Degrees of Progress: The State of Higher Education in Oklahoma* (2020) .................... 6

Press Release, Bill Prohibiting "Critical Race Theory" Curriculum Passes House, Okla. H.R. (Apr. 29, 2021) .................... 9

Press Release, Sen. Standridge Issues Statement Thanking Fellow Members for Supporting H.B. 1775, Okla. S., (Apr. 22, 2021) .................... 9

Sarah Schwartz, et al., *Map: Where Critical Race Theory is Under Attack, Education Week* (June 11, 2021) .................... 5

Univ. of Okla. Dep't of History, *Requirements for the History Major* .................... 17

Univ. of Okla., *Mission & Goals* .................... 18

Univ. of Okla., *Regents' Policy Manual for the University of Oklahoma* .................... 18

## I. PRELIMINARY STATEMENT

H.B. 1775, codified as Okla. Stat. tit. 70, § 24-157 (the "Act"), unconstitutionally restricts discussions on "race and sex" in Oklahoma's schools without any legitimate pedagogical justification, using language that is simultaneously sweeping and unclear. "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). And it is long-settled that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967). Yet the Act does precisely what Supreme Court precedent forbids. It unconstitutionally restricts students' access to information about race and sex, based on "narrow[] partisan and political" interests, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982), that are not "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

The Act's vague, overbroad, and viewpoint discriminatory language—coupled with implementing regulations that threaten to strip teachers of their licenses, Okla. Admin. Code § 210:10-1-23(j)(2)—is resulting in censorship in schools and universities across Oklahoma. Schools have struck books like *To Kill a Mockingbird* from reading lists and instructed teachers to avoid the terms "diversity" and "white privilege"; universities have ended requirements for trainings and courses that teach about harmful stereotypes and biases; and classroom teachers and college faculty are avoiding discussions about racism and sexism with students. The Act is depriving students of

information that is crucial for building the analytical skills needed to thrive in a heterogeneous community. The Act severely impinges on professors' and teachers' academic freedom and leaves them with an impossible choice: avoid topics related to race or sex in class materials and discussions, or speak about those topics and risk the loss of their livelihoods.

The Act's injurious effects are an unavoidable consequence of the Act's vague and overbroad language. It prohibits "mak[ing] part of a course" the concept that "members of one race and sex cannot and should not attempt to treat others without respect to race or sex," 70 O.S. § 24-157(1)(B)(1)(d), a restriction that is incomprehensible on its face. The Act is likewise overbroad as it prohibits, for example, "any orientation or requirement that presents any form of race or sex stereotyping or bias" at Oklahoma's public universities. *Id.* § 24-157(1)(A)(1). Such terms ban required trainings and courses that teach about harmful stereotypes in order to counteract them. The Act's restrictions, like the prohibition of the concept that "any individual should feel discomfort, guilt, anguish […] on account of his or her race or sex," *id.* § 24-157(1)(B)(1)(g), chill speech on important educational topics and violate students' right to receive information.

The Act is inflicting these harms *now*, irreversibly robbing students of the free and open exchange of ideas in academic settings that the Constitution and Supreme Court precedent have long protected. The Act on its face and as applied by Defendants is denying Plaintiffs their First and Fourteenth Amendments rights. For these and other reasons discussed herein, the Court should preliminarily enjoin enforcement of the Act.

## II. STATEMENT OF FACTS

### A. Background

Schools play a fundamental role in preparing children and adults to participate in a diverse, pluralistic society. As Oklahoma's Academic Standards recognize, it is essential that the "classroom is a place that is inclusive of the identities that reflect the richness and diversity of the human experience."[1] In order to meet the State's educational goals, "[a]ll learners must hear the voices of their own heritage in the literature they encounter."[2]

But it was not always so. Oklahoma's history is checkered with attempts to suppress the perspectives of Black, Indigenous, and other marginalized people from entering the classroom. For a century, government-run "Indian boarding schools" subjected Indigenous Oklahomans to schooling designed to "kill the Indian in him and save the man."[3] An Oklahoma legislator described how "a conspiracy of silence" kept people from learning about the parts of history that "our city and state aren't that proud of."[4] In fact, over three quarters of Oklahomans never learned about the rise and fall of Tulsa's "Black Wall Street" and the Tulsa Race Massacre in their elementary and secondary education ("Pre-K–12").[5]

---

[1] Okla. State Dep't of Educ., *2021 Oklahoma Academic Standards for English Language Arts* 5, https://bit.ly/3vDJ86w [hereinafter "Okla. Educ. Standards for Language Arts"].
[2] *Id.*
[3] Addison Kliewer et al., *'Kill the Indian, Save the Man': Remembering the Stories of Indian Boarding Schools*, Enid News & Eagle (Mar. 10, 2020), https://bit.ly/3no7Sw7.
[4] Nuria Martinez-Keel, '*A Conspiracy of Silence': Tulsa Race Massacre Was Absent from Schools for Generations*, The Oklahoman (May 26, 2021), https://bit.ly/3jtNybd.
[5] *Id.*

Until H.B. 1775, efforts were underway to tell a more complete story of Oklahoma's past. Plaintiffs are among the many educators who have worked to teach the full scope of American history and help students understand "the world around them." *See* Exhibit 8, Crawford Decl. ¶¶ 12, 20. Because of the Act, they now fear sanctions for doing so. *Id.*

Plaintiff University of Oklahoma Chapter of the American Association of University Professors's ("OU-AAUP") members are academic professionals who teach about race, gender, and the history of prejudice. They are now "self-censoring and changing their entire pedagogy practice to avoid potentially violating H.B. 1775's vague language." Exhibit 4, OU-AAUP Decl. ¶¶ 11, 13, 20, 29. Plaintiff Anthony Crawford is a high school English teacher in Millwood Public Schools who exposes his students to multiple viewpoints to create a "classroom culture of learning," but now fears punishment because of the Act's ambiguous language. Crawford Decl. ¶¶ 6, 9, 18, 20. Plaintiff Regan Killackey is a high school English teacher in Edmond Public Schools who planned to teach *To Kill a Mockingbird*, but because of the Act, his district struck the book from its reading list and instructed teachers not to say "diversity" or "white privilege." Exhibit 9, Killackey Decl. ¶¶ 12–13, 16. Plaintiff National Association for the Advancement of Colored People's ("NAACP") members include teachers and administrators who now avoid lessons and trainings related to racism, sexism, and implicit bias—material that makes school more "engaging, inclusive, [and] rigorous"—due to the Act's broad terms and severe sanctions. Exhibit 5, NAACP Decl. ¶¶ 23, 25–26.

Plaintiffs also include students who are now deprived of information that broadens their worldview and that enhances their safety and participation in class. Plaintiff Black Emergency Response Team ("BERT"), a student group founded in 2019 after several racist incidents at the University of Oklahoma ("OU"), successfully advocated for courses to help students thrive in a diverse learning community. Due to the Act, OU removed the course requirements. Exhibit 3, BERT Decl. ¶¶ 6, 8–9, 11. Plaintiff S.L. is an Eleventh-grade student in Millwood Public Schools threatened by the Act's suppression of ideas because she seeks access to information about issues Black students "are experiencing both inside and outside of the classroom." Exhibit 7, S.L. Decl. ¶¶ 8, 10–11, 16. Plaintiff NAACP's members include students whose ability to learn about racism and implicit bias has been stymied by H.B. 1775, denying them information that "sheds light on the root causes of racial and gender disparities" that directly impact their communities. NAACP Decl. ¶¶ 7, 31–32. American Indian Movement Indian Territory's ("AIM") members include Native American students who are directly impacted by H.B. 1775's chilling of diverse perspectives because AIM's members benefit from seeing their communities reflected in the curricula. Exhibit 6, AIM Decl. ¶¶ 26, 28.

As part of a nationwide effort to ban inclusive education,[6] a partisan majority of Oklahoma legislators has now overridden the pedagogical judgments of teachers and education officials in order to stifle the exchange of ideas with which they disagree.

---

[6] Laws, policies, and resolutions have been introduced in more than half the states. *See* Sarah Schwartz, et al., *Map: Where Critical Race Theory is Under Attack, Education Week* (June 11, 2021), https://bit.ly/3Bp04z7.

### B. Text of H.B. 1775 and the Emergency Rules[7]

On February 1, 2021, H.B. 1775 was introduced in the Oklahoma House of Representatives. The bill originally related to medical services at school athletic events. After going to the Senate, the bill was wholly rewritten with a list of banned concepts copied verbatim from former President Trump's Executive Order 13950, which a federal judge had partly enjoined on constitutional grounds. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020). Oklahoma legislators in both parties agreed the rewritten bill violated the legislature's "germaneness" rule, so Republicans suspended the rules.[8] Worried it might become "part of the curriculum that all white people owned slaves and because you're white, you're responsible for that"[9]—without presenting any evidence that anyone was teaching such notions—legislators passed H.B. 1775 as an "emergency" measure along strictly partisan lines. Governor Stitt signed the Act on May 7, and it became effective on July 1, 2021.

Section 1(A) of the Act applies to "institution[s] of higher education within The Oklahoma State System of Higher Education," 70 O.S. § 24-157(1)(A), encompassing 25 colleges and universities serving over 200,000 students.[10] Section (1)(A)(1) prohibits "mandatory gender or sexual diversity training or counseling" in public higher education

---

[7] The Act is attached as Exhibit 1 and the Rules are attached as Exhibit 2.
[8] House Rules of the Oklahoma House of Representatives, 58th Leg. §§ 7.6(d), 8.13 (2021–22); Matt Trotter, *GOP Lawmakers Send Stitt Bill To Ban Critical Race Theory in Oklahoma Schools*, Tulsa Public Radio (Apr. 29, 2021), https://bit.ly/3EqGAfn.
[9] Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 29, 2021, 10:42:41 AM) (Rep. West), https://www.okhouse.gov/video/default.aspx [hereinafter "April 29th House Session"].
[10] Okla. State Regents, *Degrees of Progress: The State of Higher Education in Oklahoma* 9, (2020), https://bit.ly/3B8Smck.

institutions, and "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex." *Id.* § 24-157(1)(A)(1).

Section 1(B) applies to any "teacher, administrator or other employee of a school district, charter school or virtual charter school" under the supervision of the State Board of Education, which oversees over 1,800 schools, serving nearly 700,000 students, and employing nearly 43,000 teachers.[11] Section (1)(B)(1) provides that:

> No teacher, administrator or other employee of a school district, charter school or virtual charter school shall require or make part of a course the following concepts:
>
> a. one race or sex is inherently superior to another race or sex,
> b. an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously,
> c. an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex,
> d. members of one race and sex cannot and should not attempt to treat others without respect to race or sex,
> e. an individual's moral character is necessarily determined by his or her race or sex,
> f. an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex,
> g. any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or
> h. meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race.

*Id.* § 24-157(1)(B)(1).

Notwithstanding the list of prohibited concepts, Section (1)(B) provides that the Act "shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." *Id.* § 24-157 (1)(B). But the Academic Standards require that students "tak[e]

---

[11] Okla. State Dep't of Educ., *Oklahoma Public School Fast Facts 2020–21* 9, 11, (Aug. 2021), https://bit.ly/3pxe2fX.

into consideration multiple points of view represented in arguments"[12] and encourage including diverse points of view in coursework.[13] Because the standards are "guides for developing curriculum"[14] that "[d]o not dictate how teachers should teach,"[15] teachers do not know what particular content is covered by the Act's carve-out provision. Crawford Decl. ¶ 18.

As required by the Act, the State Board of Education released temporary emergency rules for the implementation and enforcement of the Act (the "Rules"), which establish sanctions for individuals and entities that violate the Act, including loss of accreditation and teaching licenses. Okla. Admin. Code § 210:10-1-23(h), (j). Staff members subject to penalties include "superintendents of schools, principals, supervisors, librarians, school, [*sic*] classroom teachers or other personnel performing instructional, administrative and supervisory services in the public schools." *Id.* § 210:10-1-23(j). The Rules also exacerbate the chilling effect of the Act and the risk of inconsistent enforcement by allowing *any* private citizen to file a complaint and initiate an investigation into a possible instance of prohibited speech. *Id.* § 210:10-1-23(g)(1).

---

[12] Okla. State Dep't of Educ., *2021 Oklahoma Academic Standards for Social Studies* 6, 82, https://tinyurl.com/3tjh2mm5 [hereinafter "Social Studies Practices"].
[13] *See generally id.*
[14] Okla. Educ. Standards for Language Arts at 3.
[15] Okla. State Dep't of Educ., *Oklahoma Academic Standards* (July 22, 2021), https://sde.ok.gov/oklahoma-academic-standards.

### C. Implementation of the Act

At the time it was passed, legislators made clear that the Act was intended to silence and suppress speech with which they disagreed. Legislators explained the Act's purpose was to prohibit discussions of "the theory of implicit bias";[16] to stop the use of words like "diversity" instead of "excellence" and "equity" instead of "equality";[17] to suppress discussion of "police brutality" and "intersectionality";[18] and to eliminate school trainings that discussed "institutionalized racism," "white supremacy," and "whiteness" as concepts.[19]

Oklahoma school districts have responded to the Act by censoring curricula and eliminating diversity trainings. For example, Defendant Edmond Public Schools ("EPS") directed Plaintiff Regan Killackey and other English teachers to "[a]void the terms 'diversity' and 'white privilege' in class," *see* ELA 12 Align re 1775 at 3, ECF No. 1-2,[20] despite the words "diverse" or "diversity" appearing in the English Language Arts Standards 43 times.[21] EPS also removed all books authored by Black people and women

---

[16] Press Release, Bill Prohibiting "Critical Race Theory" Curriculum Passes House, Okla. H.R. (Apr. 29, 2021), https://bit.ly/3vTcDSh.
[17] April 29th House Session at 12:35:59–12:36:15 PM.
[18] April 29th House Session at 12:08:20 PM (Rep. Humphrey); Okla. S. 44, 58th Leg., 1st Reg. Sess. (April 21, 2021, 11:29:19–11:29:23 PM) (Sen. Bullard), https://oksenate.gov/live-chamber [hereinafter "April 21st Senate Session"].
[19] April 21st Senate Session at 11:10:20–11:11:40 PM; Press Release, Sen. Standridge Issues Statement Thanking Fellow Members for Supporting H.B. 1775, Okla. S., (Apr. 22, 2021), https://bit.ly/3nnXJPN.
[20] Following the filing of this lawsuit on October 19, 2021, EPS has reportedly removed this specific guidance from their training PowerPoint.
[21] *See* Okla. Educ. Standards for Language Arts. The Academic Standards also state: "The language arts classroom is a place that is inclusive of the identities that reflect the

from the list of anchor texts—books around which teachers build their curriculum. Killackey Decl. ¶¶ 8–9, 13. Anchor texts used to include Lorraine Hansberry's *A Raisin in the Sun*, Zora Neale Hurston's *Their Eyes Were Watching God*, Maya Angelou's *I Know Why the Caged Bird Sings*, Harper Lee's *To Kill a Mockingbird*, and the autobiographical *Narrative of the Life of Frederick Douglass, an American Slave*. Now they only include books by White male authors.[22] *Id.*

Likewise, Muskogee Teacher B.B., a member of Plaintiff NAACP, has modified their[23] curriculum—which was initially designed to develop students' analytical skills and creativity—because they fear that asking questions related to systemic power and oppression could be interpreted as introducing a banned concept. NAACP Decl. ¶ 19. Teacher B.B. is no longer comfortable teaching students about Dolores Huerta's contributions to the labor movement for which Cesar Chavez received most of the credit, because alluding to issues of sexism could be interpreted as including banned concepts in the course. *Id.* at ¶ 20. Students across the state have lost access to information critical to their social, cognitive, and emotional development. Exhibit 10, Dr. Lynn Decl. ¶ 31.

---

richness and diversity of the human experience." *Id.* at 6. Similarly, Oklahoma's "Social Studies Practices" place primary value on *including* diverse points of view, not restricting access to differing ideas or opinions. The Practices expressly state students should be able to "Analyze and Address Authentic Civic Issues," including a demonstrated "ability to investigate problems taking into consideration multiple points of view represented in arguments, structure of an explanation, and other sources." Social Studies Practices at 6.

[22] Only F. Scott Fitzgerald's *The Great Gatsby* and Arthur Miller's *The Crucible* remain.

[23] The gender-neutral pronouns "they", "them," and "their" are used to maintain the anonymity of Teacher B.B. and other NAACP members.

University professors are also changing their curricula to avoid violating the Act. OU-AAUP Decl. ¶¶ 10–21. The Office of the Dean of Arts and Sciences told one OU-AAUP member that he could no longer test on critical race theory[24] in classes designed to teach theories of human relations and intersecting identities. OU-AAUP Decl. ¶ 12. Other professors are dramatically changing how they present material on race, sex, and sexual orientation, and rethinking their entire pedagogy so as to avoid sanctions under the Act's vague terms. OU-AAUP Decl. ¶¶ 13, 18–19, 21. Rather than risk violating the law, some professors are refraining from mentioning race, gender, or sexual orientation altogether. OU-AAUP Decl. ¶¶ 13–14, 20. Because of the Act, OU made optional its previously mandatory sexual harassment training and a new diversity course—both adopted to address issues of equal educational access. BERT Decl. ¶¶ 13–14. Now that students are not required to learn about anti-racism and rape prevention, OU community members—particularly women, LGBTQ+ students, and students of color—face an increased risk of harassment and prejudice. *See* Dr. Lynn Decl. ¶¶ 33–37.

## III. ARGUMENT

To obtain a preliminary injunction, Plaintiffs must establish:

> "(1) a substantial likelihood of prevailing on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary

[24] Critical race theory is a body of legal scholarship and an academic movement that examines the role that race and identity play in the legal system and society. *See*, Janel George, *A Lesson on Critical Race Theory*, ABA (Jan. 11, 2021), https://bit.ly/2XH7srR. Critical race theory has been used more recently as a catch-all phrase for anti-racist and reformist ideas. *See* Rashawn Ray & Alexandra Gibbons, *Why Are States Banning Critical Race Theory*, Brookings (Aug. 2021), https://brook.gs/3vIeWYg.

> injunction; and (4) that the injunction would not be adverse to the public interest."

*South Wind Women's Center, LLC v. Stitt*, 455 F. Supp. 3d 1219, 1228 (W.D. Okla. 2020) (quoting *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001)).

**A. Plaintiffs Are Likely to Succeed on The Merits of Their Claims**

*1. The Act is too vague for Oklahoma educators to understand its provisions.*

The Act's vague directives force ordinary persons to guess at their meaning—with substantial consequences if they guess wrong. A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Faustin v. City & Cty. Of Denver, Colo.*, 423 F.3d 1192, 1201 (10th Cir. 2005). Where First Amendment rights are at stake, "[s]tricter standards of permissible statutory vagueness may be applied." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 620 (1976)). A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2002). The Act does both. Indeed, a federal court examining many of the same banned concepts in former President Trump's Executive Order 13950 found the plaintiffs in that case were likely to succeed on the merits of their vagueness claim and preliminarily enjoined enforcement of the banned concepts. *Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 543.

At the college and university level, Section (1)(A)(1) prohibits "any form of mandatory gender or sexual diversity training or counseling." 70 O.S. § 24-157(1)(A)(1). But "gender or sexual diversity" is not a commonly-used formulation and the Act provides no definition or guidance as to what this provision proscribes. Does it refer to sexual orientation? Gender identity? The reader is left to guess.

Section (1)(B)(1) lists eight concepts that teachers may not "require or make part of a course." *Id.* § 24-157 (1)(B)(1). But what does it mean to "require" a concept, or to make a concept "part of a course"? Is a concept "required" if it is addressed—even for the purposes of denouncing it? Is a concept "part of a course" if it is in some way depicted by a poster on the classroom wall? This vague language creates fear among high school teachers like Mr. Crawford who do not know whether merely exposing students to the existence of a banned concept will subject them to penalties. *See* Crawford Decl. ¶ 15.

Section (1)(B)(1)(d) forbids making part of a course the concept that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." 70 O.S. § 24-157(1)(B)(1)(d). But what does it mean to "not attempt to treat others without respect to race or sex"? The language is indecipherable. Does highlighting the race or sex of a character in a play or a figure in a painting, or analyzing the use of racial or gender stereotypes in such a work, violate this provision? As the Edmond Public Schools' guidelines admit: "Unfortunately, no one truly knows what this means or can come to agreement on its meaning." Guidance from Edmond Written at 2, ECF No. 1-1.

Section (1)(B)(1)(f) bans the concept that "an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of

the same race or sex." 70 O.S. § 24-157(1)(B)(1)(f). In this context, what does it mean to "bear[] responsibility" for others' actions? Does this refer to moral responsibility, or concepts like collective or societal responsibility? Is it unlawful to discuss reparations for past oppression in class? This section is directed at chilling discussions about the legacy of historic injustices, but due to the lack of clarity, Mr. Crawford cannot know whether he will be punished if he and his students discuss whether the wealth gap stems partly from systemic racism. Crawford Decl. ¶ 15.

Likewise, Section (1)(B)(1)(g) prohibits the concept that "any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex." 70 O.S. § 24-157 (1)(B)(1)(g). But what constitutes "any other form of psychological distress"? It is impossible for teachers to accurately predict how "any individual" will react to a given topic, much less guarantee that lessons concerning slavery, Jim Crow laws, the Holocaust, the Women's rights movement, voting rights, or immigration will not cause anyone "discomfort."

The vagueness that permeates the concepts is only compounded by Section (1)(B), which provides that the Act "shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." *Id.* § 24-157 (1)(B). This is confusing because the rest of the Act appears to ban concepts that the Academic Standards encourage teachers to teach. The Twelfth Grade English Language Arts standards state that "[s]tudents will evaluate how authors writing on the same issue reached different conclusions because of differences in assumptions, evidence, reasoning, and viewpoints, including examining

rhetorical appeals, bias, and use of logical fallacies."[25] Yet the Act bans discussions of Nazi rhetoric that portrayed "Aryans" as an inherently superior race, and anti-Black bias underlying the "Three-Fifths Compromise," because such discussions entail the concept that "one race or sex is inherently superior to another." *Id.* § 24-157 (1)(B)(1)(a).

Teachers are at a loss to discern what it means for content to "align" with the Standards so as to render permissible an otherwise illegal discussion. *See* Crawford Decl. ¶¶ 17–19; NAACP Decl. ¶ 17. Plaintiff Crawford wonders if he is "allowed to include a concept that is 'prohibited' [if teaching the concept] could allow a student to meet [state] standards." Crawford Decl. ¶ 18. Likewise, "Teacher B.B. is not clear whether they are still permitted to teach about historical figures who are not named in the state standards," including important historical Black women such as Mae Jemison and Mary McCleod Bethune. NAACP Decl. ¶ 17. In other words, the Act's "uncertain terms" cause teachers to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked"—triggering precisely the concern that requires invalidating a vague law that implicates First Amendment rights. *Dr. John's, Inc.*, 465 F.3d at 1157 (quoting *Grayned*, 408 U.S. at 109).

Edmond's ban on saying "diversity" and "white privilege" illustrates the kind of arbitrary enforcement that the Act invites. Killackey Decl. ¶ 12. Teachers do not know "how state authorities will interpret the vague language," *see* Crawford Decl. ¶ 20, and fear school officials will "make examples" of certain teachers, NAACP Decl. ¶ 16. The

[25] Crawford Decl. ¶ 17; *see also* Okla. Educ. Standards for Language Arts at 123.

Rules make arbitrary and discriminatory enforcement even more likely by allowing individuals to file complaints and to initiate investigations at the state or district level. Okla. Admin. Code § 210:10-1-23(g)(1). Plaintiffs fear the Act has already "emboldened students and faculty to harass professors teaching anti-racism pedagogy." OU-AAUP Decl. ¶ 27.

*2. The Act is a viewpoint discriminatory and overbroad infringement on academic freedom.*

The legislature's micromanagement of the concepts that educators may discuss violates Plaintiffs' academic freedom rights and is viewpoint discriminatory. In excising certain viewpoints, the Act has cast an unconstitutional "pall of orthodoxy" in schools. *Keyishian*, 385 U.S. at 603. It has chilled professors' speech and caused them to stop teaching texts "which directly address race, gender, and sexual orientation," OU-AAUP Decl. ¶ 14, discussing "whiteness, racism, oppression, and colonialism," *id.* at ¶ 21, and exposing students to the analytical lens of critical race theory alongside other frameworks, *id.* at ¶ 29. Particularly in the university setting, "it is 'axiomatic' that viewpoint-based suppression of speech is impermissible." *Giebel v. Sylvester,* 244 F.3d 1182, 1189 (9th Cir. 2001) (citation omitted).[26] Silencing a particular viewpoint—here,

---

[26] Pre-K–12 educators, too, are afforded some degree of academic freedom. *Cary v. Bd. of Ed. of Adams-Arapahoe Sch. Dist. 28-J, Aurora, Colo.*, 427 F. Supp. 945, 955 (D. Colo. 1977), *aff'd,* 598 F.2d 535 (10th Cir. 1979) ("The selection of the subject books as material for these elective courses in these grades is clearly within the protected area recognized as academic freedom"); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969) (recognizing that academic freedom likely entitled a high school English teacher to discuss a dirty word in a reading assignment).

that overcoming racism and sexism requires discussing racism and sexism—violates the First Amendment.

"Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978). In *Sweezy v. New Hampshire*, the Supreme Court explained that "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." 354 U.S. at 250. And the Court has made clear that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Keyishian*, 385 U.S. at 604 (citing *N.A.A.C.P. v. Button*, 371 U.S. 415, 438 (1963)).

The Act prohibits "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex." 70 O.S. § 24-157(1)(A)(1). This provision reaches beyond any legitimate regulation of academic speech by prohibiting the mere *presentation* of racial and sex stereotypes or bias in any required forum. OU requires all students to take a U.S. History course,[27] but professors teaching that course may be punished under the Act if they discuss how racial and sex stereotypes have fueled discrimination or undergirded American laws, or even how stereotypes about race and sex have evolved over time. How could a professor address slavery, Jim Crow, the Tulsa Race Massacre, or the movement for women's rights without presenting information

[27] Univ. of Okla. Dep't of History, *Requirements for the History Major*, https://bit.ly/3bmgSfH.

about racial and gender bias? Indeed, the Chair of OU's English Department worries teaching courses in Black literature may violate the Act. OU-AAUP Decl. ¶ 9.

The Act severely limits academic freedom in a viewpoint discriminatory manner and conflicts with OU's assertion that it is "educationally desirable that students be confronted with diverse opinions of all kinds."[28] OU aims to meet its pedagogical goals by providing "a full range of materials on any subject, even though some views might be currently unpopular or controversial,"[29] and by creating "a safe, healthy environment in which students may live, study, socialize and work."[30] But the Act targets OU's diversity programming, which was adopted for the purpose of combatting anti-Black racism and exposing students to diverse opinions. *See supra* Section II.B.

The plain letter of the law prohibits any mention of the banned concepts, not merely the affirmative promotion of racist ideas. For example, the Act does not mention "critical race theory." But according to EPS, "If a student asks, 'What is C[ritical] R[ace] T[heory]?' then a teacher may respond with, 'it's often a theory used in higher education to look at laws in society.' This response would not violate the law." Guidance from Edmond Written at 2. The suggested response does not use the word race, which is literally central to critical race theory. The Act requires educators to provide opaque, misleading answers to students' important questions—an infringement on the teachers' academic freedom.

---

[28] Univ. of Okla., *Mission & Goals*, https://bit.ly/3B7Uwsx.
[29] Univ. of Okla., *Regents' Policy Manual for the University of Oklahoma* 12, https://bit.ly/3vTdvGx.
[30] Univ. of Okla., *supra* note 31.

*3. The Act, for no legitimate purpose, restricts students' access to information.*

The Act's vague and overbroad provisions not only violate educators' speech rights; they also infringe upon students' rights to access information and ideas. "It is now well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Students, in particular, have a right to access information in schools. *See Pico,* 457 U.S. at 866–68; *see also Roberts v. Madigan*, 921 F.2d 1047, 1056 (10th Cir. 1990). "[J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico,* 457 U.S. at 868.

While governmental actors enjoy some discretion in fashioning school curricula, this discretion has constitutional limits. To avoid violating the First Amendment, the state's restrictions on students' access to information must be "reasonably related to a legitimate pedagogical interest." *Hazelwood Sch. Dist.*, 484 U.S. at 273. Even if a state demonstrates a legitimate interest, a plaintiff may establish a First Amendment violation by proving that the reasons offered by the state in fact serve to mask other illicit motivations. *See Pico*, 457 U.S. at 853;[31] *see also Axson-Flynn v. Johnson,* 356 F.3d

[31] In *Pico*, a plurality of the Supreme Court recognized that school boards could not remove library books based on "narrowly partisan or political" interests of "racial animus." 457 U.S. at 870, 871. Although Justice Rehnquist dissented from the judgment in *Pico*, he "cheerfully concede[d]" that such "discretion may not be exercised in a

1277, 1290 (10th Cir. 2004). Illegitimate motives include restricting students' access to information based upon "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the governmental actor] disagree[s]." *Pico,* 457 U.S. at 870–72.

In *Pico,* a plurality of the Supreme Court held that school boards violate the First Amendment if they "remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Removing books—as opposed to acquiring books—implicated students' First Amendment rights because "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Id.* at 861–62; 866 (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965)).

In *Hazelwood,* the Court re-emphasized the constitutional limits placed on school officials' discretion by holding a school could only "exercise editorial control" over "student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 270–71, 273. While the Tenth Circuit has not yet explicitly adjudicated what standard applies to curricula

---

narrowly partisan or political manner" or based on "racial animus." *Id.* at 907 (internal quotation marks omitted). Consequently, five members of the Supreme Court subscribed to the view that the First Amendment forbids school officials from removing materials from school libraries to further narrowly partisan, political, or racially discriminatory ends.

development, it has required the government to show that restrictions placed on school-sponsored in-class speech are reasonably related to a legitimate pedagogical interest. *See Miles v. Denver Pub. Sch.*, 944 F.2d 773, 775 (10th Cir. 1991); *Axson-Flynn*, 356 F.3d at 1289. Moreover, the Tenth Circuit has recognized the court must scrutinize any proffered justification to ensure it is not a "sham pretext for an impermissible ulterior motive." *Axson-Flynn*, 356 F.3d at 1292–93.[32]

The Act violates students' right to information because it undermines the State's pedagogical goals and only serves to advance "narrowly partisan" interests. Oklahoma's Pre-K–12 standards encourage assigning texts with which students may disagree in order to "[r]einforce critical thinking by evaluating and challenging ideas and assumptions"[33] and including differing viewpoints to hone students' "ability to investigate problems taking into consideration multiple points of view."[34] Moreover, state law requires a social studies curriculum that "reflect[s] the racial, ethnic, religious, and cultural diversity of the United States of America." 70 O.S. § 11-103.6b. And, as America's "nurseries of democracy," Pre-K–12 public schools must protect the "marketplace of ideas." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038 (2021).

[32] In examining remarkably similar restrictions on students' access to ideas, the Ninth Circuit also required state officials to demonstrate a legitimate pedagogical interest to justify removing materials from local classrooms. *Arce v. Douglas*, 793 F.3d 968, 983 (9th Cir. 2015). On remand, the district court struck provisions based on illicit racial motives. *Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 973 (D. Ariz. 2017).
[33] Social Studies Practices at 76.
[34] *Id.* at 6.

In enforcing the Act, EPS removed *A Raisin in the Sun*, *Their Eyes Were Watching God*, *I Know Why the Caged Bird Sings*, *To Kill a Mockingbird*, and *Narrative of the Life of Frederick Douglass, an American Slave* from the curriculum. The only remaining "anchor texts"—those around which teachers build their curriculum—are authored by White men. Killackey Decl. ¶ 13. This decision lacks a legitimate pedagogical purpose and runs contrary to the plurality opinion in *Pico*, which noted that students' constitutional rights would be violated if a school board, "motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration." *Pico*, 457 U.S. at 871. EPS's response to the Act has an immediate and irremediable adverse impact on Student A.A, by infringing on Student A.A.'s ability to access such information. NAACP Decl. ¶ 13; Exhibit 10, Dr. Lynn Decl. ¶¶ 6–8, 2.

The Act similarly violates Plaintiff BERT and other college students' right to receive ideas, which carries even greater weight in higher education. *See, e.g.*, *Axson-Flynn,* 356 F.3d at 1289–90. Here, adult students' rights are severely restricted by a partisan law serving no legitimate pedagogical purpose. The Act denies students—like those enrolled in OU's African American Studies, Human Relations, and Anthropology programs—access to information that is integral to their fields of study, because it could make some students uncomfortable. BERT Decl. ¶¶ 12, 16–17; OU-AAUP Decl. ¶¶ 9–22.

### B. Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016). The irreparable injury caused by the Act has already begun to accrue. School is in session, and educators are altering curricula. Because of the Act, Teacher B.B.'s students are not learning about Black women who are not named in Oklahoma's state standards. NAACP Decl. ¶ 17. And many Edmond students will not read books by Black or women authors. Killackey Decl. ¶ 13. Losing educational opportunities at this stage of students' education has long-term irremediable effects. Dr. Lynn Decl. ¶¶ 15–17, 32, 36. An ultimate victory cannot redress the harm that students are experiencing now.

For university students, the Act similarly puts education "at risk." BERT Decl. ¶ 19. Professors have scrubbed their curricula for materials that could be interpreted as presenting biases on the basis of race or sex, *see, e.g.*, OU-AAUP Decl. ¶ 20, leaving many students unable to study issues at the core of their fields, *see, e.g.*, BERT Decl. ¶ 17.

### C. Plaintiffs' Injury is Great, and Preliminary Relief Will Not Harm Defendants

Absent an injunction, students will be denied the education that Oklahoma's standards envision, because teachers will remain too afraid to expose them to potentially controversial concepts. An injunction would not harm Defendants, because "[d]elayed

implementation of a measure that does not appear to address any immediate problem will generally not cause material harm, even if the measure were eventually found to be constitutional and enforceable." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). There is no evidence that Oklahoma teachers are teaching students that one race is superior to another, or that moral character is determined by race or sex.

Representative Waldron (D) worried, "we are barring things without establishing that they are actually happening in Oklahoma. We are chasing boogeymen for the purpose of stirring things up all to win cheap political points. And in doing so we are committing to a massive government overreach into our classrooms."[35] Senator Merrick (R) insisted that "even if it's not being taught anywhere in Oklahoma . . . it is wise of us to take action now and defend our kids and protect our kids against any possibility of them hearing in their ears that they are racist because of the color of their skin."[36]

Defending against "any possibility" of hearing disfavored viewpoints cannot justify the harm that students and educators will suffer if the State continues to dictate which topics and words students and teachers are allowed to hear and say.

### D. An Injunction Would Serve the Public Interest

The Act chills and censors speech, jeopardizing the future of the nation's democratic institutions. Oklahoma's "nurseries of democracy" cannot prepare students "to become informed, contributing, and participating citizens in this democratic

[35] April 29th House Session at 11:54:27–11:54:49 AM.
[36] April 21st Senate Session at 11:05:38–11:06:04 PM.

republic"[37] when teachers fear that exposing students to controversial issues will result in loss of their teaching licenses. Scholarship and research will suffer as professors attempt to devise curricula that the Act's proponents would approve of, and university students will be unable to "gain new maturity and understanding." *Sweezy*, 354 U.S. at 250.

The Tenth Circuit has repeatedly recognized that "[v]indicating First Amendment freedoms is clearly in the public interest." *See, e.g.*, *Pac. Frontier v. Pleasant Grove City,* 414 F.3d 1221, 1237 (10th Cir. 2005); *Verlo*, 820 F.3d at 1127; *Elam Constr., Inc. v. Regional Transp. Dist.,* 129 F.3d 1343, 1346–47 (10th Cir. 1997). Here, vindicating First Amendment freedoms in Oklahoma's public schools and universities will benefit students, teachers, and the public as a whole. *See Mahanoy,* 141 S. Ct. at 2046. Inclusive education benefits not only every student who receives it, but also society as a whole, because it allows youth to work towards a more perfect union by understanding and combatting inequities and the systems that reproduce them. *See* Dr. Lynn Decl. ¶¶ 8, 30–31. As expressed by Dr. Lynn, H.B. 1775 results in "'the closing of the American mind' which is ultimately undemocratic." *Id.* ¶ 30.

## IV. CONCLUSION

For the above reasons, Plaintiffs respectfully ask this Court to preliminarily enjoin Defendants from enforcing this vague, overbroad, and viewpoint discriminatory Act.

---

[37] Social Studies Standards at 3.

Dated: October 29, 2021

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Genevieve Bonadies Torres
David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Gary Stein
Michael Cutini
Sara Solfanelli
Elahe Hosseini
Amir Shakoorian Tabrizi
Ramya Sundaram
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>[1] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,<br><br>*Defendants*. | Case No. 5:21-cv-01022-G<br><br>Hon. Charles B. Goodwin |

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs Black Emergency Response Team, et al. respectfully move the Court, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and Local Rule 7.1, for the entry of a preliminary injunction against the enforcement of H.B. 1775, codified as Okla. Stat. tit. 70 § 24-157. H.B. 1775 is vague and is a viewpoint discriminatory and overbroad infringement on academic freedom on its face and as applied to Plaintiffs.

As more fully set forth in Plaintiffs' Memorandum of Support, Plaintiffs are likely to succeed on the merits of their claims and will suffer irreparable harm from the

enforcement of the Act in the absence of preliminary relief. The balance of equities tilts strongly in their favor, and an injunction protecting their constitutional rights is in accord with the public interest.

Wherefore a preliminary injunction should issue.

Dated: October 29, 2021

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Genevieve Bonadies Torres
David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005

Gary Stein
Michael Cutini
Sara Solfanelli
Elahe Hosseini
Amir Shakoorian Tabrizi
Ramya Sundaram
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2021, I electronically filed the foregoing Motion for a Preliminary Injunction & Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction with the Clerk of Court using the CM/ECF system. The following, who are not registered participants of the Electronic Case Filing System, will be served by U.S. Mail:

**John O'Connor**
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

**Joy Hofmeister**
Oklahoma Superintendent of Public Instruction
Oklahoma State Department of Education
Oliver Hodge Building, 2500 North Lincoln Boulevard
Oklahoma City, OK 73105

**William Flanagan**
**Carlisha Bradley**
**Jennifer Monies**
**Estela Hernandez**
**Brian Bobek**
**Trent Smith**
Members of the Oklahoma State Board of Education
Oliver Hodge Building, 2500 North Lincoln Boulevard
Oklahoma City, OK 73105

**Kevin Stitt**
Office of the Governor of Oklahoma
Oklahoma State Capitol, 2300 N Lincoln Blvd.
Oklahoma City, OK 73105

**Jeffrey Hickman**
**Michael Turpen**
**Steven Taylor**
**Dennis Casey**
**Jay Helm**
**Ann Holloway**
**Joseph Parker, Jr.**
**Jack Sherry**
**Courtney Warmington**
Oklahoma State Regents for Higher Education
655 Research Parkway, Suite 200
Oklahoma City, OK 73104

**Michael Cawley**
**Frank Keating**
**Phil Albert**
**Natalie Shirley**
**Eric Stevenson**
**Anita Holloway**
**Rick Nagel**
Members of the Board of Regents of the University of Oklahoma
University of Oklahoma
660 Parrington Oval # 119
Norman, OK 73019

**Angela Grunewald**
Office of the Superintendent, Edmond Public Schools
1001 W. Danforth Rd.,
Edmond, OK 73003-4801

**Jamie Underwood**
**Cynthia Benson**
**Kathleen Duncan**
**Lee Ann Kuhlman**
Members of the Board of Education of Edmond Public Schools
Edmond Public Schools
1001 W. Danforth Rd.,
Edmond, OK 73003-4801

Respectfully submitted,

/s/ *Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@aclu.ok.org

*Counsel for Plaintiffs*

# Exhibit 1

# An Act

ENROLLED HOUSE
BILL NO. 1775

By: West (Kevin), Stearman, Stark, Caldwell (Chad), Crosswhite Hader, Williams, Olsen, West (Rick), Gann, Bashore, Kendrix, Smith, Grego, Pfeiffer, Martinez, Roe, Sneed, Marti, Steagall, Russ and Conley of the House

and

Bullard, Hamilton, Jett Standridge, Dahm, Weaver, Bergstrom, Merrick, Pederson, Rogers, Burns and Stephens of the Senate

An Act relating to education; prohibiting certain students within certain institutions from being required to engage in certain training or counseling; allowing for voluntary counseling; prohibiting orientation or requirement that presents any form of certain stereotyping or bias; directing promulgation of rules pursuant to certain act and subject to certain approval; prohibiting certain application; prohibiting employees of certain schools from requiring certain concepts to be part of a course; specifying concepts; directing promulgation of rules pursuant to certain act and subject to certain approval; providing for codification; providing an effective date; and declaring an emergency.

SUBJECT: Education

BE IT ENACTED BY THE PEOPLE OF THE STATE OF OKLAHOMA:

SECTION 1. NEW LAW A new section of law to be codified in the Oklahoma Statutes as Section 24-157 of Title 70, unless there is created a duplication in numbering, reads as follows:

A. 1. No enrolled student of an institution of higher education within The Oklahoma State System of Higher Education shall be required to engage in any form of mandatory gender or sexual diversity training or counseling; provided, voluntary counseling shall not be prohibited. Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited.

2. Pursuant to the provisions of the Administrative Procedures Act, the Oklahoma State Regents for Higher Education shall promulgate rules, subject to approval by the Legislature, to implement the provisions of this subsection.

B. The provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards.

1. No teacher, administrator or other employee of a school district, charter school or virtual charter school shall require or make part of a course the following concepts:

a. one race or sex is inherently superior to another race or sex,

b. an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously,

c. an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex,

d. members of one race or sex cannot and should not attempt to treat others without respect to race or sex,

e. an individual's moral character is necessarily determined by his or her race or sex,

f. an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex,

g. any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or

h. meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race.

2. The State Board of Education shall promulgate rules, subject to approval by the Legislature, to implement the provisions of this subsection.

SECTION 2. This act shall become effective July 1, 2021.

SECTION 3. It being immediately necessary for the preservation of the public peace, health or safety, an emergency is hereby declared to exist, by reason whereof this act shall take effect and be in full force from and after its passage and approval.

Passed the House of Representatives the 3rd day of May, 2021.

______________________________
Presiding Officer of the House
of Representatives

Passed the Senate the 21st day of April, 2021.

______________________________
Presiding Officer of the Senate

OFFICE OF THE GOVERNOR

Received by the Office of the Governor this ____________________

day of ___________________, 20_______, at _______ o'clock _______ M.

By: _________________________________

Approved by the Governor of the State of Oklahoma this _________

day of ___________________, 20_______, at _______ o'clock _______ M.

_________________________________
Governor of the State of Oklahoma

OFFICE OF THE SECRETARY OF STATE

Received by the Office of the Secretary of State this __________

day of ___________________, 20_______, at _______ o'clock _______ M.

By: _________________________________

# Exhibit 2

## TITLE 210. STATE DEPARTMENT OF EDUCATION
## CHAPTER 10. SCHOOL ADMINISTRATION AND INSTRUCTIONAL SERVICES

*PURSUANT TO THE ACTIONS DESCRIBED HEREIN, THE FOLLOWING EMERGENCY RULES ARE CONSIDERED PROMULGATED AND EFFECTIVE UPON APPROVAL BY THE GOVERNOR AS SET FORTH IN 75 O.S., SECTION 253(F):*

### SUBCHAPTER 1. GENERAL PROVISIONS

**210:10-1-23. Prohibition of race and sex discrimination**

(a) **Purpose.** It shall be the policy of the Oklahoma State Board of Education to prohibit discrimination on the basis of race or sex in the form of bias, stereotyping, scapegoating, classification, or the categorical assignment of traits, morals, values, or characteristics based solely on race or sex. Public schools in this state shall be prohibited from engaging in race or sex-based discriminatory acts by utilizing these methods, which result in treating individuals differently on the basis of race or sex or the creation of a hostile environment.

(b) **General.**

(1) **Definitions.**

(A) "Public School" means the board of education of a school district, charter school, virtual charter school or otherwise accredited school, as defined and provided for in 70 O.S. § 1-108, 70 O.S. § 3-132, 70 O.S. § 3-145.3 and 70 O.S. § 3-104, respectively.

(B) "Course" means any forum where instruction or activities tied to the instruction are provided, including courses, training, seminars, professional development, lectures, sessions, coaching, tutoring, or any other class.

(C) "Teacher" means the same as it is defined in 70 O.S. § 1-116.

(2) **Applicability.** As expressly set forth in 24 O.S. § 24-157(B), this rule shall apply to any Teacher, administrator or other employee of a Public School.

(3) **Nondiscrimination.** Nothing in this rule shall be intended to prohibit a Public School from employing lawful methods to address discrimination consistent with the requirements of the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964 ("Title VI"), Title IX of the Education Amendments of 1972 ("Title IX"), and 70 O.S. § 24-157. Further, nothing in this rule shall interfere or impair a Public School under a court order of desegregation.

(4) **Severability.** If any specific provision of this rule or its application to any person or Public School is held invalid, the remainder of the rule or the application of its provisions to any school, person, practice or entity shall not be affected.

(5) **Instruction.** Nothing in this rule shall be construed to prevent the teaching of history, social studies, English language arts, biology or any other subject matter area consistent with the Oklahoma Academic Standards as adopted and approved by the State Board of Education and approved by the Oklahoma Legislature.

(6) **Title IX of the Education Amendments of 1972.** Nothing in this rule shall be interpreted to prohibit the lawful consideration of sex, as authorized by Title IX, which permits distinctions and/or classifications based on sex in specific circumstances. This includes but is not limited to the provision of single-sex programs, the establishment of separate sex facilities (bathrooms and locker rooms) or sex-specific athletic teams, consistent with the requirements of Title IX and its implementing regulations at 34 C.F.R. Part 106.

(c) **General Prohibition**. No teacher, administrator or other school employee shall require or make part of any Course offered in a public school the following discriminatory principles:

(1) One race or sex is inherently superior to another race or sex,

(2) An individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously,

(3) An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex,

(4) Members of one race or sex cannot and should not attempt to treat others without respect to race or sex,

(5) An individual's moral character is necessarily determined by his or her race or sex,

(6) An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex,

(7) Any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or

(8) Meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race.

(d) **Specific Prohibitions Ensuring Compliance**. To ensure compliance with 70 O.S. § 24-157(B) and to not discriminate on the basis of race or sex, as a part of any Course or activities, the following requirements shall apply to Public Schools, any Teacher, administrator, other employee, or other individual, group or representative of a Public School:

(1) Public schools in this state shall be prohibited from providing, contracting to provide, offering or sponsoring any Course(s), as defined in subsection (b)(1)(B), that includes, incorporates, or is based on discriminatory practices identified in section (c).

(2) Public schools in this state shall be prohibited from using any monies, property, or any other assets or resources to engage in race or sex-based discrimination, including discriminatory practices identified in section (c).

(3) Public schools in this state shall be prohibited from adopting programs or utilizing textbooks, instructional materials, curriculum, classroom assignments, orientation, interventions, or counseling that include, incorporate or are based on the discriminatory concepts identified in subsection (c).

(4) Public schools in this state shall be prohibited from executing contracts or agreements with internal or external entities, persons, companies or businesses to provide services, training, professional development, or any other assistance that includes, incorporates or is based on discriminatory practices identified in section (c). Within sixty (60) days of the approval of this rule, existing contracts or agreements executed by public schools that conflict with this requirement shall be amended to come into compliance with this section. Contracts or agreements executed solely to provide services prohibited by 70 O.S. § 24-157(B) or sections (c) or (d) of this rule shall be cancelled or terminated, consistent with the terms of the contract and applicable law.

(5) Public schools in this state shall be prohibited from receiving or applying to receive any monies that require, as a condition of receipt, the adoption of a Course(s), policies, curriculum, or any other instructional material that includes, incorporates or is based on discriminatory practices identified in subsection (c).

(6) Public schools in this state shall be prohibited from adopting diversity, equity, or inclusion plans that incorporate the concepts identified in ~~subsection (b)~~ subsection (c). Diversity officers in public schools shall be prohibited from providing any service or performing duties that include, incorporate, or are based on discriminatory practices

identified in subsection (c).

(7) Public schools shall be prohibited from mandating diversity training that includes, incorporates or is based on discriminatory practices identified in subsection (c). This includes providing such training to employees, contractors, staff members, parents, students, or any other individual or group.

(8) Public schools in this state shall be prohibited from adopting policies, including grading or admissions policies, or providing any other benefit or service that applies to students or any school employee differently on the basis of race or sex, unless specifically permitted by Title IX. (See (b)(6)). This prohibition includes segregated classes, programs, training sessions, extracurricular activities, or affinity groups unless otherwise permitted by Title IX. (See (b)(6)).

(e) **Parents Rights**. Parents and legal guardians of students enrolled in Public Schools in this state shall have the right to inspect curriculum, instructional materials, classroom assignments, and lesson plans to ensure compliance with 70 O.S. § 24-157(B). Consistent with ~~20 O.S. § 2001-2002~~ 25 O.S. § 2002, no public school shall interfere with or infringe upon the fundamental rights of parents to determine their child's education.

(f) **State Department of Education and State Board of Education.** To ensure the compliance with the requirements of 70 O.S. § 24-157(B), as a part of any Course, the following requirements shall apply to the State Board of Education and the State Department of Education, respectively:

(1) The State Board of Education shall be prohibited from mandating state standards or promulgating any rule that is based on, includes or incorporates discriminatory concepts of race or sex-based discrimination, including concepts identified in section (c).

(2) The State Department of Education shall be prohibited from providing resources, instructional support, courses, training, seminars, professional development, or any other class to public schools that is based on, includes or incorporates discriminatory concepts identified in section (c). This prohibition includes executing contracts or agreements with external entities, persons, companies or businesses to provide services, training, professional development, or any other assistance that includes, incorporates or is based on discriminatory practices identified in section (c) to public schools under the supervision of the Oklahoma State Board of Education and State Department of Education.

