**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

**No. 24-6139 (D.C. No. 5:21-CV-01022-G) (W.D. Okla.)**

BLACK EMERGENCY RESPONSE TEAM, et al.,
Plaintiffs, and

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,
Plaintiffs-Appellants/Cross-Appellees,

v.

GENTNER DRUMMOND,
in his official capacity as Oklahoma Attorney General, et al.,
Defendants-Appellees/Cross-Appellants, and

UNIVERSITY OF OKLAHOMA BOARD OF REGENTS, et al.,
Defendants.

---

**No. 24-6140 (D.C. No. 5:21-CV-01022-G) (W.D. Okla.)**

BLACK EMERGENCY RESPONSE TEAM, et al.,
Plaintiffs, and

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,
Plaintiffs-Appellees,

v.

JOHN R. BRAUGHT, et al.,
Defendants-Appellants, and

GENTNER DRUMMOND,
in his official capacity as Oklahoma Attorney General, et al.,
Defendants.

**No. 24-6141 (D.C. No. 5:21-CV-01022-G) (W.D. Okla.)**

BLACK EMERGENCY RESPONSE TEAM, et al.,
Plaintiffs-Appellees,

v.

GENTNER DRUMMOND,
in his official capacity as Oklahoma Attorney General, et al.,
Defendants-Appellants, and

JOHN R. BRAUGHT, et al.,
Defendants.

---

**BRIEF OF OKLAHOMA APPLESEED CENTER FOR LAW AND JUSTICE AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS**

---

Respectfully submitted,

Brent L. Rowland
OKLAHOMA APPLESEED CENTER FOR LAW AND JUSTICE, INC.
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
(918) 519-5750
brent@okappleseed.org
*Counsel for* Amicus Curiae

August 29, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Oklahoma Appleseed Center for Law and Justice states that it is a 501(c)3 non-profit organization. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## CONSENT OF PARTIES

All parties have consented to amicus Oklahoma Appleseed filing this brief.

## STATEMENT OF AUTHORSHIP

No party or party's counsel authored this brief in whole or in part, or contributed money intended to fund the preparation or submission of this brief. No person other than the amicus and its counsel contributed money intended to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................vi

INTEREST OF AMICUS CURIAE ................................................1

INTRODUCTION AND SUMMARY ...............................................2

ARGUMENT ......................................................................................4

I. H.B. 1775 entrenches a policy environment that exacerbates the persistent failures of Oklahoma's public schools. ..........................................................4

A. Oklahoma now ranks last in public education. ..............................................4

B. Oklahoma's struggling schools reinforce other dismal social conditions ......6

C. H.B. 1775 codifies policy that erects yet another structural barrier to excellent public education ..........................................................................8

II. H.B. 1775 is legally insufficient as a basis to punish districts or educators.........9

A. H.B. 1775's statutory prohibitions are both vague and overly broad. ..............9

B. Without clarity in its limits, punishment provisions of H.B. 1775 become subjective and its enforcement arbitrary. ...........................................................9

C. Overarching prohibitions apply without context and with no safe harbors ...10

III. Teachers - and their exodus from the profession in Oklahoma - personify the harm done by restrictive policies like H.B. 1775 ........................................11

A. Policies that affect teaching affect teachers........................................12

B. H.B. 1775 exemplifies that type of stifling policy that burdens Oklahoma's remaining and heavily burdened teachers ............................................13

C. Sixty percent of teachers said that confining and confusing policies like H.B. 1775 inhibit their ability to teach effectively ........................................14

IV. H.B. 1775 robs teachers of autonomy and academic freedom essential to their effectiveness and job satisfaction. ..................................................................16

A. Academic freedom is not an abstraction; it is a precondition for effective teaching..........................................................................................16

B. Loss of autonomy diminishes teachers' sense of job satisfaction and

efficacy........................................................................................................17

V. Students have a constitutional right to receive information at school…………18

A. Oklahoma students have the right to understand their present context as the outcome of past forces and ideas …………………………………...19

B. Limiting engagement with Oklahoma issues ultimately limits students' power to shape future policy …………………………………..........21

CONCLUSION ………………………………………………………………..22

CERTIFICATE OF COMPLIANCE ……………………………………………..24

CERTIFICATE OF SERVICE …………………………………………………25

## TABLE OF AUTHORITIES[1]

### CASES

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ....................................18, 19

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) ................................................................................18

*Brown v. Bd. of Educ*., 347 U.S. 483 (1954) ....................................5, 6, 22

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................9, 14

*Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ..........................9, 17

*McGirt v. Oklahoma*, 591 U.S. 894 (2020) ............................................20

*Plyler v. Doe*, 457 U.S. 202 (1982) ..........................................................................8

*Shelton v. Tucker*, 364 U.S. 479 (1960) .................................................................6

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ....................................17

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ................17

*Wieman v. Updegraff,* 344 U.S. 183 (1952) ...........................................................16

### STATUTES

Okla. Stat. tit. 70, § 24-157 (2021) .............................................2, 5, 9

[1] Cases and statutes are cited in-text. To accommodate sometimes lengthy URLs and maintain readability while allowing for retrieval of each source, other authorities are cited as footnotes.

