**Nos. 24-6139, 24-6140, & 24-6141**

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

No. 24-6139

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs*,

and

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Plaintiffs - Appellants/Cross-Appellees*,

v.

GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.*,

*Defendants - Appellees/Cross-Appellants*,

and

UNIVERSITY OF OKLAHOMA BOARD OF REGENTS, *et al.*,

*Defendants. (Cont.)*

**THE STATE OF OKLAHOMA'S FIRST BRIEF ON CROSS-APPEAL**

GARRY M. GASKINS, II
*Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Main: (405) 521-3921
Garry.Gaskins@oag.ok.gov

*Counsel for State Defendants*

ZACH WEST
*Director of Special Litigation*
WILL FLANAGAN
*Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Main: (405) 521-3921
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov

On Appeal from the U.S. District Court for the Western District of Oklahoma, Case
No. 5:21-CV-1022-G, Honorable Charles Goodwin, District Judge

**ORAL ARGUMENT IS REQUESTED**

No. 24-6140

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs,*

and

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Plaintiffs - Appellees,*

v.

JOHN R. BRAUGHT, *et al.*,

*Defendants - Appellants,*

and

GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.*,

*Defendants.*

No. 24-6141

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs - Appellees,*

v.

GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.*,

*Defendants - Appellants,*

and

JOHN R. BRAUGHT, *et al.*,

*Defendants.*

i

# TABLE OF CONTENTS

PRIOR OR RELATED APPEALS ............................................................2

STATEMENT OF JURISDICTION ..........................................................2

ISSUES PRESENTED ...........................................................................3

INTRODUCTION..................................................................................5

STATEMENT OF THE CASE .................................................................7

    A.   Racist and sexist teachings proliferate in public education. .....................7

    B.   HB 1775 prevents racism and sexism in Oklahoma's schools.................9

    C.   Oklahoma Board of Education enacts rules implementing HB 1775..................................................................................12

    D.   Plaintiffs belatedly sue, and Oklahoma enforces the Act.........................13

    E.   The district court largely upholds HB 1775, with some exceptions. ........................................................................17

    F.   Oklahoma Supreme Court declines to opine on HB 1775's K-12 provisions. .....................................................................19

    G.   Response to Plaintiffs' Statement of the Case. ................................20

SUMMARY OF THE ARGUMENT .........................................................23

STANDARD OF REVIEW ....................................................................25

ARGUMENT......................................................................................26

    I.  THE DISTRICT COURT CORRECTLY DECIDED THAT K-12 STUDENTS DO NOT HAVE A FIRST AMENDMENT RIGHT TO RACIST AND SEXIST TEACHING. .......................................26

    II.  THE DISTRICT COURT CORRECTLY REJECTED PLAINTIFFS' VAGUENESS ARGUMENTS AGAINST HB 1775 AS A WHOLE. .....................35

        A. The district court used an overly stringent vagueness standard. ........................................................................37

        B. HB 1775 has a plainly legitimate sweep and common words.. .......38

        C. The Oklahoma Academic Standards support HB 1775's clarity. ......................................................................40

        D. A scienter requirement supports HB 1775's constitutionality.........41

        E. Plaintiffs' arguments and caselaw fall short of showing vagueness. ...............................................................42

**F.** **"Make part of a course" is not unconstitutionally vague.** ................47

**G.** **The six prohibitions in effect are not unconstitutionally vague.** ..........................................................................................49

**III.** **CROSS-APPEAL: HB 1775 SHOULD BE UPHELD IN ITS ENTIRETY** .........53

**A.** **"[R]equire … the following concepts" is not vague.** ........................54

**B.** **The two enjoined concepts are not vague.** ...........................................57

**CONCLUSION** .................................................................................................61

**STATEMENT REGARDING ORAL ARGUMENT** ................................................61

# TABLE OF AUTHORITIES

## Cases

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ...................................................................34, 45, 50

*Axson–Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004) ...............................................................................33

*Baker v. Bray*,
    701 F.2d 119 (10th Cir. 1983) ................................................................................26

*BERT v. Drummond*,
    571 P.3d 135 (Okla. 2025) ...........................................................................19, 45, 48

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
    457 U.S. 853 (1982) .....................................................................................29, 30, 31

*Boismier v. Walters*,
    777 F. Supp. 3d 1300 (W.D. Okla. 2025) ..........................................................14, 42

*Boring v. Buncombe Cnty. Bd. of Educ.*,
    136 F.3d 364 (4th Cir. 1998) .............................................................................34, 47

*Cary v. Bd. of Educ. of Adams-Arapahoe Sch. Dist. 28-J, Aurora, Colo.*,
    598 F.2d 535 (10th Cir. 1979) ................................................................................32

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005) ..................................................................................29

*Citizens for Const. Integrity v. United States*,
    57 F.4th 750 (10th Cir. 2023) .................................................................................35

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ..................................................................................................37

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971) ................................................................................................43

*Colorado v. Griswold*,
    99 F.4th 1234 (10th Cir. 2024) ...............................................................................26

*Conn v. Gabbert*,
    526 U.S. 286 (1999) ................................................................................................31

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ................................................................................................27

*Cummins v. Campbell,*
    44 F.3d 847 (10th Cir. 1994) ........................................................................30

*De Piero v. Pa. State Univ.,*
    711 F. Supp. 3d 410 (E.D. Pa. 2024) ..........................................................22

*Diemert v. City of Seattle,*
    689 F. Supp. 3d 956 (W.D. Wash. 2023) ...................................................22

*Doctor John's, Inc. v. City of Roy,*
    465 F.3d 1150 (10th Cir. 2006) ....................................................................37

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,*
    269 F.3d 1149 (10th Cir. 2001) ....................................................................25

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) ..........................................................................................32

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975) ........................................................................................36

*Evans v. Sandy City,*
    944 F.3d 847 (10th Cir. 2019) ....................................................................27

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.,*
    624 F.3d 332 (6th Cir. 2010) ......................................................................28

*Fabrizius v. Dep't of Agric.,*
    129 F.4th 1226 (10th Cir. 2025)...........................37, 38, 39, 40, 42, 44, 47, 54

*Fischer v. United States,*
    603 U.S. 480 (2024) ........................................................................................55

*Fleming v. Jefferson Cnty. Sch. Dist. R-1,*
    298 F.3d 918 (10th Cir. 2002) ................................................32, 33, 34, 35, 44

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ...............................................................................33, 43

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ........................................................................................56

*GTE Corp. v. Williams,*
    731 F.2d 676 (10th Cir. 1984) ....................................................................25

*Hazelwood School District v. Kuhlmeier,*
    484 U.S. 260 (1988) ...........................................................19, 32, 33, 34

*Hernandez v. Grisham,*
  2022 WL 16941735 (10th Cir. Nov. 15, 2022) ................................................26

*Honeyfund.com Inc. v. Governor,*
  94 F.4th 1272 (11th Cir. 2024) ....................................................... 43, 44

*Jake's Fireworks Inc. v. Acosta,*
  893 F.3d 1248 (10th Cir. 2018) ....................................................................39

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) .....................................................................................43

*Keyishian v. Board of Regents of University of State of New York,*
  385 U.S. 589 (1967) .....................................................................................43

*Koon v. United States,*
  518 U.S. 81 (1996) .......................................................................................25

*Lamont v. Postmaster General,*
  381 U.S. 301 (1965) ............................................................................. 28, 29

*Little v. Llano Cnty.,*
  138 F.4th 834 (5th Cir. 2025) ............................................................. 28, 30

*Local 8027 v. Edelbut,*
  2024 WL 2722254 (D.N.H. May 28, 2024)......................................... 43, 44

*M. S. v. Premera Blue Cross,*
  118 F.4th 1248 (10th Cir. 2024)....................................................................48

*Meyer v. Nebraska,*
  262 U.S. 390 (1923) ............................................................................. 31, 32

*Miles v. Denver Pub. Schs.,*
  944 F.2d 773 (10th Cir. 1991) ..........................................................30, 35, 33

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) .....................................................................................36

*Murphy v. Matheson,*
  742 F.2d 564 (10th Cir. 1984) ......................................................................37

*NAACP v. U.S. Dep't of Educ.,*
  779 F. Supp. 3d 53 (D.D.C. 2025)................................................................52

*O'Connor v. Okla. State Conf. of NAACP,*
  516 P.3d 1164 (Okla. Crim. App. 2022) .......................................................56

*Oklahoma State Conference of NAACP v. O'Connor,*
   569 F. Supp. 3d 1145 (W.D. Okla. 2021) .........................................56

*Payless Shoesource, Inc. v. Travelers Cos., Inc.,*
   585 F.3d 1366 (10th Cir. 2009) .........................................56

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) .........................................20

*PCMA v. Mulready,*
   78 F.4th 1183 (10th Cir. 2023) .........................................49

*Pernell v. Florida Board of Governors of State University System,*
   641 F. Supp. 3d 1218 (N.D. Fla. 2022) .........................................52

*Pleasant Grove City v. Summum,*
   555 U.S. 460 (2009) .........................................29

*Plessy v. Ferguson,*
   163 U.S. 537 (1896) .........................................61

*Poe v. Drummond,*
   149 F.4th 1107 (10th Cir. 2025) .........................................25, 35

*Rose v. Utah State Bar,*
   444 F. App'x 298 (10th Cir. 2011) .........................................27

*Sac & Fox Nation of Okla. v. Cuomo,*
   193 F.3d 1162 (10th Cir. 1999) .........................................26

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
   508 F. Supp. 3d 521 (N.D. Cal. 2020) .........................................21

*Schleifer v. City of Charlottesville,*
   159 F.3d 843 (4th Cir. 1998) .........................................36

*Schrier v. Univ. of Colo.,*
   427 F.3d 1253 (10th Cir. 2005) .........................................25

*Seyfried v. Walton,*
   668 F.2d 214 (3d Cir. 1981) .........................................28

*Sharp v. Tulsa Cnty. Election Bd.,*
   890 P.2d 836 (Okla. 1994) .........................................59

*Stanley v. Georgia,*
   394 U.S. 557 (1969) .........................................28

*StreetMediaGroup, LLC v. Stockinger,*
    79 F.4th 1243 (10th Cir. 2023) ..............................................................39, 57, 60

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) ................................ 5, 6, 22, 34, 39, 40, 44, 46, 50

*Sullins v. Am. Med. Response of Okla., Inc.,*
    23 P.3d 259 (Okla. 2001) ..................................................................55

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ..........................................................................6

*Taylor v. Roswell Indep. Sch. Dist.,*
    713 F.3d 25 (10th Cir. 2013) ..............................................................37

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ..........................................................................61

*U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.,*
    508 U.S. 439 (1993) ..........................................................................48

*United States v. Hansen,*
    599 U.S. 762 (2023) ..........................................................................36

*United States v. Skrmetti,*
    145 S. Ct. 1816 (2025) ......................................................................42

*United States v. Villano,*
    529 F.2d 1046 (10th Cir. 1976) ..........................................................36

*Vill. of Hoffman Ests. v. Flipside,*
    455 U.S. 489 (1982) ......................................................... 37, 38, 41, 43

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.,*
    862 F.2d 1517 (1989) ........................................................................34

*Walls v. Sanders,*
    144 F.4th 995 (8th Cir. 2025) ....................................................... 29, 30

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ..........................................................................57

*Ward v. Utah,*
    398 F.3d 1239 (10th Cir. 2005) ..........................................................36

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ..........................................................................36

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................25

*Wyoming Gun Owners v. Gray*,
  83 F.4th 1224 (10th Cir. 2023) ...................................................36

*Young v. Colo. Dep't of Corr.*,
  94 F.4th 1242 (10th Cir. 2024) ..............................................22, 51

**Statutes**

20 U.S.C. § 1686 ...........................................................................60

28 U.S.C. § 1292 .............................................................................2

28 U.S.C. § 1331 .............................................................................2

28 U.S.C. § 1345 .............................................................................2

42 U.S.C. § 1983 .............................................................................2

Okla. Stat. tit. 70, § 1-125 ............................................................59

Okla. Stat. tit. 70, § 11-103.6 .............................................10, 12, 46

Okla. Stat. tit. 70, § 24-157 ....................3, 6, 9, 10, 15, 16, 17, 18, 20, 38, 39

Okla. Stat. tit. 70, § 27-10 ............................................................60

**Rules**

9 C.F.R. § 86.5 ...............................................................................39

29 C.F.R. § 1910.109 .....................................................................39

Exec. Order No. 13950, 85 Fed. Reg. 60683
  (Sept. 28, 2020) ..........................................................................21

