Nos. 24-6139, 24-6140, 24-6141

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

No. 24-6139

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs*,

and

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

GENTNER DRUMOND, in his official capacity as Oklahoma Attorney General, *et al.*,

*Defendants-Appellees/Cross-Appellants*,

and

UNIVERSITY OF OKLAHOMA BOARD OF REGENTS, *et al.*,

*Defendants*.

No. 24-6140

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs-Appellees*,

and

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Plaintiffs-Appellees*,

v.

JOHN R. BRAUGHT, *et al.*,

*Defendants-Appellants*,

and

GENTNER DRUMOND, in his official capacity as Oklahoma Attorney General, *et al.*,

*Defendants*.

No. 24-6141

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs-Appellees*,

v.

GENTNER DRUMOND, in his official capacity as Oklahoma Attorney General, *et al.*,

*Defendants-Appellants*,

and

JOHN R. BRAUGHT, *et al.*,

*Defendants*.

On Appeal from the U.S. District Court for the Western District of Oklahoma, Case No. 5:21-CV-1022-G, Honorable Charles Goodwin, District Judge

**BRIEF OF AMICUS CURIAE OKLAHOMA COUNCIL OF PUBLIC AFFAIRS IN SUPPORT OF DEFENDANTS**

Ryan Haynie
OCPA CENTER FOR LAW
& LIBERTY
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

*Counsel for Amicus Curie*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Oklahoma Council of Public Affairs states it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................... iii

INTEREST OF AMICUS CURIAE ........................................................ 1

STATEMENT OF COMPLIANCE WITH RULE 29(A)(4)(E) ................. 2

ARGUMENT AND AUTHORITIES ..................................................... 2

   I. The text of HB 1775 is sufficiently clear......................................... 2

      A. HB 1775 is easily understandable and lacks the qualities of bills struck down for vagueness. ..................................................... 3

      B. HB 1775's standards are objective and should be construed objectively. ............................................................................. 5

   II. This Court should reject the efforts of Amici to accord substantial weight to educational consensus and expertise. ............................ 6

      A. Education research cannot take the place of constitutional law. 6

      B. There is considerable debate about whether divisive concepts like those prohibited in the Act are good for students. ............... 7

      C. The State has a legitimate interest in protecting students from divisive concepts. ..................................................................... 9

      D. Academic "scholarship" like that cited by other Amici has proven to be unreliable in recent years. ..................................... 11

CONCLUSION .................................................................................. 13

CERTIFICATE OF COMPLIANCE ..................................................... 14

CERTIFICATE OF SERVICE ............................................................. 14

# TABLE OF AUTHORITIES

**Cases**

*Baggett v. Bullitt*, 377 U.S. 360 (1964). .................................................. 4

*City of Chicago v. Morales*, 527 U.S. 41 (1999)....................................3, 5

*Cole v. Richardson*, 405 U.S. 676, 683 (1972) .......................................... 2

*Connally v. General Const. Co.*, 269 U.S. 385 (1926). ..........................3, 7

*Kolender v. Lawson*, 461 U.S. 352 (1983). ............................................... 3

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009). ............9, 10

*Posters N' Things, Ltd. v. United States*, 511 U.S. 513 (1994). ............... 5

*Smith v. Goguen*, 415 U.S. 566 (1974). .................................................... 4

*United States v. Skrmetti*, 145 S. Ct. 1816 (2025). ..........................6, 7, 9

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989). .............................. 5

**Statutes**

OKLA. STAT. Ann. 70, § 24-157(B)(1)(g).................................................... 4

**Other Authorities**

*Instructing Animosity: How DEI Pedagogy Produces the Hostile Attribution Bias*, NCRI and Rutgers Social Perception Lab (Nov. 2024), https://networkcontagion.us/wp-content/uploads/Instructing-Animosity_11.13.24.pdf. ....................................................................... 8

Jillian Kay Melchior, *Fake News Comes to Academia*, Wall Street Journal, October 6, 2018. ........................................................... 11, 12

Zach Goldberg & Eric Kaufmann, *School Choice Is Not Enough: The Impact of Critical Social Justice Ideology in American Education*, Manhattan Institute (2023), https://manhattan.institute/article/school-choice-is-not-enough-the-impact-of-critical-social-justice-ideology-in-american-education#notes. ............................................................................................. 8, 9

## INTEREST OF AMICUS CURIAE

The Oklahoma Council of Public Affairs ("OCPA") is an organization dedicated to promoting the flourishing of the people of Oklahoma by advancing principles and policies that support free enterprise, limited government, individual initiative, personal responsibility, and strong families. Amicus believes in the importance of Oklahoma children learning in an environment free from discrimination on the basis of race or sex.

