Nos. 24-6139, 24-6140, & 24-6141

# In the United States Court of Appeals for the Tenth Circuit

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs,*

and

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Plaintiffs-Appellants/Cross-Appellees,*

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of the State of Oklahoma, *et al.*,

*Defendants-Appellees/Cross-Appellants,*

and

UNIVERSITY OF OKLAHOMA BOARD OF REGENTS, *et al.*,

*Defendants.*

On Appeal from the U.S. District Court for the Western District of Oklahoma, Case No. 5:21-CV-1022-G, Honorable Charles Goodwin, District Judge

## PLAINTIFFS-APPELLANTS' SECOND BRIEF ON CROSS-APPEAL

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Megan Lambert
Rebecca Barrett
Travis Handler
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OKLAHOMA

125 Broad Street, 18th Floor
New York, NY 10004
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

Dariely Rodriguez
Michael Pillera
Maya Brodziak
Catherine M. Blalock
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
drodriguez@lawyerscommittee.org
mpillera@lawyerscommittee.org
mbrodziak@lawyerscommittee.org
cmccan@lawyerscommittee.org

P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org
rbarrett@acluok.org
thandler@acluok.org

Douglas Koff
Julia Beskin
Sara Solfanelli
Kevin Scot Johns
MCDERMOTT WILL & SCHULTE LLP
919 Third Avenue
New York, NY 10022
douglas.koff@srz.com
julia.beskin@srz.com
sara.solfanelli@srz.com
kevin.johns@srz.com

*Counsel for Plaintiffs-Appellants*

*ORAL ARGUMENT REQUESTED*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................iii

INTRODUCTION ........................................................................................1

SUMMARY OF THE ARGUMENT ........................................................5

ARGUMENT ...............................................................................................9

    I.  H.B. 1775 Violates Teachers' Fourteenth Amendment Rights
       Because It Is Unconstitutionally Vague......................................9

        A. The District Court Correctly Applied a Stringent Review.............10

        B. The Act is Unconstitutionally Vague on Its Face............................13

        C. The Act Lacks a Plainly Legitimate Sweep ...................................17

        D. Vagueness Permeates the Text of the Act.......................................19

            i.  The Act Does Not Delineate Its Reach in Words of
               Common Understanding. .......................................................20

            ii.  The Overarching Provisions That Cover the
               Prohibited Concepts Are Vague ...........................................21

                 a.  "Require" is Unconstitutionally Vague ....................22

                 b.  "Make Part of a Course" Is Also
                    Unconstitutionally Vague ..........................................24

                 c.  The Reference to Oklahoma Academic
                    Standards Only Compounds the Act's
                    Vagueness ...................................................................27

           iii. The Prohibited Concepts Themselves Are Vague...............29

        E. The Act Lacks a Scienter Provision ................................................35

         F. The Act Encourages Arbitrary and Discriminatory
           Enforcement ....................................................................................37

i

II.  The District Court Erred in Denying That H.B. 1775 Violates
     Students' First Amendment Rights ...........................................39

     A.  The District Court Erred in Refusing to Apply Any First
         Amendment Analysis to Student Plaintiffs' Claims......................40

     B.  "Government Speech" Doctrine Does Not Apply to
         Students' First Amendment Claims..................................42

         i.   *Shurtleff* Provides the Analysis For "Government
              Speech." ................................................................43

         ii.  *Shurtleff* Factors Favor Student-Plaintiffs ..........................45

     C.  This Court Should Apply *Hazelwood* to Student-Plaintiffs'
         First Amendment Claims ................................................48

     D.  H.B. 1775 Fails Under *Hazelwood* ................................51

CONCLUSION .........................................................................54

# TABLE OF AUTHORITIES

## Cases

*Albanese v. McGinnis*,
    823 F. Supp. 521 (N.D. Ill. 1993) ......................................................34

*American Federation of Teachers v. Department of Education*,
    No. CV SAG-25-628, 2025 WL 2374697 (D. Md. Aug. 14, 2025) ..................15

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015)............................................. 8, 36, 37, 49

*Association of Community Organisations For Reform Now v. Municipality of Golden*,
    744 F.2d 739 (1984)......................................................................37

*Baggett v. Bullitt*,
    377 U.S. 360 (1964).......................................................................11

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
    457 U.S. 853 (1982).......................................................................41

*Boring v. Buncombe County Board of Education*,
    136 F.3d 364 (4th Cir. 1998)....................................................... 52, 53

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011).......................................................................39

*Bystrom by and through Bystrom v. Fridley High School, Independant School District No. 14*,
    822 F.2d 747 (8th Cir. 1987).............................................................13

*City of Chicago v. Morales*,
    527 U.S. 41 (1999).........................................................................13

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971).......................................................................20

*Connally v. General Construction Company*,
    269 U.S. 385 (1926).......................................................................14

*Connick v. Myers,*
    461 U.S. 138 (1983)........................................................................53

*Doe v. City of Albuquerque,*
    667 F.3d 1111 (10th Cir. 2012) ................................................ 41, 42

*E.K. and S.K., et al. v. Department of Defense Educational Activity, et al.,*
    No. 1:25-cv-00637-PTG-IDD, 2025 WL 2969560 (E.D. Va. Oct. 20,
    2025) ..........................................................................................49

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975)........................................................................16

*Fabrizius v. Department of Agriculture,*
    129 F.4th 1226 (10th Cir. 2025)...................................... 5, 16, 17, 20

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006).....................................................................7, 44

*Giaccio v. State of Pennsylvania,*
    32 U.S. 399 (1966).........................................................................11

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972).............................................6, 10, 11, 16, 27, 30

*Hazelwood School District v. Kuhlmeier,*
    484 U.S. 260 (1988).....................................................................8, 53

*Hill v. Colorado,*
    530 U.S. 703 (2000)........................................................................16

*Honeyfund.com, Inc. v. DeSantis,*
    622 F. Supp. 3d 1159 (N.D. Fla. 2022).............................................34

*Johnson v. United States,*
    576 U.S. 591 (2015) ............................................................ 14, 15, 16

*Kashem v. Barr,*
    941 F.3d 358 (9th Cir. 2019).............................................................11

*Keyishian v. Board of Regents of University of State of New York,*
    385 U.S. 589 (1967)............................................................ 25, 26, 36

*Kleinsmith v. Shurtleff*,
  571 F.3d 1033 (10th Cir. 2009) ............................................................32

*Lamont v. Postmaster General of the United States*,
  381 U.S. 301 (1965) ...................................................................8, 42

*Little v. Llano County*,
  138 F.4th 834 (5th Cir. 2025) ..............................................................50

*Local 8027 v. Edelblut*,
  No. 21-CV-1077-PB, 2024 WL 2722254 (D.N.H May 28, 2024) .. 12, 14, 34, 46

*M.S. v. Premera Blue Cross*,
  118 F.4th 1248 (10th Cir. 2024) ......................................................26

*Mae M. v. Komrosky*,
  332 Cal.Rptr.3d 682 (Cal. Ct. App. 2025) ..........................................46

*Matal v. Tam*,
  582 U.S. 218 (2017) .................................................................. 43, 47

*McKune v. Lile*,
  536 U.S. 24 (2002) ...........................................................................12

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) .........................................................................16

*Murphy v. Matheson*,
  742 F.2d 564 (10th Cir. 1984) ............................................................10

*NAACP v. United States Department of Education*,
  779 F. Supp. 3d 53 (D.D.C. 2025) .......................................................15

*National Education Association v. Department of Education*,
  779 F. Supp. 3d 149 (D.N.H. 2025) ....................................................15

*Northeastern Pennsylvania Freethought Society v. County Of Lacakawanna
  Transit System*,
  938 F.3d 424 (3d Cir. 2019) ..............................................................34

*Oklahoma State Conference of NAACP v. O'Connor*,
  569 F. Supp. 3d 1145 (2021) ....................................................... 23, 24

*Payless Shoesource, Inc. v. Travelers Companies, Inc.*,
  585 F.3d 1366 (10th Cir. 2009)..................................................... 21, 36

*Pernell v. Florida Board of Governors of State University*
  *System*,
  641 F. Supp. 3d 1218 (N.D. Fla. 2022)................................ 14, 20, 25, 27, 34, 35

*Pharmaceutical Care Management Association v. Mulready*,
  78 F.4th 1183 (10th Cir. 2023)................................................................32

*Planned Parenthood of Central New Jersey v. Farmer*,
  220 F.3d 127 (3d Cir. 2000)................................................................12

*Santa Cruz Lesbian & Gay Community Center v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020) ................................................14

*Sessions v. Dimaya*,
  584 U.S. 148 (2018)..........................................................11, 12, 14, 17

*Shelton v. Tucker*,
  364 U.S. 479 (1960)..............................................................................1

*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022)................................................................ 7, 44, 45

*Smith v. Goguen*,
  415 U.S. 566 (1974)............................................................................20

*Spevack v. Klein*,
  385 U.S. 511 (1967)............................................................................12

*Stanley v. Georgia*,
  394 U.S. 557 (1969)...................................................................... 41, 42

*Stenberg v. Carhart*,
  530 U.S. 914 (2000)...................................................................... 23, 24

*StreetMediaGroup, LLC v. Stockinger*,
  79 F.4th 1243 (10th Cir. 2023)..................................................... 21, 27

*Students for Fair Admissions v. President & Fellows of Harvard College*,
  600 U.S. 181 (2023).......................................................................9, 19

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)...................................................................37

*Taylor v. Roswell Independant School District*,
    713 F.3d 25 (10th Cir. 2013)..............................................13

*United States National Bank of Oregon v. Independant Insurance Agents of America, Inc.*,
    508 U.S. 439 (1993)...................................................................19

*United States v. Davis*,
    588 U.S. 445 (2019)...................................................................17

*United States v. Hansen*,
    599 U.S. 762 (2023)...................................................................16

*United States v. Philips*,
    543 F.3d 1197 (10th Cir. 2008).........................................26

*United States v. Stevens*,
    559 U.S. 460 (2010)...................................................................26

*United States v. Supreme Court of New Mexico*,
    839 F. 3d 888 (10th Cir. 2016)..........................................15

*United States v. Walker*,
    918 F.3d 1134 (10th Cir. 2019).........................................32

