**Nos. 24-6139, 24-6140, & 24-6141**

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

No. 24-6139

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs*,

and

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Plaintiffs - Appellants/Cross-Appellees*,

v.

GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.*,

*Defendants - Appellees/Cross-Appellants*,

and

UNIVERSITY OF OKLAHOMA BOARD OF REGENTS, *et al.*,

*Defendants.*

No. 24-6140

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs*,

and

OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Plaintiffs - Appellees*,

v.

JOHN R. BRAUGHT, *et al.*,

*Defendants - Appellants*,

and

GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.*,

*Defendants.*

No. 24-6141

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs - Appellees*,

v.

GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.*,

*Defendants - Appellants*,

and

JOHN R. BRAUGHT, *et al.*,

*Defendants.*

On Appeal from the U.S. District Court for the Western District of Oklahoma, Case No. 5:21-CV-1022-G, Honorable Charles Goodwin, District Judge

## THE STATE OF OKLAHOMA'S FOURTH BRIEF ON CROSS-APPEAL

GARRY M. GASKINS, II
  *Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Main: (405) 521-3921
Garry.Gaskins@oag.ok.gov


*Counsel for State Defendants*

ZACH WEST
  *Director of Special Litigation*
WILL FLANAGAN
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Main: (405) 521-3921
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 2

ARGUMENT............................................................................................................ 2

I.   THE DISTRICT COURT APPLIED AN OVERLY STRINGENT VAGUENESS TEST. ............................................................................................................. 2

II.  PLAINTIFFS DISPUTE THIS COURT'S FACIAL VAGUENESS PRECEDENT. ..... 9

III. TO "REQUIRE … CONCEPTS" IS NOT UNCONSTITUTIONALLY VAGUE....12

IV.  THE TWO ENJOINED CONCEPTS ARE NOT UNCONSTITUTIONALLY VAGUE.......................................................................................................... 20

   a.   Prohibited concept: "[A]n individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex."................................................................... 20

   b.   Prohibited concept: "[M]embers of one race or sex cannot and should not attempt to treat others without respect to race or sex." ......................................................................................... 23

CONCLUSION ...................................................................................................... 25

STATEMENT REGARDING ORAL ARGUMENT................................................. 26

## TABLE OF AUTHORITIES

**Cases**

*Brecheisen v. Mondragon*,
   833 F.2d 238 (10th Cir. 1987) ..................................................................... 15

*Chiras v. Miller*,
   432 F.3d 606 (5th Cir. 2005) ......................................................................... 4

*Doctor John's, Inc. v. City of Roy*,
   465 F.3d 1150 (10th Cir. 2006) ................................................................... 10

*Fabrizius v. Dep't of Agric.*,
   129 F.4th 1226 (10th Cir. 2025) ................................................ 9, 10, 11, 12

*Giaccio v. Pennsylvania*,
   382 U.S. 399 (1966) ................................................................................... 7, 8

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ..................................................................................... 19

*In re Rogers*,
   513 F.3d 212 (5th Cir. 2008) ....................................................................... 15

*Johnson v. United States*,
   576 U.S. 591 (2015) ............................................................................... 10, 11

*Lamie v. U.S. Tr.*,
   540 U.S. 526 (2004) ..................................................................................... 15

*Little v. Llano Cnty.*,
   138 F.4th 834 (5th Cir. 2025) ....................................................................... 3

*Local 8027 v. Edelblut*,
   No. 21-CV-1077-PB, 2024 WL 2722254 (D.N.H May 28, 2024) .......... 8, 9, 22, 24, 25

*Moody v. NetChoice*,
   603 U.S. 707 (2024) ................................................................................... 9, 11

*Off. of U.S. Tr. v. John Q. Hammons Fall 2006, LLC*,
   602 U.S. 487 (2024) ....................................................................................... 6

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
   641 F. Supp. 3d 1218 (N.D. Fla. 2022) ................................................. 22, 25

*Salman v. United States*,
580 U.S. 39 (2016) .......................................................................................... 19

*Sessions v. Dimaya*,
584 U.S. 148 (2018) ................................................................................ 3, 4, 5, 11

*State v. Williams*,
728 N.E.2d 342 (Ohio 2000) .......................................................................... 15

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
600 U.S. 181 (2023) ........................................................................................ 21

*Taylor v. Roswell Independent School District*,
713 F.3d 25 (10th Cir. 2013) ........................................................................ 6, 7

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................................................ 25

*United States v. Hansen*,
599 U.S. 762 (2023) ........................................................................................ 11

*United States v. Jackson*,
138 F.4th 1244 (10th Cir. 2025) ................................................................ 11, 12

*United States v. Lesh*,
107 F.4th 1239 (10th Cir. 2024) .................................................................... 12

*United States v. Rahimi*,
602 U.S. 680 (2024) .................................................................................... 11, 12

*United States v. Salerno*,
481 U.S. 739 (1987) .................................................................................... 10, 11

*United States v. Walling*,
936 F.2d 469 (10th Cir. 1991) ........................................................................ 10

*United States v. Williams*,
553 U.S. 285 (2008) ........................................................................................ 19

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) .................................................................................... 3, 4, 5

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) .......................................................................... 4

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) .................................................................................... 9, 12

iii

*Waters v. Churchill*,
    511 U.S. 661 (1994) .................................................................................................... 6