(3) The State Department of Education shall be prohibited from receiving or applying to receive any monies that require, as a condition of receipt, the adoption of programs, policies, curriculum, or any other instructional material that includes, incorporates or is based on discriminatory practices identified in subsection (c).

(g) **Public School Policies and Investigations.** To ensure compliance, public schools shall be required to adopt policies and procedures, including incorporating into employee and student handbooks, the requirements of 70 O.S. § 24-157(B) and this rule. A public school's policy developed pursuant to this section must specifically notify individuals of the right to file complaints under subsections (g) of this rule. Public schools shall ensure that the parent or legal guardian of all students enrolled in the school are annually notified of the non-discrimination requirements in 70 O.S. § 24-157(B) and this rule.

(1) Public schools shall be required to develop a process for students, parents, teachers, school staff, and members of the public to file a complaint alleging a violation of the provisions of 70 O.S. § 24-157 or this rule. In order for a complaint to be accepted for investigation, it must:

(A) Be submitted in writing, signed and dated by the complainant, including complaints submitted through electronic mail that include electronic signatures;

(B) Identify the dates the alleged discriminatory act occurred;

(C) Explain the alleged violation and/or discriminatory conduct and how 70 O.S. § 24-157 or the provisions of this rule have been violated;

(D) Include relevant information that would enable a public school to investigate the alleged violation; and

(E) Identify witnesses the school may interview, if applicable, provided the school will not dismiss a complaint for failure to identify witnesses.

(2) Public schools shall be required to designate at least one employee to receive reports of violations filed by students, parents, teachers, school staff, or members of the public. Public schools shall identify the employee(s) responsible for receiving complaints in policies and materials published pursuant to section (g).

(A) The contact information of employee(s) responsible for receiving complaints, including telephone and e-mail, shall be included in the policies and materials adopted pursuant to section (g) and shall be made publicly available on the public school's website.

(B) The employee(s) responsible for receiving complaints pursuant to this section shall notify the complainant that the complaint has been received and whether it will be investigated within ten (10) days of receipt.

(3) Public schools shall be required to investigate all legally sufficient complaints that meet the requirements of subsection (g)(1) and make a determination as to whether a violation occurred. A public school must conclude the investigation of a complaint filed pursuant to subsection (g)(1) within ninety (90) days of receipt.

(A) A complainant shall be notified in writing of a final determination, including the public school's findings of whether a violation occurred.

(B) It is permissible for a public school to receive, process, and investigate complaints filed under this subsection in the same manner in which the public school processes and investigates all other complaints of discrimination, provided the public school notifies a complainant pursuant to ~~subsection (g)(2)(ii)~~ subsection (g)(2)(B), reaches a final determination in the investigation within ninety (90) days of receipt of the complaint pursuant to subsection (g)(3) of this rule and complies with ~~subsection (g)(3)(i)~~ subsection(g)(3)(A).

(4) A complainant may file a complaint alleging a violation of 70 O.S. § 24-157 or this rule directly with a public school pursuant to subsection (g)(1) of this rule or may file a complaint directly with the State Department of Education pursuant to subsection (h)(2) of this rule provided:

(A) A complainant may not file complaints simultaneously with a public school and the State Department of Education;

(B) The State Department of Education may not require a complainant to first file with a public school prior to seeking relief pursuant to (h)(2); and

(C) Any complainant who believes that a public school has incorrectly refused to investigate a complaint or has evidence that a public school has reached an incorrect determination may subsequently file a complaint with the State Department of Education pursuant to subsection (h)(2) of this rule.

(h) **Accreditation.** Consistent with State Board of Education's authority under 70 O.S. § 3-104.4 (I)(5), public schools in this state shall be evaluated annually to ensure compliance with 70 O.S. § 24-157(B) and the requirements of this rule.

(1) **Public School Application for Annual Accreditation**. Consistent with the provisions and requirements of OAC 210:35-3-201, a school's failure to comply with 70

O.S. § 24-157(B) or any requirement in this rule shall, at a minimum, result in the accreditation status of the public school being classified "Accredited With Deficiency." The public school shall have one school year to correct deficiencies.

(A) A public school that fails to correct deficiencies after being classified as "Accredited With Deficiency" for violations of 70 O.S. § 24-157(B) or any requirement in this rule shall be classified, at a minimum, "Accredited With Probation" in the second year of noncompliance for "deliberately and unnecessarily violating one or more regulations." (See OAC 210: 35-3-201(b)(4)C)). The public school shall have one school year to correct deficiencies.

(B) A public school that fails to correct deficiencies after being classified as "Accredited With Probation" for violations of 70 O.S. § 24-157(B) or any requirement in this rule shall be classified "Nonaccredited" in the third year of noncompliance consistent with Oklahoma statutes and the State Board of Education's administrative rules, processes and procedures. (See OAC 210: 35-3-201).

(2) **Investigation and Immediate Action.** Consistent with the requirements of 70 O.S. § 3-104.4, the Department shall investigate any complaint of any failure to comply with accreditation standards, including compliance with 70 O.S. § 24-157(B) or any requirement in this rule. If the Department determines that a public school has failed to comply with the accreditation standards, including this rule, the Department shall report the information to the State Board for further action, and within the timeline, provided in 70 O.S. § 3-104.4.

(i) **Public Reporting.** Public School employee(s) designated pursuant to subsection (g)(2) shall be required to report for each complaint filed pursuant to subsection (g)(1) to the State Department of Education within thirty (30) days of resolution of the complaint. The State Department of Education shall report quarterly to the State Board of Education on complaints filed pursuant to subsection (f), including:

(1) The number of complaints filed with Public Schools;

(2) The number of complaints dismissed or not investigated;

(3) The number of complaints opened for investigation;

(4) The number of cases where, following a full investigation, the Public School determined that a violation occurred; and

(5) The number of cases where, following a full investigation, the Public School determined no violation occurred.

(6) The number of cases where, following a full investigation, the State Department of Education has determined that a violation occurred or did not occur.

(j) **Suspension or Revocation.** Consistent with OAC 210:1-5-6 and ~~subsection (b)(1)(iii)~~ subsection (b)(1)(C), the provisions of this rule shall apply to superintendents of schools, principals, supervisors, librarians, school, classroom teachers or other personnel performing instructional, administrative and supervisory services in the public schools.

(1) **Suspension.** As a part of its investigation of a legally sufficient complaint filed pursuant to subsection (g), the State Department of Education shall make a determination of whether to initiate proceedings to suspend the license or certificate of any school employee who is found to have violated 70 O.S. § 24-157(B) or any provision of this rule, consistent with the State Board's processes and procedures for suspension of certificates.

(2) **Grounds for Revocation.** Consistent with OAC 210:1-5-6, subsection (b), the State Board of Education shall initiate proceedings to revoke the license or certificate of any school employee for "willful violation" of 70 O.S. § 24-157(B) or any requirement in this rule. (See OAC 210: 1-5-6(b)(1) - (b)(2)). The requirements and processes outlined in OAC

210:1-5-6, including the rights afforded to certificate holders, shall apply to all revocation proceedings.

(k) **Retaliation.** Consistent with the provisions of Title VI and Title IX, no individual shall be retaliated against for: 1) filing a complaint pursuant to subsections (g)(1) or (h)(2) of this rule; or 2) the purpose of interfering with any right or privilege secured by federal civil rights laws and regulations. Any school employee who retaliates against a complainant shall be subject to disciplinary action pursuant to subsection (j) of this rule.

(l) **Whistleblower Protection.** Any Teacher who files a complaint pursuant to subsection (g)(1) or (h)(2) of this rule or otherwise discloses information the teacher reasonably believes evidences a violation of 70 O.S. § 24-157(B) or this rule shall be entitled to the Whistleblower Protections in applicable laws, including those at 70 O.S. § 6-101.6b**.**

(m) **False Reporting.** Any Teacher or other school employee who, willfully, knowingly and without probable cause ~~make~~ makes a false report pursuant to subsection (g)(1) or (h)(2) of this rule may be subject to proceedings pursuant to subsection (j) of this rule.

(n) **Complaints by School Staff.** Any school employee who is discriminated against by a public school in the form of race or sex based harassment, bias, stereotyping, scapegoating, classification, or the categorical assignment of traits, morals, values, or characteristics based solely on race or sex in violation 70 O.S. § 24-157(B), may file an employment discrimination complaint with the Oklahoma Attorney General's Office of Civil Rights Enforcement pursuant to 25 O.S. § 1101, *et seq.*

(o) **Relief.** Title VI and Title IX may be enforced by private right of action, whereby aggrieved parties may seek relief, including monetary damages, for violations of federal antidiscrimination laws. Victims of discrimination may file a lawsuit directly against the Public School. In addition to any private rights of action, aggrieved parties may seek applicable remedies through the U.S. Department of Education's Office for Civil Rights or the U.S. Department of Justice's Civil Rights Division.

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

[1] BLACK EMERGENCY RESPONSE TEAM, et al.,

*Plaintiffs*,

v.

[l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,

*Defendants*.

Case No. 5:21-cv-01022-G

Hon. Charles B. Goodwin

**Declaration of the Black Emergency Response Team**

I, the Black Emergency Response Team, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am the Community Projects Coordinator for the Black Emergency Response Team (BERT), in the above captioned matter. I am authorized to provide this declaration on behalf of BERT. I have served as the BERT Community Projects Coordinator since March of 2020. I am a Black woman and a junior and anthropology major at the University of Oklahoma ("OU").

3. BERT is an independent organization of Black student leaders at the University of Oklahoma dedicated to creating a safer and more supportive university experience for Black students. Our mission is to advocate on behalf of Black students at the University of Oklahoma to the administration and to enhance the experience of Black students. We currently have six members and three advisors. We help students access support and resources when they experience racism on campus. We also work to hold the University accountable for creating an inclusive community that is accepting of all people.

4. BERT was founded in January of 2019 in response to members of the University of Oklahoma Chapter of the Delta Delta Delta (Tri Delt) sorority posting a video to social media in blackface. Black student leaders from associations across campus, including historically Black sororities and fraternities, the Black Student Association, the Black National Congress, and the National Society of Black Engineers, hosted a town hall in response to the incident. As a community, students decided to respond with a peaceful protest. The organizers of the protest became the first officers of BERT.

5. The protest occurred the week after the video of students in blackface. Students of all backgrounds and from all enclaves of campus, including members of the OU football team, gathered at Dale Hall on the southside of campus to form the largest protest on the University's campus in recent memory. The students marched to Evans Hall, the administrative building in the center of campus, where they asked for policy changes to ensure the safety of all students on campus. From Evans, the students marched to the Student Union and to the Meachum Auditorium where they discussed additional strategies for negotiating with the administration and ensuring all students were protected on campus.

6. In the fall of 2020, the University of Oklahoma faced additional racist incidents. In the same week, two professors used the n-word in class. BERT hosted a townhall for all students to discuss how to address these racist incidents. BERT then created a list of demands and planned a hunger strike and sit-in of Evans Hall. The demands included the creation of a Center for Research on Race and Ethnicity, the creation of a student advisory council to the Provost's Office, an increase in Black faculty and staff at OU, and a mandatory Diversity, Education, and Inclusion (DEI) course for all incoming freshman and transfer students. Students from all walks of life filled Evans Hall, asking for the OU's accountability and fighting for the right to belong on campus.

7. Students sat and slept on the floors of the administration building, eating nothing and drinking water and Gatorade, for days. Press filled the building during the day, and the building was emptied except for students after 5:00 pm. The Governor of Oklahoma threatened to send in the National Guard to clear the students out. Participants received death threats. And BERT met regularly with various members of the administration to discuss their demands. The sit-in lasted for three days.

8. On the third day, BERT decided to end the sit-in because the University agreed to create and require a DEI course.

9. For weeks after, many of the participants were unable to eat enough food after starving themselves for several days. Some still have nightmares around the time of the sit-in each year. Others have been diagnosed with stress and trauma induced health issues stemming from the physical and emotional stress of starvation, death threats, sleep deprivation, and the high stakes of the sit-in. BERT's win with the DEI course was hard-fought.

10. The creation of the DEI course, Gateway to Belonging was a significant step by the University to prevent racist incidents and begin to create an inclusive learning environment. It was a showing of good faith to BERT and the Black, Indigenous, and People of Color ("BIPOC") community at OU. Before the creation of the DEI course, incoming freshman were required to take a four hour diversity training and one hour sexual assault training as part of their orientation. While the training presented helpful information, students cannot unlearn racism, understand other perspectives, or contextualize the United States government's role in manufacturing and maintaining racial inequity in a few hours. The course, by contrast, would be a semester-long, interactive learning process with texts and discussion. Students would engage with the material and develop critical thinking skills rather than passively sit through the material like they could in a training. Students are far more likely to develop understanding and empathy in a course. The DEI course would make OU a significantly safer place for Black students and students of color.

11. H.B. 1775 drastically undercuts all our progress. BERT spent a year working with OU to create the Gateway to Belonging course. To comply with H.B. 1775, OU made the DEI course voluntary rather than mandatory. The move from a mandatory to voluntary DEI course harms our organization by requiring us to be more vigilant and more prepared to respond to racist incidents, which are more likely to occur in the absence of a required DEI course. The legislature directly prohibited OU from enacting our explicit goals to make campus safer for Black students. In doing so, it provided OU with a scapegoat to avoid our demands for a safer campus, making it more difficult for us to hold OU accountable for enabling a learning environment that is hostile to Black students and students of color. H.B. 1775 gives students more leeway to commit racist acts against other students with impunity.

12. H.B. 1775 and the resulting voluntary nature of the DEI course also harms BERT members as individuals. Without a mandatory DEI course, the students most in need of exposure to that information are the least likely to access it. The students

most likely to cause me harm likely have never been exposed to ideas of anti-racism. H.B. 1775 enables students to grow more comfortable in beliefs that threaten my life and the lives of our members. Many of our members, myself included, now have less trust in other students we do not know and try to stay off campus to lessen the likelihood of becoming the victim of yet another racist incident at OU.

13. In addition to no longer requiring the DEI course, OU made a previously mandatory sexual harassment training voluntary in order to comply with H.B. 1775. The sexual harassment training by OU's Gender and Equality Center teaches students about consent and ensured people do not feel entitled to others' bodies. It teaches respect and human decency. It is rape and assault prevention. Like the DEI course, the students most in need of information about consent and respect are the least likely to access it. After H.B. 1775 and without the mandatory sexual harassment training, sexual assault has been a huge problem for women on campus, and particularly Black women, women of color, and LGBTQ+ women who face compounded harassment and harm due. The Gender and Equality Center has already seen an increase in sexual assaults reported as compared to the same time frame in years prior.

14. I work on campus as a student employee, and I have already seen the negative effects of no longer requiring sexual harassment training. I hear it directly from freshman women about the inappropriate way male students will often speak to and approach them. It is clear that many of the male students do not understand the concepts of respect and consent. While this behavior has always been an issue on campus, I have noticed a significant escalation of behavior and a higher rate of incidents this year.

15. The combined result is a campus full of college students without basic cultural competence and empathy and without an understanding of consent. In this environment, members have described being on campus as "pretty scary." Many members refrain from talking to new people altogether to reduce the chances of a racially-motivated or sexual attack. Members are walking around campus in fight or flight mode, ready to defend themselves at any moment. One member compared H.B. 1775 to Norman removing all its stop signs. The sexual harassment and DEI trainings served as stop signs for students who might engage in harmful behavior. Now there are no "stops" on campus to keep students safe. Because of HB 1775, OU is severely undermined in its efforts to prevent racial or sexual attacks of students.

16. H.B. 1775 also harms the quality of education to which our members have access. BERT Co-founder and Advisor, Jamelia Reed, plans to graduate with an African American Studies major in 2022. She is concerned that professors will be unable or unwilling to teach Critical Race Theory under HB 1775. However, Critical Race Theory provides a foundational lens for African American and all other non-western ethnic studies. She understands that professors will be stymied in their efforts to teach African American Studies without Critical Race Theory and without presenting other perspectives. She also does not see the value in an education without some intellectual discomfort because change and growth happen through discomfort. Even with an approaching graduation date, Ms. Reed is considering transferring because the value of her degree will substantially decline if she cannot be exposed to the principles of Critical Race Theory. She is also concerned about quality professors leaving OU because they fear professional consequences under H.B. 1775 for engaging in necessary discussions about race and gender. She is being denied the education for which she signed up.

17. My major is Anthropology, and H.B. 1775 threatens the foundation of my course material and entire area of study. Anthropology is the search for critical understanding of how states, global forces, identity, and beliefs impact culture. The study of anthropology, especially my focus of cultural anthropology, can only be meaningfully and thoroughly pursued with a discussion of race and gender. H.B. 1775 prevents exactly that discussion. Anthropology under H.B. 1775 suffers by omitting and suppressing the experiences and voices of historically marginalized groups, thereby entrenching the dominance of the White perspective. It is merely the advancement of the White ethnocentric agenda, an issue with which anthropology as an area of study has been historically marred. However, after significant work , anthropology has moved away from a White, western-centric framework. H.B. 1775 would push the field of anthropology back decades into an exclusionary framework the field has explicitly and with great labor denounced. I am concerned that H.B. 1775 will prevent anthropology professors from coming to OU out of fear that they will be punished for their necessary discussion of race and gender. It is difficult to trust the integrity of my education under H.B. 1775. Professors at the University already barely address marginalized experiences in the United States. My history and experiences are not being taught. Now, professors may feel they have no obligation to tell the whole truth. H.B. 1775 has absolved them of their responsibility to truthfully educate.

18. H.B. 1775 will only exacerbate and encourage racist comments made by classmates because it renders them both uninformed and empowered, thus embattling the classroom environment and hindering minoritized students'

education. Classroom discussions were often uncomfortable for me and other members before H.B. 1775. I started college as a Political Science major, and in one of my classes we were discussing President Andrew Jackson's role in the Trail of Tears. The pain his actions caused was not addressed. An Indigenous student and I exchanged uncomfortable and sympathetic glances throughout the lesson as the class engaged in a disconnected, acontextual conversation about mass atrocities for which there are still systemic consequences and no reparations. The Trail of Tears' impact on Indigenous peoples was not addressed. I have felt similarly uncomfortable in other political science classes when classmates and professors discuss slavery. Again, the pain and lives lost are not addressed. During a discussion in one of my classes, a student argued that the Three Fifths Compromise is evidence that the Constitution is an anti-slavery document because slaves could have been counted as not a person at all. Ms. Reed has had students in her Black Literature class refer to Black people as "colored people." These kinds of cavalier, ignorant, and racist comments create an uncomfortable learning environment for me and for other Black and Indigenous students and other students of color. However, our discomfort was not addressed by the legislature. Racist and ignorant statements already plague our classrooms and disrupt the learning environment of minoritized students. The empowered ignorance H.B. 1775 enables will only make it more difficult for us to obtain safety or an education.

19. H.B. 1775 undermines the very purpose of a university. Higher education is supposed to be an institution of critical thinking and exposure to history and new perspectives on how the work operates. H.B. 1755 directly prevents that. It weakens the integrity of college and higher education because it disallows the critical thinking education is meant to provide for students. That lack of critical thinking and exposure to issues of race and gender has a direct impact on the mindset of our culture. People will not respect marginalized communities because the legislature allows people to ignore our experiences and realities. H.B. 1775 puts our education, our lives, and our futures at risk.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oklahoma this 13 day of October 2021.

Lilly Amechi
___________________________
Black Emergency Response Team

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al.,<br><br>*Plaintiffs*,<br>v.<br><br>[l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,<br><br>*Defendants*. | Case No. 5:21-cv-01022-G<br><br>Hon. Charles B. Goodwin |

**Declaration of the University of Oklahoma Chapter of American Association of University Professors**

I, Michael Givel, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am the President of the University of Oklahoma Chapter of the American Association for University Professors (OU-AAUP), in the above captioned matter. I am authorized to provide this declaration on behalf of the OU-AAUP. I have held the position of President since August 27th, 2020.

3. The AAUP is a national nonprofit membership association of faculty and academic professionals founded in 1915 to advance academic freedom, define professional values, promote the economic security of academic professionals, and ensure higher education's contribution to the common good. The AAUP has chapters and members at universities across the country that work to advance the mission of the AAUP through advocacy, organizing, and, in some states, collective bargaining. The AAUP has 45,800 members nationwide. Advancing and protecting academic freedom is the AAUP's core mission. Its mission statement quotes the *1940 Statement of Principles on Academic Freedom and Tenure*,

professing that "[t]he common good depends on the free search for truth and its free exposition."

4. The University of Oklahoma Chapter of the AAUP was founded in 2020 to "defend academic freedom at OU and throughout academe," promote the "interests of higher education and research," "increase the usefulness and advance the standards, ideals, and welfare of the profession," and "protect and advance the professional status and interests of all faculty and university staff." OU-AAUP has 57 members, including faculty and academic staff. Our members are diverse across race, ethnicity, gender, and sexual orientation, and we have several members who identify with minoritized identities, including members who are Black, Indigenous, and LGBTQ+.

5. H.B. 1775 is a direct affront to academic freedom and the free exchange of ideas, the very purpose of our association and our profession. By its vague terms, H.B. 1775 has invited arbitrary enforcement against our members and motivated self-censorship in others. Still more fear dire consequences for continuing to teach concepts involving race, gender, and sexual orientation.

6. Faculty, staff, and administrators at the University of Oklahoma ("OU") have experienced a great deal of confusion and concern around the meaning and implementation of H.B. 1775. Its language is convoluted and confusing. OU-AAUP members are confused about what the law means by "requirement" and whether that applies to general education courses, courses required for a given major, or any requirement within a given course. Members are also confused about the meaning and scope of the phrases "any form of race or sex stereotyping" and "bias on the basis of race or sex." The terms "stereotyping" and "bias" are broad and undefined, causing confusion and uncertainly for professors. Additionally, members are unsure whether the prohibition includes discussions of discriminatory ideas like racism and sexism, historic oppression like the Japanese Internment Camps and sundown towns, or systemic racism like redlining and colonialism.

7. More insidious still is the disconnect between the language of the bill and the conversation around it. The bill does not mention Critical Race Theory, yet legislators have spoken about how it is necessary to stop Critical Race Theory and the teaching of concepts like whiteness and white privilege. Many of our members fear the law will be enforced by fearful, cautious, and confused administrators according to their interpretation of the law's intent rather than by its language. One member, a librarian who works directly with faculty and students, stated that

people at OU are enforcing H.B. 1775 according to how they think their supervisor will interpret the law. That fear of arbitrary enforcement will chill the speech of professors who fear backlash for addressing race, sex, and gender. The speech of queer, female, Black, Indigenous, and brown professors is chilled more drastically because professors of minoritized identities feel more vulnerable to the potential consequences of violating or being seen to violate H.B. 1775.

8. H.B. 1775 chills professor speech both in and out of the classroom. In addition to limiting what professors may address in their classes, H.B. 1775 chills professors from applying for grants related to race and racism. One member, Professor Jill Hicks-Keeton, Associate Professor in Religious Studies, expressed concern that her research, which treats race and sex, might no longer receive funding from university entities. A Full Professor also expressed concern that H.B. 1775 will decrease funding for and therefore the availability of research on race. H.B. 1775 discourages professors from researching sexism and racism, resulting in a societal lack of knowledge of topics crucial for understanding our systems and cultures.

9. Entire departments are unsure of whether they can offer classes with subject matter relating to sex and gender under H.B. 1775. The Chair of the English Department, Professor Roxanne Mountford, expressed concern over whether it is possible to schedule courses in Black literature. Failing to do so would be a grave insult to the validity of the department because it is necessary to teach the entire scope of writings in the English language, which includes literature about the black experience. While she has decided to continue offering Black literature classes in the English Department, she fears that could be disciplined and other non-tenured professors could be fired for teaching them. She expressed concern for lecturers who teach the lower-level composition courses because they often engage with anti-racist pedagogy and texts and are not tenured. H.B. 1775 creates a chilling effect on the sense of academic freedom for all the first-year composition lecturers and places the integrity of the English Department at risk.

10. Librarians charged with selecting materials for the OU library and with teaching professors and students how to research materials are concerned about how H.B. 1775 may be applied to them. An OU librarian who works directly with faculty and students, is regularly asked by professors to teach their students how to research topics for students' assignments and is unsure whether, under H.B. 1775, they can use examples that include race or gender. This is particularly detrimental when they visit classes in departments that extensively address issues of race and gender, given the constitution of the departments. They are also profoundly concerned about the chilling effect H.B. 1775 will have on selecting library

materials for the university library. Librarians are unsure whether they can continue to select library materials that include issues of race, gender, and sexual orientation without facing disciplinary action. The key mission of a research library is to reflect the ongoing scholarship. People are researching racism. Therefore, to exclude texts addressing racism is to deny the very purpose of a library. It also stifles research at OU on those issues. It is an affront to academic and intellectual freedom, a core tenant of the librarian profession and mission of a university.

11. The law's vagueness is the danger to our members because the law could be applied to any content related to racism or sexism. After Black-led activism resulted in a mandatory Diversity, Equity, and Inclusion course, Gateway to Belonging, at the University of Oklahoma, professors here understand H.B. 1775, which directly targets that course, to be pushback to racial and gender justice at the university.