**OTHER**

Aaron Baker, *The "Spirit" of House Bill 1775*, Okla. City Free Press (Sept. 11, 2022) ....................................................................8, 14

Adam McCann, *States with the Best & Worst School Systems,* WalletHub (July 21, 2025) ......................................................................4

Amanda Olsen & Erica Nelson, *Perceptions of Autonomy: Differential Job Satisfaction for Teachers*, Reflection (2023)....................................17

Annie E. Casey Found., *A 2025 State-to-State Comparison of Family and Community*, 2025 Kids Count Data Book: State Trends in Child Well-Being 25 (June 9, 2025) ...........................................................................7

August Benzow et al., *Advancing Economic Development in Persistent-Poverty Communities,* Econ. Innovation Grp. (2023) ..........................................7

Brad Snyder, *Democratic Justice: Felix Frankfurter, The Supreme Court, and the Making of the Liberal Establishment* (2022) .......................................16

Dan Hahn, *Blood and Ink: A Qualitative Inquiry of Teacher Well-Being in Post-Pandemic Oklahoma* (2024) (Ph.D. dissertation, Univ. of Okla.) ........12-15, 21

Emma Murphy, *Oklahoma Voter Turnout Lowest in the Nation, Drops from Previous Presidential Elections,* Okla. Voice (Nov. 6, 2024, 4:37 PM) ...........8

J. Econ. Comm., Okla. Emp. Update (Aug. 19, 2025) ..............................7

Jack Worth & Jens Van den Brande, *Teacher Autonomy: How Does It Relate to Job Satisfaction and Retention?*, Nat'l Found. for Educ. Research (2020) ......17

Jennifer Palmer, *Education Watch: Oklahoma's ACT Scores Ranked Second-to-last*, Okla. Watch (Oct. 17, 2024) .....................................................6

Jennifer Palmer, *Oklahoma Teachers Still Leaving Classroom Despite Salary Increases*, Oklahoman (Apr. 23, 2024, 11:18 AM) ............................11, 12

Jennifer Palmer, *Supreme Court Rejects Education Department's Attempt to Ban Books*, Okla. Watch (June 14, 2024) ....................................................5

Jon May, *The Encyclopedia of Oklahoma History and Culture: Osage Murders*, Okla. Hist. Soc'y (last visited Aug. 27, 2025) .........................................20

Joseph Hanks et al., *Law and Policy Impacts on Teacher Attrition in Public Education*, 2020 BYU Educ. & Law J. (2021) ........................................18

Josh Kelly, *Oklahoma Schools Rank 50th in the Nation in Latest Educational Quality Study*, Oklahoman (July 24, 2025, 10:04 AM) ..............................5

Keaton Ross, *Oklahoma Maintains Nation's Fourth-Highest Imprisonment Rate,* Okla. Watch (Jan. 15, 2025) ...........................................................7

Kirke Kickingbird, *The Jurisdictional Landscape of Indian Country After the McGirt and Castro-Huerta Decisions*, ABA Hum. Rts. Mag. (July 26, 2023) ..20

Learning Pol'y Inst., *Distribution of Public and Private Schools, Oklahoma* (Mar. 2025) .......................................................................11

Madeline Will, *What One Record-Setting Teacher Shortage Can Tell Us About the Profession*, Educ. Wk. (Mar. 6, 2024) ........................................11

Mike Schneider, *Under "Don't Say Gay" Settlement, Florida Teachers Can Discuss Sexual Orientation and Gender Identity*, PBS (Mar. 11, 2024, 6:01 PM) ..........................................................................10

National Educ. Assoc., *Ranking of the States 2024 and Estimates of School Statistics 2025* (2025) ...................................................5

Nehemiah Frank, *Oklahoma Education Ranked Worst in Nation*, Black Wall St. Times (July 23, 2025) ...................................................5

Nuria Martinez-Keel, *Oklahoma Purchases Over 500 Bibles for Classrooms*,

Okla. Voice (Nov. 14, 2024, 4:48 PM) ........................................17

Nurullah Eryilmaz, *Teacher Job Satisfaction: International Evidence on the Role of Autonomy*, Stud. in Educ. Evaluation (2025) ..............................17

Okla. Pol'y Inst., *2023 Census Data: Oklahoma Ranks as Sixth-Poorest State* (Sept. 12, 2024) ..............................................................7

Okla. St. Regents for Higher Educ., *Blueprint 2030: Innovating and Elevating Oklahoma Higher Education for Oklahoma's Workforce* (Feb. 9, 2023) ........6

Okla. St. Regents for Higher Educ., *2023 High School Indicators Report* (2025) ......................................................................6

P'ship with Native Americans. *Trail of Tears – 1838* (last visited Aug. 27, 2025) .....................................................................20

PEN America, *For First Time, Oklahoma Education Officials Punish Two School Districts for Violating Gag Order on Teaching Race and Gender* (Aug. 23, 2022) ...............................................................10

Scott Ellsworth, *The Encyclopedia of Oklahoma History and Culture: Tulsa Race Massacre*, Okla. Hist. Soc'y (last visited Aug. 27, 2025) ..................20