Exec. Order No. 14,190, 90 Fed. Reg. 8853
  (Jan. 29, 2025) ............................................................................21

Okla. Admin. Code 210:10-1-23 .............................................12, 59

Okla. Admin. Code 210:15-3-109 ..................................................59

Okla. Admin. Code 210:15-3-110 ..................................................11

Okla. Admin. Code 210:35-3-201 ..................................................13

**Other Authorities**

Christopher F. Rufo, *Failure Factory*,
  City J. (Feb. 23, 2021) ...................................................................7

Christopher F. Rufo, *Woke Elementary*,
CITY J. (Jan. 13, 2021) ........................................................................................7

Christopher Rufo, *Embracing critical theory, teacher's union says they—not the parents—control what kids learn*, N.Y. POST (July 5, 2021) ...........................................7

David Chasanov, *Mustang Public Schools parent outraged after controversial classroom activity*,
KOKH FOX 25 (Aug. 2, 2022) .........................................................................15

MERRIAM-WEBSTER.COM ....................................................................57, 58, 59

*OU Launches Mandatory Diversity Training for All Students, Faculty, and Staff*,
THE UNIV. OF OKLA. (Aug. 27, 2020) ...............................................................8

Sabrina Conza, *Univ. of Okla. Diversity Training Requires Students, Faculty to Agree with University-Approved Viewpoints*,
FIRE (Apr. 8, 2021)............................................................................................8

WEBSTER'S THIRD NEW INT'L DICTIONARY (1993) ........................................48

**GLOSSARY**

| | |
|---|---|
| HB 1775 / the Act | Oklahoma House Bill 1775 (2021) |
| Plaintiffs | Oklahoma State Conference of the NAACP, the American Indian Movement Indian Territory, Precious Lloyd, as next friend of S.L., Anthony Crawford, and Regan Killackey |
| Oklahoma / State Defendants | Oklahoma Attorney General Gentner Drummond, Oklahoma Superintendent of Public Instruction Lindel Fields, each board member of the Oklahoma State Board of Education, Oklahoma Governor Kevin Stitt, each member of the Oklahoma State Regents for Higher Education |
| University Defendants | Each member of the Board of Regents of the University of Oklahoma (OU) |
| Edmond Defendants | The Superintendent of Edmond Public Schools, and each member of the Board of Education of Edmond Public Schools |
| Board | Oklahoma State Board of Education |
| Department | Oklahoma State Department of Education |

## PRIOR OR RELATED APPEALS

Three appeals stemmed from the same orders below: Nos. 24-6139 (Plaintiffs), 24-6140 (University Defendants), and 24-6141 (State Defendants). University Defendants have dismissed their appeal, No. 24-6140, and they have been dismissed entirely below, Doc. 285.

## STATEMENT OF JURISDICTION

Plaintiffs sued for declaratory and injunctive relief under the First and Fourteenth Amendments, as well as 42 U.S.C. § 1983, invoking the district court's jurisdiction under 28 U.S.C. § 1331. The district court granted partial preliminary relief as well as a partial motion to dismiss, and State Defendants timely appealed on July 15, 2024. This Court has jurisdiction to review interlocutory orders under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

In 2021, Oklahoma enacted House Bill 1775. HB 1775 holds that "[n]o teacher, administrator or other employee" of a K-12 public school "shall require or make part of a course" eight racist and sexist concepts, such as the idea that "one race or sex is inherently superior to another race or sex." OKLA. STAT. tit. 70, § 24-157(B)(1). Three years after enactment, the court below enjoined the word "require" and two of the concepts as vague, but otherwise allowed the Act's K-12 provisions to remain in effect. Thus, the issues are:

### *Response*

1.     Whether K-12 students have a First Amendment right to force Oklahoma to allow the teaching of the racist and sexist concepts prohibited by HB 1775.

2.     Whether HB 1775's prohibition of racist and sexist concepts from being required or made part of a course in K-12 public education is vague in its entirety.

### *Cross-Appeal*

3.     Whether it is unconstitutionally vague to prohibit racist and sexist concepts from being "require[d]" in K-12 schools.

4.     Whether it is unconstitutionally vague to prohibit teaching children that "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex."

3

5.      Whether it is unconstitutionally vague to prohibit teaching children that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex."

## **INTRODUCTION**

With HB 1775, Oklahoma sought to prohibit the teaching of specific racist and sexist concepts in public schools. Plaintiffs insist that this is unconstitutional. But just two years after HB 1775 was enacted, the U.S. Supreme Court emphasized that our Constitution does not allow schools to "employ race in a negative manner" or "involve racial stereotyping." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (*SFFA*). In a line that would be right at home in HB 1775, *SFFA* held that a "student must be treated based on his or her experiences as an individual—not on the basis of race." *Id.* at 231. Going further, the Supreme Court criticized "[m]any" schools that "have for too long done just the opposite." *Id.* These schools "have concluded, wrongly, that the touchstone of an individual's identity is not challenges bested, skills built, or lessons learned but the color of their skin. **Our constitutional history does not tolerate that choice**." *Id.* (emphasis added).

Given these binding statements, how could HB 1775 possibly be unconstitutional? Remarkably, Plaintiffs argue that students have a First Amendment right to "receive" the prohibited racist and sexist concepts from public schools. Plaintiffs' Brief ("Pls. Br.") 5. No such right exists, though, as public school teaching is government speech through and through. And regardless, Plaintiffs' claim that HB 1775 is "not 'reasonably related to legitimate pedagogical concerns,'" *id.* (citation omitted), is impossible to credit given the Supreme Court's condemnation of racism in education.

5

Plaintiffs also claim HB 1775 is vague in its entirety. But HB 1775 does not just say "racism is prohibited" or something similarly stunted. Rather, Oklahoma spelled out specific racist and sexist concepts and prohibited them from being required or made part of K-12 school courses. OKLA. STAT. tit. 70, § 24-157(B). On top of that, Oklahoma made clear that HB 1775 does "not prohibit the teaching of concepts that align to the Oklahoma Academic Standards," *id.*, which are official, lengthy, detailed, and unchallenged here. As a result, the district court correctly declined to enjoin HB 1775 as a whole. Taken seriously, Plaintiffs' arguments would mean that *SFFA*'s holding that a "student must be treated based on his or her experiences as an individual—not on the basis of race," 600 U.S. at 231, is itself impermissibly vague.

This Court should uphold HB 1775 in its entirety. The district court correctly rejected a blanket injunction, meaning much of the Act has now been in effect for more than four years. Oklahoma quibbles only with that court's decision to enjoin two concepts and the word "require." Respectfully, those provisions are not vague, either. Per its plain text and context, HB 1775 is a comprehensible law attempting to prevent the ills of racism and sexism from being forced on students. The Constitution in no way forbids this. And, needless to say, "our civilization will" not "stagnate and die" if this Court agrees. Pls. Br. 4 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)).

## <u>STATEMENT OF THE CASE</u>[1]

### A. Racist and sexist teachings proliferate in public education.

By 2021, the country was awash with reports of school districts disseminating radical teachings and indoctrinating students with racist and sexist materials. These developments alarmed many, including parents, students, and government officials. New York schoolchildren, for instance, were taught that "all white people" perpetuate systemic racism. Christopher F. Rufo, *Failure Factory*, CITY J. (Feb. 23, 2021).[2] A California elementary school forced third-graders to "deconstruct" their racial and sexual identities and then write an essay describing the aspects of their identities that "hold power and privilege." Christopher F. Rufo, *Woke Elementary*, CITY J. (Jan. 13, 2021).[3] And the country's largest teachers' union approved funding to "increase[] the implementation" of "critical race theory" in K-12 curricula. Christopher F. Rufo, *Embracing Critical Theory, Teacher's Union Says They—Not the Parents—Control What Kids Learn*, N.Y. POST (July 5, 2021).[4]

---

[1] Appendix citations will take these forms: P.A.Vol.X at ## (Plaintiffs-Appellants' Appendix) or D.A.Vol.X at ## (Defendants-Appellees' Appendix).

[2] *Available at* https://www.city-journal.org/article/failure-factory.

[3] *Available at* https://www.city-journal.org/article/woke-elementary.

[4] *Available at* https://nypost.com/2021/07/05/embracing-critical-theory-teachers-union-says-they-control-what-kids-learn/.

The Attorneys General of Montana and Arkansas, in official opinions, documented many such teachings. *See* P.A.Vol.II at 33, 45. This included a critical race theory textbook rejecting the ideal of a "colorblind" society, segregationist curriculum and practices, a school campaign against "whiteness in educational spaces," white teachers labeled as colonizers upholding racist ideas, and white Christian students being labeled "inherently oppressive and privileged." *Id.* at 35, 56–59. Montana's Attorney General opined that "[i]n many instances, the use of 'Critical Race Theory' and 'antiracism' programming discriminates on the basis of race, color, or national origin in violation of the Equal Protection Clause" and Title VI of the Civil Rights Act of 1964. *Id.* at 45. Arkansas's Attorney General made similar findings. *Id.* at 34.

Oklahoma has not been immune from this trend. In 2020, the University of Oklahoma rolled out mandatory "diversity" training for all students, faculty, and staff that drew intense criticism because it prohibited participants from answering hypotheticals in specific ways. *OU Launches Mandatory Diversity Training for All Students, Faculty, and Staff*, THE UNIV. OF OKLA. (Aug. 27, 2020)[5]; Sabrina Conza, *Univ. of Okla. Diversity Training Requires Students, Faculty to Agree with University-Approved Viewpoints*, FIRE (Apr. 8, 2021).[6] At the K-12 level, a longtime Oklahoma City Public Schools teacher

---

[5] *Available at* https://www.ou.edu/web/news_events/articles/news_2020/ou-launches-mandatory-diversity-training-for-all-students-faculty-and-staff.

[6] *Available at* https://www.thefire.org/news/updated-university-oklahoma-diversity-training-requires-students-faculty-agree-university.

and his colleagues were told in a mandatory training that they must publicly confess their white privilege and racism. P.A.Vol.II at 72 (Affidavit of James Taylor). And a former State Superintendent of Education testified that "[r]ace-based principles commonly associated with critical race theory … are being taught in Oklahoma public schools," even at an early age. *Id.* at 76 (Affidavit of Janet Barresi). Indeed, "from the earliest of grades, children are being oriented toward evaluating their environment based on skin color" and "being subject to race-based activities." *Id.* Parents across Oklahoma are deeply concerned about this, but they are scared to speak up for fear of retaliation. *Id.* at 76–77.

## B. HB 1775 prevents racism and sexism in Oklahoma's schools.

In 2021, Oklahoma's Legislature overwhelmingly passed HB 1775. In the first section—which is in effect—the Act prohibits universities from making "gender or sexual diversity training or counseling" mandatory. OKLA. STAT. tit. 70, § 24-157(A)(1). Indeed, "any form of race or sex stereotyping or a bias on the basis of race or sex" in a "require[d]" session or orientation "shall be prohibited." *Id.*

HB 1775's second section, covering K-12 education, identified eight racist and sexist topics that should not be taught. *Id.* § 24-157(B)(1). Specifically, public schools shall not "require or make part of a course the following concepts":

    a. one race or sex is inherently superior to another race or sex,

    b. an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously,

9

c. an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex,

d. members of one race or sex cannot and should not attempt to treat others without respect to race or sex,

e. an individual's moral character is necessarily determined by his or her race or sex,

f. an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex,

g. any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or

h. meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race.

*Id.* The Act contains an important limiting construction: "The provisions of this [K-12] subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." *Id.* § 24-157(B). Prepared with "Oklahoma educators and content specialists,"[7] adopted by the Board of Education, and approved by the Legislature, the Standards are the official "subject matter standards for instruction of students in the public schools of this state that are necessary to ensure there is attainment of desired levels of competencies in a variety of areas." OKLA. STAT. tit. 70, § 11-103.6b(A). These

---

[7] *Oklahoma Academic Standards*, OSDE, https://oklahoma.gov/education/services/standards-learning/oklahoma-academic-standards.html.

Standards outline in voluminous detail, impossible to fully convey here, what each K-12 student needs to understand and be able to do at the end of each grade or course.

The Standards call for a thorough evaluation of many topics involving race and sex. The "United States History" Standards indicate that students should be able to:

> Describe the Women's Suffrage Movement, focusing on … strategies used to bring attention to the suffrage cause ….

> Describe continued attempts to disenfranchise African Americans through the use of poll taxes and literacy tests by some state governments.

> Compare the viewpoints of early civil right leaders, such as Booker T. Washington, W.E.B. DuBois, and Ida B. Wells[.]