OCPA, through its own advocacy efforts, successfully advocated for HB 1775's passage in the Oklahoma Legislature. Toward the end of the 2021 legislative session, OCPA's Center for Independent Journalism wrote several articles promoting the bill as a positive for Oklahoma students. OCPA's "Legislative Scorecard" scored HB 1775 positively.

Though OCPA did not engage in the bill drafting process, it believes a person of ordinary intelligence can decipher the law's meaning. Accordingly, OCPA believes its experience can bolster the State's argument for upholding HB 1775 in its entirety.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this amicus brief.

**STATEMENT OF COMPLIANCE WITH RULE 29(A)(4)(E)**

No party's counsel authored this brief in whole or in part. No person contributed money intended to fund preparing or submitting this brief.

**ARGUMENT AND AUTHORITIES**

**I. The text of HB 1775 is sufficiently clear.**

"Almost any word or phrase may be rendered vague and ambiguous by dissection with a semantic scalpel." *Cole v. Richardson*, 405 U.S. 676, 683 (1972) (internal citations omitted). Plaintiffs and their supportive Amici, unsatisfied with the results of the democratic process, now engage in the kind of "verbal calisthenics" eschewed by the Supreme Court over fifty years ago. *Id.* at 684. The role of a federal court is not "correcting grammar but with enforcing a constitution." *Id.* For the most part, the District Court avoided this kind of exercise. But it is hard to see the District Court's decision to find certain aspects of HB 1775 unconstitutionally vague as anything other than "verbal calisthenics."

### A. HB 1775 is easily understandable and lacks the qualities of bills struck down for vagueness.

Plaintiffs and supporting Amici essentially argue that because they do not—or claim not to—understand the statute, the statute is vague. But this is not how the vagueness doctrine works. Courts have consistently required litigants to demonstrate how a word or phrase was subject to so many different meanings that enforcement would be completely arbitrary. *See Connally v. General Const. Co.*, 269 U.S. 385, 393-94 (1926) (recognizing the inherent ambiguity of a "current rate of wages" leading to the impossibility of a definite meaning).

Often laws that were struck down on vagueness grounds have been for descriptive adjectives and adverbs that can be opaque. In *Connally,* it was "current rate" and "local" modifying wages. *Id.* This general rule—striking down laws for imprecise adjectives and adverbs—has been consistent through the Supreme Court's precedent. *See City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999) (voiding a criminal loitering statute because it was impossible to know what would constitute a "apparent" purpose); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (voiding another criminal loitering statute because it was unclear what was meant by providing "credible and reliable"

3

identification); *Baggett v. Bullitt*, 377 U.S. 360, 369 (1964) (voiding a law prohibiting "subversive" persons from working in government). Even in expression cases, which this case is not, the Court's aim is often the use of an undefined adjective to invalidate laws. *See Smith v. Goguen*, 415 U.S. 566, 575 (1974) (voiding a law prohibiting treating the American flag "contemptuously").

But the kind of undefined modifiers are not at issue in this case. As the State has capably argued, the plainly legitimate sweep that prohibits the teaching of divisive concepts and the law uses commonly used words rather than words with a technical or specialized meaning. Unlike laws successfully challenged in the past, there are no ambiguous terms in the prohibition that, for instance, prohibit a school from requiring or making part of a course the idea that "any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex." OKLA. STAT. Ann. 70, § 24-157(B)(1)(g). Despite arguments to the contrary, there is scarce room for arbitrary enforcement. Either a school taught students they *should* feel guilt for their race or sex or it did not. Despite "perfect clarity and precise guidance" not being required, *Ward v. Rock Against Racism*, 491

4

U.S. 781, 794 (1989), HB 1775 gets close. Far from being unconstitutionally vague, its language is clear and unambiguous.