*United States v. White*,
    322 U.S. 694 (1944)...................................................................12

*United States v. Williams*,
    553 U.S. 285 (2008)...................................................................14

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)...................................................10, 11, 36

*Virgil v. School Board of Columbia County, Florida*,
    862 F.2d 1517 (11th Cir. 1989).........................................49

*Walls v. Sanders*,
    144 F.4th 995 (8th Cir. 2025)............................................51

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ............................................................................ 16

*Waters v. Churchill*,
    511 U.S. 661 (1994) ............................................................................ 44

*Wyoming Gun Owners v. Gray*,
    83 F.4th 1224 (10th Cir. 2023) .......................................................... 14

*Yates v. United States*,
    574 U.S. 528 (2015) ............................................................................ 20

**Statutes**

H.B. 1775, 58th Legis Assemb., Reg. Sess. (Okla. 2021) ........................................ 1

OKLA. ADMIN. CODE 210:10-1-23(d)(3) ........................................ 17, 21, 24, 25, 36

OKLA. ADMIN. CODE 210:10-1-23(j) ................................................................ 11, 36

OKLA. STAT. tit. 70 § 24-157(B) .......................................................................... 27

OKLA. STAT. tit. 70 § 24-157(B)(1) ...................................................................... 17

OKLA. STAT. tit. 70 §70-11-103.9b ....................................................................... 47

**Other Authorities**

*Oklahoma State Department of Education* ............................................................ 47

*Make*, Merriam-Webster Dictionary ................................................................... 25

**INTRODUCTION**

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). That protection is required here. H.B. 1775, 58th Legis Assemb., Reg. Sess. (Okla. 2021) (hereinafter "the Act" or "H.B. 1775"), and its list of vague prohibited concepts loom over Oklahoma classrooms, inflicting ongoing and irreparable harm.

Plaintiff-Teachers and teachers across Oklahoma risk their jobs and their teaching licenses if they in any way "require or make part of a course" one of the Act's prohibited concepts. But educators have no way of knowing what these prohibitions mean or how they will be enforced. Defendants claim that "make part of a course" means "to teach as true or otherwise affirmatively endorse," Defs.' Br. 47, while the record shows that the state has found violations of H.B. 1775 where there was no express mention of any prohibited concepts. Pls.' Suppl. Submission, App. Vol. II at 170.[1]

In light of this uncertainty and the imminent risk of losing their livelihoods, teachers are likely to steer widely around topics related to race and sex, depriving

---

[1] This brief uses the following record citation convention: [Doc. Name where not clear from the text], App. Vol. X. at XX. For citations to the record that are not in the appendix the convention is: [Doc. Name], Dkt. X (Court Name). For citations to documents filed in this Court in this case, the convention is: [Doc. Name].

students of vital learning that will prepare them to live and thrive in a multi-racial society. Amicus Br. of Nat'l Acad. of Educ. 17 (citing educational research regarding the benefits of inclusive education). In this way, the Act also impinges Plaintiff-Students' rights. Teachers are limiting what they present to students and shutting down potentially fruitful classroom discussions, including students' expression of their own views and inquiries, out of fear of running afoul of H.B. 1775. *See* App. Vol. I at 156–57, 216–19, 240–43, 247–50. This deprivation of information without any legitimate pedagogical justification is a separate constitutional problem for students.

Oklahoma students suffer as a direct result of H.B. 1775. Not only is important information being withheld from students, but students have no way of knowing what information is being withheld, preventing them from supplementing their education on their own. Student-Plaintiffs are not seeking to compel the teaching of any particular curricular materials; rather, they only ask for the nebulous prohibitions in H.B. 1775 to be enjoined from further impact on curriculum development and instruction. Am. Compl., App. Vol. I at 132. Without the constraints of H.B. 1775, the Oklahoma educators could go back to providing their students instruction according to their knowledge and skills, rather than withholding information about disfavored topics under the threat of political edicts.

Oklahoman educators have recognized that for too long students were not taught about our country's fraught racial history. For example, the record indicates that a majority of Oklahomans report that they never learned about important historical events such as the Tulsa Race Massacre in school. Am. Compl. ¶ 6, App. Vol. I at 62. Over time, educators have embraced a more inclusive model for education, where students are presented with a comprehensive history and a wide variety of perspectives, and are encouraged to see themselves in their curriculum. *Id.* at 168 (quoting Oklahoma Academic Standards 2021's and other directives to "consider[] multiple points of view" and ensure the curriculum "reflects the . . . diversity of the United States of America."). According to education researchers, this inclusive approach leads to better outcomes for students in terms of performance, engagement, and behavior. *See* Amicus Br. of Nat'l Acad. Educ. 10–21 (collecting education research).

The state legislature has overridden the reasoned determination of Oklahoma education professionals, restricting instruction based on the legislature's own political viewpoints. Expressing a clear intention for Oklahoma students to learn *less* about our past and present, legislators introduced H.B. 1775 amid racial justice protests around the country. *See* Am. Compl. ¶¶ 122, 123, App. Vol. I at 112 (Rep. West calling for an end to teaching about Black Lives Matter, a movement that was in the headlines daily and Rep. Humphrey calling police brutality—often captured

on video—a lie that should not be taught about in schools). In context, it is clear that H.B. 1775 is a misguided incursion into public-school classroom instruction by state legislators.

Plaintiffs timely filed this case and have diligently sought to vindicate their First and Fourteenth Amendment rights. Plaintiffs thoroughly pled that the Act is unconstitutionally vague and prohibits students from receiving instruction about race and sex without any legitimate pedagogical justification. Am. Compl. ¶¶ 156–170, App. Vol. I at 124–27. The district court granted in part Plaintiffs' Motion for Preliminary Injunction because it recognized that multiple provisions of H.B. 1775 are "impermissibly vague in violation of the Fourteenth Amendment." Prelim. Inj. Order, App. Vol. III at 145. Likewise, the Oklahoma Supreme Court declined to further define the Act's vague K-12 provisions, concluding that this simply could not be done on the face of the law. App. Vol. III at 167, 179–82. The remaining federal constitutional questions—(1) whether the remaining provisions of the Act are vague, and (2) whether the Act violates students' First Amendment rights—are properly before this Court.

This Court should protect the constitutional rights of Plaintiffs and all Oklahomans from H.B. 1775, an Act that is unconstitutional on its face, as applied, and in its entirety.

## SUMMARY OF THE ARGUMENT

Plaintiffs ask this Court, based on the record before it, to preliminarily enjoin the provisions of H.B. 1775 left in place by the district court because it was legal error to overlook the Act's pervasive vagueness and reject Student-Plaintiffs' claim without any First Amendment analysis.

First, as set out in Plaintiffs' opening brief, each provision of the Act necessitates subjective evaluation by the enforcer of the law, and is therefore unconstitutionally vague on its face. Pls.' Br. 19–44. The district court correctly applied a "stringent vagueness test" because the Act "threatens to inhibit the exercise of constitutionally protected rights" and "civil statutes that impose severe penalties —such as 'strip[ping] persons of their professional licenses and livelihoods'—may warrant the same high expectation of clarity" as criminal statutes. Prelim. Inj. Order, App. Vol. III at 127. Defendants point to this Court's opinion in *Fabrizius v. Department of Agriculture*, 129 F.4th 1226 (10th Cir. 2025), but that case did not establish any new standard of review for facial vagueness challenges. Indeed, H.B. 1775 fails under *Fabrizius* because it lacks a plainly legitimate sweep and does not delineate its sweep in words commonly understood in context.

The text of the Act is vague throughout. This includes overarching provisions like "require" and "make part of a course" as well as a provision that references the Oklahoma Academic Standards. While the district court enjoined "require," it left

"make part of a course" in place despite the phrase's hopeless ambiguity. The ambiguity is not just whether, in a particular instance, a teacher has "made part of a course" a prohibited concept, but what objective factors a teacher, a state official, or a court should consider in determining what it means to make an idea "part of a course." *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (recognizing "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined"). Nor do the Academic Standards provisions cure vagueness, as Defendants claim. Defendants admit that teaching historical events required in the Academic Standards will involve discussing prohibited concepts. Defs.' Br. 48. Yet they fail to explain how the reference to the Academic Standards impacts the scope or application of the Act. Likewise, the prohibited concepts themselves are vague. The district court enjoined only two of the concepts but left the others in force. This was a legal error.

Plaintiffs' anticipation that H.B. 1775's vagueness would encourage arbitrary and discriminatory enforcement has been borne out in the intervening years. The Oklahoma State Department of Education ("OSDE") has been accepting complaints from the public about suspected violations of H.B. 1775 and has pursued multiple investigations. As reflected in the record and discussed in detail below, the State applies an ever-shifting set of criteria for what violates the Act. For example, the State issued a "finding of noncompliance" to Tulsa Public Schools despite the

investigation concluding that there were "no express statements" that violated H.B. 1775, Pls.' Suppl. Submission, App. Vol. II at 170.

Second, this Court should hold that the district court erred in denying that H.B. 1775 violates students' First Amendment rights. Though they never raised the argument below, and it is therefore waived, Defendants' lead argument now seems to be that K-12 curriculum is "government speech through and through," further positing that there can be no right to receive government speech. Defs.' Br. 5. However, government speech doctrine is relevant to cases analyzing government *employee* speech. There is no dispute that under *Garcetti v. Ceballos*, since teacher's classroom instruction is speech "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. 410, 421 (2006). But that does not mean that students' First Amendment rights are nonexistent.

To decide whether a message emanating from the government is perceived as "communicat[ing] governmental messages," *Shurtleff v. City of Bost.*, 596 U.S. 243, 248 (2022), the Supreme Court has prescribed a "holistic," context-specific analytical framework factoring in the history, public perception, and degree of active government control over the speech. *Id.* at 244. In that case, the Court held that a flagpole atop City Hall was not conveying "government speech" because Boston had invited private flags to be flown played no role in determining the content of those flags. Applying that analysis here, it is clear that no one perceives public school

7

classroom instruction to be conveying a message directly from the government, and therefore, the "government speech" doctrine does not apply.