*Wilburn v. Mid-S. Health Dev., Inc.*,
    343 F.3d 1274 (10th Cir. 2003) ............................................................................... 19

**Statutes**

OKLA. STAT. tit. 70, § 24-157 ....................................................... 12, 16, 17, 18, 23

**Rules**

OKLA. ADMIN. CODE 210:10-1-23(d)(3) ............................................................. 19

**Other Authorities**

Jonathan Chait, *The Left Is Gaslighting Asian Americans About College Admissions*,
    N.Y. MAG. (Feb. 8, 2022) ........................................................................................ 21

*Require*,
    MERRIAM-WEBSTER ................................................................................................. 13

*Treat*,
    MERRIAM-WEBSTER ................................................................................................. 23

**GLOSSARY**

| | |
|---|---|
| HB 1775 / the Act | Oklahoma House Bill 1775 (2021) |
| Plaintiffs | Oklahoma State Conference of the NAACP, the American Indian Movement Indian Territory, Precious Lloyd, as next friend of S.L., Anthony Crawford, and Regan Killackey |
| Oklahoma / State Defendants | Oklahoma Attorney General Gentner Drummond, Oklahoma Superintendent of Public Instruction Lindel Fields, each board member of the Oklahoma State Board of Education, Oklahoma Governor Kevin Stitt, each member of the Oklahoma State Regents for Higher Education |
| University Defendants | Each member of the Board of Regents of the University of Oklahoma (OU) |
| Edmond Defendants | The Superintendent of Edmond Public Schools, and each member of the Board of Education of Edmond Public Schools |
| Board | Oklahoma State Board of Education |
| Department | Oklahoma State Department of Education |

## INTRODUCTION

HB 1775 squarely prohibits Oklahoma's K-12 schools from endorsing certain racist and sexist teachings. Responding to Oklahoma's cross-appeal, Plaintiffs spill much ink alleging uncertainty with the Act's provisions and attempting to rehabilitate the district court's decision to enjoin several subparts of the law. But like the district court, they make little effort to grapple with the actual text of HB 1775. That text reveals a clear and appropriately limited meaning behind each of the Act's provisions. In sum, the district court erred: the Act is not unconstitutionally vague, even partially. To avoid this conclusion, Plaintiffs are forced to argue that this Court's approach to facial vagueness challenges is misguided, they incorrectly interpret the Act's generous safe harbor provision, and they fall back on policy critiques of the Act, which should be irrelevant. Nothing they put forward justifies maintaining the current injunction of valid parts of a duly enacted State law. This Court should uphold the entire Act.

## ARGUMENT

### I. THE DISTRICT COURT APPLIED AN OVERLY STRINGENT VAGUENESS TEST.

The district court applied a "stringent vagueness test" solely because the Act allows for suspending or revoking the license or certificate of a school employee. P.A.Vol.III at 133. In so doing, the court relied solely on a single concurrence arguing that the revocation of professional licenses should be subjected to the same standard of review that courts employ for criminal statutes. P.A.Vol.III at 127 (quoting *Sessions*

*v. Dimaya*, 584 U.S. 148, 184–85 (2018) (Gorsuch, J., concurring in part)). This was error, and Plaintiffs do nothing to salvage the court's reasoning.

The Supreme Court has long held that the level of precision required by the Constitution varies based on the type of enactment. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Relevant here, civil statutes receive "greater tolerance" for vagueness than criminal statutes, *id.*, and HB 1775 is undeniably a civil statute. So why did it receive a stringent review? Plaintiffs offer two separate theories justifying this heightened level of scrutiny. Both are flawed.

First, Plaintiffs suggest stringent review is necessary because the Act "threatens to inhibit the exercise of constitutionally protected rights." Plaintiffs' Third Brief on Cross-Appeal ("Pls. Resp.") at 10 (quoting P.A.Vol.III at 127). Specifically, Plaintiffs claim the Act infringes on K-12 students' "First Amendment right to receive information free from ideologically motivated censorship." *Id.* But the only people subject to the Act's punishments are school personnel. Stringent review may be proper when the enactment is "inhibit[ing] the exercise" of someone's constitutional rights, *Flipside*, 455 U.S. at 499, but the Act doesn't bar students from doing anything, nor does it subject them to any punishment. Regardless, the district court correctly held that K-12 students do not have a First Amendment right to be taught certain views. *See* State Br. at 26; *see also Little v. Llano Cnty.*, 138 F.4th 834, 843 (5th Cir. 2025) (en banc). Thus,

for multiple reasons, the Act does not threaten the expression of K-12 students. Plaintiffs' first theory fails.[1]

Second, echoing the district court, Plaintiffs claim a stringent test is merited because the State can suspend or revoke the license of K-12 personnel. As the district court saw it, this punishment is sufficiently severe to apply the same scrutiny that applies to criminal statutes. P.A.Vol.III at 127. But the Act's commonplace civil punishments—accreditation and license changes—are not equivalent to criminal penalties. If embraced, this view would nullify any real impact of the Supreme Court's mandatory dichotomy on this point. *See Flipside*, 455 U.S. at 498–99 (courts must give "greater tolerance" to "enactments with civil rather than criminal penalties").