12. At least one of our members has already been instructed to change their teaching to comply with H.B. 1775. An Instructor of Human Relations in the Arts and Sciences College was told by the Office of the Dean of the Arts and Sciences College that they can no longer test students on Critical Race Theory in their Human Relations class, Human Relations Theory, a class in the Human Relations Department about social categorization and its impact on systems of power. Critical Race Theory as a concept and as it applies to other learning objectives is a central theme of the class. This Instructor has lost the ability to test on and ensure students understand key concepts in their class. This Instructor believes this enforcement of H.B. 1775 against them is a violation of their academic freedom. The Instructor is not tenured and fears losing their job if they test on Critical Race Theory or otherwise is seen to violate H.B. 1775. The Instructor is also concerned that their queer identity will make them more vulnerable to the consequences of H.B. 1775's enforcement.

13. Several other members of OU-AAUP are changing their curriculum out of fear that H.B. 1775 will be enforced against them.

14. A contracted Assistant Professor and Lecturer of French in the Modern Language, Literature, and Linguistics Department has changed their curriculum entirely. They used to include themes of gender and race when teaching French texts about the Holocaust, francophone literature, and the writings of Rousseau in her French classes. They will no longer include themes of sexuality, sexual orientation, and gender when teaching French literature for fear of being fired for violating H.B.

1775. From the French Capstone, this contracted Assistant Professor will exclude entirely certain texts which directly address race, gender, and sexual orientation, including Aimé Cesaire's *A Tempest*, Denis Diderot's *The Nun*, Molière's *The Learned Ladies*, Marguerite Duras' *Hiroshima, My Love*, and Maryse Condé's, *Tituba, Black Witch of Salem*. As these texts center issues of identity and oppression, they cannot include them without discussing race, gender, and sexuality. To avoid the consequences of potentially violating H.B. 1775, they will avoid them and texts with similar themes altogether.

15. This contracted Assistant Professor is extremely concerned about the professional and personal consequences of students or OU administrators believing that they have violated H.B. 1775. If students think they have violated the law, they can and likely would file a complaint with their Department Chair and the Dean. They have already received student complaints when they addressed issues of white privilege as presented by the course texts. They believe that H.B. 1775 will empower students to file complaints if they discuss material related to race that makes them uncomfortable. If they receive multiple complaints, they could be fired. They are also concerned about bullying from students if they are presented with ideas with which they disagree or perspectives that cause them discomfort. They believe H.B. 1775 has only emboldened students to disrupt the learning environment of their classroom. Tension already exists in classrooms during difficult and meaningful class discussions. They understand H.B. 1775 as a legal framework for that tension. They believe it is intentionally written to be vague to allow its enforcement against professors who challenge existing systems.

16. The exclusion of texts and themes addressing race, gender, and sexual orientation significantly diminish the value of this contracted Assistant Professor's class to their students. Without those themes, their students lose the opportunity to learn about historical contexts and cultures that are different from their own. Students lose the opportunity to learn about relevant issues, become more aware of the world around them, and develop empathy.

17. The loss to the learning environment is especially detrimental for their minoritized students. When this contracted Assistant Professor taught texts and themes involving identity and oppression, their minoritized students identified with the material on a personal level and were more engaged in class. They also learned the language for articulating issues they have faced their entire lives.

18. A tenured Full Professor of Anthropology and former Director of the Women and Gender Students Program will change the way they present material in their Race

and Ethnicity class. In particular, they are working through how to present an article about critical race theory through a lens that does not include critical race theory. The article is entitled "*Activism, Intersectionality, and Community Psychology: The Way In Which Black Lives Matter Toronto Helps Us To Examine White Supremacy In Canada's LGBTQ Community*." This Full Professor is engaging in this seemingly impossible task to avoid consequences for potentially violating H.B. 1775 while still including the best text in their class. Even if they are still able to include the article, their students lose the benefit of its honest and thorough presentation. By including themes of race, oppression, sexual orientation, and intersectionality, their students can challenge ideas of identity and power. They gain new perspectives, learn about people different from themselves, and gain a basic understanding of each other. H.B. 1775 is depriving this Full Professor's students of a multicultural education and a learning environment of free interaction, expression, and empathy.

19. This Full Professor of Anthropology fears the professional consequences of potentially violating H.B. 1775. They fear students complaining to their department Chair and Dean if they believe they have violated the law. They believe that this censorship is a violation of their academic freedom.

20. An Associate Professor of English is concerned by H.B. 1775's vague and confusing language and does not know what of their curriculum violates the text of the law or what an administrator or student would see as a violation. The law's unclear prohibitions and lack of explicit enforcement mechanisms is a source of terror for this Professor. As a result, they are self-censoring and changing their entire pedagogy practice to avoid potentially violating H.B. 1775's vague language. Some of the content they will reframe to comply with H.B. 1775 include *The Battle of Algiers*, *Do the Right Thing*, *The Spook Who Sat By My Door*, *The Tempest* by Aime Cesaire, and *The Wretched of the Earth* by Frantz Fanon. Each of these films, plays, and novels address themes of anti-colonialism, racism, white supremacy, and whiteness – themes that may challenge his students to re-evaluate themselves and their understanding of their place in a global society.

21. This Associate Professor of English fears that if they do not reframe their curricula to avoid issues of whiteness, racism, oppression, and colonialism, their students will file complaints with their department Chair and Dean, stating that they are violating H.B. 1775. They are concerned that multiple student complaints could jeopardize their chances of receiving promotions, grant money, and other professional opportunities. This professor is also self-censoring because H.B. 1775 empowers students to reject the presentation of other cultures and values. As a

result, they are concerned that continuing to teach about racism, colonialism, and other concepts related to race will lead to heightened levels of hate mail and harassment from students and others.

22. To comply with H.B. 1775, this Associate Professor of English is denying students a full and honest presentation of the curricula, which exposes them to divergent worldviews, enables them to think in new ways, and unsettles their preconceived notions.

23. Professors and staff fear the professional and personal consequences for their continued discussion of race, gender, and sexual orientation. Professors are unclear about what is prohibited and what content could result in professional discipline or personal harm.

24. A Full Professor of Philosophy is unsure whether their curricula violate H.B. 1775. The vagueness of the law has created doubts about whether they can include topics about intersectionality, racism, and sexism. Because they are tenured and cannot be fired, they plan to continue teaching those topics despite their doubts. However, they are concerned about other professional consequences for doing so. They expect student complaints and negative student evaluations from students empowered by H.B. 1775 to reject discomfort in the learning process. This Full Professor fears that the complaints and evaluations may cost some faculty members opportunities for advancement.

25. I, Professor Michael Givel, am a Full Professor of Political Science and am similarly unsure of the meaning of H.B. 1775 or how it will be enforced. Because of how vague the law is, it could be enforced against anything to do with racism or sexism. Therefore, much of my current curricula is subject to H.B. 1775's enforcement. For example, I teach a class entitled Global Urban Politics and believe that its content could be made subject to H.B. 1775 because it deals with colonialism, racism, race as a social construct, patriarchal white supremacy, the racial caste system of the United States, the Oklahoma 1889 Land Run, and Norman's history as a sundown town. Because I am protected by tenure, I do not plan to change my curriculum, despite my concerns. However, I am afraid of other professional consequences for continuing to teach issues regarding race and gender. I expect student complaints and negative evaluations from students empowered by H.B. 1775 and uncomfortable with challenging material. I fear that the complaints and evaluations will deny me opportunities for advancement at OU.

26. An Assistant Professor in the Department of International and Area Studies is confused about whether H.B. 1775 applies to their curricula. They are also concerned that, because of the law's vague language, a student will misconstrue their class content and seek to have H.B. 1775 enforced against them. They believe that their themes of race, gender, sex, colorism, structural racism, misogyny, and homophobia put them at risk for the professional consequences of H.B. 1775. They are also afraid of students submitting complaints to their department Chair and Dean. Complaints could prevent them from getting tenure or hurt their promotion. They also believe they are more vulnerable to complaints and to consequences of complaints, like tenure denial, because of their marginalized identity.

27. H.B. 1775 harms the OU-AAUP as an organization. It has emboldened students and faculty to harass professors teaching anti-racism pedagogy, and the OU-AAUP must spend time and resources defending professors from harassment and threats to their academic freedom. For example, a first year English Composition lecturer gave a voluntary workshop for other professors in April of 2021 to help professors maintain safe and productive classroom learning environments for all students. A month later, H.B. 1775 was enacted. A month after that, another instructor leaked the video of the training, which received national attention and backlash for presenting anti-racist pedagogy to colleagues. The lecturers who gave the workshop were flooded with hate mail and death threats from across the United States. The OU-AAUP dedicated our limited time and resources to publicly supporting and defending the lecturers and writing on the importance of protecting academic freedom. The OU-AAUP expects the necessity of spending time and resources defending professors and academic freedom to drastically increase as students and others including outside the university are emboldened and provided a legal framework by H.B. 1775.

28. H.B. 1775 is an outrage to the OU-AAUP's core principle of academic freedom. Professors have the right to present topics some student may not like. Learning happens through discomfort, and H.B. 1775 denies professors their right to present unpopular ideas and to encourage growth and development in their students made possible only through discomfort.

29. Inclusive education prohibited and chilled by H.B. 1775 has profound benefits for the learning environment and for a democratic society. Professors of various fields, including philosophy and anthropology, see increased student participation when discussing issues of race and gender. Students take issues of identity very seriously. Discussions of race and gender also empower students of minoritized

identities to see themselves represented in the course work. The presentation of other perspectives made possible by intersectional discussions of identity and power increase students' critical thinking skills and social consciousness. It gives them the tools to articulate and advance anti-racist work. Education about the history of prejudice empowers students to make sense of current events in our culture and to see early and varied signs of oppression. Inclusive education inherently challenges systems of oppression because exposure to different perspectives decreases bias. It provides students the tools to think about the difficult questions facing society and to examine ideas about the nature of freedom and democracy.

30. H.B. 1775 deprives students of the benefits of inclusive education, harming the classroom environment, the university, and the state. H.B. 1775 increases classroom hostility and tension toward students and professors of minoritized identities. Black, female, and queer professors expressed particular concern about how H.B. 1775 will disrupt the power balance of their classroom and create an embattled learning environment. The fear and sense of surveillance accompanying H.B. 1775 decreases class discussion, as does the lack of empirically engaging content around race and gender. Professors are also concerned about the resulting increase in queer, women and Black, Indigenous, and People of Color (BIPOC) students' discomfort in class, stating that students of minoritized identities are already more prone to discomfort. It has halted OU's stated mission of creating a more inclusive culture on campus and changed what protection and support minoritized students can expect from the university. It will harm retention and recruitment of professors, particularly professors of minoritized identities, and make the OU faculty whiter rather than more diverse. H.B. 1775 is an embarrassment to the state.

31. H.B. 1775's damage to the quality of education in Oklahoma will have profound ripple effects throughout our society. The insultingly incomplete education presented under the pall of H.B. 1775 fails to address intersectionality and anti-racism, leaving students with a lack of understanding of their own history. It also denies exposure to different views and perspectives, preventing students from questioning and re-evaluating themselves. That lack of self-evaluation creates a generation of people plagued by unexamined, assumptions and poses a serious threat to our culture. It denies students the ability to learn how to reframe discriminatory structures in ways that are more just, a central purpose of education. Inclusive education is needed to break down cultural barriers and to create a new generation of problem solvers. H.B. 1775 is also damaging to civil discourse by denying students the ability to practice discourse and analysis

respectfully engaging with one another about difficult and often deeply personal subjects. Education is the center for free exchange of information, where people practice decency and empathy. University professors are society's last defense of knowledge, reason, and civility. Each of those values are threatened when academic freedom is threatened.

32. H.B. 1775 mandates a new generation of people utterly unaware of their history and unchallenged by different perspectives. Ignorance of cultural differences breeds fear of those differences, which, in turn, motivates dehumanization and justifies oppression. For some members, the threat of H.B. 1775 is personal. The ignorance and fear engendered by H.B. 1775 makes professors of minoritized identities worried not just for their status as a professor but as a human being.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oklahoma this 16th day of October 2021.

Michael Givel
OU-AAUP

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

[1] BLACK EMERGENCY RESPONSE TEAM, et al.,

*Plaintiffs*,

v.

[l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,

*Defendants*.

Case No. 5:21-cv-01022-G

Hon. Charles B. Goodwin

**Declaration of Anthony R. Douglas, the Oklahoma State Conference of the National Association for the Advancement of Colored People ("NAACP-Oklahoma")**

I, Anthony R. Douglas, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal first-hand knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.
2. I am the President of the Oklahoma State Conference of the National Association for the Advancement of Colored People ("NAACP-Oklahoma"), in the above-captioned matter. I am authorized to provide this declaration on behalf of the NAACP-Oklahoma. I have held the position of President for sixteen years.
3. The NAACP is the nation's oldest and largest civil rights organization. Founded in 1909, the NAACP's mission is "to secure the political educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons." To advance this mission, the NAACP's principal objectives are to ensure the political, educational, social and economic equality of all citizens; to achieve equality of rights and eliminate racial prejudice among the citizens of the United States; to remove all barriers of racial discrimination through democratic, legal, educational, economic, and social processes; to seek enactment and enforcement of federal, state and local laws securing civil rights; to inform the public of the adverse effects of racial discrimination and to seek its elimination; and to educate persons

as to their constitutional rights and to take all lawful action to secure the exercise thereof.

4. The NAACP-Oklahoma implements the mission of the NAACP at the state level. Founded in 1913, the NAACP-Oklahoma is the oldest civil rights organization in Oklahoma and serves as the umbrella organization for local branch units throughout the state.

5. To support this mission, the NAACP's key goals include educational advocacy to ensure that all students have access to a quality, integrated public education. We are dedicated to eliminating the severe racial inequities that continue to plague our education system. We strive to enable every student to graduate ready for college or a career by ensuring access to great teaching, fair discipline, equitable resources and a rigorous and inclusive curriculum that ensures all students can meaningfully engage with the material and all students are best prepared to succeed in our increasingly diverse state and global society. Our ultimate goal is that every student, including students from historically marginalized groups, receives a quality public education that prepares him or her to be a contributing member of a democracy. The NAACP-Oklahoma has been at the forefront of many of the state's most significant advances in integrating our education system and dismantling discriminatory barriers. For example, the NAACP-Oklahoma represented Ada Sipuel in the lawsuit *Sipuel v. Board of Regents*, 332 U.S. 631 (1948) which struck down Oklahoma's racial segregation laws in higher education and resulted in the integration of the University of Oklahoma. Moreover, the NAACP-Oklahoma and its chapters have long been engaged in desegregation efforts in the K-12 level. For decades, NAACP members, like the late-Clara Luper, have been fierce advocates for public school integration and equal access to places of public accommodation.

6. The NAACP-Oklahoma includes over 1500 members who reside in all 77 counties of Oklahoma. While most of our members identify as African American or Black, we also have members who identify as Native American or Indigenous, as white, of mixed Black and European descent, and a diverse range of other ethnic backgrounds. The NAACP-Oklahoma aims to support all people of color and members of underrepresented and vulnerable populations, regardless of membership in the NAACP-Oklahoma. Thus, the NAACP serves as a resource for vulnerable populations across the entire state – members and non-members – who continue to face systemic racism and sexism. To advance this work, the NAACP-Oklahoma holds discussions and tackles issues at the intersection of various identities including race, sex, gender and ethnicity. We have also held meetings to explore and discuss implicit bias and cultural competency.

7. A substantial number of our members include students, parents, and teachers at all levels of public education – elementary, middle and high schools, and colleges – throughout the state. This includes middle school and high school students, and such students' parents, in the school districts of Ardmore, Chickasha, Edmond, Enid, Lawton, Muskogee, Oklahoma City, Tulsa, and others around the state.
8. The NAACP-Oklahoma's members and chapters actively participate in the NAACP's Youth & College Division. Created in 1936 to develop future leaders, the NAACP's Youth & College Division's mission is to "inform youth of the problems affecting African Americans and other racial and ethnic minorities; to advance the economic, educational, social and political status of African Americans and other racial and ethnic minorities and their harmonious cooperation with other peoples; to stimulate an appreciation of the African Diaspora and other people of color's contribution to civilization; and to develop an intelligent, effective youth leadership."
9. Young people in NAACP have long been involved in advocating for educational and equal justice issues. For example, on August 19, 1958, Clara Luper—an Oklahoma City public school Teacher and advisor for the Oklahoma City NAACP's Youth Council—led a group of Black students in the chapter's Youth Council through one of the Nation's earliest sit-ins to desegregate places of public accommodations at the Katz Drug Store.
10. Today, as part of its Youth & College Division, the NAACP-Oklahoma has over a dozen active Youth Chapters, whose members are under 25 and pay dues. Such chapters receive support from their communities, universities, and schools. The NAACP-Oklahoma also has active chapters at colleges throughout Oklahoma, including The University of Oklahoma, Langston University, University of Central Oklahoma, Oklahoma City University, The University of Tulsa, Oklahoma State University, Bacone College, Cameron University, and Northeastern State University. These college chapters strive to advance the mission of the NAACP by providing support and training for Black students and other students of color on campus and by coordinating between many different student groups and community partners towards the shared goal of promoting racial and social equity.
11. At the elementary and secondary school level, our members who are students, parents, guardians, and educators have shared that HB 1775 has directly harmed their access to an inclusive, well-rounded education that best prepares students to meet Oklahoma's instructional standards, thrive in college, and become leaders and contributing citizens in our multiracial, multiethnic democracy.

*Harms caused by Edmond Public School District's application of HB 1775*

12. For example, one NAACP-Oklahoma member is a parent of a 9th grade student ("Student A.A.") in Edmond Public Schools("EPS"). Upon information and belief, EPS has issued guidance to English Language Arts teachers at Student A.A.'s school that directs them to no longer use the terms "white privilege" and "diversity." EPS has also removed *To Kill a Mockingbird* and *Raisin in the Sun* from its list of anchor texts, while retaining books by white male authors. EPS also excluded books from the curriculum written by prominent Black authors including: *Their Eyes Are Watching God*, *Why the Caged Bird Sings*, and *Narrative of the Life of Fredrick Douglass.*

13. Student A.A. is directly and adversely impacted by EPS's actions stemming from HB 1775. Student A.A. has lost access to texts by Black and female authors that explicitly discuss racial and gender relations, and the corresponding classroom discussions that explore such issues from multiple angles. Student A.A. identifies as white and male and desires greater access to diverse texts, particularly texts by non-white and female authors, because such perspectives broaden Student A.A.'s worldview, better prepare Student A.A. to participate in a multiethnic democracy, and enable Student A.A. to engage in advanced inquiry and problem-solving. EPS's ban on certain terms has also denied Student A.A. the opportunity to critically evaluate texts from different viewpoints including a racial lens. While Student A.A. will strive to learn about diverse viewpoints outside of class, this direct denial of information and ideas stymies Student A.A.'s educational growth and ability to develop the type of critical thinking skills espoused by Oklahoma's own educational goals. Student A.A. believes that discomfort is part of the learning process, and pushes students towards greater understanding.

14. EPS's actions also inflict harm on the NAACP-Oklahoma's broader mission and members, who predominantly identify as Black, by making the classroom environment less inclusive for Black, LGBTQ+, and female students. EPS's actions also hinder NAACP-Oklahoma's mission because EPS students are less exposed to diverse viewpoints which foster innovation, cross-cultural understanding, and the leadership skills necessary to tackle today's most pressing issues that often implicate race, sex, and persistent inequities.

*Harms to Teacher B.B.*

15. NAACP-Oklahoma member "Teacher B.B." provides another example of the harms of HB 1775 for students, our members, and our mission. Teacher B.B. teaches in Muskogee Public Schools and has reported that HB 1775 is so vague and confusing that they do not understand what conduct is prohibited under the law. Teacher B.B. is concerned that HB 1775 and the Emergency Rules have not sufficiently defined terms. For example, they are unclear on what conduct will be interpreted as making a banned concept "part of a course," discussing

"unconscious[]" racism or bias, causing feelings of "discomfort, guilt, anguish or…psychological distress on account of … race or sex," or the ways in which "meritocracy" is associated with racist or sexist frameworks. The lack of definition makes Teacher B.B. worried that HB 1775's provisions are open to subjective interpretation. As a result, Teacher B.B. is not clear on what they can and cannot teach.

16. Teacher B.B. has also heard legislators say that the boundaries of the restrictions will be clarified "on the ground" as parents raise complaints. This lack of clarity and ad hoc process for identifying violations is a significant concern for Teacher B.B. because it will likely lead to arbitrary application of punishment. Teacher B.B. is aware that the emergency rules that were passed by the State Board of Education allow parents, school staff, or any other members of the public to report a teacher and open an investigation. Teacher B.B. is also aware that that sanctions could involve losing their teaching license. Teacher B.B. is concerned the law will cause school officials to "make examples" of certain teachers, and they worry these punishments will disproportionately fall on teachers of color as has been the trend across history and our penal system writ large.

17. The guidance that Teacher B.B. has been given on how to abide by HB 1775 has been insufficient, and created greater confusion. Teacher B.B.'s administrative leadership repeated HB 1775's exception that teachers can still teach to "state standards." But Teacher B.B. has shared this explanation makes the line for prohibited conduct even more confusing and unclear. For example, Teacher B.B. is not clear whether they are still permitted to teach about historical figures who are not named in the state standards. Black women such as Mae Jemison, Mary McCleod Bethune, and others have made significant contributions to our society, and we can draw lessons from their efforts. But Teacher B.B. now no longer feels comfortable teaching about them because they are not named in the state standards and such discussions often touch upon gender biases throughout history. Teacher B.B. also no longer feels comfortable bringing in many current events to their classroom. For example, Teacher B.B. no longer plans to introduce information related to the Black Lives Matter movement, or the detention centers at the border because Teacher B.B. worries that these modern movements are not mentioned in the state standards and could be interpreted as introducing a banned concept because such topics often bring up discussions about racial oppression, white privilege, systemic racism, and implicit bias.

18. Teacher B.B.'s district leadership also encouraged teachers to "be careful." District leadership suggested teachers only discuss topics that touch upon systemic racism and sexism if a student raises a question about it. This concerns Teacher B.B. because students often do not have the background knowledge to ask questions that could be a source of valuable information. It

also concerns Teacher B.B. because it will result in teachers providing varying information across classrooms, whereby students can only access information related to critical topics associated with race, gender, and systemic privilege if they or one of their peers raises a question about it.

19. As a result of uncertainty paired with potential sanctions, Teacher B.B. plans to change the way they teach, and the end result is that students' access to compelling and critical resources, pedagogies, and information will be harmed. For example, Teacher B.B. normally engages in project-based learning because—based on their experience and training—project-based learning engages higher levels of thinking on Bloom's taxonomy of learning[1] such as "analyzing, evaluating, and creating." To facilitate project-based learning, Teacher B.B. often engages in asking the class questions to deepen their evaluation of particular issues and consider all sides of a particular topic. Because of HB 1775, Teacher B.B. fears asking questions related to systemic power, oppression, or privileges because Teacher B.B. worries that such questions could be interpreted as introducing a banned concept related to race and gender.

20. Teacher B.B. also no longer feels comfortable teaching entire passages that they taught in the past. For example, there is a lesson in the Passages Curriculum about Cesar Chavez. They are concerned that they will need to skip this entirely because it addresses systemic racism. In addition, Teacher B.B. would typically talk about Dolores Huerta and her important contributions to the labor movement as part of that lesson. They would specifically raise how much Dolores Huerta helped the labor movement but Cesar Chavez received most of the credit. This type of discussion touches upon sexism and gender bias, which they worry could be interpreted as a banned concept. In a similar manner, Teacher B.B. no longer feels comfortable asking questions related to Jim Crow segregative practices for books that discuss Ruby Bridges or Martin Luther King Jr. from fear that such questions could be interpreted as suggesting an "oppressor" race or other banned concept. Furthermore, Teacher B.B. also plans to avoid entire topics such as the racial wealth gap out of fear that such discussions could be interpreted as banned under HB 1775.

21. Teacher B.B. also shared that one recommended pedagogical practice is to share a personal story to model how students can connect with the curricula and make meaning out of complex material. However, Teacher B.B. no longer feels comfortable engaging in this practice because—based on Teacher B.B.'s lived experience—their personal narrative could raise

[1] Bloom's taxonomy of learning is a hierarchical model that categorizes learning objectives into varying levels of complexity, from basic knowledge and comprehension to advanced evaluation and creation.

concepts related to race, sex, privilege, and intersectional inequities that may be banned under HB 1775.

22. Teacher B.B. also shared that Muskogee Public Schools had a student come out as transgender and transition over the summer. Teacher B.B. would typically include discussions and lessons about sexual orientation and gender identity to build a more inclusive classroom culture. These discussions prepare students to be more welcoming of students with non-conforming gender identities. Now, Teacher B.B. no long feels comfortable introducing these discussions when the student returns. Based on district leadership's instruction that teachers should wait for "students to ask a question" before addressing controversial topics, Teacher B.B. worries that the student will have to be bullied or made fun of before Teacher B.B. can introduce any topic or tool meant to create inclusion for students of varying gender identities.