Sue Bin Park, *Did an Oklahoma Survey Record the Largest Number of Teacher Vacancies in the 2022-23 School Year Since It Began Collecting Records?*, Okla. Watch (Feb. 23, 2024) ...................................................11

Tara Aveilhe, *Oklahoma: Home to More Historically All-Black Towns than Any Other U.S. State*, Univ. of Tulsa Okla. Ctr. for the Humans. (Mar. 16, 2018) ................................................................................20

Thomas Cassaro, *A Student's First Amendment Right to Receive Information in the Age of Anti-CRT and "Don't Say Gay" Laws*, 99 N.Y.U. L. Rev. 280 (2024) ....................................................................19

Tyler Kingkade & Antonia Hylton, *Oklahoma's Anti-critical Race Theory Law Violates Free Speech Rights, ACLU suit says*, NBC News (Oct. 20, 2021,

12:35 PM) ....................................................................21

U.S. HHS's ODPHP, *Social Determinants of Health*, Healthy People 2030 …7

## INTEREST OF AMICUS CURIAE

Oklahoma Appleseed Center for Law and Justice (Oklahoma Appleseed) is a public interest, non-profit law firm that uses legal research, structural litigation, legislative advocacy, and community organizing to bring about much needed positive change in Oklahoma. Oklahoma Appleseed works to fight for the rights and opportunities of every Oklahoman. Oklahoma Appleseed prioritizes education justice as an area for advocacy, and it represents students, educators, and families to that end.

Oklahoma Appleseed submits this brief as amicus curiae to support the protection of academic freedom and students' First Amendment rights within the public education system. This case raises critical questions regarding the right of students to access information and the autonomy of educators to engage in open inquiry. Oklahoma Appleseed has a strong interest in ensuring that public schools remain forums for intellectual freedom and that restrictions on speech do not undermine the educational mission or violate constitutional protections. Oklahoma Appleseed believes its experience in legislative advocacy and research can provide helpful context for the Court in assessing the broad implications of this case.

## INTRODUCTION AND SUMMARY

This case arises from the enactment and enforcement of House Bill 1775 (H.B. 1775), codified as Okla. Stat. tit. 70, § 24-157 (2021), a statute that restricts classroom discussions of race and gender in Oklahoma's public schools. Plaintiffs—students, parents, educators, and advocacy organizations—challenge the law as unconstitutionally vague and as violating students' First Amendment right to receive information**.** They argue that the statute's sweeping and undefined terms have chilled classroom instruction**,** silenced student inquiry, and narrowed educational content, leaving educators guessing at what topics, materials, or perspectives could trigger investigation, sanctions, or loss of accreditation.

Defendants, including the Governor, the State Superintendent of Public Instruction, and the members of the State Board of Education, defend the law as a neutral regulation of curriculum intended to maintain objectivity and prevent "indoctrination". In practice, however, enforcement of H.B. 1775 has been politically charged and punitive**.** The State Board of Education has downgraded the accreditation status of Tulsa Public Schools and Mustang Public Schools and revoked a teacher's license, in some cases exceeding the recommendations of its own investigators. These actions have sent a chilling message to educators

statewide: steer clear of any classroom content that could be construed as touching on race, gender, or historical inequity.

After briefing and argument, the district court granted in part and denied in part Plaintiffs' motion for a preliminary injunction. The court correctly found portions of the law unconstitutionally vague but allowed other provisions to stand, reasoning that the statute was not impermissibly vague in its entirety and declining to enjoin enforcement of the law as a whole. Critically, the court also rejected Plaintiffs' First Amendment claim on behalf of students, concluding that the statute did not clearly infringe students' right to receive information in the classroom. Plaintiffs now appeal, seeking a full injunction that addresses the pervasive vagueness and viewpoint-discriminatory effects of H.B. 1775.

This appeal raises questions that go to the heart of public education's role in a constitutional democracy. As this Court considers the Act's legality, amicus urges the Court to consider the statute's real-world consequences**.** H.B. 1775 does not operate in isolation; it entrenches a policy environment in which Oklahoma students—already attending schools that rank at or near the bottom nationally in quality, teacher pay, and per-pupil expenditures—are denied access to the information and ideas essential to understanding their history, their communities, and their civic responsibilities. By codifying vagueness and fear into law,

Oklahoma has chilled legitimate academic discourse, driven talented teachers from the profession, and impaired students' ability to prepare for higher education, employment, and meaningful participation in civic life.

Amicus writes to highlight this broader context and the policy implications of upholding such a statute. The following sections explain how H.B. 1775 exacerbates existing structural deficits in Oklahoma's public schools, creates systemic barriers to educational sufficiency and engagement, and undermines the very constitutional freedoms that the Supreme Court has recognized as essential in the classroom.

## ARGUMENT

### I. H.B. 1775 entrenches a policy environment that exacerbates the persistent failures of Oklahoma's public schools.

#### A. Oklahoma now ranks last in public education.

In 2025, WalletHub ranked Oklahoma 50th among the states for public education.[2] Oklahoma placed last in quality, reflecting its low proficiency on the

[2] Adam McCann, *States with the Best & Worst School Systems,* WalletHub (July 21, 2025), https://wallethub.com/edu/e/states-with-the-best-schools/5335.