OKLA. ADMIN. CODE 210:15-3-110(2)(B)(ii). Similarly, the Standards call for students to "[e]xamine the evolution of race relations in Oklahoma" by analyzing "the intent and effect of Jim Crow laws," describing "the continued growth of African American communities, including the emergence of 'Black Wall Street' in Tulsa's Greenwood District," examining "the rise of the Ku Klux Klan and its involvement in acts of intimidation and violence," and analyzing the "causes" and "continued … impact" of the Tulsa Race Massacre. *Id.* 210:15-3-107(2)(F)(iii).

Oklahoma could keep going. *See, e.g.*, *id.* 210:15-3-105.8(2)(B)(ii)(V) ("Examine the views of free and enslaved Blacks toward the [American] revolution …."); *id.* 210:15-3-105.8(2)(L)(i)(III) ("Explain slavery as the central factor for the secession of southern states …."); *id.* 210:15-3-107(2)(H)(i) ("Evaluate the progress of the Civil Rights Movement in Oklahoma by describing the goals, strategies, and

accomplishments toward equality.”); *id.* 210:15-3-112.2(2)(E)(ii) (“Examine how identification, legal, and economic status was used to perpetuate the Nazi ideology of the ‘Master Race’ and target Jews.”). HB 1775 is not the only law regulating school teachings on race, either. One statute requires social studies courses “that reflect the racial, ethnic, religious, and cultural diversity of the United States of America.” OKLA. STAT. tit. 70, § 11-103.6b(A).

## C. State Board of Education enacts rules implementing HB 1775.

HB 1775 took effect on July 1, 2021. The Board of Education issued emergency rules on July 12, later made permanent with minor modifications, declaring its official policy “to prohibit discrimination on the basis of race or sex in the form of bias, stereotyping, scapegoating, classification, or the categorical assignment of traits, morals, values, or characteristics based solely on race or sex.” OKLA. ADMIN. CODE 210:10-1-23(a).[8] Thus, “[p]ublic schools in this state shall be prohibited from engaging in race or sex-based discriminatory acts by utilizing these methods, which result in treating individuals differently on the basis of race or sex or the creation of a hostile environment.” *Id.* The rules explained that nothing shall “prevent the teaching” of any “subject matter area consistent with the Oklahoma Academic Standards.” *Id.* 210:10-1-23(b)(5). The Board also explained that “[n]othing in this rule shall be interpreted to

---

[8] *See also* Emergency Rules, *available at* https://oklahoma.gov/content/dam/ok/en/osde/documents/about/board-meetings/2021/september/HB%201775%20Emergency%20Rules%20-%20Corrected.pdf.

prohibit the lawful consideration of sex" under Title IX or in restrooms, locker rooms, or athletic teams. *Id.* 210:10-1-23(b)(6).

The rules ensured compliance in several ways. For instance, schools may not utilize "assets or resources to engage in race or sex-based discrimination, including discriminatory practices identified in" HB 1775. *Id.* 210:10-1-23(d)(2). And schools cannot adopt programs or "textbooks, instructional materials, curriculum, classroom assignments, orientation, interventions, or counseling that include, incorporate or are based on the discriminatory concepts." *Id.* 210:10-1-23(d)(3). The rules also established a system for filing complaints. *Id.* 210:10-1-23(g). Finally, the rules explained potential punishments. For K-12 schools, failure to comply will, at minimum, result in being accredited with deficiency, with one year to correct. *Id.* 210:10-1-23(h)(1). A "second year of noncompliance for 'deliberately and unnecessarily violating'" HB 1775 will lead to being "Accredited with Probation." *Id.*[9] And a third year of noncompliance will end accreditation. *Id.* For school personnel, only "willful" violations can result in the revocation of a license or certificate. *Id.* 210:10-1-23(j)(2).

### D. Plaintiffs belatedly sue, and Oklahoma enforces the Act.

Months after HB 1775 took effect, Plaintiffs filed suit. They argued that the Act was unconstitutionally vague, infringed on students' right to receive information, discriminated on viewpoint, and was enacted with unconstitutional animus. Late in

---

[9] Also relevant, per a different regulation, in between a mere deficiency and probation is the possibility of a warning. *See* Okla. Admin. Code 210:35-3-201(b)(4).

2021, the Plaintiffs moved for a preliminary injunction, even though the Act had by then been in effect for nearly an entire school semester across the State. Eventually, all Defendants moved for dismissal or judgment.

The district court did not rule until two-and-a-half years later. Thus, for years, the Act applied to roughly 500 Oklahoma school districts, 1,800 schools, and 700,000 students. In all, HB 1775 has been enforced just three times in four years. Plaintiffs take issue with two instances: in the Tulsa Public Schools and Mustang Public Schools.[10] In both situations, the Board of Education imposed an Accreditation With Warning sanction. Neither Tulsa Public Schools nor Mustang Public Schools is a party here, nor did either challenge the enforcement in court. Moreover, Plaintiffs omit key details.

Plaintiffs claim that the "State's determination that Mustang Public Schools violated the Act … demonstrates the Act's problematic enforcement." Pls. Br. 44. But Plaintiffs description (of a "discussion of privilege" and an "exercise," *id.*) is itself vague. Here's the reality: in 2022, a teacher led middle school students in a "Privilege Walk" based on the "concept of White Privilege." P.A.Vol.II at 211. Students were told to stand in line with their eyes closed while the instructor read out loud. Children had to step forward or back based on their race, sex, socioeconomic status, and other characteristics—stepping forward, for instance, if their race was "widely represented in

---

[10] Plaintiffs reference a third enforcement against a teacher but give no details, Pls. Br. 10, presumably because she publicly stated, "I am a walking HB 1775 violation." *Boismier v. Walters*, 777 F. Supp. 3d 1300, 1306 (W.D. Okla. 2025) (rejecting the teacher's defamation claim against the State Superintendent).

the U.S. Congress" or if they could see their race "widely represented on television …
in a POSITIVE manner," and stepping back if they "started school speaking a language
other than English." *Id.* at 211–12. At the end of this exercise, the students were
instructed to open their eyes and compare themselves. *Id.* at 212. The written
instructions discuss the "intensity of the exercise," which "could provoke certain
emotions." *Id.* at 211. It also says the objective of the exercise is to "[r]aise awareness
of various forms of privilege" in children and help them "understand the
intersectionality of race," among other things. *Id.* Plaintiffs omit these troubling details.

Understandably, a parent complained. *See* David Chasanov, *Mustang Public Schools
parent outraged after controversial classroom activity*, KOKH FOX 25 (Aug. 2, 2022).[11] Mustang
Public Schools investigated and found that a serious mistake had been made that
potentially violated HB 1775, *id.*, which prohibits teaching that "[a]ny individual should
feel discomfort, guilt, anguish or any other form of psychological distress on account
of his or her race or sex." OKLA. STAT. tit. 70, § 24-157(B)(1)(g). This was self-reported
to the Department of Education, which agreed that a violation had occurred and
recommended an accreditation with deficiency. On July 28, 2022, the Board of
Education assessed accreditation with a warning, instead. *See supra* n.9.

---

[11] *Available at* https://okcfox.com/news/local/mustang-public-schools-parent-outraged-after-controversial-classroom-activity-district-school-class-exercise-races-race-white-privilege-walk-step-forward-backward-parents-kids-bullying-statement-oklahoma-transparent-critical-race-theory-house-bill-1775.

In sum, the structure and text of this "white privilege" exercise was plainly designed to elicit discomfort, guilt, and anguish from children on account of their race (and sex). The written goal was to expose privileges, with the only privilege spelled out being "white privilege." P.A.Vol.II at 211. That is, the goal was to segregate students and teach white children that they are privileged in a way their non-white peers are not, and vice versa,[12] and the exercise was admittedly "intens[e]" and likely to stir emotions. *Id.* There is little room for argument that the intent was to teach children without causing them discomfort, guilt, or anguish. *Contra* Pls. Br. 44.

Plaintiffs spill more ink on the Tulsa teacher training. But there, training slides stated that "[e]veryone has implicit racial biases" that are "built and shaped unconsciously through our history and cultures," that "school professionals need to examine … their own implicit racial biases," and that these biases "lead people to favor those in their own racial group" against others. D.A.Vol.II at 1–2 (filed under seal). These instructions violate the prohibition on teaching that "[a]n individual, by virtue of his or her race or sex, is *inherently* racist, sexist or oppressive, whether consciously *or unconsciously*." OKLA. STAT. tit. 70, § 24-157(B)(1)(b) (emphases added). Like with Mustang, the Board assessed an accreditation warning, which has since been removed.

---

[12] One should readily anticipate that it would also cause discomfort or anguish for those who stepped backward and then surveyed their peers.

**E. The district court largely upholds HB 1775, with some exceptions.**

In June 2024, the district court declined to enjoin much of HB 1775, and it granted dismissal on several claims. Relevant here, the court determined that the phrase "make part of a course" in the K-12 section was sufficiently clear because, when "read in conjunction with the eight prohibited concepts themselves, the plain and ordinarily understood meaning … is to prohibit school personnel from directly endorsing, promoting, or inculcating any concept as a normative value." P.A.Vol.III at 134. The court enjoined the companion word "require," however, as an "illogical mismatch" with the word "concept." *Id.*

The court upheld six of the eight prohibited concepts as "sufficiently clear to give ordinary people fair notice of the conduct prohibited" and "not so standardless as to invite arbitrary enforcement." *Id.* at 135. In doing so, the court correctly construed these "directives" as "narrow in scope in light of both the plain text of the statute and the statute's express incorporation of the Academic Standards as a 'safe harbor.'" *Id.* For example, concerning the provision prohibiting teaching that "one race or sex is inherently superior," OKLA. STAT. tit. 70, § 24-157(B)(1)(a), the court wrote: "Contrary to Plaintiffs' arguments, this provision does not reasonably prohibit teaching about how mistaken beliefs about the superiority of one race or sex have existed in history, how such beliefs exist now, or how those beliefs have affected or currently affect the actions of people or institutions." P.A.Vol.III at 136–37. And so on.

The court enjoined two prohibited concepts as vague: (c) "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex," and (d) "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." OKLA. STAT. tit. 70, § 24-157(B)(1)(c)–(d). Even though it "appears likely" that the "intended result" with (c) was to "prohibit a teacher from endorsing widely rejected ideas," the court deemed the language "simply unclear" because it could be read to extend to "ideas that are accepted by a significant number of people and are reflected in current law," such as "affirmative action" or the idea that "men but not women should be subject to military conscription." P.A.Vol.III at 138–39. Similarly, he expressed concern that subsection (d) could prevent the "endorsing" of "ideas that are widely accepted and are reflected in current law," such as "that sports divisions may be established for boys and girls." *Id.* at 139. The court granted facial relief, enjoining enforcement of the law against anyone. *Id.* at 148–49.

In a companion order, the court dismissed Plaintiffs' claim that HB 1775 unconstitutionally restricted the information they could teach or receive in K-12 public schools. Relying on precedent, the court held that "curricular speech of the kind regulated by" HB 1775 "is not protected by the First Amendment." *Id.* at 108. And if there is no "First Amendment right to teach particular information in the classroom, it follows that there is no plausible claim for a violation of K-12 level student-Plaintiffs' right to receive that information." *Id.* at 109 n.16. Alternatively, even if the test identified

in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), applied, the court indicated that HB 1775 "serves a legitimate pedagogical purpose." *Id.* at 108 n.15.

Thus, three years after it took effect, the court preliminarily and facially enjoined several provisions of HB 1775, upheld a larger portion, and dismissed Plaintiffs' First Amendment "right to receive" claim.

## F. Oklahoma Supreme Court declines to opine on HB 1775's K-12 provisions.

Around the same time this appeal was filed, the court certified six questions to the Oklahoma Supreme Court. P.A.Vol.III at 156. The three K-12 questions related to the parts of HB 1775 that the court enjoined. First, the court asked "what does it mean to 'require' an identified 'concept[]?'" *Id.* at 162. Second and third, the court asked "what does it mean to 'make part of a course'" the concepts in subsections (c) and (d). *Id.*

The Oklahoma Supreme Court responded on June 17, 2025. *See BERT v. Drummond*, 571 P.3d 135 (Okla. 2025). The Supreme Court ruled against Plaintiffs on the higher education questions, *contra* Pls. Br. 8 n.2, expressly "agree[ing] with Defendants' construction" of HB 1775. *Id.* at 140. The Supreme Court then "respectfully decline[d] to answer" the K-12 questions. *Id.* at 141, 143. The Supreme Court went out of its way to state that it was declining for reasons *other* than those raised by Plaintiffs. *Id.* at 141. (Plaintiffs claimed the "statute is so vague that it is not susceptible to a limiting construction." *Id.*) For its part, the Supreme Court declined to "define these terms or phrases in the abstract" because its responses would be "advisory" to a federal claim, and "it is unclear whether President Trump's recent

promulgation" of an executive order on similar topics "will impact or moot the federal questions." *Id.* at 141–42. This appeal ensued.