### B. HB 1775's standards are objective and should be construed objectively.

Another way to think about the issue is in terms of whether the challenged language sets an objective standard or a subjective standard. *See Morales*, 527 U.S. at 94 (1999) (finding "a person's lack of any purpose in staying in one location is presumably an *objective* factor, and what the ordinance requires as a condition of an order to disperse—the absence of any apparent purpose—is a *subjective* factor"). Furthermore, statutes are to be construed *objectively*. *See Posters N' Things, Ltd. v. United States*, 511 U.S. 513, 521 (1994). In other words, statutes are construed objectively and with an eye to whether the standards they provide are objective.

Plaintiffs and their supporting Amici ask this Court to ignore these standards of objectivity. First, they ignore that the standards in HB 1775 are objective. The only relevant question is whether a school makes certain divisive concepts part of a course. Additionally, Plaintiffs and supporting Amici implicitly argue against construing the statute objectively in favor of a "hecklers' veto." Their argument is, essentially,

5

that because a few teachers claim to not understand the bill that it must be vague. That is not—and cannot be—the standard. If it were the standard, professional educators could have a veto over any new education reform by claiming confusion over the bill's language.

## II. This Court should reject the efforts of Amici to accord substantial weight to educational consensus and expertise.

In the recent Supreme Court case, *United States v. Skrmetti*, the plaintiffs attempted to convince the Court defer to what it deemed the medical consensus. 145 S. Ct. 1816 (2025). The Court rejected that approach, and Justice Thomas explained why deference to "expert" opinion is problematic for federal courts. *Id.* at 1837-49. This case is no exception.

### A. Education research cannot take the place of constitutional law.

Whether experts in education or race relations agree with the wisdom of the Act is irrelevant to the constitutional question. *See Id.* at 1840. "To hold otherwise would permit elite sentiment to distort and stifle democratic debate under the guise of [expert] judgment and would reduce judges to mere spectators in construing our Constitution." *Id.* (cleaned up).

6

What was true in the context of medical "consensus" in *Dobbs* and *Skrmetti* is as true in the context of "consensus" in the field of education. There is no amount of academic research in opposition to HB 1775 that can make the bill unconstitutionally vague. The only question is whether a person of ordinary intelligence would have to guess at the bill's meaning. *Connally*, 269 U.S. at 391 (1926). That standard, like all judicial standards, exists to prevent judges from replacing the value judgments of legislators with their own. *See Skrmetti* at 1840.

### B. There is considerable debate about whether divisive concepts like those prohibited in the Act are good for students.

Even after considering that academic research cannot take the place of constitutional law, there are still obvious reason to doubt whether divisive concepts are good for students. Amici would have this Court believe the evidence is overwhelming that the divisive concepts—or "inclusive curricula" as they refer to them—prohibited in the Act are actually good for students. No doubt teaching students a complete history and assigning books that discuss sensitive topics create well-rounded students. But there is a clear difference between teaching *about* racism and teaching students to *be* racist.

7

New studies are showing just that. In 2024, for example, the Network Contagion Research Institute (NCRI) found that subjecting subjects to material from well-known DEI scholars made them more likely to attribute racial bias where none existed rather than improve interracial attitudes. *Instructing Animosity: How DEI Pedagogy Produces the Hostile Attribution Bias*, NCRI and Rutgers Social Perception Lab (Nov. 2024), https://networkcontagion.us/wp-content/uploads/Instructing-Animosity_11.13.24.pdf.

Another study found students who were taught one or more "critical social justice" like those prohibited by HB 1775 were more likely to report "being fearful of being shamed, punished, or expelled than those who were not exposed. Zach Goldberg & Eric Kaufmann, *School Choice Is Not Enough: The Impact of Critical Social Justice Ideology in American Education*, Manhattan Institute (2023), https://manhattan.institute/article/school-choice-is-not-enough-the-impact-of-critical-social-justice-ideology-in-american-education#notes. Ironically, the same study concluded students who were exposed to divisive concepts were more apprehensive about sharing their views on

8

controversial issues. *Id*. In other words, it is the teaching of divisive concepts that chills speech—not laws prohibiting them.

Finally, contrary to the arguments of Plaintiffs and supporting Amici, most students report divisive concepts were taught without arguments against them or the arguments against were not respectable. *Id*. As discussed below, there is reason to doubt the scholarship touting divisive curricula. Regardless, the evidence is not settled and this Court should not treat it as such.