Students' First Amendment rights demand a separate inquiry. Indeed, the right to receive information can exist even when the speaker is not protected by the First Amendment. *See Lamont v. Postmaster General of the U.S.*, 381 U.S. 301 (1965) (recognizing an American reader's First Amendment right to receive communist propaganda from the Chinese government). This Court should follow the Ninth and Eleventh Circuits in applying the standard from *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) to students' First Amendment right to receive information claim, holding that a law is unconstitutional if it "threatens to chill the teaching of ethnic studies courses that may offer great value to students—yet it does so without furthering the legitimate pedagogical purpose of reducing racism." *Arce v. Douglas*, 793 F.3d 968, 986 (9th Cir. 2015). H.B. 1775 fails *Hazelwood* because it is not based on a legitimate pedagogical purpose, but rather was drafted to advance purely partisan, political and censorial objectives. Even if this Court were to accept Defendants' *post hoc* justification for H.B. 1775, namely that it is meant to address racial discrimination, Defs.' Br. 1, the Act is not reasonably related to achieving that goal because it bans instruction, not discrimination.

Relatedly, Plaintiffs must address Defendant's most-cited case in their opening brief, which is, remarkably, *Students for Fair Admissions v. President &*

*Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"). Defendants' reliance, appearing for the first time in this appeal, is unpersuasive because *SFFA* is entirely inapposite to the questions before this Court. There, the Supreme Court held that selective colleges' use of race as one factor of many to make admissions decisions failed strict scrutiny under the Equal Protection Clause. *SFFA*, 600 U.S. at 230. Defendants assert that H.B. 1775's prohibitions on instruction are "arguably *required*" by *SFFA*. Defs.' Br. 39. But whatever valid interest the State may have in addressing race-based discrimination does not insulate the Act from Due Process Clause or First Amendment challenges. Indeed, the Court in *SFFA* did not even remotely address the First Amendment or due process concerns at issue here. Defendants' reliance on *SFFA* is entirely misplaced.

## ARGUMENT

## I.    H.B. 1775 Violates Teachers' Fourteenth Amendment Rights Because It Is Unconstitutionally Vague.

As the district court correctly recognized, [t]he Act "violates the Fourteenth Amendment's guarantee of due process, as citizens are entitled to know what the law is so they can conform their conduct to it." App. Vol. III at 126 (citing *Grayned,* 408 U.S. at 108). The Supreme Court has identified two important prohibitions to ensure protection against vague laws. *Grayned*, 408 U.S. at 108. First, "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" to prevent innocent people from being trapped because they lack fair

warning. *Id.* Second, "laws must provide explicit standards for those who apply them" so they are not employed "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09. The Act fails both.

### A.    The District Court Correctly Applied a Stringent Review.

Whether considering the challenge on its face or as applied to Plaintiffs,[2] the district court properly applied a "stringent vagueness test" for two independent reasons. First, the Act "threatens to inhibit the exercise of constitutionally protected rights." App. Vol. III at 127 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)("*Flipside*")). *See also Murphy v. Matheson*, 742 F.2d 564, 570 (10th Cir. 1984) (quoting *Flipside*, 455 U.S. at 499). As discussed, *infra*, public school students have a First Amendment right to receive information free from ideologically motivated censorship. At a minimum, the Act "abuts upon sensitive areas of basic First Amendment freedoms." *Grayned*, 408 U.S. at 109 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (citation modified).

---

[2] Defendants argue that no as applied challenge is proper, Defs.' Br. 35, but at a minimum, the Court could consider and conclude that the Act is vague as to the activities Plaintiffs identify they are engaged in or intend to engage in.

Second, the district court appropriately recognized that "civil statutes that impose severe penalties—such as 'strip[ping] persons of their professional licenses and livelihoods'—may warrant the same high expectation of clarity" as criminal statutes. App. Vol. III at 127 (quoting *Flipside*, 455 U.S. at 498–99; *Sessions v. Dimaya*, 584 U.S. 148, 184–85 (2018) (Gorsuch, J., concurring in part)). The Act's civil nature does not eliminate the need for clarity, as due process protections "are not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute." *Giaccio v. State of Pa.*, 32 U.S. 399, 402 (1966); *see also Kashem v. Barr*, 941 F.3d 358, 370 (9th Cir. 2019) ("A provision that nominally imposes only civil penalties but nonetheless carries a 'prohibitory and stigmatizing effect' may warrant 'a relatively strict test.'" (quoting *Flipside*, 455 U.S. at 499)).

The Act includes severe penalties for "superintendents of schools, principals, supervisors, librarians, school nurses, classroom teachers or other personnel performing instructional, administrative and supervisory services in the Public Schools." OKLA. ADMIN. CODE 210:10-1-23(j). The Act's penalties threaten the very livelihood of school employees, including, but not limited to, the suspension or revocation of their license or certificate. *Id.*

The threat presented by the loss of licensure is severe. When considering the constitutionality of a New Hampshire law that similarly limited instruction on racism and sexism, the *Edelblut* court explained, "[a]lthough teachers do not face criminal

11

penalties for teaching a banned concept, it is difficult to conceive of more serious consequences [than the threatened loss of teaching license or civil liability] that could befall a person in a civil proceeding than those that a teacher might face if they are found to have done something that the [law] prohibits." *Local 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *8 (D.N.H May 28, 2024) ("*Edelblut*").

This holding is consistent with case law emphasizing the severity of the loss of a professional license. In his *Sessions* concurrence, Justice Gorsuch listed the loss of a professional license and livelihood as a civil penalty that is "*routinely graver* than those associated with misdemeanor crimes—and often harsher than the punishment for felonies.*"* 584 U.S. at 184–85 (Gorsuch, J., concurring in part) (emphasis added)*; see Spevack v. Klein*, 385 U.S. 511, 516 (1967) ("The threat of disbarment and the loss of professional standing, professional reputation and of livelihood are [as] powerful forms of compulsion . . . as 'the use of legal process to force from the lips of the accused individual the evidence necessary to convict him.'" (quoting *United States v. White*, 322 U.S. 694, 698 (1944)); *McKune v. Lile*, 536 U.S. 24, 49–50 (2002) (O'Connor, J., concurring) (describing the termination of employment and the loss of professional licenses as penalties that are "so great" that they "are capable of coercing incriminating testimony").

Defendants misleadingly assert that this Court applies "a more deferential standard of vagueness review . . . for 'non-criminal policies in the unique context of

public schools.'" Defs.' Br. 37 (quoting *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d

25, 50 (10th Cir. 2013)). As an initial matter, *Taylor* addressed the entirely different

issue of a school policy preventing students from the unauthorized distribution of

material on school grounds, a far cry from the Act, which threatens the professional

license and livelihood of school officials. Further, in *Taylor*, this Court issued a

"cautionary note" against the type of censorship the Act requires:

> Although public school officials enjoy more discretion regarding speech
> regulation relative to officials in other contexts, this discretion is limited.
> District officials are "not at liberty to suppress or punish speech simply
> because they disagree with it, or because it takes a political or social viewpoint
> different from … that subscribed to by the majority."

*Taylor*, 713 F.3d at 51 (quoting *Bystrom by and through Bystrom v. Fridley High*

*Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 755 (8th Cir. 1987)).

As the district court correctly noted, the Act fails either vagueness standard.

App. Vol. III at 133.

## B.    The Act is Unconstitutionally Vague on Its Face.

"Vagueness permeates the text of" the Act, making it "subject to facial attack."

*City of Chi. v. Morales*, 527 U.S. 41, 55 (1999); *see also*, *e.g.*, *Sessions*, 584 U.S. at

184–85 (Gorsuch, J., concurring in part); *Connally v. Gen. Constr. Co.*, 269 U.S.

385, 392–95 (1926). The Act turns, in every application, on subjective evaluation of

whether a teacher has "require[d] or ma[d]e part of a course" a disfavored idea. The

Act's vagueness stems from "the indeterminacy of precisely what [] fact[s]" must be

proven to hold someone liable under the law. *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1238 (10th Cir. 2023) (citing *United States v. Williams*, 553 U.S. 285, 306 (2008)); *see also Johnson v. United States*, 576 U.S. 591, 601 (2015) (A telling indicator of vagueness was "disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider."). For example, what words uttered by a teacher will convey a disfavored idea? Is an idea "ma[d]e part of a course" by assigning a work of fiction that grapples with the concept? Or does it depend upon how the teacher uses the work? The answers are not in the text of the Act or its implementing regulations.

Numerous courts addressing laws and other regulatory measures with similar language to the Act have found them facially vague. *Edelblut*, 2024 WL 2722254, at *8–9 (holding unconstitutionally vague a state statute that banned instruction that "taught, instructed, inculcated or compelled. . . student[s] to believe" certain "divisive concepts"); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1281 (N.D. Fla. 2022) (same); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020) (holding unconstitutional an executive order that prohibited the same "divisive concepts" as H.B. 1775 within federal trainings); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. CV SAG-25-628, 2025 WL 2374697, at *31 (D. Md. Aug. 14, 2025) (holding Department of Education regulatory actions, including a Dear Colleague Letter, unconstitutionally vague

14

because it was "impossible to determine what conduct triggers the prohibitions and sanctions of the letter . . . enabl[ing] the government to enforce the Letter arbitrarily, and chill[ing] the lawful and societally beneficial speech of regulated people who do not understand what D[iversity] E[quity and] I[nclusion]- or race-related speech might be allowed"); *Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149, 186 (D.N.H. 2025) (preliminarily enjoining the same Dear Colleague Letter as unconstitutionally vague); *NAACP v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53, 67 (D.D.C. 2025) (preliminarily enjoining the same Dear Colleague Letter).

Defendants misstate the constitutional standard, asserting that Plaintiffs must disprove any plausible application of the statute. As this Court has stated, it construes the "no-set of circumstances language not as setting forth a *test* for facial challenges, but rather as describing the *result* of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard." *United States v. Sup. Ct. of N.M.*, 839 F. 3d 888, 917 (10th Cir. 2016) (internal citations omitted); *see also Johnson*, 576 U.S. at 602 ("[The Court's] *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.").