*Dimaya* does not support a stringent test here. *Contra* Pls. Resp. at 11–12. *Dimaya* involved a statute governing deportation. 584 U.S. at 156–57. There, the Supreme Court reaffirmed that civil statutes are reviewed more deferentially than criminal statutes for vagueness. *Id.* at 156. Although deportation is technically civil, the Court explained that removal proceedings are an exception from the norm because of their "grave nature," which is "a 'drastic measure,' often amounting to lifelong 'banishment or exile.'" *Id.* at 157 (citation omitted). In addition to being "a particularly severe penalty" that is likely

---

[1] Nor could Plaintiffs point toward restrictions on the expression of teachers to justify stringent review. Curricular speech is government speech unprotected by the First Amendment. Thus, the Act does not interfere with free speech rights of teachers. State Br. at 29; *Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005); *Walls v. Sanders*, 144 F.4th 995, 1003 (8th Cir. 2025).

"of greater concern to a convicted alien than any potential jail sentence," removal proceedings are "intimately related to the criminal process" because deportation orders are often based on criminal convictions. *Id.* (citations omitted). Simply put, deportation is an outlier because of its severity and intimate connection to criminality.

The Act's penalties pale in comparison. A temporary suspension (or even revocation) of a teaching license does not resemble actual banishment from the United States. And Plaintiffs do not argue, nor could they, that a person might prefer a jail sentence to the Act's punishment. *Dimaya* creates an exception to the general rule, but the Act's penalties do not qualify for the exception. To hold otherwise was error.

To be sure, Justice Gorsuch's partial concurrence questioned the Court's practice of tolerating more vagueness in civil statutes. *Dimaya*, 584 U.S. at 184–85. But even he acknowledged the "truism[]" that "enactments with civil rather than criminal penalties" receive "greater tolerance" regarding vagueness. *Id.* at 184 (quoting *Flipside*, 455 U.S. at 488–89). To him, losing a license might constitute a more severe penalty than those associated with misdemeanor crimes. *Id.* But licenses were not at issue in *Dimaya,* and no justice joined him, on this point or any other. Justice Gorsuch wrote alone, criticizing the Court for not going further. *See, e.g., id.* at 188 ("My colleagues suggest the law before us should be assessed under the fair notice standard because of the special gravity of its civil deportation penalty. But, grave as that penalty may be, I cannot see why we would single it out for special treatment …."). The Court does not seemingly share his view. *Cf. Off. of U.S. Tr. v. John Q. Hammons Fall 2006, LLC*, 602 U.S. 487, 502 n.3 (2024)

5

("Readers are reminded that the dissent is 'just that.'"). His opinion is not binding, and it was erroneous for the court below to treat it as such.

The context of K-12 public education also counsels against applying a stringent review for vagueness. The Act applies exclusively to public employees. And it governs the curriculum in the State's schools. When (as here) the government is acting "as employer," it possesses "far broader powers" than it does when it is acting "as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality op.). Thus, the State may prohibit its employees "from using ... offensive utterance[s] to members of the public" even though the State must permit that language from the public. *Id.* at 672. Relevant here, the State's restrictions for its own employees may be defined less precisely than its restrictions for the public. *Id.* at 673. "[A] public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." *Id.* Given the expansive leeway the State is owed when regulating its own employees, the district court erred in applying a stringent vagueness review.

Plaintiffs push back against the State's reliance on *Taylor v. Roswell Independent School District*, 713 F.3d 25, 50 (10th Cir. 2013), where this Court applied a more deferential standard of vagueness review for "non-criminal policies in the unique context of public schools." *See* Pls. Resp. at 12–13. According to Plaintiffs, the Act's threat to the licenses of K-12 teachers is a "far cry" from *Taylor*, which involved a school district preventing the distribution of material by students on school grounds. *Id.* at 13.

But the present lawsuit indisputably concerns: (1) a non-criminal state policy; (2) in the unique context of public schools. Thus, regardless of any factual differences, *Taylor*'s stated principle straightforwardly applies.

In any event, *Taylor* is not a "far cry" from the present case. Again, *Taylor* involved a vagueness challenge to a school policy that required students to seek approval prior to engaging "in promotional activities" on school grounds. 713 F.3d at 32. Approval could be withheld if the school determined the material would lead to a "substantial disruption" or was "demeaning to any race." *Id.* at 32–33. Like Plaintiffs here, the *Taylor* students relied on precedent "requiring narrow specificity in criminal statutes that affect First Amendment expression." *Id.* at 50. In rejecting this argument, this Court relied on the Supreme Court's principle that less specificity is required for civil statutes than for criminal statutes, as well as the Supreme Court's holding that "rights of students in public school are not automatically coextensive with rights of adults in other settings." *Id.* at 51 (citation omitted). Similar logic applies here. HB 1775 contains only civil penalties, and the State possesses more regulatory power over persons within the public school setting than it does the general public.

Straining to wave away the difference between a civil and criminal statute, Plaintiffs state that "due process protections 'are not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute.'" Pls. Resp. at 11 (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966)). But it cannot be seriously contended here that the State has mislabeled a criminal statute. *Giaccio*, in stark contrast, concerned

7

a state statute that authorized actual *imprisonment* for acquitted defendants who were dilatory in paying court costs. *Id.* at 400–01. The lower court's determination there that the statute was not unconstitutionally vague "rested largely" on its view that the challenged act was of a "civil character." *Id.* at 402. Going further, it appears that Pennsylvania had argued that no civil statute could ever be unconstitutionally vague, an argument the Supreme Court rejected. *Id.* As the statute deprived an acquitted defendant of liberty and property, it "must meet the challenge that it is not unconstitutionally vague." *Id. Giaccio* is plainly inapplicable here. The State is not arguing that the vagueness doctrine should not apply at all. Rather, State Defendants contend that the civil level of scrutiny should apply as opposed to the stringent criminal review. And, again, Plaintiffs have not argued that the Act imposes criminal penalties that are incorrectly labeled as civil. *See, e.g.*, Pls. Resp. Br. at 11 (discussing "[t]he Act's *civil* nature") (emphasis added).