23. Teacher B.B. plans to modify their curriculum in the aforementioned ways due to a fear of keeping their job and avoiding investigation and sanctions. Based on experience and training, Teacher B.B. has expressed that these changes will make the classroom environment less engaging, inclusive, and rigorous. The harms will be especially felt by students of color and other marginalized identities who will feel less connected to the material, which has been associated with lower levels of learning and higher levels of alienation. However, the harms will also extend to students of all backgrounds who benefit from learning about a diverse array of backgrounds, perspectives, and cultural histories.

24. In addition, Teacher B.B. has reported that Teacher B.B.'s school did not offer the diversity, equity, and inclusion ("DEI") trainings that have been provided to teachers in prior years. Teacher B.B. believes this change in DEI training results from the school's concerns and confusion about HB 1775. Teacher B.B. explained such DEI trainings are critical because they increase teachers' capacity to support and engage all students. Such trainings also reduce teachers' use of unnecessary punitive measures and exclusion of students of color, LGBTQ+ students, and other historically marginalized groups. It also reduces the use of inappropriate interventions for students of color and LGBTQ+ students, such as the misidentification of special education needs. Without such trainings, Teacher B.B. worries about an increase in punitive and exclusionary measures against students of color.

*Harms caused to Principal C.C.*

25. Another NAACP-Oklahoma member "Principal C.C." is a principal with Chickasha Public Schools. They have been an advocate of improving diversity and inclusion within their district's schools for years. Based on

experience, Principal C.C. believes that training teachers to adequately address difficult topics involving race and gender will be essential to improve the inclusivity of the curriculum and environment at his school. These trainings include discussing implicit bias and racial disparities within the school system. Principal C.C. shared HB 1775 presents a roadblock obstructing these efforts to advance diversity and inclusion.

26. Principal C.C. no longer feels comfortable hosting important DEI training because a parent can request lesson plans and report school officials based on their subjective feelings about what is offensive or suggests biases related to race and gender. Principal C.C. recognizes that this creates a climate in which teachers will not address any sensitive topics that could potentially cause offense. In this way, Principal C.C. feels that HB 1775 makes it even harder to make the strides needed to advance diversity and inclusion.

27. Principal C.C. has also advocated for their district to develop a diversity and equity plan so the district can better evaluate its progress and shortcomings in serving students of color and other historically underserved groups. The Emergency Rules ban incorporating the banned concepts into any diversity plan, thereby preventing ongoing evaluative measures to examine and address educational inequities across racial and gender demographics. It also prevents the provision of trainings or support on implicit bias or culturally responsive teaching whether through mandatory or voluntary means. As a result, Principal C.C. has not been able to avail themselves of the tools and resources that leading experts recommend to improve the campus climate for historically marginalized groups, recruit faculty members from underrepresented backgrounds, and increase the engagement and achievement of students from all backgrounds, and particularly those from underserved groups.

*Harms to college members*

28. On the collegiate level, Oklahoma HB 1775 hinders the ability of our members to further the purpose and mission of the NAACP on their campuses and their ability to discuss racial and gender justice issues that are pressing for their university communities.

29. For example, the University of Central Oklahoma's NAACP chapter hosts events that express Black culture, provide an open forum to discuss diversity issues, and raise awareness on a variety of issues like know your rights trainings, hair discrimination in the workplace, and the Movement for Black Lives. Likewise, the Langston University NAACP chapter—the only NAACP chapter in Oklahoma at an Historically Black College & University (HBCU)—leads a peer mentorship program called "Role Modelz" to assist fellow classmates with feeling more connected to the

campus and their educational goals, to support students in developing or refining their ability to articulate and formulate plans to actively pursue their academic and career goals, as well as to help students transition to college life. The chapter has also partnered with other campus organizations to promote sexual health and wellness. Moreover, the University of Oklahoma NAACP chapter hosts campus-wide events to create inclusive spaces for Black students to discuss mental health and other issues impacting the community. The chapter has also facilitated courageous conversations about Transphobia in communities of color, led events to raise student consciousness around advocacy and community engagement, and hosted panels to discuss police brutality and accountability. HB 1775's vague language and the chilling effects threaten members' access to information and ideas that inform and strengthen such efforts.

30. HB 1775 also raises substantial concerns related to sex and gender for our college members. HB 1775's vague prohibition on mandatory counseling makes it unclear if counselors will continue to provide the necessary trainings to prevent harassment and provide support to survivors of sexual assault, which requires particularized sensitivities to the intersectional challenges faced by women of color and LGBTQ+ people of color.

*Harms across membership*

31. In the 21st Century, it is critical that students receive an education that includes diverse viewpoints and discusses contentious issues related to race and sex so that students are best equipped to work together in teams to solve the most challenging issues facing our increasingly diverse country, along with the myriad of other benefits that flow from diversity. NAACP-Oklahoma's members and community partners report that teaching about systemic racism and biases – conscious and unconscious – is critical and actively sought by members because it serves to broaden perspectives; sheds light on the root causes of racial and gender disparities across healthcare, policing, education, and many other social sectors which directly impact their communities; develops solutions for our society to build a better, more equitable future; combats ignorance which can result in hostility; and empowers the Black community and other groups to know their history, including their triumphs and tools for overcoming challenges.

32. The chilling effect of HB 1775 on discussions and trainings related to race and gender have been immediate. Members and community members across the state have reported how HB 1775 has caused schools to consider removing books that center the Black community, censored educators from applying the most engaging instructional strategies, and spawned a general culture of fear and confusion surrounding race and gender issues. These

effects increase the prevalence of racial hostility, racially disproportionate exclusionary practices, and a one-sided and often inaccurate view of history, literature, and the sciences by centering white males and sidelining (or excluding entirely) the experiences, perspectives, and contributions of all racial and ethnic groups.

33. These harms fall on all students, but they are disproportionately borne by students of color, women and girls, and LGBTQ+ students who cannot see themselves in the curricula or have many of their lived experiences discussed or understood. Moreover, such students are disproportionately harmed because HB 1775 inhibits the ability of Oklahomans to tackle the racial and gender barriers faced by historically marginalized groups.

*Organizational harm*

34. Organizationally, the NAACP-Oklahoma will be greatly impacted by the outcome of this lawsuit. In recent years, the NAACP-Oklahoma's advocacy docket has included challenging the disproportionate removal of students of color and other historically marginalized groups from classrooms based on minor disciplinary infractions. We anticipate an increase in disciplinary disparities if teachers are not being trained around implicit bias and developing inclusive curricula, and members have observed an increase in such exclusionary practices. An increase in complaints will in turn increase our case load.

35. The NAACP-Oklahoma has also been involved in advocacy and legal action calling on Oklahoma schools to remove the names of confederate generals from school buildings. HB 1775 will likely discourage schools from addressing the names of schools that venerate confederate history and thereby marginalizes and harms Black students and other people of color.

36. Altogether, HB 1775 inflicts substantial harm on NAACP-Oklahoma's mission, our membership, and the communities across Oklahoma that we serve. By cutting off access to such critical conversations, students cannot understand how far we have come as a Nation in ensuring equal justice under law, or appreciate how much further we must go to make that goal a reality. Prohibiting Oklahoma students from discussing systemic racism and other similar topics bears disturbing resemblance to the slavery- and Jim Crow era tactic of depriving Black people and other communities of color equal access to education as a method of racial subjugation and preserving the status quo's racial and gender inequities.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oklahoma this 29th day of October 2021.

Anthony R. Douglas

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

[1] BLACK EMERGENCY RESPONSE TEAM, et al.,

*Plaintiffs*,

v.

[l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,

*Defendants*.

Case No. 5:21-cv-01022-G

Hon. Charles B. Goodwin

**Declaration of Mary Topaum, on behalf of the the American Indian Movement Indian Territory chapter ("AIM Indian Territory")**

I, Mary Topaum, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal first-hand knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am the Director of the American Indian Movement Indian Territory chapter ("AIM Indian Territory"), in the above captioned matter. I am authorized to provide this declaration on behalf of AIM Indian Territory. I have held the position of Director since first being elected to the position in 2016.

3. The American Indian Movement ("AIM") is one of the most prominent grassroots Native American rights organizations the United States. Founded in 1968, the AIM's initial mission was to address the plight of Urban Indians dealing with police brutality, poverty, and systemic racism. By the early 1970s, AIM's mission eventually expanded to address other concerns impacting Native American communities, like educational

justice, treaty rights, spiritual wellness, cultural preservation, and self-determination.

4. The AIM and its grassroots chapters have a long history of challenging systemic racism and racial disparities for Native American students in education. For example, in 1972 the AIM opened "survival schools," in the Minneapolis area, to center Indigenous culture within the curricula in an effort to fight ongoing discrimination by non-Natives in school, combat the Native American school dropout rate, and resist the forced removal of "truant" children from homes by social service agencies. The first survival school—Heart of Earth Survival School—was opened in Minneapolis, and shortly after, the second—Red School House—was opened in St. Paul.

5. While the AIM was founded in Minnesota, the organization quickly grew followers throughout the country—including in the state of Oklahoma—who started grassroots AIM chapters of their own in order to address the issues impacting Native Americans in their local communities. At various times since the organization's founding, Oklahoma has had up to a dozen active grassroots AIM chapters operating across the state.

6. For AIM chapters in Oklahoma, the education of Native American children has always been a key concern, particularly due to the state's history with the Trail of Tears, Indian mission and boarding schools, and misappropriation of funds allocated for Native American children.

7. While the national AIM organization disbanded in 1978, the movement for Native American rights continued. Many state and local chapters of AIM continued to operate in order to promote Native American rights and address injustices within their own communities. Since then, grassroots AIM chapters have continued to have an active presence in the fight for Native American rights in the state of Oklahoma.

8. The AIM Indian Territory is a grassroots chapter of the AIM—created in 2016—whose mission is to "protect and fight for [ ] Indigenous rights and to better [ ] Indigenous communities," throughout the state of Oklahoma and Turtle Island. To support this mission, AIM Indian Territory has been actively addressing intersectional issues, like racial discrimination and cultural insensitivity in Pre-Kindergarten through grade 12 ("PK-12") schools, Indigenous erasure in curricula, intergenerational trauma, police brutality against BIPOC communities, and sexual assault and violence against Native American women, girls, and two-spirit individuals.

9. The AIM Indian Territory currently has 37 members statewide, who come from a variety of tribal nations and/or identify as multi-racial. Many of the AIM Indian Territory members live in Tulsa, Oklahoma City, Lawton, and surrounding areas. Approximately 30 AIM Indian Territory members are parents with children currently enrolled in PK-12 in Oklahoma public schools. The AIM Indian Territory serves as a critical resource for Native American communities and supporters—including parents and children—throughout the state of Oklahoma. To advance this work, the AIM Indian Territory meets regularly with its members to address intersectional issues that impact Native Americans within Oklahoma, including cultural competency, intergenerational trauma, gender discrimination, and LGBTQ+ concerns.

10. With regard to the AIM Indian Territory's educational advocacy, one of our key goals is to ensure that Native American students, in particular, are the recipients of a culturally relevant and inclusive education that enriches students' critical thinking skills and promotes cross-cultural exchange and appreciation for all students in Oklahoma public schools. We are especially dedicated to combating racism and discrimination in schools because of its life-long impacts on Native students and non-Native students alike. With Native American students making up approximately 15% of Oklahoma's public-school students, we believe it is imperative that they receive a culturally relevant and inclusive education that challenges the mainstream narrative of Indigenous erasure. That narrative—the idea that Native Americans no longer exists—perpetuates psychological and intergenerational trauma amongst Native American students while it also reinforces racial hierarchies and feelings of superiority for non-Native students.

11. AIM members and their children in Oklahoma public schools seek exposure to the full range of historical, literary, and contemporary accounts that—though sometimes upsetting and unfortunate—provide a fuller, more accurate rendering of the past and present so that students can form their own inquiries, truth, and solutions.

12. The Oklahoma legislature's predominate concern—that certain students are experiencing feelings of guilt or shame because of the way past and current injustices are discussed in the classroom—disregards the negative emotions that BIPOC students have reported and experienced for decades in Oklahoma's public schools.

13. Despite complaints from BIPOC students, the Oklahoma legislature has not banned other topics that make students feel discomfort, guilt, anguish, and psychological distress at school or on campus.

14. For example, students of color in Oklahoma have reported severe distress from attending school buildings named after confederate leaders and having to read books such as Huckleberry Finn that feature the n-word, and yet Oklahoma's legislators and school officials have refused to prohibit such campus speech.

15. Likewise, neither the Oklahoma legislature nor the State Department of Education have taken steps to prohibit school districts from requiring that all students—Native American and non-Native—participate in live "reenactments" of the 1889 Land Run. Though Native students have reported experiences of depression, trauma, and embarrassment when forced to participate in school-facilitated Land Run reenactments—that glorify the genocides and displacement of Native people—school districts in Oklahoma have only begun to prohibit these reenactments on a district-by-district level. While the Norman Public School district stopped participating in the reenactments in 2011, it took the Oklahoma City Public Schools until 2014 to do the same, meanwhile, it took the Edmond Public School district until 2017 to even begin having conversations about ceasing the reenactments. We have received reports from members that the Lawton Public School District and elementary schools in Oklahoma county still engage in such reenactments in spite of complaints.

16. Likewise, the Oklahoma legislature has not prohibited Oklahoma public schools from displaying derogatory "R*dskins" themed Native American caricatures as mascots, despite the repeated complaints by AIM members, supporters, and Native American students, who have voiced feelings of discomfort, contempt, and intergenerational trauma.

17. The AIM Indian Territory believes that all students in Oklahoma must have access to a culturally responsive and inclusive education that prepares them to interact with people from all races, ethnicities, genders, and backgrounds. This includes being educated and informed about the various Native American communities located within the state, especially given the recent *McGirt* decision, which declared close to half of the state of Oklahoma as Indian Territory. Our ultimate goal is that each student in Oklahoma public schools receives a quality education that teaches them about the state's rich history with Native Americans, including the past atrocities committed against us, positive contributions made by us, and current challenges we face as a result of systemic oppression.

18. The AIM Indian Territory has been at the forefront of many discussions related to racial justice in education, including conversations between members of Oklahoma's various Native American communities and public school districts around the state. For example, the AIM Indian Territory was recently contacted by a young Native American boy and his family in Clinton, Oklahoma, who reported being the target of culturally-related bullying and forcibly having his long-braided hair cut by a non-Native fellow student. The AIM Indian Territory subsequently organized a rally and march in solidarity with the young student, to raise awareness and cultural competency around why Native men and women wear long-braids today, and to educate folks on the legacy of scalping in Native American communities.

19. The AIM Indian Territory has also advocated for curricula change and diversity training for staff in Oklahoma public schools, as many Native American students continue to experience cultural insensitivity in the classroom, as well as attend schools with Indian Mascots and prohibitions from wearing traditional regalia at graduation or Eagle feathers in one's high school graduation cap, to celebrate student's achievements through an incorporation of Indigenous culture. Recently, we received a report from one student and their family in Shawnee, Oklahoma, that an art class syllabus explicitly banned the drawing of Indigenous people within the classroom for being a "cliché" depiction.

20. The AIM Indian Territory has also addressed the unique issues that female Native American students experience in Oklahoma public schools. Recently, the AIM Indian Territory was contacted by two Native American girls in Morris, Oklahoma, who reported—at different times—having male teacher accost them and grab their hair without consent while saying "I've always wanted to pull a braid." Acts like these, particularly those committed by people employed to educate our children, are deeply concerning to the AIM Indian Territory, as it perpetuates the hyper-sexualization of Native American women and girls and contributes to sexual harassment in schools.

21. To address instances, like those aforementioned, from occurring in Oklahoma public schools, the AIM Indian Territory believes it is essential that students can access a more diverse and inclusive curricula that incorporates a more complete depiction of Indigenous communities, histories, and cultures. Equally important, it is essential that schools provide diversity, equity, and inclusion trainings for teachers, administrators, faculty and staff that help them to unpack their own implicit

biases and preconceived notions about the communities in which they serve. Such steps are necessary for establishing a more inclusive educational environment.

22. The AIM Indian Territory believes that there are several benefits to providing Oklahoman students with a culturally relevant and inclusive education. For example, providing Native American students, in particular, with culturally responsive education helps to combat the detrimental impact intergenerational and psychological trauma has on Indigenous youth and their families when Native American communities have constantly been described as "primitive," or "extinct." It also provides BIPOC, mixed-race, and multicultural students with a social and historical understanding that allows them to put their own life's experiences in context while making them feel seen in the classroom, facilitating a sense of belonging. Moreover, providing white students with the same culturally relevant material helps them to breakdown existing misconceptions that they may have about Native American people and other historically marginalized communities.

23. Ultimately, the AIM Indian Territory believes that it is important that students of all backgrounds have access to this sort of information because it teaches the tolerance, compassion, and cross-cultural understanding that is necessary to successfully navigate and thrive in a country that is growing more racially and ethnically diverse.

24. The AIM Indian Territory is particularly concerned with the chilling effect that HB 1775 is having, and will have, on progressive steps taken to ensure that all students in Oklahoma receive a quality and inclusive education.

25. The AIM Indian Territory believes that the Oklahoma legislature is hampering students' ability to think critically, become life-long learners and global citizens through HB 1775, by denying them access to culturally responsive curricula and to the language and information necessary to understand and challenge structural inequality impacting their own communities.

26. The AIM Indian Territory members and their children want access to the kind of information currently being suppressed under HB 1775, like conversations regarding white-privilege, allyship, and intersectionality, even if such conversations can be challenging because they also enrich the learning environment. For example, while Indigenous leaders' perspectives on the violent relocation of Native Americans may be uncomfortable for some students, members believe such perspectives are

critical because it helps to promote cross-cultural understanding, tolerance, compassion, and empathy amongst current and future generations. It also helps AIM Indian Territory's student members better understand their own ancestors' history and their lived reality.

27. The AIM Indian Territory also wants teachers to have access to diversity, equity, and inclusion trainings that address issues of racial and gender-based discrimination, so that they can teach all students in a culturally-competent manner. However, we are concerned that HB 1775 seeks to chill these conversations and stifle educators' ability to connect with each student in a culturally responsive manner.

28. We believe that prohibiting classroom discussions on topics, like systemic racism and gender-based oppression, significantly undermine any efforts made by educators and local school districts, following the 2020 National Reckoning for Racial Justice, to make the classroom environment more inclusive for historically underrepresented and marginalized communities.

29. The AIM Indian Territory is concerned that a lack of culturally responsive and inclusive teaching is perpetuating, and will perpetuate, ideas of pre-existing racial hierarchies, enable bullying against BIPOC students, lead to increased psychological trauma, and contribute to depression—which is already extremely high for Indigenous youth.

30. The AIM Indian Territory is especially concerned by the Oklahoma legislature's purpose behind HB 1775 because it appears to be yet another attempt by the legislature to silence the dissenting voices of those that challenge mainstream narratives of U.S. history and culture and those whose contributions and experiences have been historically excluded.

31. Principally, the AIM Indian Territory wants all students—including Indigenous youth and other students from historically marginalized backgrounds—to feel represented in their course curricula. To further this objective, we believe that all students must be allowed to have access to both a diversity of experience and diversity of ideas in order to become well-rounded individuals, productive workforce participants, and civic leaders in their communities.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oklahoma this 13th day of October 2021.

Mary Topaum
Mary Topaum

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al.,<br><br>*Plaintiffs*,<br>v.<br><br>[l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,<br><br>*Defendants*. | Case No. 5:21-cv-01022-G<br><br>Hon. Charles B. Goodwin |

**<u>Declaration of S.L.</u>**

I, S.L., pursuant to 28 U.S.C. § 1746, declare the following:

1. My name is S.L., and I am under 18 years of age. The facts set forth in this declaration are based on my personal first-hand knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am an eleventh-grade student in the Millwood Public School District. I identify as a Black woman. I currently attend Millwood High School and am enrolled in AP US History and Mr. Anthony Crawford's English 4 course, amongst other classes. This is my sixth year attending Millwood public schools.

3. My favorite subjects in school are English and History, though I have also enjoyed the Black History and Sociology courses that I have taken. I like these subjects because they each have tangible implications for life in the

"real world." I believe that it is important to discuss current events and real-world topics in the classroom because it exposes students to society, by showing them the good, the bad, and the ugly.

4. For example, in my English and Sociology classes, we were able to debate critical issues, like maternal and reproductive health, in the classroom by conducting our own research, analyzing statistics, and crafting our own persuasive arguments. Exercises like these not only addressed the historical context for the social issues we were discussing, but also addressed the unique and intersectional experiences of marginalized communities, seeking to find solutions to the problems they experience. In these courses, my teachers encouraged us to think about matters from other perspectives, and discover and unpack the root causes to issues in order to find an appropriate solution. It is through this method of learning that I have been challenged to think most critically about the world around me.

5. I find my education to be most enjoyable when my teachers use culturally relevant material. I believe that it is important for all students to have access to readings by authors who are Black, Indigenous, and other people of color (BIPOC) because it helps to introduce additional perspectives into the classroom that vary from the traditional white-washed materials.

6. I find it most difficult to connect with subjects and materials when texts lack depth or nuance, or adequate representation of historically marginalized communities. When students are only taught from the perspective of people in positions of power and privilege, who dictate the narrative and the ideas brought forth, oftentimes the text encompasses a blind-spot that goes unchecked—that particularly paints a tone-deaf depiction of BIPOC and other historically marginalized communities.

7. I believe that in order to know where you are going, you have to first know where you have been, and you cannot do that without also understanding your past. This is why I think it is important that all students be provided with access to historically accurate and complete information that—may at times cause them to feel uncomfortable—in order for them to be prepared to address the real-world issues and challenges they might face in the future.

8. Unfortunately, our curriculum predominantly discusses the perspectives of white males, rather than that of other diverse communities. For example, while I am interested in learning more about topics like Native American and Black history in school, our teachers rarely touch on them, even during Black History Month and Native American Heritage Month. While the Oklahoma Standards say we are supposed to learn about the Trail of Tears

in school, we barely discuss it in the classroom beyond a surface level.

9. Even in a predominantly Black school district such as Millwood, students are graduating with a limited knowledge of people who look like them and that have made influential contributions to society. It is a disservice to Black students to only teach them a limited list of Black figures such as Harriet Tubman, Fredrick Douglas, Rosa Parks, Malcolm X, and Martin Luther King Jr., when the list of Black luminaries, authors, and leaders is substantially longer.

10. I am especially interested in learning about the histories of BIPOC communities in a more historically accurate manner. When my English 4 teacher, Mr. Crawford, asked us to share about "topics you are interested in learning more about," I responded that I would like to learn more about systemic racism and critical race theory.

11. I wanted to learn more about these topics because these are the issues that students, who look like me, are experiencing both inside and outside of the classroom. For example, statistics show us that racial discrimination is a problem in every aspect of American life from interactions with law enforcement to the school to prison pipeline. This is why I think it is important for all students, but especially BIPOC students, to have access to this kind of information because it helps them make sense of the ways in which racial discrimination in society can impact their lives.

12. I also believe it is important to discuss these topics in order for all students to understand that oppression is something that is experienced on a structural level, rather than just on an individual basis, so that they can begin to think critically about how to combat it when they come across it.

13. Though I believe that it is important for all students to learn about systemic racism, and other similar topics, I believe it is especially important for high school students. In high school, we are at the age where some of us are about to become adults and others already are, making any effort, to shield us from critical issues impacting the "real world," infantilizing.

14. While some students may be uncomfortable when real world issues and current events are discussed in the classroom, it should not be an excuse to avoid engaging in courageous conversations. For example, although discussions about racial and gender disparities in education, the workforce, and the healthcare system could instill discomfort amongst some students, it is something that all students should learn about before graduating high school because of the far-reaching implications of inequity and

discrimination in the real world.

15. I want access to this kind of intellectually stimulating and challenging information, that addresses issues of a social, political, and societal nature—despite how uncomfortable these topics might make other students feel—because I strongly believe that access to this information will help me to develop the critical thinking and cross-cultural communication skills necessary to understand past and contemporary issues. For example, I'm interested in exploring how our society has decided rightly or wrongly who is deserving, or has "merit", so that I can better understand, analyze, and critique existing gaps in wealth, housing, and employment by race and gender.

16. HB 1775 directly impacts and interferes with my ability to engage in these courageous classroom conversations by chilling the speech of students and teachers, who—like me—are interested in discussing issues of racial- gender- and sexual orientation-based discrimination and oppression.

17. For generations, BIPOC Oklahoman students have advocated for adequate representation in the course curricula and for a historically accurate depiction of the struggles BIPOC communities have faced, and continue to face, as well as contributions BIPOC communities have made, and continue to make. Yet, the legislature has not chosen to pass meaningful and sufficient legislation in this area.

18. I was in elementary school when I had my first personal experience with racism. If my parents had to have "the talk" with me about race, discrimination, and injustice at age 8, then why are my white counterparts being shielded from these same conversations in the classroom at 16 years old. We should encourage, rather than chill, critical discussions of race topics in the classroom—no matter how ugly they may be—in order to teach students how to handle having difficult conversations in a respectful and empathetic manner.