National Assessment of Educational Progress (NAEP), low median ACT scores, and high dropout rates.[3]

The Supreme Court has long recognized that education is "perhaps the most important function of state and local governments" and "the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). Oklahoma, however, consistently underinvests in its schools, ranking near the bottom nationally in teacher pay and per-pupil expenditures.[4] Still, policymakers have pursued ideological mandates such as requiring King James Version Bibles in classrooms, banning culturally significant and critically respected literature from school libraries, and placing broad restrictions on classroom discussion of race and gender through H.B. 1775 rather than addressing the structural deficits that debilitate Oklahoma schools.[5] Okla. Stat. tit. 70, § 24-157 (2021). The Supreme

---

[3] Josh Kelly, *Oklahoma Schools Rank 50th in the Nation in Latest Educational Quality Study*, Oklahoman (July 24, 2025, 10:04 AM), https://www.oklahoman.com/story/news/education/2025/07/24/oklahoma-schools-ranked-nearly-the-worst-in-the-nation-in-new-study/85310196007/.

[4] National Educ. Assoc., *Ranking of the States 2024 and Estimates of School Statistics 2025*, 21, 30, 31, 39, 49, 50 (2025), https://www.nea.org/sites/default/files/2025-04/2025_rankings_and_estimates_report.pdf.

[5] Nuria Martinez-Keel, *Oklahoma Purchases Over 500 Bibles for Classrooms*, Okla. Voice (Nov. 14, 2024, 4:48 PM), https://oklahomavoice.com/briefs/oklahoma-purchases-over-500-bibles-for-classrooms; Jennifer Palmer, *Supreme Court Rejects Education Department's Attempt to Ban Books*, Okla. Watch (June 14, 2024),

Court speaks to Oklahoma today when it says "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).

**B. Oklahoma's struggling schools reinforce other dismal social conditions.**

When schools fail, the effects reverberate across all aspects of life. The Supreme Court has long emphasized that education "is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954).

Oklahoma's systemically weakened and underperforming schools contribute to:

- Students being ill-prepared for higher education or skilled employment, with average ACT scores that are next-to-lowest in the nation, only 42% of high school graduates enrolling in college, and only 29% of Oklahomans holding a bachelor's degree;[6]

---

https://oklahomawatch.org/2024/06/12/supreme-court-rejects-education-departments-attempt-to-ban-books; Nehemiah Frank, *Oklahoma Education Ranked Worst in Nation*, Black Wall St. Times (July 23, 2025), https://theblackwallsttimes.com/2025/07/25/oklahoma-education-ranked-worst-in-nation.

[6] Jennifer Palmer, *Education Watch: Oklahoma's ACT Scores Ranked Second-to-last*, Okla. Watch (Oct. 17, 2024) https://oklahomawatch.org/newsletter/education-watch-oklahomas-act-scores-ranked-second-to-last; Okla. St. Regents for Higher Educ., *2023 High School Indicators Report* (2025), https://okhighered.org/wp-

• Persistent poverty and weak workforce participation, correlating with low wages and underemployment;[7]

• Poor health outcomes, as limited employment options correlate with reduced access to health care and higher rates of chronic disease and food insecurity;[8]

• Family and community instability, as the state's education system fails to provide upward mobility and erodes social capital;[9]

• Mass incarceration, with high dropout rates and exclusionary discipline disproportionately affecting students of color and students with disabilities, fueling Oklahoma's nation-leading imprisonment rate;[10] and

---

content/uploads/2025/04/hsir2023.pdf; Okla. St. Regents for Higher Educ., *Blueprint 2030: Innovating and Elevating Oklahoma Higher Education for Oklahoma's Workforce* (Feb. 9, 2023), https://okhighered.org/wp-content/uploads/2023/02/Okhighered-Blueprint2030-Strategic-Plan.pdf.

[7] Okla. Pol'y Inst., *2023 Census Data: Oklahoma Ranks as Sixth-Poorest State* (Sept. 12, 2024), https://okpolicy.org/2023-census-data-oklahoma-ranks-as-sixth-poorest-state; J. Econ. Comm., Okla. Emp. Update (Aug. 19, 2025) https://www.jec.senate.gov/public/vendor/_accounts/JEC-R/employment/state/Oklahoma%20Employment%20Update%20%28PDF%29.pdf; August Benzow et al., *Advancing Economic Development in Persistent-Poverty Communities,* Econ. Innovation Grp. 5 (2023), https://eig.org/wp-content/uploads/2023/06/EIG-Persistent-Poverty-Report.pdf.

[8] U.S. HHS's ODPHP, *Social Determinants of Health*, Healthy People 2030, https://odphp.health.gov/healthypeople/priority-areas/social-determinants-health (last visited Aug. 26, 2025).

[9] Annie E. Casey Found., *A 2025 State-to-State Comparison of Family and Community*, 2025 Kids Count Data Book: State Trends in Child Well-Being 25 (June 9, 2025), https://assets.aecf.org/m/resourcedoc/Aecf-2025kidscountdatabook.pdf.