## G. Response to Plaintiffs' Statement of the Case.

In a brief accusing Oklahoma of vagueness, Plaintiffs speak in noticeably ambiguous terms about what they are promoting. For example, they claim to support of "racial justice," "culturally responsive curricula and programming," "address[ing] racism and bigotry," and "nationwide … efforts to address racism." Pls.' Br. 6–7. But if that is so, what could possibly be wrong with HB 1775? The Act, after all, merely prohibits teaching K-12 children things like "one race or sex is inherently superior to another race or sex." OKLA. STAT. tit. 70, § 24-157(B)(1)(a). What do Plaintiffs want to teach that contradicts this? Plaintiffs expressly decry an inability under HB 1775 to indoctrinate Oklahoma schoolchildren about their "white privilege." Pls. Br. 9, 27, 42. What Plaintiffs apparently deem appropriate "inclusive and culturally responsive curricula" that would "address racism and bigotry," Pls. Br. 6–7, looks remarkably like racial stereotyping. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.").

Plaintiffs point out, correctly, that the prohibited K-12 concepts appeared in an executive order (EO) from the first Trump Administration. Pls. Br. 7. In 2020, President Trump issued an EO "on Combating Race and Sex Stereotyping." EO No.

13950, 85 Fed. Reg. 60683 (Sept. 28, 2020).[13] That EO declared it "the policy of the United States not to promote race or sex stereotyping or scapegoating in the Federal workforce or in the Uniformed Services, and not to allow grant funds to be used for these purposes." *Id.* at 60685. The EO identified nine "divisive concepts" to avoid, such as the idea that "one race or sex is inherently superior to another race or sex." *Id.*

That EO was enjoined in the final weeks of the first Trump Administration, but only as to independent federal contractors and grantees—not the government's own workforce. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 546, 550 (N.D. Cal. 2020). The injunction evaded appellate review because the EO was withdrawn by the Biden Administration. Moreover, the second Trump Administration issued an EO entitled "Ending Radical Indoctrination in K-12 Schooling," criticizing attempts to compel schoolchildren "to adopt identities as either victims or oppressors solely based on their skin color" and defines "[d]iscriminatory equity ideology" using terms that are nearly identical to the various concepts forbidden by HB 1775. EO No. 14,190, 90 Fed. Reg. 8853, 8853–54 (Feb. 3, 2025).[14] Provisions like those found in HB 1775, that is, are expressly supported by the United States.

---

[13] *Available at* https://www.federalregister.gov/documents/2020/09/28/2020-21534/combating-race-and-sex-stereotyping.

[14] *Available at* https://www.federalregister.gov/documents/2025/02/03/2025-02232/ending-radical-indoctrination-in-k-12-schooling.

Plaintiffs also ignore that the concepts they wish to teach—like "white privilege"—risk violating civil rights laws. In *Diemert v. City of Seattle*, 689 F. Supp. 3d 956 (W.D. Wash. 2023), for example, a federal court held that an employee "stated a plausible claim for a hostile-work environment based on race" when, among other things, he was repeatedly told "he had white privilege and racist motives." *Id.* at 961, 963. Citing that case, this Court "endorse[d]" the "settled and sound principle" that while "merely discussing 'the influence of racism on our society does not necessarily violate federal law,'" when "employers talk about race—any race—with a constant drumbeat of essentialist, deterministic, and negative language, they risk liability under federal law." *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1253 n.4 (10th Cir. 2024) (quoting *De Piero v. Pa. State Univ.*, 711 F. Supp. 3d 410, 424 (E.D. Pa. 2024)). And in the educational context, of course, the U.S. Supreme Court recently struck down "affirmative action" admissions processes that "unavoidably employ race in a negative manner" and "involve racial stereotyping." *SFFA*, 600 U.S. at 230.

When Plaintiffs claim HB 1775 had "an immediate chilling effect" and "educators in the state[] are in an impossible bind," Pls. Br. 10, 16, they are not speaking for teachers who believe HB 1775 is "well written and straightforward." P.A.Vol.II at 99. As one longtime Oklahoma teacher testified below, "[i]f you can't teach a history class without labeling kids in the narrow ways that are barred by HB 1775, you're probably in the wrong profession." *Id.* Teachers can still "teach on touchy and controversial subjects," such as slavery and the Tulsa Race Massacre, so long as they

don't "label" or "demean" children based on skin color. *Id.* at 99–100. Another witness testified that "[a]s an educator, I do not find HB 1775 ambiguous or vague, or broad." *Id.* at 72. "Rather, it appears designed to allow teachers to teach broadly" and is "very easy to comply with." *Id.* at 72–73.

Plaintiffs also assert that Edmond Public Schools "removed anchor texts that discussed race from English classes" as well as "all of the texts from diverse authors." Pls. Br. 42. But Edmond Public Schools ably rebutted this claim below. D.A.Vol.I at 6, 21–30. The district's English reading lists were adjusted "without regard to H.B. 1775" and now "represent a more diverse selection of texts than the ones" previously required—including 29 minority authors. *Id.* at 6–7. HB 1775 has not decreased diversity within Edmond's English classrooms, nor has it caused Edmond to "strip[]" *To Kill a Mockingbird* from reading lists. *Compare* Pls. Br. 5, *with* D.A.Vol.I at 6–7.

Finally, nothing in the Act "deprives students of information from diverse perspectives," and it most certainly does not cut "off students' ability [to] develop their own viewpoints on these topics" in classrooms. *Id.* at 6. In any event, K-12 students are free to explore whatever material they (and their parents) deem fit, on their own time, and they may develop their viewpoints free from interference. HB 1775 has nothing to do with these matters.

## SUMMARY OF THE ARGUMENT

Plaintiffs challenge Oklahoma's effort, through HB 1775, to prevent racist and sexist concepts from being taught to the State's schoolchildren. First, Plaintiffs argue

that HB 1775 violates students' First Amendment right to receive information. But Plaintiffs have not properly appealed this claim, which was dismissed by the district court. In any event, as multiple appellate courts have affirmed, no one has a First Amendment right to receive speech from a government entity. And students have no right to be taught any specific concept, let alone concepts that violate principles of equality enshrined in the Constitution. Even Plaintiffs admit the applicable standard under their theory is akin to rational basis review, a review that HB 1775 easily passes.

Plaintiffs also claim the district court erred by declining to enjoin the K-12 provisions as vague. But Plaintiffs have not demonstrated that any aspect of the Act is particularly difficult to understand, much less so vague as to lack meaning. Below, they neglected to discuss several prohibited concepts, meaning those arguments should be considered waived. And in purporting to analyze the key words and phrases, Plaintiffs contort basic words, contradict the statute's text and context, and embrace absurdities. As State Defendants have maintained for four years now, HB 1775's provisions are straightforward. The Act has a plainly legitimate sweep and uses words of common understanding. And HB 1775 expressly incorporates the comprehensive Oklahoma Academic Standards, providing a safe harbor for teachers. Combatting the promulgation of racist and sexist concepts in Oklahoma education is a topic that should not be controversial in a country where racism and sexism are prohibited in countless legal ways. This Court should accept the plain meanings offered by Oklahoma and reject the twisting of language implausibly embraced by Plaintiffs.

Finally, Oklahoma cross-appeals the limited portions of HB 1775 that the district court enjoined. In light of the text, context, and express incorporation of the Academic Standards, the district court erred as a matter of law in finding that any provision in HB 1775 is vague. Neither "require" nor the two enjoined concepts are difficult to understand, as they are clearly prohibiting teachers from forcing students to embrace racist and sexist teachings such as the idea that colorblindness is impossible.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008); *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). To obtain it, a plaintiff must show: (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Preliminary injunctions are the "exception rather than the rule," *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984), and "the right to relief must be clear and unequivocal." *Schrier*, 427 F.3d at 1258 (quotation omitted). This Court reviews the grant or denial of a preliminary injunction for abuse of discretion. *Poe v. Drummond*, 149 F.4th 1107, 1120 (10th Cir. 2025). But this Court evaluates the district court's legal determinations de novo. *Id.* Thus, "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996). Also, this Court "disfavor[s]" preliminary injunctions that, like here, "alter the status quo." *Colorado v. Griswold*, 99 F.4th 1234, 1240 n.4 (10th

Cir. 2024). "When reviewing a disfavored preliminary injunction request, this court requires the moving party to 'make a heightened showing of the four factors.'" *Id.*

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY DECIDED THAT K-12 STUDENTS DO NOT HAVE A FIRST AMENDMENT RIGHT TO RACIST AND SEXIST TEACHING.

Plaintiffs argue that K-12 "[s]tudents have a First Amendment right to receive" the racist and sexist "curricular information" prohibited by HB 1775. Pls. Br. 45. The district court denied Plaintiffs an injunction of HB 1775 on that basis, however, and it simultaneously dismissed this "right to receive" claim entirely, on the merits. P.A.Vol.III 109 n.16, 118, 146.

As an initial matter, Plaintiffs appeal only the denial of a preliminary injunction— not the dismissal. *E.g.*, Pls. Br. iii, 2–3, 53, 58. This was likely insufficient to preserve the matter for review. This Court has repeatedly indicated that an underlying dismissal moots an appeal of a preliminary injunction on that claim. *See, e.g.*, *Baker v. Bray*, 701 F.2d 119, 122 (10th Cir. 1983) ("the claim upon which the request for a preliminary injunction was based … was dismissed by the district court, and this action certainly mooted the issue raised herein"); *Sac & Fox Nation of Okla. v. Cuomo*, 193 F.3d 1162, 1168 (10th Cir. 1999) (deeming moot an appeal from the denial of an injunction following dismissal of underlying action); *Hernandez v. Grisham*, No. 20-2176, 2022 WL 16941735, at *1 (10th Cir. Nov. 15, 2022) (unpublished) ("[w]e lack jurisdiction to consider" a "misguided" injunction appeal after summary judgment grant).

26

The wrinkle here is that the district court did not dismiss Plaintiffs' entire case. As a result, there is a question as to whether the underlying First Amendment dismissal was an appealable order. *See* FRCP 54(b). Here, though, Plaintiffs have not even *tried* to appeal that dismissal; they have chosen only to seek preliminary relief relating to a dismissed claim. This appears to be improper. *See Rose v. Utah State Bar*, 444 F. App'x 298, 300 (10th Cir. 2011) (unpublished) ("Ms. Rose's proper course of action is to pursue her appeal from the … order dismissing the complaint.").

In any event, Plaintiffs are unlikely to prevail in showing that the First Amendment protects the teaching and receipt of the racist and sexist concepts prohibited by HB 1775 in K-12 schools. Simply put, there is no First Amendment right for a K-12 student to be taught any specific concept, let alone concepts that contravene principles of equality enshrined in bedrock federal law.

"As a threshold matter, we must first consider whether the activity in question constitutes protected speech under the First Amendment." *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019). If it is unprotected, "we need go no further." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). The district court was correct: "it is plain that the in-class instructional speech of K-12 Schools and teachers regulated by [HB 1775] is not protected by the First Amendment." P.A.Vol.III at 108 n.15. "In concluding that the First Amendment does not protect primary and secondary school teachers' in-class curricular speech," the Sixth Circuit has observed, "we have

27

considerable company." *Evans-Marshall v. Bd. of Ed. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 342 (6th Cir. 2010) (collecting cases).

Plaintiffs do not contest this proposition. Pls. Br. 45–46. But from that proposition, it "follows that there is no plausible claim for a violation of K-12 level student-Plaintiffs' right to receive that information." P.A.Vol.III at 109 n.16; *see also, e.g.*, *Seyfried v. Walton*, 668 F.2d 214, 216 (3d Cir. 1981) ("[A] student has no First Amendment right to study a particular aspect or period of history in his or her senior history course ...." (citation omitted)). Nevertheless, Plaintiffs claim that "students possess an independent First Amendment right to receive information" in the classroom context. Pls. Br. 46. This is illogical, given Plaintiffs' refusal to argue that a teacher has a First Amendment right to teach the same information. It is also incorrect.