### C. The State has a legitimate interest in protecting students from divisive concepts.

As Justice Thomas made clear in *Skrmetti*, Courts should give weight to a legislature's consideration of whether a banned act is ethical or contrary to public policy. 145 S. Ct. at 1845 (2025). The State briefed more than adequately the broad power of states to regulate what their schools teach. This brief will shift the focus to how impractical the "right to receive information" theory is when thinking about how a state regulates school curricula.

"The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). The Supreme Court

9

has emphasized that when the government is speaking, it is ultimately accountable through the democratic process. *Id.* at 468. This case is an attempt to skirt that democratic process.

Instead of allowing the legislature, which is accountable by the electorate, to determine what may and may not be taught in public schools, Plaintiffs and supporting Amici argue for a student's "right" to receive information. This is simply impractical.

To begin with, such a "right" would not stop with the divisive concepts Plaintiffs like. Such a right would allow *students* to require teachers and schools to teach that the 2020 election was stolen or that progressive ideology leads to violence. There is no end to the conspiracy theories and nonsensical ideas this Court would open the school doors to if it recognizes a student's "right" to receive information.

More importantly, such a system is unworkable. After all, there may be some value to presenting disproved ideas like flat-earth theory if for no other reason than to debunk them and explain how people can fall into similar conspiracy theories. But mandating that every student—or even a majority of students—can dictate what information they have a right to receive is ludicrous.

The government can—and regularly does—set its own speech, and the First Amendment is not implicated. Not only does the legislature have the power to regulate its own speech—it is difficult, if not impossible, to conceive how government would operate if it could not do so. *Id.*

### D. Academic "scholarship" like that cited by other Amici has proven to be unreliable in recent years.

Despite the number of academic journals cited by Amici supporting Plaintiffs, there is reason to be skeptical of academic publishing on the subject. In 2018, it was discovered that three scholars had successfully published several hoax papers in academic journals to criticize what they deemed "grievance studies." Jillian Kay Melchior, *Fake News Comes to Academia*, Wall Street Journal, October 6, 2018. One paper accepted for publication, addressing social justice as it pertains to sex was titled, "Our Struggle Is My Struggle: Solidarity Feminism as an Intersectional Reply to Neoliberal and Choice Feminism." *Id.* Part of it was a rewrite of "Mein Kampf." *Id.* In short, many academic publications—particularly those in the area of

11

"grievance studies," will publish anything—including sections of "Mein Kampf"—if it fits the desired narrative.

Another paper submitted but not published (the journal said they would consider a revised version) "proposed a teaching method centered on 'experiential reparations.'" *Id*. It detailed teaching methods wholly consistent with those prohibited by the Act like identifying privileged kids and having them sit on the floor while wearing light chains. *Id*. One comment from a peer remarked how much they liked the concept and wondered how "to make privileged students feel genuinely uncomfortable in ways that are humbling and productive, but not so uncomfortable (shame) that they resist with renewed vigor." *Id*. (cleaned up).

However one feels about the ethics of "hoax papers," the implications are clear. There exists a bias in academia that will publish even the most outlandish "scholarship" if it fits the narrative of the academic zeitgeist. In addition to all the reasons listed above, this Court should be extremely skeptical of taking that scholarship at its word.

12

## CONCLUSION

HB 1775 is not unconstitutionally vague. Its terms are easily understandable do not carry the hallmarks of laws typically struck down for vagueness. An objective reading of its objective standards is understandable to people of ordinary intelligence. Academic literature advocating for teaching divisive concepts cannot replace the judgment of lawmakers selected through the democratic process. For these reasons, this Court should uphold HB 1775 in its entirety.

Respectfully submitted,

*s/Ryan Haynie*
Ryan Haynie
OCPA CENTER FOR LAW
& LIBERTY
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

*Counsel for Amicus Curie*

October 27, 2025

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2,290 words.

2. This document complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word version 16.100.3 in Century Schoolbook 14-point font.

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2025, I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to all counsel of record by cooperation of the CM/ECF system.

*s/Ryan Haynie*
Ryan Haynie
OCPA CENTER FOR LAW
& LIBERTY
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

*Counsel for Amicus Curie*