Defendants also mistakenly rely on First Amendment overbreadth caselaw in rebutting Plaintiffs' Fourteenth Amendment Due Process vagueness claim. Defs.' Br. 36 (citing *United States v. Hansen*, 599 U.S. 762, 767–69 (2023); *Erznoznik v. City*

*of Jacksonville*, 422 U.S. 205, 216 (1975); *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024); and *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). To assess overbreadth, a court compares the invalid and valid applications, asking whether a law burdens a "substantial amount of protected" expression in relation to its "plainly legitimate sweep." *Hansen*, 599 U.S. at 770. A vague law will often also trigger overbreadth concerns. However, the overbreadth test is an inapt, and incorrect, *see, e.g.*, *Johnson*, 576 U.S. at 602, test for vagueness, which asks as a matter of due process whether the law provides objective standards to govern each application, giving fair notice and guard rails against arbitrary and discriminatory enforcement. *Hill v. Colo.*, 530 U.S. 703, 732 (2000); *see also Grayned*, 408 U.S. at 108.

For the same reasons, Defendants' attempt to rely on "plainly legitimate sweep" language from *Fabrizius* fails. *Fabrizius*, 129 F.4th at 1238 (quoting *Washington State Grange*, 552 U.S. at 459 (considering overbreadth)). *Fabrizius* arose in the context of a direct appeal from agency enforcement of an economic regulation. There, this Court held that the regulation was not vague as applied. *Id*. Although the Court went on to discuss facial vagueness, there is no indication that it intended to establish a governing standard. The *Fabrizius* court did not address, and no party appears to have raised, the standard articulated by the Supreme Court in *Johnson,* nor other cases adopting this holding, which clearly controls. *See, e.g.*,

*Sessions*, 584 U.S. at 159 n.3 (explaining that *Johnson* "anticipated and rejected… [the argument that] a court may not invalidate a statute for vagueness if it is clear in any of its applications"); *United States v. Davis*, 588 U.S. 445 (2019) (finding a statute unconstitutionally vague without consideration of whether it was vague in all applications).

### C.    The Act Lacks a Plainly Legitimate Sweep.

Even if "a plainly legitimate sweep" were required under *Fabrizius*, 129 F. 4th at 1238, the Act still fails to pass muster. Without objective standards, the scope of the Act's prohibitions is indefinite, and any attempt to pinpoint a core fails. The Act prohibits teachers from "requir[ing] or mak[ing] part of a course," OKLA. STAT. tit. 70 § 24-157(B)(1), which the district court defined as "directly endorsing, promoting, or inculcating any concept as a normative value." App. Vol. III at 134. The State Board of Education Rules ("Rules") draw a different line, focusing instead on programs, assignments, and materials that "include, incorporate or are based on" the prohibited concepts, OKLA. ADMIN. CODE 210:10-1-23(d)(3). Defendants assert that require means to "call for as *suitable* or *appropriate*" or "demand as necessary or essential." Defs.' Br. 55. But which is it? Each attempt to divine the Act's meaning results in new standards.

As a functional matter, (1) including, (2) using as a basis, (3) directly endorsing, (4) inculcating, (5) promoting, (6) framing as true or normative, (7)

17

calling for as suitable, and (8) demanding as necessary are all different standards.
Because teachers do not understand how they can teach within the confines of the
Act, Plaintiffs raised a number of practical questions about the scope of prohibited
instructional activities. Pls.' Br. 27–28. Defendants could not answer most of them,
acknowledging these were "tougher questions" yet simultaneously dismissing them.
Defs.' Br. 47. The answers Defendants did give—namely that "H.B. 1775 does not
prohibit" texts on racial oppression, teaching certain aspects of history, and the use
of texts by diverse authors—do not point to any text within the law distinguishing
permissible from impermissible actions to resolve Plaintiff-Teachers' confusion. *Id*.
at 46–47; Pls.' Br. 27. Further, the boundless nature of the Act's prohibited concepts
makes discernment of any plainly legitimate sweep elusive. Teachers cannot predict
what instruction could be interpreted to convey a prohibited concept, particularly
when discussing issues concerning race or sex.

Defendants' remaining arguments in favor of a "plainly legitimate sweep" fall
flat. Defendants cite *SFFA* to argue that a generalized interest in nondiscrimination
supersedes vagueness concerns.[3] But *SFFA* bears no relation to the Act's
prophylactic speech restriction. Rather, *SFFA* concerns conduct, and clarified in the
context of an equal protection claim that universities may not "make admissions

---

[3] Defendants also cite Supreme Court case, *United States v. Skrmetti*, 605 U.S. 495
(2025), despite there being no vagueness claim in that case.

decisions that turn on an applicant's race." 600 U.S. at 208. In fact, it is unclear whether and how teachers could even talk to students about the *SFFA* case while steering clear of the Act's vague prohibitions. As addressed, *infra*, Plaintiffs' First Amendment claims are not controlled by the government speech doctrine, and in any event, contrary to Defendants' arguments, Defs.' Br. 43, this would not dispose of the Act's vagueness problems under the Due Process clause.

### D.    Vagueness Permeates the Text of the Act

Consideration of the Act as a whole confirms its unconstitutionality: the objective verbs, the prohibited concepts, and the exception for teaching that aligns with the Oklahoma Academic Standards. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("Statutory construction . . . must account for a statute's full text, language as well as punctuation, structure, and subject matter.").

Because "require or make part of a course" does not clarify what recognized instructional activities or pedagogical practices transgress the Act, clarity on the prohibited concepts that trigger danger is imperative. But the prohibited concepts offer no relief because they do not give fair notice of the statements or topics that are prohibited by the law. Finally, the exception for Oklahoma Academic Standards is not even a true safe harbor because teachers are left to guess the meaning of "align" in the context of an Act that Defendants admit was meant to ban instruction. Defs.' Br. 1, 55–60.

### i.     The Act Does Not Delineate Its Reach in Words of Common Understanding.

Defendants emphasize that the Act uses words found in the dictionary to assert that it uses "words of common understanding," *Fabrizius*, 129 F.4th at 1238. But this cannot be the end of the inquiry; if so, any legislation without made up words or technical terms would suffice. *See, e.g.*, *Smith v. Goguen*, 415 U.S. 566, 578 (1974) (invalidating statute with prohibition on "treat[ing] contemptuously"); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (statute with operating term "annoying" found vague). As the Supreme Court noted in *Yates v. United States*, 574 U.S. 528, 538 (2015), dictionary definitions "bear consideration, [but] they are not dispositive of the meaning of" words within a statute. Ultimately, "[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well] by the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 537. *See also Pernell*, 641 F. Supp. 3d at 1281 ("the fact that the [challenged law] uses real words found in an English dictionary does not magically extinguish vagueness concerns"). Defendants themselves vacillate between arguing that the inquiry should rest on the common nature of words and appealing to the canons of statutory interpretation. *See* Defs.' Br. 39 (citing *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023) ("We look to the text of the Act to understand its scope.")); *id.* at 48 ("'[M]ake part of a course' must be interpreted in light of the entire statute"); *id.* at 54

(discussing the canon of *noscitur a sociis*); *id.* at 56 (citing *Payless Shoesource, Inc. v. Travelers Cos., Inc.*, 585 F.3d 1366, 1374 (10th Cir. 2009) ("we derive meaning not just from abstract words in isolation, but from their context and from the document as a whole")).

The scope of instruction and instructional activities prohibited by the Act is not at all clear when its provisions are considered in context. Teachers are required to teach but lack clarity about how they may do so within the confines of the law. If any mention of the prohibited concepts is not completely banned, as Defendants at some—but not all—points assert, how are teachers supposed to address them in class? The Rules restrict schools "from adopting programs or utilizing textbooks, instructional materials, curriculum, classroom assignments, orientation, interventions, or counseling that include, incorporate or are based on" the prohibited concepts. OKLA. ADMIN. CODE 210:10-1-23(d)(3). What pedagogical strategies and instructional materials may they utilize in the scope of teaching about race and sex? As discussed, *infra*, the prohibited concepts are hopelessly vague. *See also* Pls.' Br. 29–37. Beyond reading the prohibited concepts verbatim, teachers are left to guess what statements could be interpreted to cross an indecipherable line.

### ii. The Overarching Provisions That Cover the Prohibited Concepts Are Vague.

The vagueness of "require or make part of a course" and the exception for the Oklahoma Academic Standards, provisions that apply to all prohibited concepts, make the entire Act unconstitutional.

### a.  "Require" is Unconstitutionally Vague.

This Court should affirm the district court's holding that "require" is unconstitutionally vague. App. Vol. III at 134. The district court gave "require" its ordinary meaning. *Id.* It correctly noted that the Act, "presents an illogical mismatch between verb and object," directing that "a *concept* may not be *required*" and opening the law to various interpretations. *Id.* at 134–35. How does one "require" an idea? Whatever the legislature intended, some additional explanation is necessary to apply this prohibition. The district court recognized that it would need to rewrite the statute to make "require" comprehensible, including to reach Defendant's suggestion that "require" be read to mean "to teach . . . as being true." *Id.* A federal court cannot add modifiers to a state statute. *Id.* (citing *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000); *Okla. State Conf. of NAACP v. O'Connor*, 569 F. Supp. 3d 1145, 1153 (2021)).

Defendants fail to demonstrate a clear meaning of "require" in the context of the Act. Defendants rebuff the need to address the scope of the Act as warranting a *War and Peace* length statute but demand an enumeration of every conceivable interpretation of "require." Defs.' Br. 41, 54. The district court was not required to

list and analyze every interpretation of the term. The district court considered the ordinary meaning of "require," which is not, as Defendants suggest, an acknowledgement that the use of the term is a common word immune from vagueness. *Id.* at 54. There is not a common understanding that "require" means "to make students believe as true" in the context of education. Defs.' Br. 56. Achievement in required courses, such as American History or English Literature, does not depend on a student's personal agreement with concepts presented therein. Accordingly, the court declared that "require" in this context is an illogical mismatch lacking a delineated reach or common understanding. App. Vol. III at 135.