Finally, Plaintiffs rely on one federal district court's decision to subject a similar New Hampshire law to the "most exacting vagueness review" because of the severity of its punishment. Pls. Resp. at 11–12 (citing *Local 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *8 (D.N.H May 28, 2024)). This nonbinding decision is currently on appeal. *Edelblut*, No. 24-1690 (1st Cir. July 26, 2024). It is also distinguishable. In addition to authorizing revocation of teaching credentials, the New Hampshire statute granted anyone aggrieved by a violation the power to sue individual employees for participating in the violation. *Edelblut*, 2024 WL 2722254, at *7. This is

8

not present in HB 1775. Regardless*, Edelbut*'s reasoning was bizarre. State Br. at 44. And in discussing teaching licenses in particular, *Edelblut* committed the same errors the district court made below. That is, *Edelblut* relied extensively on *Dimaya*'s non-binding concurrence without acknowledging the increased deference the State is owed by virtue of acting as employer and overseer of public K-12 schools. 2024 WL 2722254, at *7.

## II. PLAINTIFFS DISPUTE THIS COURT'S FACIAL VAGUENESS PRECEDENT.

Plaintiffs attempt to avoid the high burden they must meet to succeed in their facial attack on HB 1775. Facial challenges are "disfavored," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), and "hard to win" because they "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice*, 603 U.S. 707, 723 (2024) (citation omitted). Plaintiffs criticize State Defendants for citing this precedent, Pls. Resp. at 15–16, but it plainly controls; indeed, this Court has relied on these cases when explaining facial vagueness. *See Fabrizius v. Dep't of Agric.*, 129 F.4th 1226, 1238 (10th Cir. 2025). In *Fabrizius*, this Court declared definitively that "[a] regulation is not vague *facially* if it 'has a plainly legitimate sweep.'" *Id.* at 1238 (quoting *Wash. State Grange*, 552 U.S. at 449). Plaintiffs' assertion that "there is no indication that*" Fabrizius* "intended to establish a governing standard" with this language, Pls. Resp. at 16, defies reality. And *Fabrizius* is not an outlier. *See, e.g., Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) ("a party must show, at a minimum, that the challenged law would be

9

vague in the vast majority of its applications"). That should end the matter. The standard is indisputably high, even if Plaintiffs wish it was not.

Stuck with *Fabrizius*, Plaintiffs next insinuate that the standard this Court explained there is inconsistent with the facial standard as elucidated by the Supreme Court. Pls. Resp. at 16–17. But even if this was an arguable point, this panel is bound by *Fabrizius* in the absence of an intervening Supreme Court decision. *See United States v. Walling*, 936 F.2d 469, 472 (10th Cir. 1991) ("one panel of the court cannot overrule circuit precedent"). In any event, the purported conflict between *Fabrizius* and Supreme Court precedent is illusory.

Rather than point to an intervening decision, Plaintiffs claim that *Johnson v. United States*, 576 U.S. 591 (2015), repudiates the view that a statute is not facially vague if it has a plainly legitimate sweep. Pls. Resp. at 15–17. Certainly, in analyzing the vagueness of the residual clause of the Armed Career Criminal Act (ACCA), *Johnson* rejected "the theory that a vague provision is constitutional merely because there is some conduct that clearly falls with the provision's grasp." 576 U.S. at 602. But in doing so, *Johnson* did not cite or interact with the well-known facial challenge standard from *United States v. Salerno*, 481 U.S. 739 (1987), much less overrule it. *See id.* at 746 ("A facial challenge to a legislative Act is … the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). As such, Justice Alito "assume[d] that the Court d[id] not mean to abrogate the no-set-of-circumstances rule in its entirety." *Johnson*, 576 U.S. at 636 n.2 (Alito, J.,

10

dissenting). Instead, he supposed the Court may have "simply created an ACCA exception." *Id.*

Although Justice Alito's statements are no more binding than Justice Gorsuch's in *Dimaya*, Justice Alito proved to be correct. Multiple times in recent years the Supreme Court has embraced *Salerno*'s standard, with nary a mention of *Johnson. See, e.g.*, *Moody*, 603 U.S. at 723 (2024); *United States v. Hansen*, 599 U.S. 762, 769 (2023) ("[L]itigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances exists under which the [statute] would be valid.'*" (quoting *Salerno*, 481 U.S. at 745)). Plaintiffs retort that this is merely "First Amendment overbreadth caselaw." Pls. Resp. at 15–16. But the Supreme Court has used the same standard for the Second Amendment. *See United States v. Rahimi*, 602 U.S. 680, 693 (2024) ("[T]o prevail, the Government need only demonstrate that Section 922(g)(8) is constitutional in some of its applications …."). And in *Moody* and *Hansen* the Supreme Court was describing how facial challenges operate in *non*-First Amendment contexts. *See Moody*, 603 U.S. at 723 ("In *other* cases, a plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" (citations omitted) (emphasis added)).