19. At a time when educators around the country are beginning to think critically about how to make their classrooms a more welcoming environment for all students—following the 2020 National Reckoning for Racial Justice—the legislature has chosen now as their time to act.

20. I do not understand why my life, the histories of people who look like me, and the things I experience inside and outside of the classroom are considered political? I am a human being, like all of my classmates, and I, too, deserve to receive an education that reflects the stories of people like

me in the curricula.

21. In the Oklahoma public schools, every student should be taught the truth about the issues impacting our communities and be provided access to information that allows them to formulate their own ideas about challenges facing our society.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oklahoma this 29th day of October 2021.

SL
____________________
S.L.

# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

[1] BLACK EMERGENCY RESPONSE TEAM, et al.,

*Plaintiffs*,

v.

[l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,

*Defendants*.

Case No. 5:21-cv-01022-G

Hon. Charles B. Goodwin

**Declaration of Anthony Crawford**

I, Anthony Crawford, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal first-hand knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am an English teacher in the Millwood Public School District. I currently teach English 3 and English 4 at Millwood High School. This is my third year teaching at Millwood High School, and this is my sixth year teaching in Oklahoma schools. Students enrolled at Millwood High School predominantly identify as Black or African American, but I teach students of all racial and ethnic backgrounds. I personally identify as Black and male, and I strive to expose my students to authors and thinkers from all walks of life.

3. My goal is for students to gain the skills that they need to be strong writers, readers, and analytical thinkers who can form their own opinions after considering multiple sources of facts, experiences, and sources of evidence. This is essential for my students to succeed in high school and state exams. But equally important, it is essential for them to excel in any college and graduate courses, and it is necessary for them to succeed as workers, leaders, and citizens in the broader society that they will enter as graduates.

4. In my English 3 course, students are reading Paulo Coelho's *The Alchemist* and George Orwell's *1984.* As part of teaching these books, I engage my students by asking them tough questions and providing writing prompts that require further reflection, examination, and discussion with one another. By creating an atmosphere of inquiry, I can achieve multiple instructional goals: the state standards are covered, my students are more engaged and participatory, and my students are prepared to be open-minded and independent thinkers. An atmosphere of inquiry is also what makes learning fun.

5. My English 4 course is a more advanced course that engages students on topics that can help them better understand the world around them. We read books such as PowerNomics that raise questions and ideas about poverty, homelessness, and the wealth gap. Most of my English 4 students are seniors who are beginning to search for work and college, start businesses, and navigate society. They are most interested in learning about topics that touch upon their day-to-day lives.

6. As an English teacher, I teach them the art of debate and how to use facts and statistics in order to craft persuasive arguments. This requires me to expose my students to a variety of ideas so that they can comprehend the bigger picture. I help my students open their minds to new and additional information by getting them to write about topics which interest them.

7. In my course readings, I try to include authors of all racial backgrounds. I include Black authors because I believe that representation matters. Reading books by authors who are Black, Indigenous, and people of color (BIPOC) can be empowering for my students, who mostly identify as Black, because it helps them see people of color as writers and intellectuals when the media often portrays people of color in negative, stereotypical ways. Many of my students have expressed the mentality that they cannot be writers or academics because they have never seen someone like themselves do that work. I want all of my students to realize that they can be part of the literary world and that they can achieve their greatest potential. Including BIPOC authors also helps to show the diversity of thought within the BIPOC community. I have also observed a high degree of engagement and participation from BIPOC students when they read materials by BIPOC authors.

8. While I try to make sure my students can see themselves in course materials, I teach texts from racially diverse authors who express diverse viewpoints. I do not try to indoctrinate students with my personal perspectives. I teach all of my students the importance of considering ideas from perspectives that are not their own, in order for them to develop the

skills necessary to be cross-cultural communicators and problem solvers today, and in the future.

9. To create a classroom culture of learning, I raise questions and ideas that will prompt debate because I believe that classrooms should be student-led environments. The students in my classroom are the teachers, and help lead dialogues and facilitate conversations about topics in which they are interested, like wealth, sports, and mass incarceration. I believe that learning requires some struggle. My course is like a college class in that I ask my students questions to push their learning, in order to prepare them for life after completing their education. Some of my favorite questions to ask are: "What did you learn? What is your view on what you read? What do you disagree with?"

10. Each year, I ask my students what topics they want to learn about in class. This year, I got a lot of interesting responses, including: taxes, credit, and economics; critical race theory; and the LGBTQ+ community. I try to be responsive to what my students want to learn about by incorporating these topics into my courses through readings, writing prompts, and discussions.

11. It is necessary to discuss issues around race, sex, gender, and power in the classroom because my students bring up these topics when they engage in readings or respond to writing prompts. Readings also discuss topics like race, gender, and power. For example, I have taught texts that discuss the eugenics movement, which exposes students to how people have historically discussed race and intelligence and makes them think deeply about how we frame these discussions today. I think that it is crucial that I expose my students to a wide range of concepts and ideas because in order to be productive and engaged civic participants, we must have a better understanding of the systems in which we exist and operate.

12. My students want access to the full gambit of information, even ideas that may cause discomfort or that they may disagree with. Discomfort can lead to growth, and growth leads to learning. I believe these forms of social-emotional learning and conversations help our students understand complex issues and comprehend the world around them.

13. At the beginning of the year, we create classroom "agreements" to support a classroom culture of learning and vigorous dialogue. One of those agreements is "do not take anything personally" because the purpose of class is to push ourselves to think in new ways so we can become more analytical and informed thinkers. This requires hearing multiple ideas and hearing multiple perspectives so we can come to a greater understanding.

14. It is not clear to me what type of conduct violates HB 1775 because the law's language is extraordinarily confusing and vague. Its terms are not clearly defined. For example, it is not clear what the law means when it says a teacher cannot "make part of a course" the idea that certain races or genders have been racist or sexist "consciously or unconsciously." Racism and sexism have been part of our society for centuries and so it comes up in readings and in my students' responses to writing prompts.

15. It is also not clear to me what the law means when it says teachers cannot "make part of a course" the idea that individuals "bear[] responsibility for actions committed in the past." Student-led discussions and debates in my class about wealth, taxes, and power sometimes raise ideas about the racial and gender wealth gap. There are different opinions on the sources of the wealth gap and its solutions. HB 1775 makes it unclear whether students can be exposed to the idea that the wealth gap results from systemic racism, alongside the alternative idea that the wealth gap results from individual decision-making.

16. It is not also not clear to me what the law means when it says teachers cannot "make part of a course" ideas that suggest individuals should "feel discomfort, guilt, anguish or any other form of psychological distress" related to race or sex. Based on my experience, discussions that raise multiple, diverse viewpoints can create discomfort but they also stimulate learning and growth.

17. I am also confused by the law's exception stating that "the provisions of this section shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." This creates a contradiction in the law that I do not know how to resolve. The Oklahoma Standards expect students in grade 12 to critically examine and analyze bias in a text. For example, the English Language Arts standards for grade 12 state that:

> "Students will evaluate how authors writing on the same issue reached different conclusions because of differences in assumptions, evidence, reasoning, and viewpoints, including examining rhetorical appeals, bias, and use of logical fallacies."

But the prohibitions in HB 1775 suggest that teachers cannot "make part of a course" concepts that include bias related to race or sex. As another example, students in grade 12 are expected to "acknowledge counterclaims or alternate perspectives." But the prohibitions in HB 1775 suggest that teachers must restrict students' exposure to alternate perspectives.

18. It is not clear to me whether I am allowed to include a concept that is "prohibited" but could allow a student to meet these standards. In short, the exception makes the law even more confusing instead of adding clarity because I do not understand how deeply or extensively I – or my students – can discuss, write about, or read about issues related to race or sex.

19. Furthermore, as shown above, the standards are more general and are not intended to be proscriptive. As a teacher, I am responsible for selecting our curriculum and instruction. Because of the vague and overbroad language in HB 1755, I am at a loss of determining whether my teaching and materials may convey a concept that falls within the standards and one that falls with the banned concepts under HB 1755.

**20.** I am aware that the law allows parents, teachers, or anybody in the public to file a complaint not only with my school district, but also with the State Board of Education or the State Attorney General. While I believe the content and structure of my courses further the state's learning goals for students, I fear that somebody might file a complaint against me. I am not clear how state authorities will interpret the vague language of HB 1775 and so I fear punishment for teaching material that I believe best meets the needs of my students but may be interpreted as violating HB 1775.

**21.** I believe HB 1775 harms students, our educational system, and our greater society. If we do not prepare students to respond to diverse and varying viewpoints before they graduate high school, then students will be stuck viewing issues from a narrow perspective as adults. Moreover, depriving students of color access to information related to race and sex, and racially diverse authorship, hampers their ability to connect with—and thrive in—an academic environment that too often leaves out the experience of BIPOC communities. We need a generation of analytical, open-minded thinkers who have the skills to address today's issues that often involve sex, race, and inequality. HB 1775 takes these skills away by trying to silence certain ideas that are important for understanding our past, examining our present, and building a better future.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oklahoma this 13th day of October 2021.

Anthony Crawford

# Exhibit 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al.,<br><br>*Plaintiffs*,<br>v.<br><br>[l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,<br><br>*Defendants*. | Case No. 5:21-cv-01022-G<br><br>Hon. Charles B. Goodwin |

**Declaration of Regan Killackey**

I, Regan Killackey, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am an English teacher for Edmond Public Schools. I teach Advanced Placement Language, Advanced Placement Literature, English 3, and Advanced Placement Research at Edmond Memorial High School. I have taught English in the Edmond Public School District for 14 years. I have taught English in Oklahoma public schools for 19 years. During this time, I've engaged in countless trainings on how to engage students in the classroom, ensure that students not only meet but exceed state standards and become life-long learners.

3. Since 2014, I also work for the College Board as Advanced Placement Language and Composition Exam Reader and Table Leader, as well as a national Consultant for other Advanced Placement Language teachers during the summer months.

4. Since 2014, I additionally work for the National Math and Science Initiative as an Academic Coach working with Advanced Placement Language students and teachers across the nation.

5. The Advanced Placement courses I teach are offered to the most gifted students and are guided by the standards of College Board, an independent non-profit that

seeks to increase access to higher education. Students in Advanced Placement classes can take an exam by College Board at the end of the course. Students who score high enough on the exam receive college credit for that course subject.

6. In each of my classes, I teach critical thinking, argumentation, and language art analysis by guiding students through a variety of texts by diverse authors. My courses, by their nature, develop higher level thinking skills that require students to form the critical thinking skills necessary to properly analyze and ultimately understand complex perspectives. These higher-level thinking skills are necessary for doing well on state exams, excelling in college, and engaging in our civic institutions.

7. In my Advanced Placement Language class, I teach argumentation and persuasive writing with College Board curriculum to prepare students for the Advanced Placement Language exam and for critically analyzing rhetoric in their everyday lives. The arguments with which we engage often address themes of race, sex, gender, and equity. Consistent with College Board curricula, I address different forms of identity, power, and their intersections in the classroom. The Advanced Placement Language exam directly addresses issues of identity, and students must incorporate those concepts in the way they build their arguments in relation to a variety of curricula. The Advanced Placement Langugage exam directly addresses current controversies and asks students to build arguments regarding current social issues. Current controversies nearly always involve the concepts of race, sex, gender, equity, power, and their intersections. To adequately teach students to engage with argumentation and rhetoric critically and analytically and to prepare students for the Advanced Placement Language exam, I must discuss race, sex, and gender in ways that challenge students to think from the perspective of people from identities outside their own. Often, those discussions require students to consider how White people and men historically and currently use the privilege of their identities to assert and maintain power over other people.

8. In my Advanced Placement Literature class, I teach language art analysis using College Board curricula, which requires a diverse authorship. While College Board does not have a list of required texts, the presentation of texts by a diverse authorship is a required standard for Advance Placement curricula because they are critical for a complete understanding of American and World literature and well-developed textual analysis. Texts include *Heart of Darkness* by Joseph Conrad, *Things Fall Apart* by Chinua Achebe, *Invisible Man* by Ralph Ellison, *The Poisonwood Bible by Barbara Kingsolver*, and *Othello by William Shakespeare,* all of which directly address themes of race, gender, oppression, and racism. To adequately analyze art that centers themes of race, gender, and power, I must address those themes and teach students how to engage with them.

9. In my English III class, I teach American Literature. American Literature by its nature includes perspectives on the American experience, including racism, sexism, and overall conflict. I choose texts from a diverse authorship to give students an honest perspective of the scope of relevant work, to help prepare them for difficult conversations about current events, and to ensure all my students can see themselves reflected in the material. In guiding students through the texts, I must address and engage with these themes.

10. In my English III courses, I also teach non-fiction through historical and contemporary controversy consisting of editorials, letters, political speeches, and essays – many of these addressing imbalances of power regarding sexism, racism, and identity. I use all valid media outlets, from breaking news resources to our district-approved textbook *Collections*.

11. H.B. 1775 causes school districts to distrust teachers' ability to have courageous conversations about race. As a result, my school district has attempted to silence its teachers for fear we may violate the H.B. 1775.

12. On June 28, 2021, I received an email from Edmond Public School District English Language Arts Curriculum Coordinator Jackie Resnic, which included guidance to Edmond Public School District English teachers from grades 6 through 12 on how H.B. 1775 will impact our classrooms. On a slide entitled "Questions on Concerns about H.B. 1775," we are instructed to "avoid the terms 'white privilege' and 'diversity' in class." Another slide told us to "Avoid the term 'diversity' when naming units or lessons," and stated that, "Under 1775, Do not discuss 'white privilege' as part of your lesson." The district made clear that these prohibitions are to ensure compliance with H.B. 1775. Because this prohibition applies to English teachers district-wide, I understand it to apply to all of my classes. Due to the content of my courses, these are terms students and I use frequently in the classroom as we engage in a broader discussion that airs multiple viewpoints and perspectives. These terms arise organically as we engage in meaningful class discussion of the material.

13. In addition to the prohibition of essential terms like "diversity" and "white privilege," Edmond Public Schools changed our anchor texts for on-level English classes in 2021. We are no longer required to teach anchor texts that meaningfully address race. Texts like *To Kill a Mockingbird* by Harper Lee or *Raisin in the Sun* by Lorraine Hansberry were previously required as options to introduce the complexities of race in America, and these texts were also options in which we were encouraged to scaffold our curriculum with contemporary companion pieces. The district similarly removed *Their Eyes Are Watching God* by Zora Neale Hurston, *Why the Caged Bird Sings* by Maya Angelou, and *Life of Fredrick Douglas* by Fredrick Douglas as anchor text options from our curricula in response

to H.B. 1775. Our only remaining anchor texts are *The Great Gatsby* by F. Scott Fitzgerald and *The Crucible* by Arthur Miller, both of which are written by White male authors.

14. The loss of these texts from my classroom is a detriment to the students' social, cognitive, and emotional development. The texts enable honest conversations about race, create meaningful moments students can use in their writing and when engaging with controversy, and establish a classroom environment where students can be themselves and feel comfortable as themselves.

15. The benefit of teaching texts from diverse authorships that deal with issues of race, oppression, racism, and privilege is especially significant to my students of color. Through those texts, students of color have their voices heard in a predominantly White classroom. They are given the space and the language in which to express themselves and their experiences and to contrast their experiences with those of privilege. When we talk through *To Kill A Mockingbird* and *Their Eyes Are Watching God*, my Black students get to tell pieces of their stories by solidly connecting with the author and content within the narrative, which is critical for their development. They know their peers – often for the first time – hear what it is like to be Black in America and feel a piece of the discrimination that my Black students and students of color experience every day. To share that experience with others is empowering for my students.

16. Before H.B. 1775 and its implementation by Edmond Public Schools, I was planning to teach *To Kill a Mockingbird* through lenses that push students to engage in critical inquiry, including the lens of systemic racism by pointing every instance of institutional influence and action. For example, I would point out the institutional influence of the 1930's US Criminal Justice System, Jim Crow Laws, and the KKK, so that, by the end of the novel, my students understand the systemic significance of the result. I am now at a loss on whether I can teach such a text, much less how I can do that without using the term "white privilege."

17. In implementing H.B. 1775, Edmond Public Schools is requiring a whitewashed version of English literature. This is detrimental to all my students but especially students of color who will not see themselves or their perspective reflected in the curricula. Moreover, it is an inaccurate, incomplete, and dishonest presentation of the scope of English Literature.

18. This whitewashing to comply with H.B. 1775 is in stark contrast to the district's previous approach to course curricula. Before H.B. 1775, Edmond Public Schools was implementing anti-racist teaching with Professional Development and was developing a diverse curriculum to support and honor students of all identities. As a result, I saw increased class participation from all students and a drastic increase

from my Black students. We had more meaningful class discussions tied to current events and personal experiences. Though we were addressing more challenging and emotionally fraught subjects, the classroom environment improved as students began to have greater trust in each other.

19. In 2020, Edmond Public Schools offered diversity, equity, and inclusion training as part of our professional development. In 2021, we received no such training. In its place, we were handed a page entitled "Guidance for HB 1775," which broke down each prohibition of HB 1775 and provided guidance on its meaning. For the prohibition reading, "members of one race and sex cannot and should not attempt to treat others without respect to race or sex," the guidance column read, "Unfortunately, no one truly knows what this means or can come to an agreement on its meaning." H.B. 1775's broad language instills fear in the administrators charged with its implementation and results in sweeping, absurd, and harmful enforcement in the classroom.

20. I anticipate student and parent complaints that my teaching does not comply with HB 1775 regardless of whether I follow district guidelines. Addressing these misguided and unnecessary types of student complaints with my principal takes up contracted instructional time. Should I have a principal validate these complaints, I could face formal admonishment leading to the removal of my current teaching position and a reassignment for an alternate certified teaching position within the district.

21. H.B. 1775 and its implementation prohibit teachers from adequately performing core functions of our profession in a way that is far more intrusive into the content of my classroom than any other education policy with which I am familiar. As English teachers, we are entrusted to present students with a representative sample of English literature for their analysis, to instruct students in crafting and criticizing argumentation, and to expose students to new perspectives, issues, and ideas. Under H.B. 1775, I am required to only present the White male perspective. This is a dishonest and incomplete view of literature, argumentation, and the American experience. It is antithetical to my responsibility as a teacher.

22. I teach current controversies and address issues of race, gender, oppression, and power to empower my students to become socially conscious people who understand the role of bias and prejudice. I teach a variety of perspectives because exposure to different perspectives challenges and dissolves bigotry. I pour my life into the lives of my students to arm them with critical thinking skills, compassion, and empathy.

23. H.B. 1775 is a direct affront to my task of creating an inclusive, inquisitive classroom environment and from nurturing open-mindedness, free and critical

inquiry. It prohibits me from guiding the next generation of responsible citizens capable of collectively forming robust public opinion.

24. H.B. 1775 and its implementation limit students' ability to succeed. College entrance exams like the ACT, SAT, and PSAT, include issues of race, gender, power, oppression, diversity, and white privilege. Denying students access to these issues in high school is setting them up for failure and threatening their ability to access a college education. Issues of identity and oppression impact our society and culture. Denying students access to these issues and language with which to discuss them will render them unable to fully communicate through life. The whitewashed English education mandated by Edmond Public School's implementation of H.B. 1775 breeds ignorance and misinformation by only allowing the presentation of narrow half-truths.

25. H.B. 1775 places students of color in danger. The law allows students to act on fear and denies them the opportunity to practice empathy with people of different backgrounds and perspectives. The fear engendered by the law and its denial of empathy create a hostile learning environment for my students of color. They are denied a supportive curriculum in which they are represented and placed in a learning environment which centers the white perspective and upholds bigotry, bias, and racism.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oklahoma this 22 day of October 2021.

Regan Killackey (Oct 22, 2021 12:21 CDT)
_______________________________
Regan Killackey

# Exhibit 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al.,<br><br>*Plaintiffs*,<br>v.<br><br>[l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,<br><br>*Defendants.* | ) | Case No. 5:21-cv-01022-G<br><br>Hon. Charles B. Goodwin |

**Declaration of Marvin Lynn, Ph.D.**

I, Marvin Lynn, pursuant to 28 U.S.C. § 1746, declare the following:

1. I am a Professor and former Dean of the College of Education at Portland State University in Oregon. I have worked in the field of education for nearly three decades and have conducted extensive research in education. Prior to working in higher education, I worked as an elementary school teacher in New York City and Chicago. For the last two decades, I have worked as a professor and full-time academic dean or associate dean in Colleges or Schools of Education in Indiana, Illinois, Wisconsin, Maryland, and Oregon. I have taught mainly graduate courses in multicultural education, urban education, elementary education, critical race theory, and African American education. I have attached a copy of my curriculum vitae that lays out my education, experience, and expertise.

2. I was asked to give my expert opinion and impressions regarding the benefits of certain teachings reflecting race, culture, and gender, as well as diversity and harassment training, and potential implications of Oklahoma's House Bill 1775 on teaching, student learning and environment. In forming my opinions in this case, I rely on my experience and expertise, the research cited in this report, and the following documents reviewed: the complaint, client declarations, Oklahoma Academic Standards, House Bill 1775 and State Board implementing regulations.

3. My research has documented how teachers of color, particularly African American men, draw on their students' culture to effectively teach in poor and working-class

urban public schools (Lynn, 1999, 2001, 2002, 2006a, 2006b), (Lynn & Jennings, 2009), and (Lynn, Johnson & Hassan, 1999). My scholarship has been situated squarely within the rich body of research that examines how teachers draw on students' cultural resources to promote academic success for students of color. Additional research (Ladson-Billings, 1995) and my own teaching experiences demonstrate how all students benefit from teaching practices that view students' culture and language as assets.

4. These approaches to teaching are referred to as "Resource Pedagogies" (Paris & Ball, 2009), (Paris, 2012), and (Reyes & Norman, 2021). Resource pedagogies, view students' culture and language as assets and not deficits (Reyes and Norman, 2021). Moreover, resource pedagogies "repositioned the linguistic, cultural, and literate practices of poor communities—particularly poor communities of color—as resources" (Paris, 2012).

5. Culturally responsive teaching, culturally relevant teaching, and culturally sustaining pedagogy are defined as Resource Pedagogies.

6. Culturally responsive teaching, "is defined as using the cultural characteristics, experiences, and perspectives of ethnically diverse students as conduits for teaching them more effectively" (Gay, 2002). Culturally responsive teachers situate learning within the realm of students' experiences as a way to make learning more personally meaningful. Academic outcomes for students of color, in particular, are increased (Gay, 2002).

7. Culturally relevant teaching focuses on ensuring that students of color achieve academic success, develop a deep appreciation for their own culture and history, learn to be concerned about issues of social inequality, and begin to see themselves as empowered citizens in a democracy with the responsibility to be engaged in community uplift and advancement (Ladson Billings, 1994, 1995a, 1995b).

8. There is an overwhelming amount of research that suggests that culturally responsive and culturally relevant teaching methods have a strong positive impact on student learning (Howard & Rodriguez-Minkoff, 2017) and (Byrd, 2016). In fact, Byrd (2016) conducted a student survey that included the perspectives of over 300 White, African American, Latinx, and Asian American students and found that the vast majority of these students believed culturally relevant instruction was important for their academic success.

9. Culturally sustaining pedagogy is an evolution of both of these areas of focus. It has been argued that too much emphasis is placed on teaching students of color to learn the language of the dominant culture (Paris, 2012). Teachers should have the freedom to do more than draw on student culture as a basis for making the

curriculum more responsive and/or relevant or as a way to teach students. Classrooms should be places where bilingualism and bi-culturalism are encouraged, promoted, and ultimately *sustained* (Paris, 2012).

10. Culturally sustaining pedagogy also seeks to challenge trans/homophobia and sexism in schools by recognizing racially and ethnically diverse students also are diverse in their sexual and gender identities (Paris & Alim, 2017). These identities are also sustained and not erased. As such, culturally sustaining pedagogies demand that both schools and classrooms shift their practices to suit the cultural and linguistic needs of their students.

11. Resource pedagogies demand that teachers shift from a deficit-based mindset about communities of students of color to an asset-based approach that values and honors students' culture and lived experiences. In order to do this, teachers must confront their own internalized racial, ethnic, gender, and social class biases and believe in their own ability to positively impact the achievement of all students (Lynn, et al., 2010).

12. There is a strong relationship between teacher quality and student achievement (Darling-Hammond, 2000), (Lynn, et al., 2010), and (Peske & Haycock, 2006). In fact, for students of color, who may not have access to a wealth of academic resources at home, good teachers are critically important for their academic success (Haycock, 2006).

13. Good teachers value their students' home cultures and lived experiences, possess a high degree of cultural competence, understand how to draw on resource pedagogies as a tool to advance academic achievement for all students, and have a high degree of self-efficacy (Lynn, et al., 2010). In fact, teachers' self-efficacy beliefs are a critical factor in shaping their ability to effectively teach African American, Latinx, and Indigenous students – especially those who may be experiencing poverty (Noguera, 2007). In other words, teachers must believe in their students' potential for success, if they are going to help their students to become academically successful. Successful teachers of students of color must overcome their own biases in order to effectively teach these students.

14. Resource pedagogies demand that teachers confront and transform their biases and embrace the culture and lived experiences of all students (Paris, 2012). This is an important precursor to academic success for populations that have historically experienced persistent school failure.