[10] Keaton Ross, *Oklahoma Maintains Nation's Fourth-Highest Imprisonment Rate,* Okla. Watch (Jan. 15, 2025), https://oklahomawatch.org/2025/01/13/oklahoma-maintains-nations-fourth-highest-imprisonment-rate/.

• Civic disengagement, as inadequate insight into and understanding of present context, policy, and democratic process depress voter participation and reduce public accountability of elected officials.[11]

These patterns illustrate the Supreme Court's concern that denying meaningful education produces a permanent underclass that adds to the problems of unemployment, welfare, and crime. *Plyler v. Doe*, 457 U.S. 202, 230 (1982).

**C. H.B. 1775 codifies policy that erects yet another structural barrier to excellent public education.**

In short, Oklahoma's schools already operate under systemic burdens that have produced the nation's lowest ranking. Rather than mitigating these burdens, H.B. 1775 compounds them with vague, overbroad language that leaves educators uncertain about what the law prohibits or allows. The statute's punitive policy creates a pervasive chilling effect in classrooms, a fear that even when teachers strictly adhere to the law's text, they will be subject to complaints, investigations, or professional penalties; and that fear prompts widespread self-censorship.[12] By entrenching a policy environment hostile to open inquiry, H.B. 1775 ensures that

---

[11] Emma Murphy, *Oklahoma Voter Turnout Lowest in the Nation, Drops from Previous Presidential Elections,* Okla. Voice (Nov. 6, 2024, 4:37 PM) https://oklahomavoice.com/2024/11/06/oklahoma-voter-turnout-lowest-in-the-nation-drops-from-previous-presidential-elections.

[12] Aaron Baker, *The "Spirit" of House Bill 1775*, Okla. City Free Press (Sept. 11, 2022), https://freepressokc.com/the-spirit-of-house-bill-1775/.

Oklahoma's schools remain sources of poverty, poor health, incarceration, and democratic decline, rather than engines of opportunity.

## II. H.B. 1775 is legally insufficient as a basis to punish districts or educators.

### A. H.B. 1775's statutory prohibitions are both vague and overly broad.

H.B. 1775 bans "race or sex stereotyping" and "race or sex scapegoating," yet it provides no definitions sufficiently precise to put a reasonable teacher on notice of what speech is prohibited. Okla. Stat. tit. 70, § 24-157 (2021). It fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited". *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Because the statute sweeps across a broad range of constitutionally protected classroom expression, it violates both due process and the First Amendment. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

### B. Without clarity in its limits, punishment provisions of H.B. 1775 become subjective and its enforcement arbitrary.

The statute's defects are compounded by its punitive enforcement mechanism. H.B. 1775 authorizes state officials to investigate and sanction districts based on subjective interpretations of teacher conduct. The State Board of Education's decision to downgrade the accreditation status of Tulsa Public Schools

and Mustang Public Schools for alleged violations of H.B. 1775.[13] In both cases, the Board imposed formal accreditation demotions, signaling a willingness to politically enforce H.B. 1775 beyond its text.[14]

### C. Overarching prohibitions apply without context and with no safe harbors.

H.B. 1775 contains no safe harbor protecting the discussion of historical or scholarly context.[15] The law's far-reaching restrictions leave no room for teachers to appropriately frame controversial topics that are critical to the sufficiency of students' education and essential to their engagement. This omission is fatal: courts have repeatedly emphasized that statutes must provide room for legitimate expression rather than chilling it altogether. *See Keyishian*, 385 U.S. at 603.

---

[13] PEN America, *For First Time, Oklahoma Education Officials Punish Two School Districts for Violating Gag Order on Teaching Race and Gender* (Aug. 23, 2022), https://pen.org/press-release/for-first-time-oklahoma-education-officials-punish-two-school-districts-for-violating-gag-order-on-teaching-race-and-gender/.

[14] *Id*.

[15] *See* Mike Schneider, *under "Don't Say Gay" Settlement, Florida Teachers Can Discuss Sexual Orientation and Gender Identity*, PBS (Mar. 11, 2024, 6:01 PM), https://www.pbs.org/newshour/education/under-dont-say-gay-settlement-florida-teachers-can-discuss-sexual-orientation-and-gender-identity.

### III. Teachers— and their exodus from the profession in Oklahoma— personify the harm done by restrictive policies like H.B. 1775.

Fewer teachers, and fewer qualified teachers, want to teach in any of Oklahoma's public school classrooms. In 2023, over one thousand teaching positions remained vacant across Oklahoma's 1,792 public schools, disproportionately affecting students in its lowest-performing areas.[16] To keep schools functioning in at least some capacity, the State Department of Education issued a record 4,676 emergency teaching certificates in 2023-24 to those who hold degrees but otherwise lack teaching qualifications.[17] But even more are leaving. The number and percentage of teachers exiting the profession have increased each year since 2019-2020, with six thousand leaving the field in 2023 alone, a record at

[16] Learning Pol'y Inst., *Distribution of Public and Private Schools, Oklahoma* (Mar. 2025), https://learningpolicyinstitute.org/sites/default/files/2025-03/pub_private_Oklahoma_MAP.pdf; Sue Bin Park, *Did An Oklahoma Survey Record the Largest Number of Teacher Vacancies in the 2022-23 School Year Since It Began Collecting Records?*, Okla. Watch (Feb. 23, 2024), https://oklahomawatch.org/2024/02/23/did-an-oklahoma-survey-record-the-largest-number-of-teacher-vacancies-in-the-2022-23-school-year-since-it-began-collecting-records/.