"[T]he Government may not infringe on 'the right to receive information and ideas.'" Pls. Br. 45 (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)). But as the *en banc* Fifth Circuit just explained, none of the Supreme Court cases interpreting that right has ever involved "a right to receive information from the *government*." *Little v. Llano Cnty.*, 138 F.4th 834, 843 (5th Cir. 2025) (en banc). "And none suggested that the First Amendment obligates the government to provide information to anyone." *Id.* Rather, the "right to receive" has always been a "negative right against government interference." *Id.* (citation omitted). *Stanley*, for example, emphasized that the "State has no business telling a man, *sitting alone in his own house*, what books he may read." 394 U.S. at 565 (emphasis added). And *Lamont v. Postmaster General,* 381 U.S. 301 (1965), the first

case Plaintiffs cite for their proposition, Pls. Br. 46, held that the Postal Service could not interfere with private citizens' receipt of "communist political propaganda" in the mail. *Lamont*, 381 U.S. at 306–07. In other words, as the Eighth Circuit just held, the "right to receive information cannot constrain the government's ability to decide what to say and what not to say." *Walls v. Sanders*, 144 F.4th 995, 1003 (8th Cir. 2025); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) (collecting cases holding that the Free Speech Clause "does not regulate government speech").

Public K-12 school teaching is undeniably government speech. *See Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005) ("[W]hen the SBOE devises the state curriculum for Texas … it is the state speaking …."); *Walls*, 144 F.4th at 1002 (similar). Thus, the "right to receive" is not implicated by HB 1775, which merely regulates the State's own speech in the K-12 context. "Just as ordinary citizens cannot require the government to express a certain viewpoint or maintain a prior message, students cannot oblige the government to maintain a particular curriculum or offer certain materials in that curriculum …." *Walls*, 144 F.4th at 1003 (collecting cases). As such, the Eighth Circuit reversed a district court's preliminary injunction against an Arkansas law that prohibited the teaching of racist and sexist materials in public schools, including the idea that some races are "inherently superior or inferior" to others. *See id.* at 1000, 1006.

Plaintiffs claim the Eighth Circuit misread *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 862 (1982). It is Plaintiffs' reliance on *Pico* that is misplaced. This Court has apparently not cited *Pico* in 31 years, since *Cummins v.*

29

*Campbell*, 44 F.3d 847, 853 n.4 (10th Cir. 1994). And *Cummins* explained that *Pico*: (1) "produc[ed] no majority opinion on the merits," and (2) remanded "for a trial to determine whether there was a free speech violation" present in a "school board's removal of books present in the school's library." *Id.* Moreover, *Cummins* held in favor of the Oklahoma State University Board of Regents on a First Amendment issue in part because the "Regents have not restrained anyone's speech … *but its own.*" *Id.* at 853 (emphasis added). Even earlier, this Court relied on the *dissent* from *Pico* to hold that "caselaw does not support [the] position that a secondary school teacher has a constitutional right to academic freedom." *Miles v. Denver Pub. Schs.,* 944 F.2d 773, 779 (10th Cir. 1991) (citing *Pico*, 457 U.S. at 920 (Rehnquist, J., dissenting)).

Per this Court, *Pico* offered no majority opinion and no First Amendment determination. And that is exactly what the Eighth Circuit explained: "*Pico* lacks any holding as to the First Amendment because the narrowest grounds for the judgment was the opinion of Justice White who declined to decide any constitutional questions." *Walls*, 144 F.4th at 1003; *see also Little*, 138 F.4th at 843 ("[O]ur en banc court ruled long ago that *Pico* carries no precedential weight."). Nevertheless, Plaintiffs claim that Justice White's controlling concurrence "would have been pointless if no facts could have established a First Amendment violation." Pls. Br. 49. Justice White, however, saw "no necessity" for "address[ing] the First Amendment" but instead wanted to wait until the lower courts analyzed an "unresolved factual issue" on remand. *Pico*, 457 U.S. at 883 (White, J., concurring in the judgment). He could hardly have been clearer on this: "We

30

should not decide constitutional questions until it is necessary to do so." *Id.* at 884. Plaintiffs should not put words in Justice White's mouth.

Similarly, Plaintiffs assert that "a majority of Justices on the *Pico* Court agreed that removing materials from school libraries implicates students' First Amendment rights." Pls. Br. 48–49. Multiple circuits have disclaimed similar readings of *Pico*, as discussed above. Regardless, Plaintiffs ignore that the *Pico* plurality *repeatedly* deemed it significant that the respondents did "not seek in this Court to impose limitations upon their school Board's discretion to prescribe the curricula of the Island Trees schools," meaning "[o]ur adjudication of the present case *thus does not intrude into the classroom.*" *Pico*, 457 U.S. at 862 (emphasis added). Indeed, the plurality observed that "Petitioners might well defend their claim of absolute discretion in matters of *curriculum* by reliance upon their duty to inculcate community values," but found "that duty is misplaced where, as here, they attempt to extend their claim of absolute discretion beyond the compulsory environment of the classroom." *Id.* at 869 (plurality). If anything, *Pico* favors the State.

Plaintiffs reach back over a century, claiming that *Meyer v. Nebraska*, 262 U.S. 390 (1923), held that "the 'state's power to prescribe a curriculum' must still be constitutionally 'reasonable.'" Pls. Br. 46. *Meyer* made no such holding. "*Meyer* held that substantive due process for[]bade a State from enacting a statute that prohibited teaching in any language other than English." *Conn v. Gabbert*, 526 U.S. 286, 291 (1999). For their assertion, Plaintiffs stitch together two different quotes, the latter of which merely observed that, there, no "challenge [has] been made of the state's power to

prescribe a curriculum." *Meyer*, 262 U.S. at 402; *see also Cary v. Bd. of Educ. of Adams-Arapahoe Sch. Dist. 28-J, Aurora, Colo.*, 598 F.2d 535, 540 (10th Cir. 1979) (*Meyer* "was based upon due process grounds and contains little reasoning of aid to us in the instant [First Amendment] case."). Plaintiffs also rely on non-free speech cases like *Epperson v. Arkansas*, 393 U.S. 97 (1968), which dealt with the intersection of government teaching and the Establishment Clause. The establishment of religion is not at issue here.

Overall, Plaintiffs place much reliance on *Hazelwood*, 484 U.S. 260, claiming that it stands for the proposition that "the government may not restrict public school students' First Amendment rights in the curricular context unless such restrictions are 'reasonably related to legitimate pedagogical concerns.'" Pls. Br. 45 (quoting *Hazelwood*, 484 U.S. at 273). This overreads *Hazelwood*, which evaluated a principal's decision to remove two pages of a student-made school newspaper prior to publication. 484 U.S. at 262–65. The Court found the school's decision not "to sponsor student speech" did not violate the First Amendment because the school's decision was "reasonably related to legitimate pedagogical concerns." *Id.* at 272–73.

*Hazelwood* involved student speech, not government speech or a "right to receive," thus its standard of review should not necessarily apply here. Indeed, this Court has (in cases cited by Plaintiffs, Pls. Br. 49) explained that "[b]etween pure student speech and government speech is 'school-sponsored' speech, which is governed by *Hazelwood*." *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 923 (10th Cir. 2002). Such "[s]chool-sponsored speech," this Court made clear, "is *student* speech that a

school 'affirmatively … promote[s].'" *Id.* (emphasis added) (quoting *Hazelwood*, 484 U.S. at 270–71). "When the government speaks," however, "such as the principal speaking at a school assembly … it may choose what to say and what not to say." *Id.*; *see also Axson–Flynn v. Johnson*, 356 F.3d 1277, 1285 (10th Cir. 2004) ("Axson–Flynn's speech in this case constitutes 'school-sponsored speech' and is thus governed by *Hazelwood.*").

To be sure, this Court has applied *Hazelwood* to a teacher's in-class speech. *See Miles*, 944 F.2d at 773. But that speech, which this Court deemed unprotected, involved informal commentary and "rumor" spreading, not teaching. *Id.* at 774, 779. In any event, it is difficult to square a *Hazelwood* application to teachers with *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. at 421. *Garcetti* expressly avoided the question of this principle's application to "teaching," *id.* at 425, however, so the question "has not yet been conclusively answered." P.A.Vol.III at 108 n.15. Nevertheless, *Garcetti*, as well as *Fleming*, *Axson–Flynn*, and recent decisions from the Fifth and Eighth Circuits, undermine Plaintiffs' argument that governmental decisions on what to teach implicate the First Amendment and are subject to *Hazelwood*.

In truth, though, this is an academic point. HB 1775 is "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. "The makeup of the curriculum ... is by definition a legitimate pedagogical concern," *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 370 (4th Cir. 1998), and discouraging racism (and sexism) is

a *compelling* pedagogical interest. *See SFFA*, 600 U.S. at 231. And here, the text of HB 1775 straightforwardly prohibits the teaching of racist and sexist concepts. Once again, Plaintiffs' own citations betray them. Specifically, Plaintiffs cite Ninth and Eleventh Circuit cases to argue that *Hazelwood* applies to "right to receive" claims. *See Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015); *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517 (1989). In *Arce*, the Ninth Circuit affirmed that states have a "legitimate pedagogical interest in reducing racism," and it held that interest was rationally furthered by a state statute that "prohibits any courses or classes that '[p]romote resentment toward a race or class of people,'" as well as a statute that "prohibits courses and classes that '[a]dvocate ethnic solidarity instead of the treatment of pupils as individuals.'" 793 F.3d at 985–86 (citations omitted). This is on point here. In *Virgil*, the Eleventh Circuit deemed *Hazelwood* "a relatively lenient test" and therefore upheld a school's removal of a "textbook from an elective high school class because of objections to the material's vulgarity and sexual explicitness." 862 F.2d at 1518, 1521. Applying these cases, the district court was correct not to enjoin HB 1775 in its entirety.

Still, Plaintiffs claim that HB 1775 is "precisely the kind of viewpoint discrimination the First Amendment is designed to prevent." Pls. Br. 50. But this Court was clear in *Fleming* that "*Hazelwood* does not require viewpoint neutrality." 298 F.3d at 928–29. To hold otherwise for public K-12 school teaching would produce outlandish results. Teachers would have to remain neutral between the Nazis and the Allies,

34

between slaveholders and slaves, or between rioters and those they slaughtered in the Tulsa Race Massacre. This insanity is not required.

In the end, Plaintiffs assert that "there is no reason to believe" combating discrimination "was actually what motivated the state legislature." Pls. Br. 51. But there is every reason to believe this: the text of HB 1775 says so. *See Fleming*, 298 F.3d at 925 ("[W]e give substantial deference to educators' stated pedagogical concerns."). And the text controls. *See, e.g., Poe*, 149 F.4th at 1126 (declining to find Oklahoma had a pretexual purpose because of what "[t]he statute's text demonstrates"). Plaintiffs retort that "legislators' and other state officials' own words belie this manufactured justification." Pls. Br. 51. But "contemporary statements from a few legislators do not persuade us of discriminatory intent." *Poe*, 149 F.4th at 1125; *see also Citizens for Const. Integrity v. United States*, 57 F.4th 750, 768 (10th Cir. 2023). And no quote shows pretext. One representative, for example, said HB 1775 would "end the requirements for race-based biased curriculum in our schools," P.A.Vol.I 109, which supports the State's argument.

## II. THE DISTRICT COURT CORRECTLY REJECTED PLAINTIFFS' VAGUENESS ARGUMENTS AGAINST HB 1775 AS A WHOLE.

Plaintiffs bring a facial vagueness challenge to HB 1775's K-12 regulations.[15] For facial relief, "it is necessary to proceed with caution and restraint," *Erznoznik v. City of*

---

[15] Plaintiffs briefly mention an "as-applied" challenge. Pls. Br. 11. But the Act has not been enforced against any named Plaintiff, the schools to which the Act has been enforced have not sued the State, and the district court prohibited the State from enforcing the enjoined provisions anywhere, against anyone.

*Jacksonville*, 422 U.S. 205, 216 (1975), "[b]ecause facial challenges push the judiciary towards the edge of its traditional purview and expertise." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005). Indeed, the Supreme Court has "made facial challenges hard to win" because they "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citation omitted). Facial challenges are "disfavored," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), and plaintiffs "normally 'must establish that no set of circumstances exists under which the [statute] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (citation omitted). "[C]ourts must be vigilant in applying a most exacting analysis to such claims." *Ward*, 398 F.3d at 1247.

Plaintiffs face a doubly heavy burden here, given that "[s]triking down ordinances … as facially void for vagueness is a disfavored judicial exercise." *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998). The Constitution, after all, "does not … impose impossible standards of specificity, and courts should remain ever mindful that general statements of the law are not inherently incapable of giving fair and clear warning.'" *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023) (citation omitted). "That there may be some borderline questions to decide is not fatal to" a law. *United States v. Villano*, 529 F.2d 1046, 1055 (10th Cir. 1976). Thus, Plaintiffs "must show, at a minimum, that the challenged law would be vague in the vast majority of its applications; that is, that 'vagueness permeates the text of [the] law.'" *Doctor John's, Inc.*

*v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)). Nothing of the sort exists here.