Further, Defendants proffered two distinct definitions of "require": no school officials shall "call for as suitable or appropriate" the prohibited concepts or "demand [them] as necessary or essential." Defs.' Br. 55. This exacerbates the Act's vagueness. "[B]an[ning] the teaching of these concepts as 'suitable' or 'appropriate' for schoolchildren," suggests that the focus of the prohibition is on whether the subject matter is appropriate altogether, while banning teaching about the concepts as "something 'necessary or essential' for children to believe as true," suggests that only some viewpoints about the concept are prohibited. *Id*. at 55–56. Either definition still fails to elucidate what particular teaching practice would be deemed to have "required" the prohibited idea. These definitions also do not comport with the Defendants' characterization elsewhere that merely conveying a concept violates

the Act, *id*. at 38–39, or the Rules' similar caution that including, incorporating, or basing instruction, assignments, or materials on the prohibited concepts violates the Act. *Id.*; OKLA. ADMIN. CODE 210:10-1-23(d)(3). Defendants' arguments at best demonstrate multiple ways of understanding the term "require" in the context of the statute. The text of the Act neither tells educators which standard they should follow to stay within the law, nor does it provide an objective basis for enforcement.

### b. "Make Part of a Course" Is Also Unconstitutionally Vague.

The Act's prohibition on making the enumerated concepts part of a course is also unconstitutionally vague. The district court found that the term was not vague by defining the term as "directly endorsing, promoting, or inculcating any concept as a normative value or teaching as true." App. Vol. III at 134. But this definition impermissibly limits the scope of the plain text, adding words and meaning that the state legislature did not. *See Stenberg*, 530 U.S. at 944; *Okla. State Conf. of NAACP*, 569 F. Supp. 3d at 1153.

The Act uses a transitive phrasal verb, where prohibited concepts are the direct object of the verb phrase "make part of a course." In this context, the ordinary dictionary definition of "make" as, "to put together from components," or perhaps "to bring into being by forming, shaping, or altering material" is most fitting.[4] The

---

[4] *Make*, Merriam-Webster Dictionary, https://perma.cc/ZT4U-VWCJ. Another of the 25 uses of the transitive verb "make" is "to cause to act in a certain way." *Id*.

common use of "make part of" in this way does not imply that the thing incorporated must be true or a normative value. By its terms, the Act could forbid conveying a prohibited concept for any purpose, not just to express approval. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 599 (1967); *Pernell*, 641 F. Supp. 3d at 1282–84 (rejecting an attempt to redefine "objective" to only include speech condemning a prohibited concept, not approving of it, because the definition "d[id] not comport with common sense"). *Cf.* App. Vol. I at 215–16, 242–43 (Plaintiffs convey a lack of understanding of how the term applies). The district court's definition and Defendant's legal arguments also conflict with the Rules' caution that including, incorporating, or basing instruction, assignments, or materials on the prohibited concepts violates the Act. Defs.' Br. 38; Okla. Admin. Code 210:10-1-23(d)(3). Given the breadth of formulations and the lack of any terms limiting violations of the Act, this Court cannot rely on Defendants' current representations, Defs.' Br. 47, that "require or make part of a course" only prohibits endorsement. *See United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

---

But this definition does not plausibly apply where the object of the phrase is a concept. Even if one could make sense of this definition, it is plainly not the only or most obvious meaning of the term "make" used in the Act.

Defendants attempt to distinguish *Keyishian*, referring to Plaintiffs' citations as "cherry-pick[ed] quotes." Defs.' Br. 43. But the plain fact is that the Supreme Court in *Keyishian* confronted a similar prohibition against one who "advocat[es], advis[es], or teach[es] the [prohibited] doctrine" and found this language to be vague for the same reasons the Act fails here. *See Keyishian*, 385 U.S. at 599.

Defendants further ask this Court to gloss over the vagueness of "require" and "make part of a course" and read them together as a "tag-team," but this argument fails too. Defs.' Br. 48, 48 n.16. Defendants cite *M.S. v. Premera Blue Cross*, 118 F.4th 1248, 1270 (10th Cir. 2024), to argue that the Court should apply the *noscitur a sociis* canon of statutory interpretation, whereby "the meaning of a catchall phrase is given precise content by the specific terms that precede it." *Id.* (quoting *United States v. Philips*, 543 F.3d 1197, 1206 (10th Cir. 2008)). However, in *M.S.*, this Court considered the meaning of "other instruments," an unspecific phrase that followed five other examples. *Id.* By contrast, the Act does not have a "specific list [that] constrains the definition." Both terms in the Act are unconstitutionally vague.

Likewise, although "mathematical certainty" is not required, *Grayned*, 408 U.S. at 110, a law must still provide objective parameters for application. Defendants cite *StreetMediaGroup, LLC*, 79 F.4th at 1253, but the facts of that case are clearly distinguishable. Defs.' Br. 60. There, the law defined the subject of its regulation, "advertising devices," *StreetMediaGroup, LLC*, 79 F.4th at 1254, whereas H.B. 1775

prohibits a teacher from in any way "requiring or making part of a course" a prohibited concept. Further, the law in *Streetmedia* delineated rules for obtaining a permit, including a specific set of reasons for which a permit must or may be denied, placing objective limits on its enforcement. *Id.* In contrast, the Act leaves those charged with enforcement unclear as to what action must have occurred (what it means to "require or make part of a course") as well as whether a prohibited idea has been conveyed.

### c.  The Reference to Oklahoma Academic Standards Only Compounds the Act's Vagueness.

As with the Act's terms "require or make part of a course," the exception for the "teaching of concepts that align to the Oklahoma Academic Standards" applies to the entirety of the Act and only compounds its vagueness. OKLA. STAT. tit. 70 § 24-157(B). *See, e.g.*, *Pernell*, 641 F. Supp. 3d at 1283–84, 1286 (holding a savings clause in law prohibiting teaching of certain concepts was vague and, because this clause "command[ed] the entire statute," the law was vague in its entirety).

The Act's text does not clarify the scope of the academic standards exception. Defendants concede that teaching to the Oklahoma Academic Standards "will undoubtedly require mentioning and even discussing several prohibited concepts." Defs.' Br. 48–49. However, Defendants don't have an argument for how the Act's exception for alignment with academic standards provides objective guidelines and refer back to their faulty argument regarding the definition of "require." *Id.* This

would eliminate the exception by treating all instruction, whether aligned with the Oklahoma Academic Standards or not, the same. Defs.' Br. 48. Their suggestion that the exception encourages refutation of prohibited concepts, *id.*, is not found in the text of the Act. Alternatively, the exception could be read to prohibit altogether instruction involving race or sex that is not enumerated in the standards. Pls.' Br. 38–39. Another plausible interpretation is that the banned concept provisions do not apply to instruction involving topics mentioned in the Oklahoma Academic Standards, Defs.' Br. 41, but that argument would permit a teacher to teach as true a banned concept as long as they do so in the context of discussing the Tulsa Race Massacre.

Even if the exception for teaching "concepts that align to" academic standards does permit instruction on the prohibited concepts, it does not answer any of Plaintiff-Teachers' questions about types of instructional materials, pedagogical practices, or class discussions that violate the Act. Pls.' Br. 38–39. The exception does not clarify what, if any, limitations the Act imposes on instruction or academic materials that involve topics mentioned in the academic standards. Defs.' Br. 38. It does not answer how closely instruction must "align" to the standards to be covered. The definition of alignment depends on a subjective interpretation, denying teachers fair notice. And notably, the Standards do not cover Advanced Placement classes, providing no guardrails against censorship in these courses. Pls.' Br. 39.

28

Plaintiffs have not argued that the existence of any questions invalidates the Act. Rather, these particular questions illustrate confusion over the scope of the Act's prohibitions. Far from hypotheticals, Plaintiffs provided real-world examples rooted in their own instruction. The Act does not clarify, for example, whether they are vulnerable under the Act for merely conveying prohibited concepts. Defs.' Br. 38. Indeed, the Act refers to "*concepts* that align to [] Academic Standards," suggesting that the manner of teaching the concept may not matter at all.

Defendants make light of Plaintiffs' request for additional clarity, Pls.' Br. 41, but for Teacher-Plaintiffs, confusion on the meaning of "align" could lead to termination. Per the Rules, the permissibility of instructional texts, materials, and classroom assignments depends on the scope of this term. Defendants could not answer any of Plaintiffs' practical questions about the scope of the exception based on the Act's text. Pls.' Br. 38–39. Teachers are left to guess at their own peril.

### iii.    The Prohibited Concepts Themselves Are Vague.

The Act's prohibited concepts deny teachers "a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108; *see also* Pls.' Br. 29–37. Unable to credibly counter Plaintiffs' arguments about the vagueness of each prohibited concept, Defendants resort to a number of ineffective tactics. First, Defendants fail to engage with the actual requirements of the vagueness standard, that the Act must provide fair notice and prevent arbitrary and discriminatory enforcement. *Grayned*,

408 U.S. at 108–09. Second, Defendants cannot deny the weight of case law finding the same or substantially similar terms unconstitutionally vague in other laws limiting instruction on racism or sexism, so they focus on the cases' footnotes rather than their legal analysis. Third, Defendants continually cite *SFFA* as if it is a safe harbor for ideological censorship in K-12 classrooms. It is not. *SFFA* is an opinion applying strict scrutiny to racial classifications in higher education admissions. Defendants repeatedly attempt to tie the interpretation of the Act's vague text to the language in *SFFA*'s majority opinion, Defs.' Br. 39, 44, 50, but *SFFA* is not a statute and does not explain or justify the confusing formulation of the prohibited concepts.

Throughout their brief, Defendants fail to grapple with examples of the law's vagueness. This includes Plaintiffs' discussion of the Edmond Public Schools' direction to attempt compliance with a law no one confidently understands by refraining from saying particular phrases. Instead, Defendants suggest hyperbolically that Plaintiffs argue they should be permitted to "indoctrinate Oklahoma schoolchildren about their 'white privilege," Def. Br. 20 (citing Pls. Br. 9, 27, 42), and that what Plaintiffs refer to as "'inclusive and culturally responsive curricula' . . . looks remarkably like racial stereotyping." *Id.* (citing Pl. Br. 6–7). To the contrary, Plaintiffs argue that the Act is vague precisely because it invites subjective valuations such as these rather than provide objective standards.

Defendants engage in a circular argument: they complain that Plaintiffs ask too many questions about the Act, inviting the Court to disregard Defendants' inability to answer, Defs.' Br. 46–47, but also argue that questions posed about prohibited concepts are insufficient, *id*. at 49, 51. Plaintiffs' questions about the unclear scope of the prohibited concepts and the opinions of other courts finding the same or substantially similar concepts unconstitutionally vague, Pls.' Br. 29–37, illustrate the inability to delineate the Act's scope and the absence of a common understanding.