This Court has understandably followed the Supreme Court's lead, and not just in *Fabrizius*. In *United States v. Jackson*, 138 F.4th 1244 (10th Cir. 2025), this Court observed in analyzing a Second Amendment claim that "[a] facial challenge 'is the most difficult challenge to mount successfully because it requires a defendant to establish that

no set of circumstances exists under which the [challenged statute] would be valid.'" *Id.* at 1250 (quoting *Rahimi*, 602 U.S. at 693). Even more on point, in *United States v. Lesh*, 107 F.4th 1239 (10th Cir. 2024), this Court explained that "[a] statute … is vague on its face, and thus void, where 'no set of circumstances exists under which the [regulation] would be valid.'" *Id.* at 1246 (quoting *Wash. State Grange*, 552 U.S. at 449). This Court's holdings in *Jackson*, *Lesh*, and *Fabrizius* are consistent with Supreme Court precedent. Plaintiffs' focus on *Johnson* to the exclusion of subsequent caselaw lacks merit.

### III.  TO "REQUIRE … CONCEPTS" IS NOT UNCONSTITUTIONALLY VAGUE.

HB 1775 states that "[n]o teacher, administrator, or other employee of a school district ... shall require or make part of a course the following concepts." OKLA. STAT. tit. 70, § 24-157(B)(1). It then lists eight prohibited concepts, two being at issue in this cross-appeal. The Act also contains a safe harbor provision: the K-12 subsection "shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." *Id.* Before addressing the two enjoined subparts, the threshold question is whether "require" is unconstitutionally vague. It is not. The word "require" means what any English speaker would understand: teaching the prohibited concepts as true or endorsing them. This interpretation is confirmed by (1) the ordinary definition of "require"; (2) the Act's text as a whole; (3) the Oklahoma Academic Standards safe harbor; (4) the Oklahoma Supreme Court's interpretation; and (5) common sense.

Again, the Act prohibits school personnel from teaching the eight discriminatory concepts as true. It does not prohibit schools from mentioning them, discussing them,

presenting multiple viewpoints about them, or refuting them. Teachers can and must teach about racism, sexism, and historical discrimination—the Academic Standards require it. What teachers cannot do is endorse discrimination as desirable.

Plaintiffs try to manufacture confusion where none exists. They argue that State's definitions for "require" somehow exacerbate the Act's vagueness. Pls. Resp. at 23. This is unconvincing. Again, "[r]equire" is defined as "to call for as suitable or appropriate" or "to demand as necessary or essential: have a compelling need for." *Require*, MERRIAM-WEBSTER.[2] Applied to the present scenario, both definitions would prohibit teaching concepts as true or something that students should believe.[3]

In response, Plaintiffs claim there is no "common understanding that 'require' means 'to make students believe as true' in the context of education." Pls. Resp. at 23. This oddly misquotes Oklahoma's brief, State Br. at 56, in a way that mangles the point. It is irrelevant whether students in fact believe is what is required by a school. What matters is whether they are taught that they *should* believe it. Thus, Plaintiffs' complaint that "[a]chievement in required courses … does not depend on a student's personal agreement with concepts present therein" is a red herring. Pls. Resp. at 23. Whether a student subjectively embraces a concept required by a school—say, that 2+2=4—does

---

[2] *Available at* https://www.merriam-webster.com/dictionary/require.

[3] Plaintiffs also claim that the State has taken a position broader than these definitions. Pls. Resp. at 23–24. This misreads the State's brief. Oklahoma has consistently argued that the Act prohibits teaching the concepts as true, as opposed to altogether banning teachers from mentioning the topics. P.A.Vol.II at 24–25; State Br. at 56.

not change the reality that it was *required* learning. This is only difficult or confusing for those trying hard not to understand.

Plaintiffs next suggest that the two definitions of "require" are "distinct": the first ("suitable or appropriate") "suggests that the focus of the prohibition is on whether the subject matter is appropriate altogether, while banning teaching about the concepts as 'something necessary or essential for children to believe as true,' suggests that only some viewpoints about the concept are prohibited." Pls. Resp. at 23. No such thing is suggested by these definitions; Plaintiffs are inventing inanities out of whole cloth in an attempt to muddy the waters. Though there may be slight definitional differences between them, *suitable*, *appropriate*, *necessary*, and *essential* all support the State's point that to "require" means to endorse. A teacher who deems "appropriate" or "necessary" the view that one race is inherently superior to another is teaching that this racist opinion should be adopted by the students.

To defend the district court's neglect of the common definitions of "require," Plaintiffs argue that "[t]he district court was not required to list and analyze every interpretation of the term." Pls. Resp. at 22–23. This misses the point. The court below did not consider *any* dictionary definitions of "require" before deeming it likely unconstitutional. P.A.Vol.III at 134–35. This is insufficient and inconsistent with this Court's statement that, when considering vagueness, "courts must indulge a presumption that [the statute] is constitutional, and the statute must be upheld unless

14

the court is satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution." *Brecheisen v. Mondragon*, 833 F.2d 238, 241 (10th Cir. 1987).