15. Given what we know about the important links between student success and teacher quality as determined by teachers' cultural competence, their ability to draw on student assets, and their self-efficacy beliefs – efforts to narrow the teacher education curriculum and limit teachers' opportunities to honestly address

issues of race and culture in the classroom will likely stifle teachers' creativity and severely limit their ability to teach diverse students effectively.

16. Since there is a strong link between culturally sustaining teaching practices and the academic success of students of color, efforts to curtail teachers' ability to use these practices will likely negatively impact the overall success of students of color.

17. This will also negatively impact our ability to diversify the teaching workforce. Students of color who express an interest in teaching do so because of their commitment to uplifting and advancing their own communities (Lynn, 2006). My own research has shown that teachers of color are motivated to teach because they see culturally sustaining teaching practices as one key way to support their students and thereby uplift their communities. If they are not able to use these approaches in the classroom, they are far less likely to see teaching as a viable professional opportunity worth pursuing.

18. Other research I've conducted has also shown that teacher education students generally have high expectations about developing the necessary skills to effectively teach students of color (Lynn & Smith-Maddox, 2007). They expect to learn to become social justice educators equipped with tools to advance high achievement for all students. If teacher education programs cannot offer the curriculum that would support teachers to become social justice educators, teacher education programs will face severe declines in enrollment. Ultimately, the teaching profession will face even greater shortages than those we are seeing now.

19. There is already strong evidence to suggest that "laws banning critical race theory are putting a chill on" teachers' ability to plan their lessons effectively (NPR, May 28, 2021). Critical race theory has been misconstrued broadly by conservative pundits who have purposefully attached the term to a whole range of ideas including culturally relevant teaching, culturally responsive teaching, patriarchy and other ideas and practices that have been commonplace in schools for decades (Wallace-Wells, 2021).

20. The aforementioned NPR article quotes an Oklahoma City teacher and school board chair who argue that the passage of state law banning discussions of race in schools has stifled instruction and made it difficult for teachers to determine how to approach challenging topics such as race – which are ever-present in our society. The article goes on to talk about how the law has created a climate of fear among teachers across the state and in other states where such laws have been passed. Kim (2021) refers to such laws as "an assault" on pedagogy and teachers' autonomy as education professionals.

21. The sworn declarations filed in this case also provide evidence that H.B. 1775 is chilling and censoring important teaching in classrooms. This "assault" on teaching, as referred to by Kim (2021), related to diversity, equity, and inclusion ("DEI") has been harmful to African American students according to NAACP-Oklahoma. Parents comment that the lack of access to DEI courses and curriculum across the educational pipeline has directly harmed their students. One parent included in the NAACP's declaration has noted how this has already led to the exclusion of books from the curriculum that have been written by African American authors. One of the students included (Student A.A.) expressed serious concerns about a lack of representation of authors of color in the curriculum. This student, who is White, expressed concerns about having a limited worldview based on the way the law has narrowed the curriculum.

22. Additional evidence provided in the declaration prepared by AIM leaders details a shocking history of racialized and cultural harassment of Native students in Oklahoma schools. Research supports their position that both Native and Non-Native students will benefit from information about the history of Native Americans and other communities of color in the state and in the nation – even if that history is difficult.

23. Similarly, the Killackey declaration offers a teacher's perspective on how H.B. 1775 is negatively impacting teaching and learning. My review of the banned concepts reinforces his view that the law essentially forces teachers to "whitewash" the curriculum and forces them to offer a very limited and narrow curriculum. He addresses the potential harm that could befall him and other teachers who attempt to offer a more honest and inclusive curriculum. Teachers should never fear losing their jobs because of their commitment to providing all students with a broad, diverse, and inclusive curriculum.

24. Crawford's declaration speaks to the confusion that many teachers are facing because of the vagueness of HB 1775. I agree that while the law seems to state that it will not prohibit teachers from implementing the state curriculum standards, the law, in many ways, stands in direct contradiction to the values espoused in the standards. Both Crawford and Killackey are teachers who use culturally relevant approaches to teaching. They should be rewarded for their commitment to student learning and to helping students to reach the standards, not threatened.

25. Finally, the student, S.L. rightly expresses concerns about being denied the opportunity to experience a culturally relevant classroom. It is clear that S.L. does not believe H.B. 1775 is in the best interest of her and her fellow students in their district. S.L.'s response is reasonable. Based on my experience as an educator and researcher, students of color like S.L. can benefit greatly from Resource Pedagogies as can other students. These benefits are at-risk under H.B. 1775.

26. As the vast majority of research has shown, learning experiences including courses, professional development, and training that focus on race, culture, gender, and human sexuality are positive or do not show harm to students or their teachers within K-12 schools or on college campuses (Denson & Bowman, 2017).

27. In addition, the legal constriction of opportunities for students and their teachers to learn about these important concepts has had a chilling effect on the profession of teaching across the educational pipeline. Teachers feel less certain about whether their efforts to teach an honest curriculum will cause harm or lead to significant student and parent complaints. As the declaration from the Oklahoma NAACP makes clear, there is a high level of fear and uncertainty in the environment.

28. As an administrator, I am also very concerned about the complaint process, as outlined. It places an undue burden on school administrators to sort through large volumes of paperwork that will unnecessarily distract educators and administrators from doing their most important work – teaching and managing schools.

29. H.B. 1775 does not appear to have any sound pedagogical basis and it negatively impacts educators' ability to make independent decisions about what they will teach and how they will teach it. As noted in the declaration written by Crawford, the language is vague, unclear, and easily misunderstood. Additionally, as stated earlier, it directly contradicts the state standards. And as pointed out by both high school English teachers – Killackey and Crawford – the restrictions may undermine the State's efforts to ensure Oklahoma's students have the skill sets needed to be prepared for college.

30. This limits their autonomy and agency as educators who should be able to use their intellectual resources to construct relevant curriculum and teaching materials in their classrooms. In my view, this results in what Allan Bloom (1987) referred to as "the closing of the American mind" which is ultimately undemocratic. It is tantamount to the elimination of academic freedom and brings about a serious restriction of free speech and the free exchange of ideas and information that is critical to learning and building a true democracy.

31. According to the sworn declarations, this is happening now in schools across Oklahoma and it is harming students' social, cognitive and emotional development. Based on my experience and expertise as an educator, researcher, and higher education faculty member and administrator, there is an imminent need to stop this harm now as the detrimental effects can be expected to compound overtime.

32. In my opinion, this will also lead to teacher shortages – across the board – which will ultimately result in a serious decline in student attainment and achievement across the pre-school through graduate school educational pipeline.

33. Some of the research on sexual harassment on college campuses has examined the relationship between sexual harassment training and workers' attitudes about issues of sexual harassment (Antecol and Cobb-Clark, 2003). According to Sandler (2007), such training does lead individuals to be more reflective about the types of workplace behaviors that can be construed as discriminatory or harassing. Based on Antecol and Cobb-Clark's research, one could reasonably infer that increased understanding about what constitutes sexual harassment and discrimination would lead students on college campuses to reflect more deeply about their behavior and how it contributes to the overall creation of environments that are safe for women and girls. The only way to ensure that this occurs is to require it of students and university personnel. This is also supported by my own experience as a university administrator where I have observed an overall reduction in the number of complaints from faculty, staff, and students about discrimination and harassment along the lines of race, gender, and sexuality once faculty and staff became more actively engaged in professional development designed to increase their knowledge about various forms of discrimination that exist and how to avoid it. While I observed that there were always individuals who were not comfortable participating in training on gender discrimination, they were less likely to engage in discriminatory behavior and practices. As a result, employee complaints regarding other employees ceased to exist.

34. There is some research which suggests that "diversity courses" on college campuses do lead students to have more positive attitudes about LGBT+ issues (Case & Stewart, 2010). Choi-Pearson, Castillo & Maples (2004) found that as "diversity training" increased for student services professionals on a college campus, their levels of prejudice in the areas of race, gender, and sexuality decreased.

35. Denson & Bowman (2017) examined the impact that diversity courses offered on college campuses had on overall student outcomes. While the impact of these courses on students varies based on a variety of factors – including instructor background, knowledge, teaching skill, as well as their disposition and attitude – the data and studies showed these courses, by and large, do not cause harm to students. The evidence does not support a claim to the contrary.

36. Research in this area also examines how certain programs, such as the Meyerhoff Scholars program at the University of Maryland-Baltimore County impact the STEM participation as well as the retention, persistence and graduation rates of students of color at those institutions (Maton, et al., 2012). There is broad consensus that campus-based DEI efforts – including courses, training and specialized programs for students of color that provide additional socio-emotional, financial, and academic support to students of color – have a strong positive impact on those students' success rates. Not only do these courses, programs, and

training activities fail to cause harm, they greatly benefit students of color who may lack other forms of support.

37. The BERT declaration offers a student group's personal account of what they have experienced at the University of Oklahoma in the wake of the passing of H.B. 1775. The multitude of racist incidents occurring on the University of Oklahoma campus – both in the classroom and in the public space – is startling and disconcerting. The declarant's observation that there are increasing concerns about safety for both racially marginalized students and women, is also of great concern. Based on the research and my experience as a Dean and faculty member, the University could have taken appropriate steps to bring greater awareness and safety to the students through the required DEI course and the mandatory sexual assault training. However, H.B. 1775 forced the University to abandon both as mandatory requirements. This will likely make the campuses less safe, welcoming, and engaging for all students but especially marginalized students.

38. I have not testified as an expert witness at trial or by deposition during the previous four years.

I am producing this declaration on a pro bono basis.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oregon this 28th day of October 2021.

Marvin Lynn

**Reference List for Marvin Lynn's Sworn Declaration**

Antecol, H., & Cobb-Clark, D. (2003). Does sexual harassment training change attitudes? A view from the federal level. *Social Science Quarterly*, *84*(4), 826-842.

Bloom, A. (1987). *Closing of the American mind*. Simon and Schuster.

Byrd, Christy M. "Does culturally relevant teaching work? An examination from student perspectives." *Sage Open* 6.3 (2016): 2158244016660744.

Case, K. A., & Stewart, B. (2010). Changes in diversity course student prejudice and attitudes toward heterosexual privilege and gay marriage. *Teaching of Psychology*, *37*(3), 172-177.

Choi-Pearson, C., Castillo, L., & Maples, M. F. (2004). Reduction of racial prejudice in student affairs professionals. *Journal of Student Affairs Research and Practice*, *42*(1), 132-146.

Darling-Hammond, L. (2000). Teacher quality and student achievement. *Education policy Analysis Archives*, *8*,1.

Denson, N., & Bowman, N. A. (2017). Do diversity courses make a difference? A critical examination of college diversity coursework and student outcomes. In *Higher education: Handbook of theory and research* (pp. 35-84). Springer, Cham.

Gay, G. (2002). Preparing for culturally responsive teaching. *Journal of Teacher Education*, *53*(2), 106-116.

Haycock, K. (2006). Improving achievement and closing gaps between groups. *Washington DC: The Education Trust*.

Howard, T. C., & Rodriguez-Minkoff, A. C. (2017). Culturally relevant pedagogy 20 years later: progress or pontificating? What have we learned, and where do we go? *Teachers College Record*, 119, 010308, 0161-4681.

Kim, R. (2021). 'Anti-critical race theory' laws and the assault on pedagogy. Phi Delta Kappan, *103*(1), 64-65.

Ladson-Billings, G. (1994). *The Dreamkeepers: successful teachers of African American children*. John Wiley & Sons.

Ladson-Billings, G. (1995a). But that's just good teaching! The case for culturally relevant pedagogy. *Theory into practice*, *34*(3), 159-165.

Ladson-Billings, G. (1995b). Toward a theory of culturally relevant pedagogy. *American Educational Research Journal*, *32*(3), 465-491.

Lynn, M. (2001). *Portraits in Black: Storying the lives and the pedagogies of Black men educators*. University of California, Los Angeles.

Lynn, M. (2006a). Dancing between two worlds: A portrait of the life of a black male teacher in South Central LA. *International Journal of Qualitative Studies in Education*, *19*(2), 221-242.

Lynn, M. (2006b). Education for the community: Exploring the culturally relevant practices of Black male teachers. *Teachers College Record*, *108*(12), 2497-2522.

Lynn, M., Bacon, J., Totten, T., Bridges III, T., & Jennings, M. (2010). Examining teachers' beliefs about African American male students in a low-performing high school in an African American school district. *Teachers College Record*, 112(1), 289-330.

Lynn, M., Johnson, C., & Hassan, K. (1999). Raising the critical consciousness of African American students in Baldwin Hills: A portrait of an exemplary African American male teacher. *Journal of Negro Education*, 42-53.

Lynn, M., & Jennings, M. E. (2009). Power, politics, and critical race pedagogy: A critical race analysis of Black male teachers' pedagogy. *Race, Ethnicity, and Education*, *12*(2), 173-196.

Lynn, M., & Smith-Maddox, R. (2007). Preservice teacher inquiry: Creating a space to dialogue about becoming a social justice educator. *Teaching and Teacher Education*, *23*(1), 94-105.

Maton, K. I., Pollard, S. A., McDougall Weise, T. V., & Hrabowski, F. A. (2012). Meyerhoff Scholars Program: A strengths-based, institution-wide approach to increasing diversity in science, technology, engineering, and mathematics. *Mount Sinai Journal of Medicine: A Journal of Translational and Personalized Medicine*, *79*(5), 610-623.

Noguera, P. (2007). Extended view: race, student achievement and the power and limitations of teaching. *Sage Race Relations Abstracts*, 32, 44-47

NPR. (May 28, 2021). Teachers say laws banning critical race theory are putting a chill on their lessons. Accessed at: https://www.npr.org/2021/05/28/1000537206/teachers-laws-banning-critical-race-theory-are-leading-to-self-censorship.

Paris, D. (2012). Culturally sustaining pedagogy. A needed change in stance, terminology, and practice. *Educational Researcher*, 41(3), 93-97.

Paris, D., Ball, A. (2009). Teacher knowledge in culturally and linguistically complex classrooms:
Lessons from the golden age and beyond. In Morrow, L. M., Rueda, R., Lapp, D. (Eds.), Handbook of research on literacy instruction: Issues of diversity, policy, and equity (pp. 379–395). New York, NY: Guilford.

Peske, H. G., & Haycock, K. (2006). Teaching Inequality: How Poor and Minority Students Are Shortchanged on Teacher Quality: A Report and Recommendations by the Education Trust. *Education Trust*.

Reyes, A., & Norman, T. Resource pedagogies and the evolution of culturally relevant, responsive, and sustaining education. *Oxford Research Encyclopedia of Education.* Retrieved 29 Oct. 2021, from https://oxfordre.com/education/view/10.1093/acrefore/9780190264093.001.0001/acrefore-9780190264093-e-1698.

Sandler, B. R. (2007). Title IX: How we got it and what a difference it made. *Cleveland State Law Review*, *55*, 473.

Wallace-Wells, B. (2021). How a conservative activist invented the conflict over critical race theory. *The New Yorker*.

# MARVIN LYNN

Professor, College of Education – On sabbatical
Portland State University
mlynn@pdx.edu

Phone: (312) 607-7027 14211 SW Tewkesbury Drive
Email: marvin.lynn@gmail.com Tigard, Oregon 97224

## EDUCATION

**PhD** UCLA, Social Sciences & Education — June 2001
Dissertation: "**Portraits in Black**: Storying the Lives and Pedagogies of Black Men Educators"
Committee: Dr. Daniel Solórzano (chair), Devon Carbado (J.D.), Dr. Don Nakanishi

**MS** Teachers College-Columbia University, Curriculum & Teaching — May 1996
Thesis: "**Choosing your battles**: Progressive young teachers of color and their experiences in urban schools"
Advisors: Dr. Joseph Grannis, Dr. Paula Hajar

**BS** DePaul University, Elementary Education — June 1993
Minored in Music

## HONORS AND AWARDS

**Special Award: In Recognition Contribution to the Advancement of Critical Race Theory in Education Globally and in South Africa** — 2013
Awarded to scholars who contribute to developing "sustainable learning environments" by Project Director Prof. Mahlomaholo of *University of the Free State – Blomfontein, South Africa*

**AACTE Certificate of Distinguished Service** — 2012
Award given to volunteers who have provided outstanding service and leadership to the *American Association of Colleges for Teacher Education*.

**Derrick Bell Legacy Award for Influential Scholarship and Enduring Commitment to Social Justice** — 2012
Award given to scholars whose work has had a major impact on the field of Critical Race Studies in Education.

**AERA Award for Interdisciplinary Analysis** — 2011
Award given by the Critical Examination of Race, Ethnicity, Class and Gender in Education Special Interest Group at the *American Educational Research Association* to scholars whose research draws on multiple academic disciplines to address critical issues in the field of education.

**New England Board of Higher Education Dissertation Fellowship** 2000

**Grants** *Internal Grants*

*Research Fellowship Award*. Maryland Institute for Minority Achievement & Urban Education, University of Maryland, College Park. ($5,000). 2003

*General Research Board Summer Research Award*. Office of Graduate Studies. Research, University of Maryland, College Park. 2004. ($8,700) 2004

*Domestic Intercultural Immersion Experiences Program Award*. Office of Undergraduate Studies, University of Wisconsin-Eau Claire. ($4900). 2012

*Implementing the Teacher Performance Assessment in UWS Educator Preparation Program.* Office of the Senior Vice President for Academic and Student Affairs, University of Wisconsin System. ($58,142). 2012

*External Grants*

*A Qualitative Investigation and Reporting of Reform in the Baltimore City Public School System*. ($60,624). 2006

*The Hooked-on-Books Reading Program*. The Chicago Community Trust. ($16,000). 2008

*IU South Bend Summer Math Camp.* The Wells Fargo Foundation. ($10,000) 2014

*IU South Bend Summer Literacy and Math Camp.*100 Black Men of Greater South Bend. ($14,800). 2016

*The Transformation of Teacher Preparation at Portland State University*. The Dell Foundation. US Prep. ($300,000). 2020

*The Diverse Teacher Pathways Consortium*. The Meyer Memorial Trust. ($35,000). 2020

*Contracts*

*A Qualitative Investigation of the Stupski Foundation's Effort to Improve Student Achievement in the Baltimore City Public School System*. ($45,000). 2005

## PROFESSIONAL EXPERIENCE

Portland State University, Oregon — July, 2021 to Present
Professor, College of Education – On sabbatical

**Portland State University**, Oregon — June, 2017 to June, 2021
**Dean & Professor – The College of Education**

- Managed all aspects of the college including budget, faculty review, vision setting, external partnerships, public relations & fundraising
  - Developed a comprehensive 3-year strategic plan in 2019
    - Established a process for measuring the success of objectives outlined
  - Increased faculty diversity to 35% exceeding goals established
  - Increased the diversity of dean's office staff by 40%
  - Significantly increased funding for equity-focused research
  - Online Masters programs grew significantly and increased in ranking
  - Hired the inaugural Coordinator for Equity, Diversity & Inclusion
  - Hired a Director of Research who provided direct support for junior faculty to prepare for external funding opportunities
  - Enhanced partnerships with area school districts
    - Joined Carnegie Foundation's "ILEAD" partnership in connection with Portland Public Schools
    - Joined Wallace Foundation's Educational Leadership initiative in partnership with Portland Public Schools
    - Maintained an advisory board which included all area superintendents and key educational organizations to increase partnership pathways

- Fundraising
  - Raised $8M+ to support capital construction, student scholarships, and strategic planning
  - Received $300K+ in external grants
  - Received $80K from the Oregon Higher Education Coordinating Commission to support the hiring of diversity professional who would support diverse students
  - Received

- *Internal Service*
  - Chair or Co-Chair
    - University Partnership Council (2019-2021)
      - Helped to lead the university's engagement agenda regularly convening faculty and staff across the university to discuss community partnerships.
      - Participated in APLU meetings and represented the university at national meetings on civic and community engagement
    - Leadership & Infrastructure Taskforce for the Office of Global Diversity & Inclusion (2020-Present)
      - Worked with leaders from across campus to develop a set of strong recommendations for ensuring that university infrastructure would support the implementation of an equity plan.
    - Social Work Dean Search Committee (2019)
      - Successfully recruited a new dean to lead the School of Social Work
  - Committee Memberships

    - Provost Search Committee (2019)
    - Associate Vice President for Marketing & Communications Search Committee (2021)
    - Capital Advisory Committee (2017-Present)
    - Space Allocation Committee (2017-2021)
    - Postsecondary Transition Action Committee (2020-2021)
    - Portland Teachers Program Executive Committee, 2017-2021

- *External Service*:
  - President of the Oregon Association of Colleges for Teacher Education, 2020-2021
    - Developed the Oregon Educator Preparation Consortium to bring faculty together with state leaders to discuss
  - Director, Oregon Educator Advancement Council (2018-Present)
  - Board of Directors, American Association of Colleges for Teacher Education (2020-Present)
    - Elected as Secretary to the Board, term beginning 2022
  - Executive Committee Member, Council of Academic Deans from Research Education Institutions (Elected 2021)
    - Term ended June 30, 2021
  - Board of Directors, Carnegie Project for the Education Doctorate (2019 – Present)
  - Education Recovery Committee, Governor's Racial Justice Council (2020-Present)
  - AERA Division K Early Career Award Selection Committee (2021)
  - Oregon Community Ministry Board, Providence Health & Services
    - Co-Chair of the Equity Sub-committee
  - Member, Oregon Educator Advisory Group (2017-Present)

**Indiana University – South Bend**, Indiana 2013 to 2017
**Dean & Professor – The School of Education**

- Managed all aspects of the School of Education
  - Stabilized enrollment
  - Crystallized partnerships with community agencies including 100 Black Men, the Boys & Girls Club
  - Partnered with the University of Notre Dame
  - Served on a statewide committee to determine whether the IU Bloomington and IU Indianapolis School of Education should separate
  - Led a consortium of IU Deans to determine best approaches to collaborating across schools and college
  - Began a successful initiative to recruit Black males into the teaching profession
  - Began a student union that gave students opportunities to work directly with the dean's office to resolve concerns and issues

**University of Wisconsin – Eau Claire** 2011 to 2013

**Associate Dean & Associate Professor – The College of Education & Human Sciences**

- Managed assessment and accreditation for all licensure programs

**University of Illinois at Chicago** 2007 to 2011
**Associate Professor, College of Education**

- Managed the graduate and undergraduate elementary education programs
- Taught courses in Black Education, Social Studies Education and Multicultural Education

**University of Maryland, College Park** 2001 to 2007
**Assistant Professor, The College of Education**

- Developed, and coordinated the Minority & Urban Education graduate program
- Taught courses in Urban Education, Elementary Education, Multicultural Education, and the Politics of Education.
- Awarded tenure in 2007.

## PUBLICATIONS

### *Books*

Lynn, M. & Dixson, A.D., (2013) *Handbook of Critical Race Theory in Education*, New York: Routledge, In Press.

Lynn, M. & Dixson, A.D., (In Press.) Handbook of Critical Race Theory in Education (*Second Edition*). New York: Routledge Press.

### *Journals Edited*

Lynn, M., Yosso, T. J. Solorzano, D. G., & Parker, L. (Eds.). (2002). Critical race theory and education: Qualitative research in the new millennium [Special Issue]. Qualitative Inquiry, 8(1).

Lynn, M. (Ed.). (2002). Critical race theory and education: recent developments in the field [Special Issue]. Equity & Excellence in Education, 35(2).

Stovall, D. O., Lynn, M., Martin, D. B., & Danley, L. (2009). Critical race praxis in education. Race, Ethnicity & Education, 2(12).

Berry, T. R., Jay, M., & Lynn, M. (Eds.). (2010). Theorizing race, class, gender & sexuality in critical race studies in education research. The Journal of Educational Foundations, 24(1-2).

***Chapters in Books***

Lynn, M. (2005). Reflecting Black: maintaining a politics of opposition in graduate school. In Brown, M. C. & Land, R. R. (Eds.). *The Politics of Curricular Change: Race, Hegemony & Power in Education*. NY: Peter Lang Publishing Group.

Lynn, M. (2005). Critical race theory, Afrocentricity, and their relationship to critical pedagogy. In Leonardo, Z. (Ed.). *Critical Pedagogy and Race Theories*. NY: Blackwell Publishers, pp. 127-140. Adapted from Lynn, M. (2004). Inserting the race into critical pedagogy: an analysis of race-based epistemologies. The Journal of Educational Philosophy and Theory, 37(2), 153-165.

Lynn, M., Williams, A., Benigno, G., Park, G. & Mitchell, C. (2006). Race, class and gender in urban education: Exploring the critical research on urban pedagogy and school reform. In *Urban Education: An Encyclopedia*. Kincheloe, J., Anderson, P., Rose, K., Griffith, D. & Hayes, K. New York: Greenwood Press, pp. 89-101.

Lynn, M. (2006). Toward a critical race pedagogy: a research note. In Ross, E.W. & Pang, V. O. (Eds.). *Race, Ethnicity & Education: Racism and Anti-racist Education. Vol. IV*. Westport, CT: Praeger, pp. 191-206. Adapted from Lynn, M. (1999). Toward a critical race pedagogy: A research note. Urban Education, 33(5), 606-627.