[17] Madeline Will, *What One Record-Setting Teacher Shortage Can Tell Us About the Profession*, Educ. Wk. (Mar. 6, 2024), https://www.edweek.org/teaching-learning/what-one-record-setting-teacher-shortage-can-tell-us-about-the-profession/2024/03#:~:text=Pay%20is%20increasing%2C%20but%20turnover,2011%2D12%20school%20year

that point.[18] Moreover, fewer of Oklahoma's own are entering the state's colleges of education, with enrollment declining by more than 85% between 2008 and 2021—more than any other state.[19]

### A. Policies that affect teaching affect teachers.

Historically, the teacher shortage in Oklahoma has been linked to low funding and low pay for schools and educators. However, even with increased salaries following the 2018 teacher walk-out (advocating for better pay), Oklahoma has seen some of its highest teacher turnover rates in the years following the COVID-19 pandemic.[20] If not for pay, then what? In Oklahoma, teachers will tell you: policy matters.

Policies like H.B. 1775 that are simultaneously perceived (and enforced) as tight even while facially vague continue the drive of educators out of Oklahoma public schools and away from their calling – teaching students. One teacher stated, "If you want a prime example of how government can make or break an education

---

[18] Jennifer Palmer, *Oklahoma Teachers Still Leaving Classroom Despite Salary Increases*, Oklahoman (Apr. 23, 2024, 11:18 AM).

[19] *Id*.

[20] *Id*.

system, I would look to Oklahoma. . . . I have very solid plans to move out of Oklahoma at the end of this year."[21]

**B. H.B. 1775 exemplifies that type of stifling policy that burdens Oklahoma's remaining and heavily burdened teachers.**

*Blood and Ink*, a study of state teachers by Oklahoman Dan Hahn, gives voice to the discouragement that they feel when trying to educate and inspire within the confines of political policies like H.B. 1775. Every teacher in the study described feelings of frustration, anger, divestment, and fatigue when faced with another policy that burdens them and the system without real benefit to students.[22]

The statute's lack of clear definitions creates profound uncertainty. It does not distinguish between teaching historical fact and promoting a proscribed "concept." For example, a lesson on the Tulsa Race Massacre or gender-based wage disparities might be construed by some as a prohibited endorsement of "systemic racism" or "sex discrimination." Without statutory boundaries, educators cannot know whether neutral, fact-based instruction is safe from sanction.

---

[21] Dan Hahn, *Blood and Ink: A Qualitative Inquiry of Teacher Well-Being in Post-Pandemic Oklahoma* 130 (2024) (Ph.D. dissertation, Univ. of Okla.) (Google Scholar).

[22] *Id.*

Speaking on content regulation, one teacher told Hahn, "At this point I am nervous to teach anything."[23]

### C. Sixty percent of teachers said that confining and confusing policies like H.B. 1775 inhibit their ability to teach effectively.[24]

Many educators liken the persistent fear they experience while teaching to operating in an "impossible" environment, analogizing punitive policies to "landmines" where small missteps cause irreparable harm to their schools, their districts, or their own careers.[25] The punitive sanctions of H.B. 1175 have created a statewide chilling effect, as educators and districts—facing the potential of severe institutional penalties—are now self-censoring discussions of race, gender, and history, even where the instruction clearly complies with the statute.[26] The Supreme Court warned against the dangerous potential for arbitrary application of vague laws that then "impermissibly delegate[] basic policy matters … to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Grayned*, 408 U.S. at 108–09.

---

[23] *Id*. at 112.

[24] *Id*. at 120.

[25] *Id.*

[26] Baker, *supra* note 11.

Without clear guidance or safe harbor in the law, and faced with the loss of accreditation or licensure, the only rational response is self-censorship. The result is an education system where the law's cloud of uncertainty and chilling effect, rather than professional judgment, dictate what Oklahoma students will be allowed to learn. The emotional toll on teachers is draining: "I truly am scared about the trajectory and the political rhetoric and policymaking that's happening right now . . . I'm just kind of scared about the way things are going right now . . . I have never felt that way before."[27] A Tulsa educator shared that every time a new policy or regulation comes out, their life becomes, "harder and harder," to the point that they no longer see themselves retiring as an Oklahoma teacher.[28] Another echoed the persistent thoughts of leaving teaching behind, stating that the persistent deprofessionalization of teaching from state leadership, "really makes people want to give up."[29]

Oklahoma students and Oklahoma's way of life depend on Oklahoma's public school teachers. They cannot afford even one more reason for teachers to leave, for the state's talent to seek careers where their well-being matters more than

---

[27] Hahn, *supra* note 21 at 111.

[28] *Id*. at 91.

[29] *Id*. at 92.

performative politics. When it comes to Oklahoma's teacher crisis, H.B. 1775 is one more brick in the wall.