### a.  The district court used an overly stringent vagueness standard.

In analyzing vagueness, "the Supreme Court has 'expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.'" *Fabrizius v. Dep't of Agric.*, 129 F.4th 1226, 1238 (10th Cir. 2025) (quoting *Vill. of Hoffman Ests. v. Flipside*, 455 U.S. 489, 498–99 (1982)). The Supreme Court has also indicated that "perhaps the most important factor" calling for *less* tolerance of uncertain wording is whether a law "threatens to inhibit the exercise of constitutionally protected rights." *Murphy v. Matheson*, 742 F.2d 564, 570 (10th Cir. 1984) (quoting *Flipside*, 455 U.S. at 499). Here, HB 1775 is civil, it does not regulate constitutional rights, and its implementing rules require a finding of willfulness. Thus, courts should give it "greater tolerance" in a vagueness analysis.

The district court "applie[d] a stringent vagueness test," however, almost entirely due to its assessment that suspending or revoking a teacher license is "sever[e]" enough to merit the higher standard. P.A.Vol.III at 133. Having a teaching license suspended is no trifling matter, but it is undeniably civil and "qualitatively less severe" than criminal penalties. *Flipside*, 455 U.S. at 499. Moreover, this Court has already held that a more deferential standard of vagueness review is appropriate for "non-criminal policies in the unique context of public schools." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 50 (10th Cir. 2013). And again, "perhaps the most important" factor is whether constitutional

rights are involved, *Flipside*, 455 U.S. at 499, and the district court correctly found that they were not, P.A.Vol.III at 133. The district court's insistence that a stringent test applied contradicted precedent from this Court and the Supreme Court.

Even applying an overly rigorous standard, however, the district court rightly upheld the bulk of HB 1775's K-12 regulations. That is how weak Plaintiffs' claims of vagueness are here. The court applied a higher standard than necessary and *still* upheld most of Oklahoma's law.

### b.  HB 1775 has a plainly legitimate sweep and common words.

Critically, yet ignored by Plaintiffs, a statute "is not vague facially if it has a plainly legitimate sweep." *Fabrizius*, 129 F.4th at 1238 (10th Cir. 2025) (cleaned up). Nor can it be facially vague "if it 'delineates its reach in words of common understanding.'" *Id.* (citation omitted). HB 1775 undeniably uses "words of common understanding," *and* "it has a plainly legitimate sweep" in prohibiting specific racist and sexist concepts from being foisted upon public schoolchildren. *Id.* Thus, the district court correctly declined to preliminarily enjoin the entire Act, facially.

*First*, HB 1775 uses words of common understanding. Rather than deploy academic terminology like "critical race theory" or "intersectionality," P.A.Vol.I at 109–14, Oklahoma instead spelled out in plain, lay terms what specific concepts should not be required or made part of a K-12 course. OKLA. STAT. tit. 70, § 24-157(B)(1). There is nothing uncommon, technical, or obscure about saying schools should not convey that "one race or sex is inherently superior to another race or sex" or that "an

individual's moral character is necessarily determined by his or her race or sex." *Id.* §

24-157(B)(1)(a), (e). And this language is more commonly phrased than regulations that

this Court has held used "common" words. *See, e.g.*, *Fabrizius*, 129 F.4th at 1237–38

(upholding 9 C.F.R. § 86.5(a)'s documentation requirements for interstate movement

of covered livestock); *Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1258 (10th Cir. 2018)

(upholding 29 C.F.R. § 1910.109(b)(1)'s ban on hazardous storage, handling, or

transportation of "explosives or blasting agents").

    *Second*, HB 1775's K-12 regulations have a plainly legitimate sweep. The

Constitution does not allow public schools of any stripe to "employ race in a negative

manner" or engage in "racial stereotyping." *SFFA*, 600 U.S. at 230. Thus, logically,

States are allowed—and arguably *required*—to prohibit the teaching of racial stereotypes

and use of race in a negative manner in their schools. States can insist that every

"student must be treated based on his or her experiences as an individual—not on the

basis of race." *Id.* at 231. And HB 1775 does exactly that. *See StreetMediaGroup, LLC v.*

*Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023) ("We look to the text of the Act to

understand its scope."). It regulates the State's own speech, at times in language that

practically mirrors the Supreme Court in *SFFA*. *See* OKLA. STAT. tit. 70, § 24-

157(B)(1)(c) (cannot teach that "an individual should be discriminated against or receive

adverse treatment solely or partly because of his or her race or sex"). Even Plaintiffs

admit, "[o]f course," that "preventing invidious discrimination can be a legitimate

pedagogical interest." Pls. Br. 51. Plainly, HB 1775 has a legitimate sweep. And "[i]f that condition is met—as it is here—our inquiry ends." *Fabrizius*, 129 F.4th at 1239.

Plaintiffs try to dodge this by claiming that the Legislature acted with pretext, but that is baseless for reasons already covered, as is Plaintiffs' absurd argument that Oklahoma must maintain viewpoint neutrality in its own speech. *See supra* pp.34–35. In a different vein, Plaintiffs argue that "Oklahoma schools are already subject to state and federal antidiscrimination laws that" protect students, thus implying that "a prophylactic ban on teaching about certain ideas" is unnecessary. Pls. Br. 52. But that is not Plaintiffs' call to make. The State gets to determine its speech and whether additional laws are necessary to protect students. On top of that, the Supreme Court explained in 2023 that "[m]any" universities "have concluded, wrongly, that the touchstone of an individual's identity is not challenges bested, skills built, or lessons learned but the color of their skin." *SFFA*, 600 U.S. at 231. As these findings and the K-12 examples listed above show, *supra* pp.7–9, racist and sexist indoctrination *is* occurring in public schools of all stripes. This is not a phantom problem.

HB 1775 has a plainly legitimate sweep and uses common words, so this Court should "readily conclude the law is not vague facially." *Fabrizius*, 129 F.4th at 1238.

### c.  The Oklahoma Academic Standards support HB 1775's clarity.

Plaintiffs' argument that the Academic Standards create vagueness, Pls. Br. 37–39, reveals the game being played here. In multiple places, Plaintiffs complain that the Legislature did not provide definitions, essentially arguing that the law is too succinct.

But when the Legislature expressly includes a voluminous and detailed "safe harbor," as the district court termed it, P.A.Vol.III at 143, Plaintiffs then argue that this only "deepens the Act's vagueness," Pls. Br. 37. This is incoherent.

The Academic Standards are a vital part of HB 1775. As the district court found, the Standards "limit[] the scope of each of the directives," and "reasonably require discussion of[] past and present race and sex discrimination" on topics such as slavery, colonization of tribal lands, Black Codes and Jim Crow Laws, the Tulsa Race Massacre, and more. P.A.Vol.III at 143–45. Even Plaintiffs (halfheartedly) acknowledge that "a topic explicitly mentioned in the standards"—which are admittedly "broad[]"—would not be subject to HB 1775. Pls. Br. 37. And they concede that the Standards require students to evaluate "differences in assumptions, evidence, reasoning, and viewpoints" among authors. *Id.* at 38 (citation omitted). So what is the problem?

In another about-face, Plaintiffs claim that the admittedly "broad[]" Standards are not broad enough. They "do not answer teachers' outstanding questions about what particular materials, pedagogical practices or classrooms conversations the Act prohibits or allows." *Id.* Apparently, the Legislature is required to enact a *War and Peace*-length statute before it can be considered to have passed legislation that is understandable. This is not how laws, or the vagueness doctrine, works.

### d. A scienter requirement supports HB 1775's constitutionality.

"[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice." *Flipside*, 455 U.S. at 499. Plaintiffs claim the "lack of a

scienter requirement" in HB 1775 is "monumental," Pls. Br. 40, but Plaintiffs admit that, under the rules implementing HB 1775, "the license or certificate of any school employee" shall be revoked only if the employee is found in "willful violation" of HB 1775. *Id.* at 14 n.9 (citing OKLA. ADMIN CODE 210:10-1-23(j)). This scienter requirement counsels in favor of the law's constitutionality. Contra Plaintiffs, teachers cannot "be caught in the Act's snares without any intent to violate the Act." Pls. Br. 40. (In the one enforcement action against a teacher in four years, the teacher publicly stated, "I am a walking HB 1775 violation." *Boismier*, 777 F. Supp. 3d at 1306.) Even ignoring the rules, though, a "regulation's lack of a scienter requirement" does not automatically signal vagueness. *Fabrizius*, 129 F.4th at 1240. Earlier this year, after all, this Court upheld the regulation in *Fabrizius* without a scienter provision. *Id.*

### e.  Plaintiffs' arguments and caselaw fall short of showing vagueness.

Plaintiffs' feigned inability to understand HB 1775 does not make it vague. Plaintiffs complain time and again that the Act does not define its terms. Pls. Br. 21, 25, 29. But definitions are not constitutionally required, and the Academic Standards provide a more-than-sufficient equivalent of definitional assistance. Plaintiffs also assert that "teachers were forced to avoid using recognized best teaching practices, to students' detriment, in an effort to prevent complaints." Pls. Br. 10. But if a "recognized" teaching practice promotes racism or sexism, then the State is well within its power to prohibit it. *Cf. United States v. Skrmetti*, 145 S. Ct. 1816 (2025). And to the

extent any school (out of hundreds) has applied HB 1775 in an absurd way untethered from the text, that would be fodder for an as-applied challenge, not a facial one.

Plaintiffs cite *Keyishian v. Board of Regents of University of State of New York*, 385 U.S. 589 (1967), but that case predates decisions where the Supreme Court laid out bedrock First Amendment (*Garcetti*) and vagueness (*Flipside*) standards. *Garcetti*, for instance, made no mention of *Keyishian*, whereas the dissenters cited it in "hope" that *Garcetti* would not apply to universities, making no mention of K-12 schools. 547 U.S. at 438–39 (Souter, J., dissenting). And in cherry-picking quotes from *Keyishian*'s complicated scenarios, Plaintiffs ignore that the anti-sedition laws there restricted public employees "inside the classroom or out." 385 U.S. at 602. The laws did not concern government speech but rather were all-encompassing prohibitions for individuals' lives. *See also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022) (implying that *Keyishian* does not apply to government speech). Plaintiffs' other Supreme Court vagueness citations, Pls. Br. 30–31, are distinguishable, as well. *See, e.g.*, *Coates v. City of Cincinnati*, 402 U.S. 611 (1971) (ban on "annoying" others on sidewalks was vague).

Plaintiffs cite a smattering of district court decisions from other circuits. *E.g.*, Pls. Br. 26. But at least two such decisions are currently on appeal, including *Local 8027 v. Edelbut*, No. 21-cv-1077, 2024 WL 2722254 (D.N.H. May 28, 2024), *appeal docketed*, No. 24-1690 (1st Cir. July 26, 2024), and the third did not involve schools and was affirmed on viewpoint discrimination (and not vagueness) because it applied to private businesses, *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024). This Court has

43

held that viewpoint decisions *are* allowed in schools, *Fleming*, 298 F.3d at 928–29, meaning that *Honeyfund.com* is irrelevant. Regardless, Oklahoma disagrees with these courts, which show little deference to states, require extreme levels of precision, and effectively contest the ability of words to have objective meaning. It is impossible to square the hypercritical approach taken by these courts with the emphasis in *SFFA* that a "student must be treated based on his or her experiences as an individual—not on the basis of race." 600 U.S. at 231. If those district courts are correct, the Supreme Court's language is unconstitutionally vague.

These decisions are also bizarre. *Edelbut*, for instance, criticizes New Hampshire for using "general terms" like those in HB 1775 and *not* using academic terms like "critical race theory," "structural racism" and "implicit bias." 2024 WL 2722254, at *9 & n.6. And Plaintiffs embrace *Edelbut*'s critique on this point. *See* Pls. Br. at 22–23. But that critique contradicts this Court's preference for words of common understanding, *Fabrizius*, 129 F.4th at 1238. Incredibly, *Edelbut* also enjoined New Hampshire from prohibiting "teaching that certain groups are 'inherently superior' to others"—even though the "plaintiffs have not explained how" this concept "fails to give adequate notice or invites arbitrary enforcement." *Edelbut*, 2024 WL 2722254, at *9 n.7. This turns the legal process on its head. These courts should *not* be followed off a cliff.