As Plaintiffs argued below, and numerous examples make plain, "vagueness [] permeates the concepts." App. Vol. I at 161. Moreover, the vagueness of the overarching provisions prohibiting teachers from "requir[ing] or mak[ing] part of a course" infects each of the concepts. Likewise, each concept operates similarly in relation to the supposed savings clause, which further asks whether instruction "aligns" with academic standards. There is no dispute that Plaintiffs challenge the entirety of the K-12 provisions on their face as vague.

Despite this, Defendants argue that Plaintiffs do not challenge subsections (b), (c), (e), or (h), and that these arguments are waived. Defs.' Br. 49. Defendants' rely on a single case authority, but Plaintiffs' consistent arguments differ significantly from those at issue in *Pharmaceutical Care Management Association v. Mulready*, 78 F.4th 1183, 1204 (10th Cir. 2023), where the state altogether failed to raise a

defensive argument that a savings clause defeated plaintiffs' claims, only mentioning the clause in passing, and where only *amici* raised the argument on appeal. *Id.* at 1205. Whether an issue is preserved for appeal is a matter of the Court's discretion, *United States v. Walker*, 918 F.3d 1134, 1153 (10th Cir. 2019), and certainly here, where it is clear Plaintiffs challenged the full statute and all of its prohibited concepts as vague, and where the district court addressed each of the prohibited concepts in turn, the Court should not set aside Plaintiffs' arguments.

The district court correctly held that concepts (c) and (d) are unconstitutionally vague because they do "not provide fair notice to school administrators and teachers as to what is prohibited." App. Vol. III at 139–40. Thus, school officials subject to the Act "must necessarily guess at [these concepts'] meaning and as to [their] application." *Id.* at 140 (quoting *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1038 (10th Cir. 2009)). Regarding concept (c), "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex," and (d) "members of one race or sex cannot and should not attempt to treat others without respect to race or sex," the district court described the expansive scope of the words "treat" and "treatment," noting that these terms extended "across every social, political, historical, and religious context." App. Vol. III at 138. Thus, the court concluded, *inter alia*, the concepts' sweep was "unclear," meaning it was neither plain nor legitimate. *Id*. In fact, the district court correctly

identified that these concepts would circumscribe instruction in alarming ways; it could foreclose classroom discussion of "subjects of current political debate . . . or ideas that are accepted by a significant number of people and are reflected in current law." *Id*. at 138–39. Defendants' argument that the court's attempt to discern the likely intended scope of concept (d) constitutes a concession of plainly legitimate sweep, Defs.' Br. 58, is belied by its identification of multiple plausible interpretations. App. Vol. III at 138. Ultimately, the court concluded that concept (c) and (d)'s "broad scope might be merely broad and not also ambiguous, but here the totality of the Act reflects that these provisions are simply unclear." *Id.* at 138–39. Concept (d)'s triple negative makes it indecipherable. Defendants' own evidence underscores the vagueness of concept (d): "[u]nfortunately, no one truly knows what this means or can come to agreement on its meaning." App. Vol. I at 160. Nevertheless, Defendants continue to insist the concept has a simple meaning. Defs.' Br. 50–60.

Other courts have repeatedly deemed concepts (c) and (d) vague. The *Edelblut* court expressed difficulties applying language nearly identical to concept (c) to teaching about affirmative action and "efforts to redress past discrimination and promote discovery." 2024 WL 2722254 at *10–11. When considering nearly identical language in *Pernell*, the court noted that concept (d) "features a rarely seen triple negative, resulting in a cacophony of confusion." 641 F. Supp. 3d at 1281. The

*Edelblut* court held a similar provision was "'borderline unintelligible' because it employed the dreaded triple negative form." 2024 WL 2722254 at * 11 (quoting *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1182 (N.D. Fla. 2022)). *See also Ne. Pa. Freethought Soc'y v. Cnty. Of Lacakawanna Transit Sys.*, 938 F.3d 424, 437 n.2 (3d Cir. 2019) (holding "a tangle of double negatives" as vague); *Albanese v. McGinnis*, 823 F. Supp. 521, 563 (N.D. Ill. 1993) ("Triple negatives are not conducive to comprehension.").

The State's enforcement of concept (g) contradicts Defendants' interpretation, further demonstrating its lack of clarity. Defendants argue that the concept (g), that "any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex," is limited to instruction that a student should feel these emotions solely because of her race. Defs.' Br. 52. However, Defendants' evidence of Mustang Public Schools' violation of this concept depended on a statement that an exercise "*could* provoke certain emotions," thus conflating *"*should" and "could," as well as demonstrating the imprecise scope of emotions covered. Defs.' Br. 15 (emphasis added). Defendants argue at length that the instruction was inappropriate, but fail to show that the Act gave clear guidelines indicating that the instruction was illegal. They argue that the instruction was "plainly designed to elicit discomfort, guilt and anguish," *id*. at 16, suggesting the Act's prohibitions are met where "[o]ne should readily anticipate that it would also

34

cause discomfort or anguish." *Id.* at 16 n.12. But the Act does not include a "ready anticipation" standard of culpability. Moreover, prohibiting instruction that "would cause discomfort or anguish" is a different and broader standard than a prohibition on "telling a young child she *should* feel distress." *Id.* at 52. Defendants misrepresent *Pernell* as support for their claim that concept (g) is not vague, *id.* at 52, but the court did not endeavor to outline the vagueness of each prohibited concept because there, as here, the vague overarching provisions rendered the entire statute vague. *Pernell*, 641 F. Supp. 3d at 1286.

###    E.    The Act Lacks a Scienter Provision.

Defendants' arguments that H.B. 1775 includes a scienter provision are belied by the text and Rules. The Rules permit termination of "the license or certificate of any school employee" if the employee is found in "willful violation." OKLA. ADMIN. CODE 210:10-1-23(j). The supposed scienter requirement does not clearly require a "willful" intent to endorse or teach a banned concept as true; it could mean merely a willful intent to include particular materials within a lesson plan. Indeed, this second reading is most consistent with the Act's prohibition on "making [a concept] part of a course," which, as addressed *supra*, does not imply a requirement that the thing is true or of normative value. It is also the most plausible reading in keeping the remainder of the Rules, *see, e.g.*, *Payless Shoesource*, 585 F.3d at 1374, which prohibit teachings that "include, incorporate or are based on" the prohibited

concepts, OKLA. ADMIN. CODE 210:10-1-23(d)(3). For example, a teacher can be caught in the Act's snares simply for intentionally providing instruction on race and sex that they thought aligned to an academic standard. Further, no scienter provision applies at all to a vast array of penalties, including the suspension of a license or certificate of any school employee.

Even if the Court concludes there is a scienter requirement, that does not settle the vagueness inquiry. Defs.' Br. 42. At best, a "scienter requirement may *mitigate* a law's vagueness." *Flipside*, 455 U.S. at 499 (emphasis added); *see also Keyishian*, 385 U.S. at 599–600 (law requiring instructors to act "wilfully [sic] and deliberately" was unconstitutionally vague). The absence of scienter and a defined scope distinguishes this Act from the statute at issue in *Arce*, 793 F.3d 968. The Arizona law prohibited the "promot[ion of] resentment toward a race or class of people" and "advoca[cy of] ethnic solidarity *instead of* the treatment of pupils as individuals." *Id.* at 973. The court recognized guardrails that are not present here: the law only punished "the *intention* to promote resentment, or to invite racism in schools" and "the conduct of advocating 'ethnic solidarity' is prohibited only if it is done *instead of* treating pupils as individuals." *Id.* at 989. H.B. 1775 censors instruction on racism and sexism without any such limitations. A teacher can still face punishment under the Act without any intent to promote resentment, invite racism, or treat students differently on account of their race or sex.

**F.    The Act Encourages Arbitrary and Discriminatory Enforcement.**

Without objective standards, the Act invites arbitrary and discriminatory enforcement. Defendants cite the *number* of enforcement actions in defense of the Act but cite no authority in support of this position. There is no doubt that Oklahoma is enforcing H.B. 1775, and the credible threat of enforcement is sufficient to challenge the Act. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). Encouragement of arbitrary and discriminatory enforcement depends on the lack of objective standards, not the number of enforcement actions or the length of time a statute has been enacted. *See Ass'n of Cmty. Orgs. For Reform Now v. Mun. of Golden*, 744 F.2d 739, 748 n.5 (1984) (noting that the "lack of precise standards permits arbitrary and discriminatory enforcement").

The Oklahoma State Board of Education's enforcement of the Act against Tulsa exemplifies the Act's vagueness. Defendants' description of the conduct in the training that violated the Act differs dramatically from the Board's General Counsel, illustrating that enforcement depends on subjective interpretations and turns on the listener's reaction. Defendants assert that the specific language in the training violates concept (b), that an individual, by virtue of their race, is inherently racist, whether consciously or unconsciously. Defs.' Br. 16. However, after consideration of the same statements, the Board's General Counsel wrote, "[t]o be clear, while there may not be express statements that an individual is inherently racist because of

their race, consciously or unconsciously, there is evidence making it more likely than not that the training incorporated and/or or is based on such concepts." App. Vol. II at 170–71.

The Board's General Counsel further concluded:

> Similarly, whereas *there was not explicit content* that an individual, because of their race, is responsible for actions in the past, evidence provided makes it more likely than not that the training is *based on or incorporates* that responsibility. Finally, though *there were not direct statements* in the training that an individual should feel discomfort or guilt because of their race, the design and basis of the training makes it *more likely than not that it incorporates and/or is based* on such a concept.

*Id.* (emphasis added). The General Counsel did not elaborate on what that evidence was.

The Act has created a vast chilling effect on instruction on racism and sexism. The record is replete with testimony from Plaintiffs establishing that they delivered training or instruction in the past that they wish to continue for the benefit of their students. App. Vol. I at 156–57, 216–19, 240–43, 247–50. However, due to the Act's severe penalties, they now plan to withhold that instruction. *Id.* at 156–57, 160–63, 216–19, 243, 250. Teachers are censoring their instruction on racism, sexism, and other potentially controversial topics to avoid vulnerability to investigation. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 807 (2011) (Alito, J., concurring)

("Vague laws force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (citation modified).