The crux of Plaintiffs' argument is that to "require" a "concept" "presents an illogical mismatch between verb and object." P.A.Vol.III at 134; Pls. Resp. Br. at 22. Essentially, Plaintiffs argue that it makes little sense to prohibit a concept or view from being required by a school. Grammatical criticisms do not make the Act—or any law— indecipherable, however. Courts have consistently held that "a statute is not ambiguous simply because it is inartfully drafted." *In re Rogers*, 513 F.3d 212, 226 (5th Cir. 2008); *see also State v. Williams*, 728 N.E.2d 342, 361 (Ohio 2000) (similar). A statute might be "awkward, and even ungrammatical; but that does not make it ambiguous." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004).

This is not to say the State concedes inartful drafting. It is not difficult to imagine scenarios where people could use the Act's formulation of "requiring" a specific view in the school context. For example, one law student advising another on studying for a Con Law final might state that the professor "required originalism." The listener would understand that a student who adopted the professor's preferred approach on the final would be more likely to receive a good grade than a student who emphasized, say, living constitutionalism. Similarly, a high school student might explain that a psychology teacher requires Freudian sentiment in a student paper. The student would be understood to be advising his fellow students to embrace a particular point of view.

15

And so on. Any teacher labeled as requiring a concept would undoubtedly be understood to be endorsing that concept.

Importantly, the safe harbor provision stating that the Act's K-12 regulations "shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards" provides even more clarity. OKLA. STAT. tit. 70, § 24-157(B). Any suggestion that "require" should be read to prohibit all teaching about racist events or about racism is undermined by the Academic Standards, which mandate the teaching of many topics involving race, such as the Civil War and the Ku Klux Klan, as well as current issues with race relations. State Br. at 10–12. A teacher could hardly teach about the Ku Klux Klan without discussing rampant racism, for instance. Thus, by the very text of HB 1775, a teacher *can* discuss racism and racist historical events without violating the prohibition on "requiring" the concept that "one race or sex is inherently superior to another race or sex." OKLA. STAT. tit. 70, § 24-157(B)(1)(a). The text of the Act and the Academic Standards bely Plaintiffs' arguments.

Plaintiffs implausibly claim that incorporating the Academic Standards "compounds the Act's vagueness." Pls. Resp. at 27. But first, Plaintiffs seemingly agree with the State that "teaching to the Academic Standards 'will undoubtedly require mentioning and even discussing several prohibited concepts.'" *Id.* at 27 (quoting State Br. at 48–49). Because this is true, a teacher cannot violate the Act merely by discussing a prohibited concept in class. With that textual context in mind, again, the only plausible interpretation of "require" is that it forbids endorsing the prohibited concepts or

16

teaching them *as true*. This conclusion also comports with the Oklahoma Supreme Court's conclusion that the purpose of the Act was to prohibit the promotion of racism and sexism. *See* P.A.Vol.III at 176 ("[T]he Legislature intended to prohibit orientation and the like that *promote* forms of race or sex stereotyping ...." (emphasis added)).

Plaintiffs complain that this conclusion eliminates the exception "by treating all instruction, whether aligned with the Oklahoma Academic Standards or not, the same." Pls. Resp. at 28. But this misunderstands the reference to the Academic Standards. It functions as more than a mere exception. Before listing the prohibited concepts, the Legislature unequivocally expressed its intent that prohibiting the eight specified concepts would not affect the teaching of the Academic Standards. The Standards— and the concepts embodied within—provide the lens for interpreting the Act. In short, the Academic Standards serve as both a safe harbor and as a helpful (and mandatory) rubric through which to interpret the prohibited concepts themselves.

Moving on, Plaintiffs claim that the Academic Standards reference "could be read to prohibit altogether instruction involving race or sex that is not enumerated in the standards." Pls. Resp. at 28. This is nonsensical. The Act states that the K-12 subsection "shall not prohibit the teaching of concepts that *align to* the Oklahoma Academic Standards." OKLA. STAT. tit. 70, § 24-157(B) (emphasis added). This safe harbor does not restrict teaching in any way; rather, it is a permissive provision that serves to clarify that robust teaching is allowed. And the phrase "align to" indicates that it protects teaching not expressly mentioned in the Standards so long as such teaching

17

is in line with the voluminous Standards. Moreover, none of the specific prohibited provisions comes close to banning all "instruction involving race or sex." Plaintiffs' proposed interpretation is foreclosed by the Act's text.

Next, Plaintiffs suggest that the safe harbor could mean that "the banned concept provisions do not apply to instruction involving topics mentioned in the Oklahoma Academic Standards." Pls. Resp. at 28. This interpretation is foreclosed by the text of the statute, as well. The Act states that "concepts" consistent with the Academic Standards are not prohibited. OKLA. STAT. tit. 70, § 24-157(B). It does not state that teaching about topics or events included within the Standards is somehow exempted from the Act's prohibitions. Under the Act, a teacher could not teach about the Tulsa Race Massacre by instructing students that white people are superior to black people, even though the Standards require teaching about the Tulsa Race Massacre. This is common sense and basic textualism.[4]

Plaintiffs also protest that the Act "does not answer how closely instruction must 'align' to the standards to be covered." Pls. Resp. at 28. But a statute cannot answer every question about enforcement. "Close cases can be imagined under virtually any statute." *United States v. Williams*, 553 U.S. 285, 305–06 (2008); *Salman v. United States*,

---

[4] Plaintiffs also criticize the State for not responding to their "practical questions" about the Academic Standards. Pls. Resp. at 29. But those "questions" have obvious answers. Of *course* teachers may teach about historical figures not named in the Standards. Pls. Resp. at 39. Yes, teachers may assign texts that discuss racism. *Id.* And so on. Nothing in the text of HB 1775 or the Standards comes close to forbidding such lessons.