Lynn, M. & Bridges, T. (2009). Critical race studies in education and the “endarkened” wisdom of Carter G. Woodson. In Tillman, L. (Ed.) *Handbook of African American Education*. Thousand Oaks, California: Sage Publishers, pp. 339-350.

Lynn, M. (2010). Foreword in Hughes, S. and Berry, T. (Eds). *The New Politics of Race in Education: Living, Learning, and Teachi*ng. Education and Policy Series, Cresskill, NJ: Hampton Press.

Lynn, M. (2011). “Exorcizing Critical Pedagogy” Again: Reflections on Being an Angry Black Man in the Academy. In Jackson, S. & Johnson III, R. G. *The Black Professoriate: Negotiating a Habitable Space in the Academy*. New York: Peter Lang.

Lynn, M. (2014). The contextual factor of race in equity, access and achievement. In Sealey-Ruiz, Y., Lewis, C., & Toldson, I. (Eds). *Teacher Education and Black Communities: Implications for Access, Equity and Achievement*. Charlotte, NC: Information Age Publishing.

Lynn, M. (2015). Foreword in Aviles de Bradley, Ann. *From Charity to Equity—Race, Homelessness, and Urban Schools*. NY: Teachers College Press.

Lynn, M. (2019). Foreword in DeCuir-Gunby, J., Schutz, P. A., & Chapman, T. K. *Understanding Critical Race Research Methods and Methodologies: Lesson from the Field*. New York: Routledge.

Lynn, M. (2019). Foreword in Davis, J. & Jett, C.C. (Eds) *Critical Race Theory in Mathematics Education*. New York: Routledge.

Lynn, M. (2021). In Honor of Selma White. In Ellis, A. L., Bryan, N., Sealey-Ruiz, Y., Toldson, I. & Emdin, C. (Eds). *The Impact of Classroom Practices: Teacher Educators' Reflections on Culturally Relevant Teachers*. Charlotte: Information Age Publishing, INC.

Lynn, M. (In Press). Invited Commentary in Patton Davis, L., Rivers, I.D., Farmer-Hinton, R., Lewis, J.D. (Eds) *Re-Authoring Savage Inequalities: Narratives of Striving and Success in Urban Educational Environments*. New York: SUNY Press.

***Journal Publications***

Lynn, M. (1999). Toward a critical race pedagogy: a research note. *Urban Education*, 33 (5), 606-627. *Reprinted* in Ross, E.W. & Pang, V. O. (Eds.). (2007). *Race, Ethnicity & Education: Racism and Anti-racist Education.* Vol. IV. Westport, CT: Praeger, pp. 191-206.

Lynn, M., Hassan, K., & Johnson, C. (1999). Raising the critical consciousness of African American students in Baldwin Hills: a portrait of an exemplary African American male teacher. *Journal of Negro Education*, 68 (1), 42-53.

Lynn, M. (2002). Critical race theory and the perspectives of Black men teachers in the Los Angeles Public Schools. *Equity & Excellence in Education*, 35(2), 87- 92.

Lynn, M. & Adams, M. (2002). Critical race theory and education: recent developments in the field. *Equity & Excellence in Education*, 35 (2), 119-130.

Lynn, M., Yosso, T., Solorzano, D.G., & Parker, L. (2002). Guest editor's introduction: Critical race theory and education: Qualitative research in the new millennium. *Qualitative Inquiry*, 8(1), 3-6.

Parker, L. & Lynn, M. (2002). What's race got to do with it? Critical race theory's conflicts with and connections to qualitative research methodology and epistemology. *Qualitative Inquiry*, 8 (1), 7-22.
***Consistently one of the most downloaded articles in the journal.**

Lynn, M. (2004). Inserting the race into critical pedagogy: An analysis of race- based epistemologies. *The Journal of Educational Philosophy and Theory*, 37(2), 153-165.

*Reprinted* in Leonardo, Z. (Ed.). (2005). *Critical Pedagogy and Race Theories*. NY: Blackwell Publishers, pp. 127-140.

Yosso, T., Parker, L., & Solorzano, D. & Lynn, M. (2004). From Jim Crow to affirmative action and back again: A critical race discussion of racialized rationales and access to higher education. *Review of Research in Education*, 28, 1-25.

Jennings, M. & Lynn, M. (2005). The house that race built: critical pedagogy, African-American education, and the re-conceptualization of a critical race pedagogy. *The Journal of Educational Foundations*, 19 (3-4), 15-32

Morfin, O. J., Perez, V. H., Parker, L., Lynn, M. & Arrona, J. (2006). Hiding the politically obvious: A critical race theory preview of diversity as racial neutrality in Higher Education. *Educational Policy*, 20(1), 249-270.

Lynn, M. (2006). Race, culture and the education of African Americans. *Educational Theory*, 56(1), 107-119.

Lynn, M. (2006). Dancing between two worlds: A portrait of the life of a black male teacher in South Central L.A. *International Journal of Qualitative Studies in Education*, 19(2), 221-242.

Lynn, M., Benigno, G., Williams, A., Park, G., Mitchell, C. (2006). Critical theories of race, class and gender in urban education. *Encounter: Education for Meaning and Social Justice*, (2006), 19(2). *Adapted* from Lynn, M., Williams, A., Benigno, G., Park, G. & Mitchell, C. (2006). Race, Class and Gender in Urban Education: Exploring the Critical Research on Urban Pedagogy and School Reform.

Lynn, M. (2006). Education for the community: Exploring the culturally relevant practices of black male teachers. *Teachers College Record,* 108(12), 2497-2522.

Lynn, M. & Parker, L. (2006). Critical race studies in education: examining a decade of research on k-12 schools. *The Urban Review*, 38(4), 257-290.

Lynn, M. & Smith-Maddox, R. (2007). Pre-service teacher inquiry: creating a space to dialogue about becoming a social justice educator. *Teaching and Teacher Education,* 23(1), 94-105.

Lynn, M. & Jennings, M. E. (2009). Power, politics and critical race pedagogy: a critical race analysis of Black male teachers' pedagogy. *Race, Ethnicity & Education.* 12(2), 173-196.

Stovall, D., Lynn, M., Danley, L., & Martin, D. (2009). Critical race praxis in education INTRODUCTION. Race, Ethnicity & Education, 12(2), 131-132

Lynn, M., Bacon, J., Totten, T., Bridges, T., & Jennings, M. (2010). Examining teachers' beliefs about African American male students in a low-performing high school in an African American school district. *Teachers College Record*, 112(1), 289-330. ***One of "The Most Read" articles of 2010 in Teachers College Record.***

Berry, T. R., Jay, M., & Lynn, M. (2010). Introduction: Thoughts and ideas on the intersectionality of identity. *The Journal of Educational Foundations, 24(1-2),3-7.*

Lynn, M., Jennings, M.E., & Hughes, S.A. (2013). Critical race pedagogy 2.0: lessons from Derrick Bell. *Race, Ethnicity & Education. 16(4), 603-628.*

Lynn, M. (2018). Research on Black male teachers, then and now, Journal for Multicultural Education, Vol. 12 No. 2, pp. 90-92. https://doi.org/10.1108/JME-03-2017-0017.

Lynn, Marvin; Riser, Chris; and Yeigh, Maika. (2018). An Intergenerational Conversation Between Dr. Marvin Lynn and Chris Riser: Social Activism and the Black Male Educator. *Northwest Journal of Teacher Education*: Vol. 13 : Iss. 2 , Article 5.

Gist, C., Bianco, M. & Lynn, M. (2019). Examining grow your own programs across the teacher development continuum: mining research on teachers of color and nontraditional educator pipelines. *Journal of Teacher Education*.

***Newspaper/Magazine Articles***

Lynn, M. (2014, March 19). Making culturally relevant pedagogy relevant to aspiring teachers. *Diverse Issues in Higher Education*.

Lynn, M. (2014, April). IU South Bend School of Education Engaging the Community. *South Bend Tribune*: South Bend, IN.

Lynn, M. (2020, December). Reflecting back to move equity and education forward. *Diverse Issues in Higher Education*.

**Reports**

Lynn, M. (2003, Spring). *Prince George's County Achievement Gap Study*. Collaborations: K-16 Partnership Development Center. Maryland Institute for Minority Achievement and Urban Education. University of Maryland, College of Education. Number 1.

Lynn, M. (2004, Spring). *Race, Class and Gender in a Low-Performing School in Prince George's County: The Case of African American Males*. Connections: A Newsletter of the Consortium on Race, Gender, & Ethnicity, Spring, 2004.

Lynn, M. (2005, March). *A Study of Disengaged Youth in Columbia: Report of the Long Reach Youth Task Force*. The Long Reach Community Association, Columbia, MD.

Lynn, M. (2006, March). *Building the Capacity for Transformation: Analyzing the Impact of the Initial Engagement Period between the Stupski Foundation and the Baltimore City Public School System*. The Stupski Foundation, Mill Valley, CA.

Lynn, M. (2006, June). *Examining the Early Stages of the Baltimore City Public School System's Move toward an Aligned Instructional System*. The Stupski Foundation, Mill Valley, CA.

Lynn, M., Art, J., Ashley, M., Colley, K., Ford, L., & Reyes, K. (2010, March). *Strategic Thinking Document.* University of Illinois at Chicago Graduate College Diversity Strategic Thinking and Planning Committee. Chicago, IL.

**Book Reviews**

Lynn, M. (2004). Black in school: Afrocentric reform, urban youth, and the promise of hip-hop culture. [Review of the book *Black in School: Afrocentric, Reform, Urban Youth, and the Promise of Hip-Hop Culture]. Teachers College Record,* 106 (11).

Lynn, M. (2005). In search of wholeness: African American teachers and their culturally specific classroom practices. [Review of the book *In Search of Wholeness: African American Teachers and their Culturally Specific Classroom Practices]. Race, Ethnicity & Education*, 8(3).

**Talks and Papers Presented**

*Invited*

Lynn, M., & Dance, L. (2002, February). Urban schools and student achievement. Paper presented at Perspectives on Minority of Achievement hosted by The Maryland Institute for Minority Achievement and Urban Education, University of Maryland College of Education, College Park, Maryland.

Lynn, M. (2002, April). Re-mapping race and gender: exploring the work and lives of Black men who teach in urban schools. Paper presented at the Annual Meeting of the American Educational Research Association, New Orleans, Louisiana.

Lynn, M. (2003, March). Exploring the major paradigms in urban education. Presented at Columbia Union College in Takoma Park, Maryland

Lynn, M. (2005. April). Examining the scholarship on Black teachers. Presented at the EDCI Graduate Student Association's Pre-Conference Symposium. University of Maryland, College Park.

Lynn, M. (2005, December). Conducting research in the Baltimore City Public Schools: Knowledge capture strategies uncovered. Presented at the Stupski Foundation. Mill Valley, CA.

Lynn, M. (2006, April). Examining the role of race in the recruitment and retention of minority teachers in the United States. Presented at the Annual Meeting of the American Educational Research Association, San Francisco, California.

Lynn, M. (2006, June). Doing critical race pedagogy in K-12 contexts: Challenges and possibilities. Presented at the 8th Annual Mexican American/Raza Studies K- 12 Summer Institute, Tucson, Arizona

Lynn, M. (2006, August). Instructional and behavioral strategies for African American students. Presented at the Annapolis Cluster School Improvement Retreat, Annapolis, Maryland.

Lynn, M. (2006, November). Exploring the Philosophical Foundations of Critical Race Theory. Presented at Manchester Metropolitan University, Didsbury, Manchester, England.

Lynn, M, McCall, H., Polite, V. (2007, April). How to recruit, retain and employ men of color who participate in the Star program. Presented at Mott Community College in Flint, MI.

Lynn, M. & Romero, A. (2007, April). The Mexican American/Raza Studies Institute: Helping teachers become critically compassionate pedagogues. Session Organized for the Annual Meeting of the American Educational Research Association, Chicago, IL.

Lynn, M. (2007, July). The Recruitment and Retention of African American Male Teachers in Urban Schools in the US. Presented at the 9th Annual Mexican American/Raza Studies K-12 Summer Institute, Tucson, Arizona

Lynn, M. & Fleming, J. (2008, April). Division K Affirmative Action Committee Session. Toward a Community-Centered Urban Teacher Education Model: Working Through the Early Stages of the Transformative Process. Session Organized and Chaired at the Annual Meeting of the American Educational Research Association, New York, New York.

Gallegos, B., Grant, C. & Lynn, M. (2008, April). Race, Ethnicity, Class, and Gender Issues in Research for Schools, Communities, and Neighborhoods. Presented at the Annual Meeting of the American Educational Research Association, New York, New York.

Lynn, M. (2008, April). "From Can't to Can't": The Promises and Perils of Doing Teacher Education in the 'Global City'. Presented at the Third Annual Symposium on

Education: Schooling and Empowerment: Education as Political Action, College Park, Maryland.

Lynn, M. (2009, April). Conducting Research on African American Male Teachers: Exploring Issues of Relevancy, Positionality, and Epistemology. Presented at the Annual Meeting of the American Educational Research Association, San Diego, CA.

Lynn, M. (2009, April). The Role of Teacher Education Programs in Increasing the Presence of African American Male Teachers in Urban Schools. Presented at Improving Student Achievement and Teaching Quality Conference. Sponsored by Educational Testing Service. Kentucky State University. Frankfort, KY.

Lynn, M. (2009, April). Critical Race Theory and Educational Research Day Professional Development Course. Served as an Instructor at the Annual Meeting of the American Educational Research Association, San Diego, CA.

Lynn, M. (2009, April). Conducting Research on African American Male Teachers: Exploring Issues of Relevancy, Positionality, and Epistemology. Presented at the Annual Meeting of the American Educational Research Association, San Diego, CA.

Lynn, M. (2009, April). Urban Renewal: Rethinking Education for Optimizing the Success of African American Males. Participated as a Discussant at the Annual Meeting of the American Educational Research Association, San Diego, CA.

Lynn, M. (2009, September). Reflections on the K-12 Schooling Experiences of African American Males: Lessons for Private Universities. The Multicultural Colloquium for the Associated Colleges of Illinois. University of St. Francis, Joliet, IL.

Dixson, A.D., Chapman, T. Lynn, M. (2010, April). Critical Race Theory and Educational Research Day Professional Development Course. Participated as in instructor at the Annual Meeting of the American Educational Research Association. Denver, CO.

Abbate-Vaughn, J., Paugh, P., Larrabee, J., Resende, L. Lynn, M., (2011, February). Urban Educator Preparation: Teacher Research and Praxis in Diverse Classrooms. Presented at the Annual Meeting of the American Educational Research Association. New Orleans, LA.

Lynn, M. (2010, April). Teaching Critical Race Theory in a "Post-racial Era": Challenges and Best Practices. Served as Discussant at the Annual Meeting of the American Educational Research Association, Denver, CO.

Lynn, M. (2011, April). Examining the Connection Between Teacher Beliefs and African American Male Student Engagement in School. Talk presented at Purdue University, Calumet.

Lynn, M. (2011, April). We Have a Charge to Keep: Revisiting the Agenda for the AERA Commission on Research in Black Education (CORIBE), 2000-2010. Participated as a panel member. Organized by Joyce E. King at the Annual Meeting of the American Educational Research Association, New Orleans, LA.

Lynn, M. (2011, April). Reducing Vulnerability: Responding to the Challenges Confronting Black Males Through the Development of Research-Based Interventions. Served as a discussant for a session organized by Chezare Warren at the Annual Meeting of the American Educational Research Association, New Orleans, LA.

Lynn, M., Boix-Mansilla, V., Chowdhary, N., Manise, J., Moss, D. (2012, February). AACTE Major Forum: Preparing and Assessing Globally Minded Teachers. Session moderated at the Annual Meeting of the American Association of Colleges for Teacher Education, Chicago, IL.

Lynn, M., Clarken, R., Lin, E., Rong, Y., Cordeiro, P., Turner, J. (2012, February). The Policy and Politics of a Globalized Teacher Education, Chicago, IL.

Lynn, M. (2012, April). Counternarratives: Voices from New Scholars of Color. Served as a discussant along with Tara M. Brown at the Annual Meeting of the American Educational Research Association. Vancouver, Canada.

Lynn, M. (2012, April). Pushing Black Males through the Pipeline: Research to Practice. Served as the Chair and Discussant at the Annual Meeting of the American Educational Research Association. Vancouver, Canada.

Lynn, M. (2012, April). Strategies to Support Social Justice Teaching. Served as the Chair and Discussant at the Annual Meeting of the American Educational Research Association. Vancouver, Canada.

Hartlep, N. M., Hayes, C., Fasching-Varner, K. J., Lynn, M., Stovall, D. O., Ayers, W. C., Sheffield, E. (2013, April). Graduate Student Council Past Chair Fireside Chat: Life as a Professor: Key Insights from a Diverse group of Faculty Members. Presenter at the Annual Meeting of the American Educational Research Association. San Francisco, CA.

Lynn, M. (2013, October). Critical race theory and education: Implications for a global pedagogy of transformation. Keynote speech delivered at the University of the Free State in Bloemfontein, South Africa.

Lynn, M. (2013, November). Black Men, Race, Hegemony, Patriarchy and then what? Freeman R. Butts Lecture delivered at the annual meeting of the American Educational Studies Association in Baltimore, MD.

Annamma, S., Stovall, D., Meiners, E., Lynn, M., & Wakefield, D. (2014, April). The School-to-Prison Pipeline: What It Is and What We Can Do to Disrupt It. Symposium hosted by the School of Education at Indiana University Purdue University – Indianapolis.

Lynn, M. (2014, September). edTPA: the national perspective. Keynote delivered at the Indiana Association of Colleges for Teacher Education. Ball State University. Muncie, IN.

Lynn, M. (2014, October). Making Culturally Relevant Pedagogy Relevant to Aspiring Teachers and the edTPA. Keynote delivered at the Minnesota edTPA summit. St. Cloud State University. St. Cloud, Minnesota.

Lewis, C., Ladson-Billings, G., Fenwick, L. T., Lynn, M., Carothers, S. C., Sealey-Ruiz, Y., & Toldson, I. (2015, April). Teacher Education and Black Communities: Implications for Access, Equity, and Achievement. Presented at the Annual Meeting of the American Educational Research Association. Chicago, IL.

Lands, C., Lynn, M., Howard-Hamilton, M., & Watts, D. (2015, August). Increasing University Completion Rates for Students of Color. Presented on a panel at the Indiana State NAACP Education Summit in Indianapolis, Indiana

Lynn, M, Beauchamp, S., Bare-Benak, J., Darr, C. & Neff, T. (2015, October). A Partnership to Improve K-12 Student Learning and Advance Teacher Education. Panel presentation at Evaluation Systems' Conference on Teaching: Teachers Engaging Learners conference. Chicago, IL.

Lynn, M. (2015, October). Education, the Last Civil Right. Keynote speech delivered at the NAACP Awards Banquet in Elkhart, IN.

Lynn, M. (2016, April). Education and the Cacophony of Policy in the State of Indiana. Keynote speech delivered at the NAACP Banquet in Niles, IN

Lynn, M. (2016, June). Presented week-long workshop on race and education for the Department of Educational Leadership and Management faculty at the University of South Africa in Pretoria, South Africa

**** Additional updates will be added.*

*Refereed*

Lynn, M. (2002, February). Community teachers: a new framework for the preparation of exemplary urban teachers. Paper presented at the American Association of Colleges of Teacher Education, New York City, New York.

Lynn, M. (2002, April). Portraits in Black: Storying the lives and pedagogies of Black men educators. Paper presented at the Annual Meeting of the American Educational Research Association, New Orleans, Louisiana.

Lynn, M. (2003, April). Critical race theory, Black feminist thought, Afrocentricity & Black teachers' work. Paper presented at the Annual Meeting of the American Educational Research Association, Chicago, Illinois.

Lynn, M. (2003, April). Exposing critical pedagogy's racial blindspots: Drawing relationships between critical race theory and critical pedagogy. Paper presented at the Annual Meeting of the American Educational Research Association, Chicago, Illinois.

Lynn, M. & Benigno, G. (2003, November). Examining critical sociological approaches to the study of urban education. Paper presented at the Annual Meeting of the American Educational Studies Association, Mexico City, Mexico.

Lynn, Marvin. (2004, April). Portraits in black: the narratives of three African American male teachers. Presented at The Annual Meeting of the American Educational Research Association, San Diego, CA.

Lynn, M. (2004, April). Race critical theories in education and the lives of Black male teachers. Presented at The Annual Meeting of the American Educational Research Association, San Diego, CA.

Lynn, M. (2004, November). Running in place: A critical appraisal of the school politics that promote the underachievement of African American Males in Prince George's County. Presented at the Tools for Social Justice Conference, Consortium for Race, Gender & Ethnicity at the University of Maryland, College Park.

Lynn, M. & Lewis, C. (2006, February). Examining the recruitment, retention and impact of African American male teachers. Paper presented at the Annual Meeting of the American Association of Colleges of Teacher Education in San Diego, CA.

Parker, L., Lynn, M., Gill, C., & Cain, L. (2006, April). Critical race reflections on racial desegregation and the public interest: Forgotten perspectives and new challenges. Discussant at the Annual Meeting of the American Educational Research Association, San Francisco, CA.

Lynn, M. & Totten, T. (2006, April.). Examining the impact of teacher beliefs on the achievement of African American male students. Paper presented at the Annual Meeting of the American Educational Research Association, San Francisco, CA.

Lynn, M. & Massey, C. (2007, April). A multi-city examination of the challenges to urban school reform. Session Organized and Chaired for the Annual Meeting of the American Educational Research Association, Chicago, IL.

Lynn, M., Massey, C., Bridges, T., & Bacon, J. (2007, April). The challenge leaders face in navigating through the political "noise" to reform schools in a poor, urban district. Paper presented at the Annual Meeting of the American Educational Research Association, Chicago, IL.

Lynn, M. (2008, April). We ain't never gon' be "saved": The Africana Studies tradition in Critical Race Studies in Education as a "call to work". Session Organized and Chaired at the Annual Meeting of the American Educational Research Association, Chicago, IL.

Lynn, M. (2008, April). Toward an Africana Studies approach to Critical Race Studies in Education. Paper presented at the Annual Meeting of the American Educational Research Association, Chicago, IL.

Dixson, A.D., Lynn, M., Brown, K., Ladson-Billings, G., Solorzano, D. G., Gillborn, D., Parker, L. (2013, April). Critical Race Theory: Examining it's History and Looking Forward to its Future. Served as Discussant at the Annual Meeting of the American Educational Research Association, San Francisco, CA.

Dixson, A.D., Lynn, M., Cook, D.A., Decuir-Gunby, J., Villalpando, O., Valles, B., Covarrubias, A., and Velez, V. N. (2013, April). Researching the Context of Race in Education: Methodological Considerations in Critical Race Theory and Education. Served as Discussant at the Annual Meeting of the American Educational Research Association, San Francisco, CA.

Dixson, A.D., Lynn, M., Anderson, C. R., Cross, B. E., Fasching-Varner, K.J., Mitchell, R. W., Howard, T.C., Reynolds, R. Horsford, S. D., Grosland, T. J. (2013, April). "But be Ye Doers of the Word, and Not Hearers Only": Using Critical Race Theory to Challenge Teachers' Beliefs and Dispositions. Served as Discussant at the Annual Meeting of the American Educational Research Association, San Francisco, CA.

Lynn, M., Moss, G. D., Davis, H. S., Wesley, L. (2015, April). Toward Justice: An Illustrative Example of a University-School Partnership Designed to Advance an Agenda for Transforming Black Education. Served as Chair, Organizer and Presenter at the Annual Meeting of the American Educational Research Association, Chicago, IL.

Lynn, M., Callender, C., Jackson-Cole, D., Reiss, M. J., Mujtaba, T., Simeon, E. J., Lindsay, B. (2015, April). Critical Academic and Public Policy Issues Affecting Minorities in STEM. Served as Chair of the session at the Annual Meeting of the American Educational Research Association, Chicago, IL.

Toldson, I., Lewis, C., Lynn, M. Maylor, U., Davis, J., Callender, C., Parker, W., Miller, P. (2015, April). International Perspectives of Black Male Teachers.

Participated as chair at the Annual Meeting of the American Educational Research Association Conference in Washington, D.C.

Gist, C., Lynn, M., Mahoney, T., Quezada, R., Shultz, G., Wilson, N. (2016, February). Developing a Diversified Teaching Workforce in Teacher Education: Organizing and Realizing a Commitment to Teacher Diversity in Praxis. Presented at the 68th Annual Meeting of the American of Association of Colleges for Teacher Education. Las Vegas, Nevada.

Matias, C. E., Nishi, N., Silva, E., Parker, A., DePouw, C., & Lynn, M. (2016, April). Critical Race Parenting: Teaching for Our Children's Lives and Humanity. Participated as Session Chair at the Annual Meeting of the American Educational Research Association Conference in Washington, D.C.

Carter-Andrews, D., Lynn, M., Villegas, A. M., & Campano, G. (2016, April) Division K Graduate Student Pre-Conference Seminar. Mentored doctoral candidates at a 2-day pre-conference meeting of the Annual Meeting of the American Educational Research Association Conference in Washington, D.C.

** Updates forthcoming