## IV. H.B. 1775 robs teachers of autonomy and academic freedom essential to their effectiveness and job satisfaction.

### A. Academic freedom is not an abstraction; it is a precondition for effective teaching.

Justice Felix Frankfurter, a devotee of judicial restraint, called teachers, "from the primary grades to the university," the priests of our democracy.[30] *Wieman v. Updegraff,* 344 U.S. 183, 196 (1952). He understood the vital importance of teachers' practice, and even the "atmosphere which they generate", in which "they must be exemplars of open-mindedness and free inquiry". *Id*. Frankfurter recognized:

> [Teachers] cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them. ***They must have the freedom of responsible inquiry, by thought and action, into the meaning of social and economic ideas*****,** into the checkered history of social and economic dogma (emphasis added).

*Id*. Frankfurter adds that teachers' practice is assured against infraction by national or state governments by the freedoms of thought, speech, inquiry

[30] Brad Snyder, *Democratic Justice: Felix Frankfurter, The Supreme Court, and the Making of the Liberal Establishment* 20-21 (2022).

and worship "guaranteed by the Constitution of the United States". *Id*. at 196-97.

Teachers must be able to select age-appropriate course materials, facilitate open classroom discussion, and encourage critical thinking without fear of sanction. Academic freedom in this sense is not merely a First Amendment entitlement but a professional necessity. Without it, teachers cannot fulfill their role in equipping students to be engaged citizens. *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957) (plurality opinion).

### B. Loss of autonomy diminishes teachers' sense of job satisfaction and efficacy.

When teachers are stripped of professional discretion and forced into silent paralysis wrought by confusion, their work ceases to be intellectually fulfilling. Research consistently confirms that teachers' job satisfaction is strongly correlated with autonomy and academic freedom.[31] H.B. 1775 thus not only chills classroom

---

[31] Jack Worth & Jens Van den Brande, *Teacher Autonomy: How Does It Relate to Job Satisfaction and Retention?*, Nat'l Found. for Educ. Research 2–3 (2020), https://files.eric.ed.gov/fulltext/ED604418.pdf; Nurullah Eryilmaz, *Teacher Job Satisfaction: International Evidence on the Role of Autonomy*, Stud. in Educ. Evaluation (2025), https://www.sciencedirect.com/science/article/pii/S0191491X25000318?via%3Dihub; Amanda Olsen & Erica Mason, *Perceptions of Autonomy: Differential Job*

discourse but also accelerates Oklahoma's teacher shortage by discouraging dedicated educators from entering or remaining in the profession.[32] The resulting loss of teachers compounds the very systemic crises—low rankings, underfunding, and poor student outcomes—that already place Oklahoma last in public education.

**V. Students have a constitutional right to receive information at school.**

The First Amendment protects students' right to receive information and share ideas in the school setting. Writing for a plurality of the Court, Justice Brennan in *Board of Education, Island Trees Union Free School District v. Pico* articulated that access to ideas equips students to actively engage in a diverse and contentious society, which they will soon participate in as adults. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868 (1982). The Court's ruling in *Pico* reinforces the power of our lower courts to find that the state's restriction of information to students violates their constitutional "right to know" under the First Amendment.

---

*Satisfaction for Teachers*, Reflection (2023) https://www.sciencedirect.com/science/article/pii/S0742051X22003742.

[32] Joseph Hanks et al., *Law and Policy Impacts on Teacher Attrition in Public Education*, 2020 BYU Educ. & Law J. 1–2 (2021), https://scholarsarchive.byu.edu/cgi/viewcontent.cgi?article=1008&context=byu_elj.

The 2015 Ninth Circuit case, *Arce v. Douglas*, builds on *Pico* to highlight the value of, and the need for protection of, students' access to diverse ideas and cultural perspectives. *Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015). In *Arce*, when a school district's Mexican American Studies program was effectively terminated by Arizona's House Bill 2281, the Ninth Circuit found that the First Amendment guaranteed students the right to engage with a spectrum of ideas through their curriculum.[33] Further, citing *Pico*, the court held that the greater the discretion given the state to curtail access to information, the greater the potential harm to the development of the insight and experience students need to "meaningfully exercise [their] rights of speech, press, and political freedom." *Arce* at 983.

**A. Oklahoma students have the right to understand their present context as the outcome of past forces and ideas.**

Oklahoma's students are facing the same restrictions as the students in *Arce*—they will be denied access to information important to the development of Oklahoma and their relationship to the state. Oklahoma students live in a state profoundly shaped by historical events and ideas that continue to influence its social, economic, and political landscape. Restrictions on discussion of race or gender threaten to infringe on their First Amendment right to know their history

[33] Thomas Cassaro, *A Student's First Amendment Right to Receive Information in the Age of Anti-CRT and "Don't Say Gay" Laws*, 99 N.Y.U. L. Rev. 280 (2024).

and thereby understand the meaningful exercise of their rights.