In citing these courts, Plaintiffs tellingly omit the Ninth Circuit decision in *Arce* that they elsewhere cite. Reiterating that "[d]ue process does not require impossible standards of clarity," and "in light of the statute's purpose to reduce racism in schools,"

the Ninth Circuit found that several "phrases" similar to HB 1775 in Arizona law "sufficiently give notice as to what conduct is prohibited and do not inherently invite arbitrary enforcement." 793 F.3d at 988 (citation modified). For example, "in the context of the entire statute … the phrase 'promotes resentment toward a race or class of people' reasonably targets classes or courses that are designed with the *intention* to promote resentment, or to invite racism in schools." *Id.* at 988–89.

Plaintiffs also rely on the Oklahoma Supreme Court's statement that it could not "reasonably define these terms or phrases in the abstract." *BERT*, 571 P.3d at 142. But the Oklahoma Supreme Court was clear that its decision to not answer the certified questions was "for reasons *not* raised by Plaintiffs," who had "argued that the statute is so vague that it is not susceptible to a limiting construction." *Id.* at 141 (emphasis added). Furthermore, the Oklahoma Supreme Court stated that "any term or phrase can be interpreted using its common, ordinary usage" and that "relying on dictionary definitions to provide the common, ordinary usage of the terms and phrases at issue is something that the Western District has done in this case *and could undertake*." *Id.* at 141–42 (emphasis added). In sum, the Oklahoma Supreme Court discretionarily decided it was not wise to comment on the statute as a facial matter but believed it would be interpretable on an as-applied basis. This is the State's position.

Plaintiffs also argue that the Act promotes arbitrary and discriminatory enforcement, Pls. Br. 41–44, while simultaneously conceding that only three enforcement actions have occurred in four years. Plaintiffs contend that the Act fails

45

"to specify the instructional content and pedagogical methods that are prohibited," *id.* at 41, as if the Legislature is required to exceed even the voluminous Academic Standards in detail before escaping unconstitutional vagueness. (It's not.) Plaintiffs also rely on one-sided versions of the Mustang and Tulsa enforcement actions, as well as for the individual teacher, which have already been addressed above, without acknowledging that single actions, even if inappropriate, cannot render statutes facially invalid. *See supra* pp.14–16. In the end, Plaintiffs essentially admit that schoolchildren in Oklahoma should be subject to racial stereotyping in the form of "white privilege" walks and teaching. Pls. Br. 42. The Constitution does not require Oklahoma to permit this. *See SFFA*, 600 U.S. at 230. They also continue to claim that HB 1775 bans "diversity," when its K-12 provisions say nothing about diversity, and Oklahoma law expressly requires "social studies core curriculum" to "reflect the racial, ethnic, religious, and cultural diversity of the United States." OKLA. STAT. tit. 70, § 11-103.6b(A).

Finally, Plaintiffs offer a "litany" of hypotheticals, claiming confusion over what the law allows. *E.g.*, Pls. Br. 27–28. There is not enough space to address each, but most are easily resolved through plain language and the Academic Standards. No, the Act does not ban texts that "directly mention racial oppression." *Id.* at 27. No, teachers do not have to "omit teaching certain aspects of history." *Id.* No, HB 1775 does not prohibit the "use [of] texts by diverse authors." *Id.* Yes, a teacher can respond to a student's comments "without making [them] 'part of a course.'" *Id.* No, student comments are not all made "part of a course" if a "teacher does not respond or

interject," *id.*, unless a teacher has unwisely turned instruction over to a student. To be sure, there are tougher questions with HB 1775, as with any statute. But as courts have repeated *ad nauseam*, "'[t]hat there may be some borderline questions to decide is not fatal to' a regulation." *Fabrizius*, 129 F.4th at 1238 (citation omitted).

### f.   "Make part of a course" is not unconstitutionally vague.

More granularly, Plaintiffs contend that the prohibition on "mak[ing] part of a course the following concepts" is vague. Pls. Br. 25. It is not. As the district court held, and as common sense dictates, "make part of a course" prohibits "school personnel from directly endorsing, promoting, or inculcating any concept as a normative value." P.A.Vol.III at 134. It does not—contrary to what Plaintiffs repeatedly argued earlier in this litigation, *e.g.*, P.A.Vol.I at 165, P.A.Vol.II at 252, arguments they have now largely abandoned—bar schools or teachers from merely mentioning the prohibited concepts or refuting them. It means to teach as true or otherwise affirmatively endorse.

As discussed above, "make part of a course the following concepts" uses words of common understanding, and it clearly has a legitimate sweep. Even if Plaintiffs were correct that it prohibits even the mention of the concepts in any fashion, that would be the State's prerogative to speak how it wants. *See Boring*, 136 F.3d at 370 ("The makeup of the [high school] curriculum ... is by definition a legitimate pedagogical concern."). But Plaintiffs are not correct, and the law is not vague on this point. As the State's chief legal officer has now affirmed publicly for four years, "make part of a course" does *not* prohibit any and every reference to the concepts, but prohibits only endorsement.

47

Mentioning or denouncing something is not the same thing as requiring it or making it a part of a course—it is very nearly the opposite. *See, e.g.*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1993), defining "require," among other things, as "to call for as suitable or appropriate in a particular case" and "to demand as necessary or essential").[16] Thus, read accurately and as a whole, the law does not ban refutation of these concepts, or even the mention of these concepts. *See* P.A.Vol.II at 72 ("As an educator, I do not find HB 1775 ambiguous or vague, or broad."); *id.* at 77 ("H.B. 1775 … is narrowly constructed"); *id.* at 99 ("If you can't teach a history class without labeling kids in the narrow ways that are barred by HB 1775, you're probably in the wrong profession."). If anything, the law encourages teachers to refute the concepts in class.

Put differently, "make part of a course" must be interpreted in light of the entire statute. *See, e.g.*, *U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993). And as the Oklahoma Supreme Court indicated, HB 1775's obvious purpose, from beginning to end, is to prohibit the *promotion* of discrimination, not the mere mention of it. *See, e.g.*, *BERT*, 571 P.3d at 140 ("[T]he Legislature intended to prohibit orientation and the like that *promote* forms of race or sex stereotyping …." (emphasis added)). Any other interpretation would be absurd and clash with the Academic Standards, which are expressly incorporated into HB 1775 and require students to,

---

[16] Part of the issue, as Defendants will discuss shortly, is that the district court enjoined the word "require," which tag-teams with "make part of a course." *See M. S. v. Premera Blue Cross*, 118 F.4th 1248, 1270 (10th Cir. 2024) ("under the canon *noscitur a sociis*, 'a word is known by the company it keeps.'" (citation omitted)).

among other things, analyze Jim Crow laws, Ku Klux Klan violence, and the Tulsa Race Massacre. *Supra* pp.10–12. Teaching students to do so will undoubtedly require mentioning and even discussing several prohibited concepts.

In the end, none of this would be controversial if a prohibited concept were, say, that "the world is flat." No one would read "require or make part of a course" in that context to mean a teacher could not talk about Galileo's opponents and their beliefs. Rather, they would know not to tell students they could fall off the edge of the world.

### g.  The six prohibitions in effect are not unconstitutionally vague.

In their motion and reply below, Plaintiffs did not specifically challenge the vagueness of Subsections (b), (c), (e), or (h), so those arguments should be waived. P.A.Vol.I at 160–63; P.A.Vol.II at 118–23; *see* 10th Cir. R. 28.1(A); *PCMA v. Mulready*, 78 F.4th 1183, 1204 (10th Cir. 2023). Nevertheless, Oklahoma addresses the six upheld provisions here. They are not "inherently nebulous concepts or ideas." Pls. Br. 29. Far from it. They each use common words and have a plainly legitimate sweep.

#### 1.  *"[O]ne race or sex is inherently superior to another race or sex"*

This provision is about as straightforward as the English language gets. It is not "oblique[]" or "confusingly broad," Pls. Br. 29, 31, but uses common words with a plainly legitimate sweep. Utilizing the Oxford English Dictionary, the district court correctly found this provision was "sufficiently clear" and held it "does not reasonably prohibit teaching about how mistaken beliefs about the superiority of one race or sex have existed in history, how such beliefs exist now, or how those beliefs have affected

or currently affect the actions of people or institutions." P.A.Vol.III at 135–36. If this provision is unconstitutionally vague, then so is *SFFA* and many civil rights laws. *See also Arce*, 793 F.3d at 988–89 ("the phrase 'promotes resentment toward a race or class of people' reasonably targets classes or courses that are designed with the *intention* to promote resentment, or to invite racism in schools." (citation omitted)).

Plaintiffs offer little substance on this provision, but rather just point to courts that enjoined similar provisions. Pls. Br. 32–33. Oklahoma can think of no better way to discredit those opinions than their finding that barring this clear statement in schools somehow *violates* the Constitution. Plaintiffs' challenge to this provision is frivolous.

> 2. *"[A]n individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously"*

Plaintiffs did not contest this provision below, so their objection is waived. The district court correctly found this provision "sufficiently clear." P.A.Vol.III at 136–37. For example, the provision "does not reasonably prohibit teaching that an action by a person or an institution is racist or sexist or results in undue oppression." *Id.* Plaintiffs deem this finding "inexplicabl[e]," Pls. Br. 34, but it is unclear why. The Act prohibits teaching that individuals are "inherently" racist or sexist, not that "action[s]" can be racist or sexist. Plaintiffs rely on unpersuasive district court decisions, expressing concern that "implicit bias" and "white privilege" teachings could violate this provision. But they clearly *could*, if teachers tell students that they are "inherently racist, sexist or

oppressive, whether consciously or unconsciously" because of their "race or sex." *Cf. Young,* 94 F.4th at 1253 n.4.

> 3.  *"[A]n individual's moral character is necessarily determined by his or her race or sex"*

Plaintiffs did not discuss this provision below, and they barely mention it on appeal, Pls. Br. 34, so their objection is waived. The district court correctly found this provision "sufficiently clear." P.A.Vol.III at 140. The "text does not prohibit teaching that a particular action by a person or institution—including a failure to recognize racism or sexism and to act to rectify it—is morally wrong." *Id.*

> 4.  *"[A]n individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex"*

The district court found this provision "sufficiently clear." P.A.Vol.III at 141. "Contrary to Plaintiffs' arguments, the text does not prohibit teaching about historical or current events in which members of one race or sex acted criminally, maliciously, or discriminatorily toward members of another race or sex." *Id.* Plaintiffs' arguments against this provision come close to indicating that Plaintiffs *do* want to teach this concept. *See* Pls. Br. 34–35 (indicating concern that "instruction on … collective responsibility would violate" this provision). In any event, a district court case expressing confusion about the word "advantage," Pls. Br. 35 (quoting *NAACP v. U.S. Dep't of Educ.,* 779 F. Supp. 3d 53, 66 (D.D.C. 2025)), a word that is not in this provision, is not sufficient to show unconstitutional vagueness.

> 5. *"[A]ny individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex"*

The district court found this provision was "sufficiently clear." P.A.Vol.III at 141. "[C]ontrary to Plaintiffs' concerns, the text … does not prohibit the teaching of subjects" (including historical events) "involving race or sex merely because they might cause a student to feel discomfort or distress." *Id.* at 142. The words "should" and "on account of" are common words and give the provision a plainly legitimate sweep. Plaintiffs protest that "a teacher cannot divine whether each student will interpret a statement that could cause guilt as intended." Pls. Br. 36. But the provision, as worded, does not "depend on the listener's reaction." *Id.* There is an enormous gap between teaching, say, that slavery was an evil perpetrated mostly by white people and telling a young child she *should* feel distressed about slavery *solely because she is white*. Such basic distinctions are not difficult or confusing. Plaintiffs again cite an unpersuasive district court case that is still on appeal, *Pernell v. Florida Board of Governors of State University System*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), *appeal docketed*, No. 22-13992 (11th Cir. Nov. 30, 2022), but they omit that even that court admitted that "Defendants may be right that some of the eight concepts are not vague," *id.* at 1281. And the court did not single out this concept as a vague one.

> 6. *"[M]eritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race"*

Plaintiffs did not challenge this provision below, so their objection is waived. The district court correctly found this provision "sufficiently clear." P.A.Vol.III at 142–

43. Plaintiffs cite the views of individual teachers to claim vagueness, Pls. Br. 35–36, even though the views of single individuals out of thousands cannot possibly equate to facial vagueness. And other teachers testified that the Act is "well written and straightforward" and not "ambiguous or vague, or broad." P.A.Vol.II at 72, 99.