The Court should affirm the district court's holding that "require" as well as concepts (c) and (d) are unconstitutionally vague. The Court should further reverse the district court's holdings as to (1) "make part of a course," (2) the remainder of the concepts, and (3) the exception for teaching concepts that "align to" Oklahoma Academic Standards and should enjoin these provisions, and the totality of the Act's K-12 provisions, as unconstitutionally vague.

## II.    The District Court Erred in Denying That H.B. 1775 Violates Students' First Amendment Rights.

Student-Plaintiffs in Oklahoma public schools alleged that H.B. 1775 violates their First Amendment right to receive information because the Act forces teachers to withhold content from students without any reasonable justification based on a legitimate pedagogical basis. Am. Compl. ¶¶ 165–70, App. Vol. I at 126–127. Student-Plaintiffs moved for a preliminary injunction on that claim, App. Vol. I at 166, but the district court denied preliminary relief. App. Vol. III at 146. Pursuant to 28 U.S.C. § 1292(a)(1), Plaintiffs timely filed an interlocutory appeal of the denial of the injunction. Contrary to Defendants' assertion, the dismissal of Student-Plaintiffs' First Amendment claim is not appealable as a final action under Federal Rule of Civil Procedure 54(b) because the district court did not dismiss all of

Plaintiffs' claims. Defs.' Br. 27. Defendants cite a string of inapposite caselaw to

including *Baker v. Bray*, 701 F.2d 119 (10th Cir. 1983), but this Court's primary

holding in that case was that several appeals were moot because the election in

question had passed. Therefore, the appropriateness of a preliminary injunction

based on Student-Plaintiffs' First Amendment right to receive information claim is

properly before this Court.

### A.    The District Court Erred in Refusing to Apply Any First Amendment Analysis to Student Plaintiffs' Claims.

In its order granting in part and denying in part Plaintiffs' motion for

preliminary injunction, the district court disposed of Student-Plaintiffs' First

Amendment claim with a mere two sentences. App. Vol. III at 146. The court cross-

referenced its reasoning "as set forth by separate Order," *id.*, and summarily denied

an injunction on the claim. *Id*. But, in the district court's Order on Defendants'

Motion for Judgment on the Pleadings, the court devoted more than three pages to

analyzing K-12 teachers' First Amendment rights, *id*. at 105–09, and relegated its

analysis of Student-Plaintiffs' First Amendment claim to a two-sentence footnote.

*Id*. at 109 n.16.

The entirety of the district court's reasoning consisted of stating that the "right

to receive information is a corollary of the speaker's right to express it." *Id.* The

court cited *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S.

853, 867 (1982) for this proposition as well as *Stanley v. Georgia*, 394 U.S. 557, 564

40

(1969) and *Doe v. City of Albuquerque*, 667 F.3d 1111, 1118 (10th Cir. 2012), two cases about obscenity laws. The court summarily concludes that there was "no adequately pleaded claim based on a violation of K-12 level instructor-Plaintiffs' First Amendment right to teach particular information in the classroom, it follows that there is no plausible claim for a violation of K-12 level student-Plaintiffs' right to receive that information." App. Vol. III at 109 n.16. The court did not cite any precedent for that proposition.

The district court erred in conflating the right to receive with the right of the speaker. *Stanley* did not consider whether there was a corollary speaker's right and forcefully rejected Georgia's argument that because "obscenity is not protected by the First Amendment," the defendant had no First Amendment right to receive information. 394 U.S. at 560. *Doe* likewise affirmed that speakers and listeners require separate First Amendment inquiries. 667 F.3d at 1119.

Indeed, the Supreme Court's first case vindicating the First Amendment right to receive information was *Lamont*, 381 U.S. 301 where the speech in question was *The Peking Review*, "communist political propaganda," and the speaker was the Chinese Government. The unanimous Court held that the postal service policy of "detain[ing]" mail coming from "a foreign country" violated the recipient's First Amendment rights by impeding his access to the *Review*. *Id.* at 302, 306. The Court was not implying that the Chinese government, speaking from China, was protected

41

by the First Amendment. It was the receivers' rights alone that were at issue in *Stanley*, *Doe*, and *Lamont*.

Since the district court's sole reason for denying Student-Plaintiffs' claim was an inferential leap contrary to Supreme Court caselaw, its order regarding that claim should be reversed. Applying the proper analysis to the record in this case, this Court should grant the injunction. In the alternative, this Court could vacate the district court's order and remand the issue with direction to apply appropriate First Amendment scrutiny to Student-Plaintiffs' claim.

### B.    "Government Speech" Doctrine Does Not Apply to Students' First Amendment Claims.

Defendants opened their first brief in this Court with the declaration that "public school teaching is government speech through and through" Defs.' Br. 5. But the phrase "government speech" does not appear anywhere in the district court record, including Defendants' briefing and the court's orders, so this argument has been waived. And even if it has not been waived, it should be rejected. The Supreme Court warned that judges "must exercise great caution before extending [the Court's] government-speech precedents" because "it is a doctrine that is susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Defendants' proposal to extend the government speech doctrine to public school instruction, and extend immunity from First Amendment review, would realize the Supreme Court's fears.

Defendants' assertion that "public school teaching is government speech" conflates government employee speech under *Garcetti* with "government speech" under *Shurtleff*. The government employee speech inquiry evaluates whether a public employee is speaking in their capacity as an employee or as a private citizen for the purposes of *their own* First Amendment speech rights. Plaintiffs have never disputed that *Garcetti* applies to teachers' classroom instruction, nor have they brought First Amendment claims on behalf of teachers in this case. Pls.' Br. 46. It is therefore uncontroverted that, since teachers' classroom instruction is "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421. That is, teachers are not protected by the First Amendment to say whatever they want in classrooms. But the inquiry for "government speech," as opposed to government *employee* speech, is different and provides the more relevant analysis here. *See id.* at 418 ("[T]he government as employer indeed has far broader powers than does the government as sovereign" (quoting *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion))).

  i.   ***Shurtleff* Provides the Analysis For "Government Speech."**

To decide whether a message that is indisputably emanating from the government is perceived as "communicat[ing] governmental messages," *Shurtleff*, 596 U.S. at 248, the Supreme Court has prescribed a "holistic inquiry […] driven by a case's context rather than the rote application of rigid factors." *Id.* at 252. The Court

set out three, non-dispositive "indicia," namely "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 244. In *Shurtleff*, the question was whether flags flying atop Boston's City Hall might accurately be described as "government speech." Weighing the three indicia, the Court found that "some evidence favors Boston, and other evidence favors Shurtleff," *id.* at 253, ultimately holding unanimously that in the specific context of the City Hall flag flying program, the "government speech" doctrine did not apply to the flags. *Id.* at 258.

The Court reached this holding without expressing concern that city employees are the ones implementing the plan and that their on-the-job speech is undoubtedly covered by *Garcetti*. In fact, the majority opinion did not even mention *Garcetti* or government employee speech. Justice Alito's concurrence, joined by Justices Thomas and Gorsuch, provide further evidence that Defendants misconstrue "government speech." In the concurrence, those justices posit that "Government speech is [] the purposeful communication of a governmentally determined message *by a person exercising a power to speak for a government*." *Id.* at 268 (emphasis added). Not all speech coming from government employees is automatically "government speech," so *Garcetti* cannot control all the First Amendment analysis here.

44

### ii.   *Shurtleff* Factors Favor Student-Plaintiffs.

Taking each *Shurtleff* indicator in turn, it is clear that K-12 instruction is not "government speech." First, K-12 instruction has not historically been subject to legislative micromanagement. In fact, courts have long recognized that they should tread carefully when second guessing school officials' decisions. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) (noting that the Court has "repeatedly emphasized the need for affirming the comprehensive authority" of state and local education officials to administer public schools). The absence of substantial caselaw addressing statewide laws that ban teaching disfavored ideas speaks to how rarely legislatures have taken on this role. When state legislators have recently intruded into classroom instruction, students and teachers have challenged these efforts successfully. *See Edelblut*, 2024 WL 27222545 (striking down a similar prohibited concepts law on vagueness grounds); *Mae M. v. Komrosky*, 332 Cal.Rptr.3d 682, 688 (Cal. Ct. App. 2025) (holding that elected school board's ban on Critical Race Theory was "unconstitutionally vague on its face because it employs ambiguous language, lacks definitions, is unclear in scope, is seemingly irreconcilable with state-mandated educational requirements, and contains no enforcement guidelines").

Second, the public does not perceive K-12 teachers and other educators to be the government's mouthpieces for whatever message it chooses to convey. Of

course, public schools are funded by the state and overseen by local school districts, so no one doubts that they are public institutions on a basic level. But when students are in class, neither they nor their families understand themselves to be receiving a message directly from the governor or state legislature or any agency of government. For example, when a public-school teacher assigns students to read a work of fiction, whether it be *Frog and Toad Are Friends* or Shakespeare's *Othello*, those works are not somehow communicating a governmental message. Teachers are expected to not only impart information, but also to teach students how to be critical thinkers. One common way to encourage empathy and creative thinking is to hold classroom debates with students assigned to a particular viewpoint. If all instruction was "government speech" by virtue of being included in the school curriculum, it begs the question of what exactly the government is saying. *Matal*, 582 U.S. at 219 (noting that "if trademarks become government speech when they are registered, the Federal Government is babbling prodigiously and incoherently"). We trust teachers to provide instruction and support in line with professional best practices and their own expertise, no matter who is in elected office. In that way, public school instruction is special—we perceive it neither as the teacher's personal views, nor as the officially sanctioned message of the current political administration.