580 U.S. 39, 51 (2016) ("even clear rules 'produce close cases'") (citation omitted). And this provision reassures instructors that they may still teach about racism and historic events without running afoul of the Act. Here it "is clear what the [Act] as a whole prohibits." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). The Act prohibits teaching the eight discriminatory concepts as true. It is not difficult to comply with the Act while teaching subjects and concepts contained within the Academic Standards. *See* P.A.Vol.II at 99 ("[i]f you can't teach a history class without labeling kids in the narrow ways that are barred by HB 1775, you're probably in the wrong profession").

Finally, for the first time on appeal, Plaintiffs argue that the Board of Education's Rules interpret the Act differently than prohibiting teaching the concepts as true. Pls. Resp. at 17. This argument was not raised below or in Plaintiffs' opening brief, and it is thereby waived. *See, e.g.*, *Wilburn v. Mid-S. Health Dev., Inc.*, 343 F.3d 1274, 1280 (10th Cir. 2003) ("An issue is waived if it was not raised below in the district court."). Regardless, the Rules are consistent with the State's longstanding interpretation in this case. In full, the contested provision of the Rules states that "Public Schools in this state shall be prohibited from adopting programs or utilizing textbooks, instructional materials, curriculum, classroom assignments, orientation, interventions, or counseling that include, incorporate or are based on the discriminatory concepts identified in [the Act]." OKLA. ADMIN. CODE 210:10-1-23(d)(3). This provision does not expand the Act's meaning beyond teaching the discriminatory concepts as true, nor could it. Rather, this provision ensures that schools cannot dodge the Act's prohibitions by using

19

instructional material, *e.g.*, books or articles, in a way that endorses the prohibited concepts contained in the material. It does *not* prohibit utilizing such material to refute the concepts, or to show that such debates exist—again, the Rules must be interpreted in light of the Act's text, including the safe harbor, and the clear intent in that text.

## IV. THE TWO ENJOINED CONCEPTS ARE NOT UNCONSTITUTIONALLY VAGUE.

Plaintiffs repeatedly decry the alleged vagueness of HB 1775, broadly, but they devote little space to articulating why the plain text of the two specific provisions at issue in this cross-appeal are vague. In fact, Plaintiffs spend barely two pages total discussing these two subparts. Pls. Resp. at 32–34. Contrary to Plaintiffs' view, a textual analysis reveals a readily understandable meaning for each provision.

### a. Prohibited concept: "[A]n individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex."

Plaintiffs neglected to address *any* of the State's textual arguments concerning this straightforward provision. Pls. Resp. at 32–33. As State Defendants outlined, the ordinary meanings of "discriminate," "adverse," and "treatment" reveal that this provision prohibits endorsing the idea that individuals should be harmed or treated worse than others because of their race or sex. State Br. at 57–58. That interpretation comports with common sense, and Plaintiffs do not dispute it.

The district court's concern was not that this provision was impossible to understand, but that it stretched farther than the court thought proper. P.A.Vol.III at 138. For example, the court stated that in addition to prohibiting teaching that public

accommodations ought to be restricted by race, the provision would prohibit teaching that universities should engage in affirmative action. *Id.* But the provision applying to disputed issues like affirmative action does not make the Act vague or unclear. Affirmative action constitutes racial discrimination,[5] as the Supreme Court just held. *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 231 (2023) ("*SFFA*") ("the student must be treated based on his or her experiences as an individual—not on the basis of race"). Thus, the State has merely exercised its right to ensure that public schoolchildren will not be taught that people should be discriminated against based on their race.

Moreover, this provision does not entirely prohibit discussions about affirmative action. Instructors could provide arguments both in favor and against such policies, especially as background to explaining a case like *SFFA*, but they may not endorse the view that racial discrimination is good or necessary. Again, this provision only prohibits teaching that an individual should be racially discriminated against. It does not prohibit teaching that such discrimination occurs or has occurred in the past.

Plaintiffs rely on two district courts that held that similar provisions were vague. Pls. Resp. at 33–34 (citing *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp.

---

[5] *See, e.g.*, Jonathan Chait, *The Left Is Gaslighting Asian Americans About College Admissions*, N.Y. MAG. (Feb. 8, 2022), https://nymag.com/intelligencer/2022/02/the-left-is-gaslighting-asian-americans-on-school-admissions.html.

21

3d 1218 (N.D. Fla. 2022), and *Edelblut*, 2024 WL 2722254). Neither case justifies the holding of the court below.

*Pernell* conceded that "Defendants may be right that some of the eight concepts are not vague." 641 F. Supp. 3d at 1281. It then stated that "some certainly are" vague and provided as an example a different concept. *Id.* Crucially, *Pernell* did not state that this provision was one of the vague provisions. *Id.* at 1281–82. Like the court below, *Pernell* clearly did not approve of the State's policy decision, but that does not make this provision unclear. That court also construed the Florida statute to stretch farther than HB 1775, prohibiting mere debates about affirmative action. *Id.* at 1333–34. HB 1775, however, allows for the presentation of both sides of an issue. It merely prohibits teaching that students should support affirmative action. The statute in *Pernell* also applied to university classrooms, *id.* at 1232, which the Act here does not.