The 1921 Tulsa Race Massacre decimated the prosperous Greenwood District, leaving generational trauma and economic disenfranchisement in its wake.[34] Similarly, the Osage "Reign of Terror" in the 1920s exposed the intersection of racism, greed, and official complicity.[35] The forced relocation of tribal nations during the Trail of Tears and subsequent allotment policies stripped Native communities of land and autonomy.[36] Contemporary jurisdictional disputes, as affirmed in *McGirt v. Oklahoma*, 591 U.S. 894 (2020), demonstrate that tribal sovereignty remains a living legal and cultural reality.[37] Oklahoma's historically all-Black towns invite inquiry into the state's complex history around race and civil

[34] Scott Ellsworth, *The Encyclopedia of Oklahoma History and Culture: Tulsa Race Massacre*, Okla. Hist. Soc'y, https://www.okhistory.org/publications/enc/entry?entry=TU013 (last visited Aug. 27, 2025).

[35] Jon May, *The Encyclopedia of Oklahoma History and Culture: Osage Murders*, Okla. Hist. Soc'y, https://www.okhistory.org/publications/enc/entry?entry=OS005 (last visited Aug. 27, 2025).

[36] P'ship with Native Americans. *Trail of Tears - 1838*, https://nativepartnership.org/trail-of-tears-1838/ (last visited Aug. 27, 2025).

[37] Kirke Kickingbird, *The Jurisdictional Landscape of Indian Country After the McGirt and Castro-Huerta Decisions*, ABA Hum. Rts. Mag. (July 26, 2023), https://www.americanbar.org/groups/crsj/resources/human-rights/archive/jurisdictional-landscape-indian-country-after-mcgirt-castro-huerta.

rights.[38] The events of the past that affected the people of Oklahoma then still affect them today.

All these topics potentially trigger the reporting and punishment provisions of H.B. 1775 and its related regulations. Yet students' understanding of them is essential for students to develop the critical thinking skills necessary to engage with present-day challenges and future opportunities for Oklahoma. For some students, suppressing certain aspects of history on the basis of race or gender feels like purposeful censorship. A seventeen-year-old senior in Oklahoma City said he sees H.B. 1775 as a way for Oklahoma to hide its past, so the next generation doesn't "know all the horrible things that went on before they were born."[39]

**B. Limiting engagement with Oklahoma issues ultimately limits students' power to shape Oklahoma policy.**

By restricting access to these critical narratives, H.B. 1775 does more than distort Oklahoma's history — it deprives students of the very tools they need to become informed and engaged participants in civic life. The First Amendment

---

[38] Tara Aveilhe, *Oklahoma: Home to More Historically All-Black Towns than Any Other U.S. State*, Univ. of Tulsa Okla. Ctr. for the Humans. (Mar. 16, 2018), https://humanities.utulsa.edu/oklahoma-home-historically-black-towns-u-s-state/.

[39] Tyler Kingkade & Antonia Hylton, *Oklahoma's Anti-critical Race Theory Law Violates Free Speech Rights, ACLU suit says*, NBC News (Oct. 20, 2021, 12:35 PM), https://www.nbcnews.com/news/us-news/oklahoma-critical-race-theory-lawsuit-aclu-rcna3276.

protects students' right to know because a functioning democracy depends on citizens who can critically evaluate the forces that shape their world. As *Pico* and *Arce* make clear, when the state suppresses ideas, it thwarts students' understanding of democracy, how it has developed, how it has worked, how it has changed, and what it will become.

For Oklahoma students, the potential for constitutional harm is profound: when students cannot access truthful and complete information, they are not merely less informed — they are systematically disempowered. Protecting their right to receive information is therefore not an abstract legal principle, but an urgent imperative to ensure that public education fulfills its constitutional role as "the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

## CONCLUSION

The proverb from *Poor Richard's Almanac*— "For want of a nail the shoe was lost…"—is a reminder of how the loss of something small can lead to consequences on the largest scale. Because of an unconstitutionally vague restriction on speech in education, teachers lose autonomy, job satisfaction, and efficacy. Teachers are lost. The quality of education is sacrificed, and the quality of life for Oklahomans is further diminished. Students lose access to the information

they need to understand their state, their communities, and the people who make them what they are. Our future electorate is left without the knowledge to effectively participate in democratic processes, and future leaders are left without the insight necessary to shape informed, effective policy.

In *NAACP v. Drummond*, this Court has the opportunity to uphold precedent and to positively shape the course of public education in Oklahoma. The fates of kingdoms sometimes depend on something so small as a nail. The educational landscape—and the chance for better social and civic conditions in Oklahoma—depend on the Court's judicious protection of the rights at the heart of this case.

Respectfully submitted,

s/ Brent L. Rowland

Brent L. Rowland
OKLAHOMA APPLESEED CENTER FOR LAW AND JUSTICE, INC.
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
(918) 519-5750
brent@okappleseed.org
*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,368 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word version 16.100 in Times New Roman 14-point font.

Respectfully submitted,

s/ Brent L. Rowland
Brent L. Rowland
OKLAHOMA APPLESEED CENTER FOR LAW AND JUSTICE, INC.
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
(918) 519-5750
brent@okappleseed.org
*Counsel for* Amicus Curiae

August 29, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2025, I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to all counsel of record by cooperation of the CM/ECF system.

Respectfully submitted,

s/ Brent L. Rowland
Brent L. Rowland
OKLAHOMA APPLESEED CENTER FOR LAW AND JUSTICE, INC.
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
(918) 519-5750
brent@okappleseed.org
*Counsel for* Amicus Curiae

August 29, 2025