Plaintiffs claim that our district court's disagreement with "other courts is itself indicative of the law's openness to different interpretations." Pls. Br. 37. This is nonsense. If unconstitutional vagueness existed every time courts split on an issue, very few laws in our nation would be allowed to stand.

## III.   CROSS-APPEAL: HB 1775 SHOULD BE UPHELD IN ITS ENTIRETY.

For reasons already discussed and more, the district court erred as a matter of law in enjoining the State from utilizing the word "require" and two prohibited concepts in HB 1775's K-12 regulations. The court erred, for instance, in applying an overly stringent vagueness standard to a civil law. *See supra* p.37. The court correctly upheld most of HB 1775's K-12 provisions anyway, but the error matters for the provisions the court enjoined.[17] The court also erred in declining to treat Plaintiffs' request as a disfavored injunction. P.A.Vol.III at 124–25. The court asserted that its "preliminary injunction would not disturb the status quo," *id.* at 125, but the injunction was not sought until three months after the law took effect, and when the injunction issued the

---

[17] In a footnote, the court claimed that its analysis would be the same under a lesser standard. P.A.Vol.III at 133 n.10. The court offered no explanation for this, and it strains plausibility given how deferential courts are to legislatures on facial vagueness.

provisions had been in effect for three *years*. The court's ruling otherwise, applied logically, would mean that no effort to enjoin a statute could ever count as disfavored, no matter how long the statute has been in effect. This cannot be.

Moreover, the court's appropriate recognition of the importance of the Academic Standards, P.A.Vol.III at 143–45, should have carried more weight in relation to the enjoined provisions. Most significantly, the enjoined provisions also involve common words and have a plainly legitimate sweep—indeed, the district court did not find otherwise. Thus, they are not facially vague, *see Fabrizius*, 129 F.4th at 1238, even if they could conceivably be vulnerable to an as-applied challenge.

### a. "[R]equire … the following concepts" is not vague.

The district court found that "require … the following concepts" in HB 1775 "presents an illogical mismatch between verb and object." P.A.Vol.III at 134. The court then mused that to *teach* "the following concepts" or something similar would make more sense. *Id.* But, the court held, "to generally direct that a *concept* may not be *required* opens the statute to a variety of interpretations." *Id.* This was erroneous.

*First*, the court never really explained what interpretations it had in mind. Even if multiple interpretations are possible, that does not make them equally plausible or prevent the provision from having a legitimate sweep. And "require" is a word of ordinary meaning, as the court acknowledged. P.A.Vol.III at 135. The court itself deployed "requirement" in its opinion. *See, e.g., id.* ("The directive in subsection (a) is

sufficiently clear to satisfy the due process *requirement* of the Fourteenth Amendment." (emphasis added)). Thus, invalidation on facial vagueness grounds was inappropriate.

*Second*, a text "susceptible to multiple interpretations" is not unconstitutional, but rather subject to the "rules of statutory construction." *Sullins v. Am. Med. Response of Okla., Inc.*, 23 P.3d 259, 263 (Okla. 2001). Below, the court missed a key rule, the *noscitur a sociis* canon, where "the meaning of a doubtful word may be ascertained by reference to the meaning of the words associated with it." *Id.*; *see also Premera Blue Cross*, 118 F.4th at 1270. "[R]equire" is paired with "make part of a course," which the court correctly found "prohibit[s] school personnel from directly endorsing, promoting, or inculcating any concept as a normative value." P.A.Vol.III at 134. Applying *noscitur a sociis*, "require" must mean something similar. *See Fischer v. United States*, 603 U.S. 480, 487 (2024) ("[*N*]*oscitur a sociis* … avoids ascribing to one word a meaning so broad that it is inconsistent with the company it keeps." (citation modified)).

Indeed, "require" helps clarify that "endorsing, promoting, or inculcating" are necessary. Merriam-Webster, for example, defines "require" as "to call for as *suitable* or *appropriate*" or alternatively "to demand as *necessary* or *essential*: have a compelling need for." *Require*, MERRIAM-WEBSTER (emphases added).[18] These definitions indicate that the Legislature sought to ban the teaching of these concepts as "suitable" or "appropriate" for schoolchildren—*i.e.*, as something "necessary or essential" for

---

[18] *Available at* https://www.merriam-webster.com/dictionary/require.

children to believe as true, rather than as something they should merely learn to understand the wrongheaded views of others throughout history. "[R]equire" and "make part of a course" work well together to make this point, and they should not have been separated.

The district court objected to the State's argument that to "require" a concept means to teach it as true, however, stating that it was "not empowered to rewrite a state statute by adding such modifiers" as the word "true." P.A.Vol.III at 134–35.[19] But the court did not need to add that word in, as it is reasonably understood to be part of the word "require," "make part of a course," and the broader context. *See Payless Shoesource, Inc. v. Travelers Cos., Inc.*, 585 F.3d 1366, 1374 (10th Cir. 2009) ("we derive meaning not just from abstract words in isolation, but from their context and from the document as a whole"). Courts do not overstep their bounds, to give just one example, by finding that state statutes prohibiting threats actually mean *true* threats.

*Third*, the court cited nothing in finding an "illogical mismatch" between "require" and "concept," nor is any "mismatch" fatal. Because "we can never expect mathematical certainty from our language," *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972), courts have repeatedly held that "perfect clarity and precise guidance have never

---

[19] Oddly, the two decisions the court cited for this point have been effectively abrogated. P.A.Vol.III at 97. For example, the injunction approved in *Oklahoma State Conference of NAACP v. O'Connor*, 569 F. Supp. 3d 1145 (W.D. Okla. 2021), was dissolved after the Court of Criminal Appeals, upon this Court's certification, disagreed with the Western District's interpretation of the riot law in question. *See O'Connor v. Okla. State Conf. of NAACP*, 516 P.3d 1164 (Okla. Crim. App. 2022).

been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). This is especially so in a facial vagueness challenge, where any plainly legitimate sweep renders a statute enforceable. Just two years ago, in rejecting such a challenge, this Court held that a Colorado signage law "passes constitutional muster" even though "it cannot be said to be a model of clarity." *StreetMediaGroup*, 79 F.4th at 1254. The same applies here, even accepting an alleged mismatch. That the district court thought the statute could be improved does not make it unconstitutional. Ergo, the court erred in enjoining "require" in HB 1775.

**b. The two enjoined concepts are not vague.**

The district court enjoined two of the eight concepts prohibited by HB 1775, finding they were "so indefinite" as to cause people to "guess" at meaning and "differ" on application. P.A.Vol.III at 140. The district court erred in these assessments.

> 1. *"[A]n individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex"*

The court first erred in enjoining this provision because Plaintiffs did not even discuss it in their injunction briefs below. P.A.Vol.I at 160–63; P.A.Vol.II at 118–123. In any event, "[d]iscriminate" means "to make a difference in treatment or favor on a basis other than individual merit." *Discriminate*, MERRIAM-WEBSTER.[20] Combined with "against," this means a teacher cannot endorse the idea that an individual should be treated worse than others on the basis of race or sex. Similarly, "treatment" is defined

---

[20] *Available at* https://www.merriam-webster.com/dictionary/discriminate.

as "conduct or behavior towards another." *Treatment*, MERRIAM-WEBSTER.[21] And "adverse" means "hostile," "unfavorable," or "opposed to one's interests." *Adverse*, Merriam-Webster.[22] Taken together, this prohibits endorsing the idea that any individual should be harmed or treated worse than others because of race or sex. The word "should," in particular, makes clear that it does *not* prohibit teaching that invidious discrimination occurs or has occurred in the past. These are all common words, and the sweep is plainly legitimate.

The court below found it "likely" that the Legislature's "intended result" with this provision was to "prohibit a teacher from endorsing widely rejected ideas (*e.g.*, that it is acceptable to restrict access to public accommodations based on race)." P.A.Vol.III at 138. The court called it "unclear," however, because it could sweep more broadly and "prohibit a teacher from making part of a course ideas that are subjects of current political debate" such as affirmative action, "or ideas that are … reflected in current law" such as differences in military conscription. *Id.* at 138–39. This was erroneous.

*First*, the court's observation about the likely intended result amounts to a concession that the provision has a plainly legitimate sweep. *Second*, that a provision can be read broadly to prohibit public school teaching on "subjects of current political debate" or the like does not make it vague or unconstitutional, since the Legislature can

---

[21] *Available at* https://www.merriam-webster.com/dictionary/treatment.

[22] *Available at* https://www.merriam-webster.com/dictionary/adverse.

regulate the State's own speech in this way if it so desires. *Third*, the Academic Standards and other Oklahoma laws ensure that the provision does not sweep so broadly. After all, the Standards call for students to analyze the military draft, OKLA. ADMIN. CODE 210:15-3-109(2)(H)(ii)(VI), and Oklahoma law affirmatively requires public school restrooms to be separated based on sex, OKLA. STAT. tit. 70, § 1-125. Even more significant, the implementing rules for HB 1775 state that "[n]othing … shall be interpreted to prohibit the lawful consideration of sex" under Title IX or in restrooms, locker rooms, or athletic teams. OKLA. ADMIN. CODE 210:10-1-23(b)(6). The district court erred by not harmonizing this provision with the Standards, the rule, and Oklahoma law. *See Sharp v. Tulsa Cnty. Election Bd.*, 890 P.2d 836, 840 (Okla. 1994) ("If possible, statutes are to be construed so as to render them consistent with one another."). *Fourth*, the court erred by glossing over key words like "discriminated against" and "adverse," which indicate that legal and long-permitted benign sex distinctions in bathrooms and sports are not covered.

> ### 2. *"[M]embers of one race or sex cannot and should not attempt to treat others without respect to race or sex"*

"Treat" means "to regard and deal with in a specified manner" or "to bear oneself toward." *Treat*, MERRIAM-WEBSTER.[23] Thus, this provision simply means that instructors cannot teach students that racial colorblindness—or the attempt to treat others the same regardless of race (or sex)—is an unworthy or impossible goal.

---

[23] *Available at* https://www.merriam-webster.com/dictionary/treat.

Teachers must avoid teaching that students should not try to treat people of all races and sexes the same. That is a plainly legitimate sweep, with common words.

The court below found, however, that this "cumbersome" provision "would prohibit making as part of a course the proposition that it is proper in any circumstance to draw distinctions based on race or sex," including the idea that "separate sports divisions may be established for boys and girls." P.A.Vol.III at 139. This was erroneous.

*First*, the provision does not prohibit teaching that differences in sex can matter. To hold otherwise would contradict the implementing rules, Oklahoma law, and federal laws. *See, e.g.*, OKLA. STAT. tit. 70, § 27-106 (authorizing separate sports teams); 20 U.S.C. § 1686 (authorizing separate living facilities). *Second*, that a statute is not "a model of clarity" does not render it unconstitutionally vague. *StreetMediaGroup*, 79 F.4th at 1254. *Third*, the provision focuses on one-on-one individual treatment of others, not government programs or group regulations. Thus, a teacher may endorse the idea of separate sports teams—again, in accordance with Oklahoma law—but must avoid teaching boys and girls that they cannot attempt to treat other boys and girls as equals regardless of their sex. This is legitimate, and the provision uses common words.

Dr. Martin Luther King, Jr. dreamed that his "four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character."[24] And the Great Dissenter argued that the Constitution "is color-

---

[24] Martin Luther King, Jr., I Have A Dream: Address to the March on Washington for Jobs and Freedom (Aug. 28, 1963).

blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting). This provision ensures that Oklahoma schools will not contradict this colorblind ideal, and nothing more. It should be upheld.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should uphold HB 1775 in its entirety. At a bare minimum, this Court should limit the existing preliminary injunction to the actual Plaintiffs, rather than the universal relief the court below granted. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oklahoma requests oral argument here. The promulgation of racist and sexist teachings in public schools is a highly significant concern for the State and its citizens, and further questioning and discussion would assist both the parties and this Court moving forward.

Respectfully submitted,

_s/ Zach West_
GARRY M. GASKINS, II
  _Solicitor General_
ZACH WEST
  _Director of Special Litigation_
WILL FLANAGAN
  _Assistant Solicitor General_
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov
_Counsel for the State of Oklahoma_

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word 2016. The document complies with the type-volume limitation of Fed. R. App. P. 32, because it contains 15,300 words, excluding the parts exempted.

s/ *Zach West*

ZACH WEST

## CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with the most updated Crowdstrike antivirus software.

s/ *Zach West*

ZACH WEST

## CERTIFICATE OF SERVICE

I certify that on October 17, 2025, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system. No paper copies are required pursuant to 10th Cir. R. 31.5.

s/ *Zach West*

ZACH WEST