Third, the Oklahoma state legislature does not "actively shape or control" classroom instruction. The legislature does occasionally create general requirements

for public schools, such as OKLA. STAT. tit. 70 §70-11-103.9b, that requires Oklahoma public schools to teach about mental health. However, that law appropriately leaves the selection of curriculum and content up to school districts and educators. With the appropriations from the legislature, the Oklahoma State Department of Education sets Academic Standards "equipping educators with tools and inspiration to transform learning" providing "resources that empower educators to inspire students and enhance learning in the classroom."[5] But even the Department does not play a direct role in deciding what specifically will be taught, and how, since curricula and classroom materials are selected at the district or school level. Even with this local control, teachers' specific words in a classroom and the discussions that ensue are not seen as the direct message of local school board officials. In the classroom, teachers have substantial control over pedagogy and instruction, and this is appropriate. Amicus Br. of Okla. Appleseed Ctr. for Law and Just. 16 (underscoring the importance of preserving teacher autonomy to provide a quality education). Teachers are generally responsible for developing lesson plans on a daily basis, choosing which materials, exercises, and other resources to employ during a particular day or period.

---

[5] *Oklahoma State Department of Education*, https://perma.cc/LW97-EV85.

If Defendants are correct that there are no First Amendment guardrails on K-12 instruction, then students and their educations are truly subject to the whim of whichever party or regime is currently in power. In fact, Defendants concede that "[e]ven if Plaintiffs were correct that [the Act] prohibits even the mention of the concepts in any fashion, [it] would be the state's prerogative to speak how it wants." Defs.' Br. 47. According to Defendants, any state could tomorrow ban mention of any disfavored idea—whether it is true or false, controversial or universally-accepted—and students would have no recourse. This Court should not encourage this subversion of our public school system and the students therein.

### C.   This Court Should Apply *Hazelwood* to Student-Plaintiffs' First Amendment Claims.

Students' First Amendment right to receive information in K-12 instruction has not been addressed directly by the Supreme Court or this Circuit. Therefore, there is no binding precedent directly on point to guide this Court's decision. This Court should follow the well-reasoned decisions of the Eleventh and Ninth Circuits recognizing K-12 students' First Amendment right to receive information in classroom curriculum, applying *Hazelwood* whereby any restriction on students' right to receive information must be "reasonably related to legitimate pedagogical concerns." *See Arce*, 793 F.3d 968 (holding that students' First Amendment right to receive information was violated by the removal of a Chicano Studies curriculum); *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517 (11th Cir. 1989)

(recognizing a student's First Amendment rights were implicated by the removal of humanities textbooks). In *Arce*, the Ninth Circuit held Arizona's curriculum law violated students' First Amendment rights because it "threatens to chill the teaching of ethnic studies courses that may offer great value to students—yet it does so without furthering the legitimate pedagogical purpose of reducing racism." 793 F.3d at 986. While the Eleventh Circuit ultimately held that the school district's removals satisfied *Hazelwood* under the particular facts at hand in *Virgil*, the central point is that both the Ninth and Eleventh Circuits applied appropriate First Amendment scrutiny to the students' claims. That did not happen in this case.

In a recent case solely considering students' First Amendment right to receive information in K-12 school curriculum and school libraries, *E.K. and S.K., et al. v. Dep't of Def. Educ. Activity*, *et al.*, No. 1:25-cv-00637-PTG-IDD, 2025 WL 2969560 (E.D. Va. Oct. 20, 2025), the district court granted a preliminary injunction to student-plaintiffs based under *Pico* and *Hazelwood*. In so doing, the court roundly rejected defendants' "government speech" argument. *Id*. at *11–14. The court directed the Department of Defense, which runs the school district in question, to immediately return all books and curricular materials that were removed pursuant to Executive Orders and agency directives.

Defendants point to recent cases out of the Fifth and Eighth Circuits that they claim support their position. As a threshold matter, *Little v. Llano County*, 138 F.4th

834 (5th Cir. 2025), was about book removals in a county library, not K-12 curriculum. In that case, a fractured series of *en banc* Fifth Circuit opinions overruled both the district court and the appellate panel decision that recognized patrons' right to receive information, consciously overruling circuit precedent. *Id*. at 837 (expressly overruling circuit precedent recognizing students' First Amendment right to receive information in public school libraries). But the *en banc* court did not take the further extraordinary step of holding that the speech in question was "government speech," with less than half of the full court joining in that portion of the majority opinion. *Id*.

In *Walls v. Sanders*, 144 F.4th 995 (8th Cir. 2025), the Eighth Circuit similarly overruled circuit precedent recognizing students' First Amendment right to receive. *Id.* at 1006 (declining to follow decades-old circuit precedent recognizing students' right to receive information in K-12 curriculum). In so doing, the Eighth Circuit did not meaningfully engage with whether the government speech doctrine applies to public school instruction. *Id.* at 1002. Instead, the court reasoned that the First Amendment requires a "willing speaker" for a listener to assert their right to receive information. *Id.* But teachers and other educators are willing—eager, in fact—to continue to provide instruction on a full range of topics. It is the state legislature that is prohibiting these "willing speakers" from reaching their "willing audience." This

Court should not follow these circuits down the perilous path to unrestricted partisan, political control over public school instruction.

**D.    H.B. 1775 Fails Under *Hazelwood*.**

As Plaintiffs have repeatedly argued, the limitations on instruction in H.B. 1775 are based on the legislature's desire to prevent Oklahoma students from learning about histories and perspectives the legislature wants to suppress, not a "legitimate pedagogical concern." Am. Compl., App. Vol. I. at 59, 126, 128; Motion for Prelim. Inj. at 19–22, App. Vol. I at 166–69; Pls.' Br. 50–52. In fact, legitimate pedagogical concerns on the part of educators weigh in favor of inclusive curricula and pedagogical practices. *See* Am. Compl. ¶ 5, App. Vol. I at 161 (recognizing that curriculum should be "inclusive of the identities that reflect the richness and diversity of the human experience"); Amicus Br. of Nat'l Acad. Educ. 10–20 (collecting and analyzing relevant educational research). Decades of educational research point to the benefits in terms of academic achievement and engagement, social and emotional well-being, civil and political participation, and cohesion across groups. *Id.* at 13, 14, 17, 20. Likewise, limiting access to diverse perspectives harms students' performance and development. *Id.* at 21. In light of this research by educational experts, it is hard to understand how banning vague concepts about race and sex is based on any legitimate pedagogical concern.

As Plaintiffs have argued from the beginning of this case, there is ample reason to believe that H.B. 1775 was passed by the legislature to advance partisan, political, and censorial goals like suppressing discussion of "the theory of implicit bias," the concept of "intersectionality," and even the existence of "police brutality." Am. Compl., App. Vol. I at 109–14; Motion for Prelim. Inj., App. Vol. I at 156; Pls.' Br. 50–1. In response, Defendants now rely on *SFFA* as cover for a legitimate pedagogical interest. Defs.' Br. 34. As stated *supra*, Defendants' reliance on *SFFA* is misplaced since that case did not have anything to do with *Hazelwood* analysis or K-12 instruction.

Defendants cite *Boring v. Buncombe County Board of Education*, 136 F.3d 364 (4th Cir. 1998) for the proposition that all curricular content is "by definition a legitimate pedagogical concern," but that was a pre-*Garcetti* case applying *Hazelwood* and *Connick v. Myers*, 461 U.S. 138 (1983) to a teacher's First Amendment retaliation claim. As such, *Boring* is arguably not good law. It is also easily distinguishable. In *Boring*, a school district transferred a teacher to a different school, allegedly in retaliation for the teacher having put on a controversial play. There was no prophylactic prohibition on any ideas. The Fourth Circuit concluded that the case was "nothing more than an ordinary employment dispute." 136 F.3d at 368.

Plaintiffs have never disputed that counteracting racial discrimination is, in principle, a legitimate pedagogical concern. Pls.' Br. 51. If this Court is inclined to credit Defendants' belated and dubious justification for passing the law, this Court should proceed to the second step of the *Hazelwood* inquiry and interrogate whether H.B. 1775 is "reasonably related" to addressing racial discrimination. *Hazelwood*, 484 U.S. at 273. Put simply, H.B. 1775 is not "reasonably related" to addressing discrimination because accurate and age-appropriate teaching *about* racism and sexism does not constitute racial or gender discrimination. In fact, teaching about current and historic injustice improves social cohesion and can help prevent future discrimination. Amicus Br. of Nat'l Academ. Educ. 20. The racial discrimination referenced in Defendants' brief amount to questioning particular curricular materials or exercises. Defs.' Br. 7–9. And while Amicus Oklahoma Council of Public Affairs casts aspersions at the conclusions of research professionals generally by noting "hoax papers," Amicus Br. 11, neither Defendants nor *amici* challenge the veracity of any study or conclusion specifically cited by Plaintiffs or the National Academy of Education.

Instead of encouraging teachers to provide high quality instruction to students, the Act prohibits conveying educationally valuable information to students, severing any reasonable relationship between the Act's prohibitions and its purported

justifications. Therefore, the Act, in its entirety, is unconstitutional and should be enjoined.

## CONCLUSION

For the reasons stated above, this Court should reverse the district court's preliminary injunction order to the extent it left in place some provisions of H.B. 1775 and enjoin the Act in its entirety.

Dated Nov. 19, 2025                   Respectfully Submitted,

                                                    /s/ Emerson Sykes

<table>
<tr><td>

Megan Lambert
Rebecca Barrett
Travis Handler
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org
rbarrett@acluok.org
thandler@acluok.org


Douglas Koff
Julia Beskin
Sara Solfanelli
Kevin Scot Johns
MCDERMOTT WILL & SCHULTE LLP
919 Third Avenue
New York, NY 10022
douglas.koff@srz.com
julia.beskin@srz.com
sara.solfanelli@srz.com
kevin.johns@srz.com

</td><td>

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor New
York, NY 10004
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org


Dariely Rodriguez
Michael Pillera
Maya Brodziak
Catherine M. Blalock
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
drodriguez@lawyerscommittee.org
mpillera@lawyerscommittee.org
mbrodziak@lawyerscommittee.org
cmccan@lawyerscommittee.org

</td></tr>
</table>

## CERTIFICATION OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 28.1(e)(2)(A)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,831 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman in size 14-point.

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that (1) all required privacy redactions have been made; and (2) any paper copies of this document submitted to the Court are exact copies of the version electronically filed.

Dated: 19th November 2025                        /s/ Emerson Sykes

                                               Emerson Sykes

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: 19th November 2025                                  /s/ Emerson Sykes
                                                          Emerson Sykes