*Edelblut* also focused on affirmative action. 2024 WL 2722254, at *10–11. *Edelblut* noted that "there is no real consensus" surrounding race-conscious remedies and affirmative action. *Id.* But that does not make the State's proscription of a one-sided endorsement of racial discrimination unclear. Put differently, the provision does not "force teachers to guess as to which diversity efforts can be touted and which must be repudiated." *Id.* at *11. If a "diversity effort[]" involves blatant race or sex discrimination it cannot be "touted." If a diversity effort involves, say, meritocracy and colorblindness, it can be. This is not ambiguous.

**b. Prohibited concept: "[M]embers of one race or sex cannot and should not attempt to treat others without respect to race or sex."**

Plaintiffs' primary argument against this provision's lucidity stems from the so-called "triple negative." Pls. Resp. at 33–34. But the concept does not really contain three negatives. Rather, the concept is that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." OKLA. STAT. tit. 70, § 24-157(B)(1)(d). This at most includes a double negative, and as has already been discussed, an arguable grammatical faux pas does not equate to unconstitutional vagueness. Plaintiffs have reached three negatives by including the prohibition on teaching the concept as a listed negative. Such semantic games do not make this provision mandating colorblindness unconstitutionally vague.

Breaking the concept into two parts helps demonstrate its clarity. Start with "members of one race or sex cannot and should not." *Id.* This is easy. It clearly means that individual members of one race or sex are not able to ("cannot") and possess an obligation to not ("should not") do whatever follows the phrase. And what follows is the phrase "treat others without respect to race or sex." The word "treat" is defined as "to regard and deal with in a specified manner" or "to behave or act toward." *Treat*, MERRIAM-WEBSTER.[6] Thus, this phrase means to regard or act towards someone in a manner that does not take race or sex into account. Putting the halves together, a school may not teach as true: (1) that students should believe that individuals are unable to

---

[6] *Available at* https://www.merriam-webster.com/dictionary/treat.

23

treat other persons without regard for race or sex, or (2) that individuals should treat others based on race or sex. This is a bit more complex than the other concepts, to be sure, but it not particularly challenging to understand that the Legislature is prohibiting teachers from indoctrinating their students against the ideal of colorblindness.

Once again, the two district court cases interpreting similar provisions cited by Plaintiffs, Pls. Resp. at 33–34, do not persuasively contradict this conclusion. *Edelblut* involved a similar New Hampshire law that prohibited the endorsement of four concepts that largely mirror K-12 subsections (a), (b), (c), and (d) of H.B. 1775. The New Hampshire analogue to the provision under the microscope here prohibited teaching "[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to" those same characteristics. *Edelblut*, 2024 WL 2722254, at *2. The district court held that it was "unable to discern" what the legislature "intended to ban" with this provision "that was not already banned by the first three" concepts. *Id.* at *11. This is absurd. Again, subsection (d) is addressing teaching kids that individuals either are unable to or should not even try to treat people in a colorblind (or sex-blind) manner. This is plainly distinct from saying one race is "inherently superior" to others or that "an individual should be discriminated against" because of their race. *Id.* at *2. The court's question of "[h]ow, if at all, is teaching that individuals should be discriminated against on the basis of race different than teaching that individuals should not be treated without regard for race?,"

24

*id.* at \*11, has a straightforward answer. The first provision prohibits teaching that individuals should be treated worse because of race. The second provision prohibits teaching that an individual should not try to treat others without considering race. It is not that complicated.

*Pernell* is no more convincing. The Florida law in that case prohibited employers from endorsing the position that "[m]embers of one race, color, national origin, or sex, cannot and should not attempt to treat others without respect to race, color, national origin, or sex." *Pernell*, 641 F. Supp. 3d at 1279. In finding this provision vague, the court practically *admitted* that it understood the thrust of the provision. *See id.* at 1281 ("Does this prohibit anything other than colorblindness?"). And the hypotheticals the court cited are easy to answer. "Does it ban topics such as affirmative action and diversity?" *Id.* No, the provision does not ban discussions of diversity. And by focusing on *individuals'* treatment of people of other races, this particular provision does not touch on affirmative action programs. The provision is not vague.

## **CONCLUSION**

For the foregoing reasons, this Court should uphold HB 1775 in its entirety. At minimum, this Court should limit the existing preliminary injunction to the actual Plaintiffs, rather than the universal relief the court below granted. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

**STATEMENT REGARDING ORAL ARGUMENT**

Oklahoma requests oral argument. The promulgation of racist and sexist teachings in public schools is a highly significant concern for the State and its citizens, and further questioning and discussion would assist both the parties and this Court moving forward.

Respectfully submitted,

s/*Zach West*
GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
WILL FLANAGAN
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov
*Counsel for the State of Oklahoma*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word 2016. The document complies with the type-volume limitation of Fed. R. App. P. 32, because it contains 6,468 words, excluding the parts exempted.

s/ *Zach West*

ZACH WEST

## CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with the most updated Crowdstrike antivirus software.

s/ *Zach West*

ZACH WEST

## CERTIFICATE OF SERVICE

I certify that on December 17, 2025, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system. No paper copies are required pursuant to 10th Cir. R. 31.5.

s/ *Zach West*

ZACH WEST